IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KEVIN T. LAVERY, M.D.,

                  Plaintiff,

v.

PURSUANT HEALTH, INC.,

                  Defendant.

_____

Case No. _____

Bruce A. Inosencio, Jr., P54705
Kristina M. Fisk, P64634
Inosencio & Fisk, PLLC
Attorneys for Plaintiff
740 West Michigan Avenue
Jackson, Michigan 49201
Telephone: (517) 796-1444
Email: bruce@inosencio.com
       kfisk@inosencio.com

_____

## **COMPLAINT**

NOW COMES the Plaintiff, Kevin T. Lavery, M.D., by and through his attorneys,

Inosencio Fisk, and for his *Complaint* against the Defendant, Pursuant Health, Inc., a

Delaware corporation ("Pursuant Health"), states as follows:

1.      The Plaintiff, Kevin T. Lavery, M.D. ("Dr. Lavery") is a resident of the State of Michigan whose place of residence is located within Jackson County, Michigan.

2.      Dr. Lavery is a renowned ophthalmologist, physician, and leader in the medical field of vision and eyesight.

3.      Dr. Lavery is board-certified by the American Board of Ophthalmology, is a member of the American Academy of Ophthalmology, and an inventor of a medical screening apparatus and method used in the field of human vision and eyesight.

4.      Dr. Lavery has authored clinical studies and scholarly papers, and he also has performed tens of thousands of surgeries that have helped people afflicted with eye trauma and vision disorders such as glaucoma and diabetic retinopathy.

5.      As the inventor of a medical screening apparatus and method used in the field of human vision and eyesight, Dr. Lavery filed a Patent Application in 2001 ("the Application").  A copy of the Application is attached hereto, and made part hereof, as **Exhibit 1**.

6.      Dr. Lavery obtained a patent on his invention, U.S. Patent No. 6,594,607 ("the Patent") in 2001.  A copy of the Patent is attached hereto, and made part hereof, as **Exhibit 2**.

7.      The Defendant, Pursuant Health, Inc., ("Pursuant Health") is a corporation duly organized under the laws of the State of Delaware.

8.      Dr. Lavery brings this action against Pursuant Health to protect his legal rights regarding valuable intellectual property consisting of the Patent and all proprietary information, trade secrets, and other intellectual property rights held by Dr. Lavery attendant to the Patent (collectively referred to hereafter as "the Intellectual Property").

9.      Pursuant Health has misappropriated and illegally profited from its use of the Intellectual Property.

10.     Dr. Lavery seeks substantial compensatory and punitive damages, as well as comprehensive declaratory and injunctive relief, to remedy gross misconduct committed by Pursuant Health with respect to the failure of Pursuant Health to pay Dr. Lavery a perpetual intellectual property royalty ("the Perpetual Intellectual Property Royalty") owed to him for Pursuant Health's use of the Intellectual Property.

11.     On October 11, 2007, Dr. Lavery entered into an Amended and Restated Operating Agreement ("Operating Agreement") with SoloHealth, LLC, a Delaware limited liability company ("SoloHealth").

12.     At the time Dr. Lavery entered into the Operating Agreement with SoloHealth, he became a Member of SoloHealth.

13.     The only other Member of SoloHealth when Dr. Lavery joined the company was Bart Foster ("Foster").

14.     At the time Dr. Lavery entered into the Operating Agreement with SoloHealth, he also entered into a Contribution Agreement ("the Contribution Agreement") with SoloHealth.   A copy of the Contribution Agreement (without its Exhibit A and Exhibit C included) is attached hereto, and made part hereof, as **Exhibit 3**.

15.     As part of the Contribution Agreement, Dr. Lavery agreed to contribute certain intellectual property to SoloHealth.  **Exhibit 3.**

16.     The intellectual property Dr. Lavery contributed to SoloHealth pursuant to the Contribution Agreement included "U.S. Patent No. 6,594,607" and "[a]ll proprietary information, trade secrets, and other intellectual property rights held by Lavery and attendant to the Patent".  **Exhibit 3.**

17.     As part of the Contribution Agreement, SoloHealth agreed to contribute capital and business expertise, and seek funding from other investors, to establish and fund its activities.  To implement their plan, Dr. Lavery and Foster, the sole member of SoloHealth, agreed to amend and restate the Operating Agreement of SoloHealth.

18.     At the outset of the business relationship between Dr. Lavery and Foster, they combined their various talents, skills, and resources to develop and market Dr. Lavery's medical screening apparatus and method ("the Invention") to prospective customers.

19.     One of the most important results of the business relationship between Dr. Lavery and Foster was SoloHealth's commercial exploitation of the Invention.

20.     The Invention was eventually marketed by SoloHealth under the name "EyeSite".

21.     SoloHealth intended to use the Invention to provide access to health and wellness kiosks for consumers in existing retail locations throughout North America.

22.     The health and wellness kiosk developed in conjunction with the Invention and the Intellectual Property continues to be manufactured by Pursuant Health.   The kiosk is based on highly secret, proprietary information that Dr. Lavery developed and which is a valuable trade secret.

23.     The Invention was patented in the United States by Dr. Lavery under Patent No. 6,594,607.   **Exhibit 2.**

24.     Pursuant Health's products include a self-service vision testing kiosk as well as a self-service health and wellness kiosk for testing blood pressure, body mass index, and vision.

25.     Between the end of 2009 and the end of 2010, SoloHealth managed to grow its revenues by a multiple of five (5).

26.     By the end of March 2010, SoloHealth launched EyeSite® in nine (9) metro markets nationwide.

27.     Between April 2010 and June 2010, SoloHealth was awarded a $1,200,000 grant by the National Institutes of Health.

28.     In 2010 Q4, SoloHealth was awarded as the top "Emerging Business" by TechAmerica.

29.     In 2011, SoloHealth raised in excess of $13,000,000, launched its SoloHealth Station, tripled its number of employees, and developed strategic partnerships with Verizon, Intel, Proctor & Gamble, and Coinstar/Redbox.

30.     By the end of 2012, SoloHealth deployed 1,300 SoloHealth Stations nationwide and those were deployed in all 50 states.

31.     Also in 2012, SoloHealth added three more strategic partners (Dell, WellPoint, and NCR), it increased its number of employees to 36, and at least 1,500,000 users were using a SoloHealth kiosk each month.

32.     By this *Complaint,* Dr. Lavery now seeks the intervention of this Court to secure unpaid perpetual royalties associated with the Intellectual Property, declare his legitimate ownership of the Perpetual Intellectual Property Royalty, and ensure he is not put at risk for future unpaid royalties related to the Intellectual Property.

33.     Based on the circumstances summarized above and the additional averments set forth below, this Court should (a) declare that Dr. Lavery continues to be entitled to his Perpetual Intellectual Property Royalty, (b) enjoin Pursuant Health from infringing on Dr. Lavery's Intellectual Property and his rights related to same, and (c) hold Pursuant Health liable in damages for breach of contract and unjust enrichment. The Court should also order Pursuant Health to disgorge to Dr. Lavery all profits that

Pursuant Heath has unjustly gained from its unlawful conduct by failing to pay Dr. Lavery his Perpetual Intellectual Property Royalty.

## PARTIES

34.     Dr. Lavery is a citizen of the United States who maintains his residence and domicile in Michigan.

35.     Pursuant Health, Inc., is a corporation organized and incorporated under the laws of the State of Delaware, and, according to the Georgia Secretary of State, Corporations Division, its principal place of business is located at 825 Progress Center Avenue, Suite A, Lawrenceville, Georgia 30043.  Pursuant Health, therefore, is a citizen of Delaware and Georgia.

## JURISDICTION AND VENUE

36.     The sole Plaintiff in this action is a citizen of Michigan, and the Defendant is a citizen of Delaware and Georgia.  Accordingly, there is complete diversity between the parties, and this action is between citizens of different states.

37.     As alleged herein, the amount in controversy between the parties substantially exceeds $75,000.00, exclusive of interest and costs.

38.     By virtue of the foregoing facts, this Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1).

39.     Venue is properly laid in this judicial district under 28 U.S.C. §1391 because the Defendant is subject to personal jurisdiction in Michigan.

## FACTS COMMON TO ALL COUNTS

**A.      Dr. Lavery's groundbreaking work inventing a retinal scan kiosk.**

40.      This case involves intellectual property, contractual rights, trade secrets, and expertise provided by Dr. Lavery related to the invention, development, manufacture, sale, and distribution of a retinal scan kiosk.

41.      The retinal scan kiosk includes a housing containing a user interface, an automatic medical test apparatus, and a transmitting means for communicating the output of the medical test apparatus to a remote site for analysis.

42.      The user interface is a video display capable of receiving user data and it is also capable of displaying the medical test output.

43.      The retinal scan kiosk also includes a control means, in the housing, for controlling the user interface, activation of the medical test apparatus, and operation of the transmitting means.

44.      The retinal scan kiosk, when fully functional, will include a digital retinal camera which will be used to conduct a medical screening test on a user or patient.

45.      The primary advantage of the retinal scan kiosk is the quick and easy taking of a medical screening test on a user or patient.  This procedure causes users to more readily have the medical screening test performed so as to detect any diseases (such as diabetic retinopathy) at an earlier stage.  Usage of the retinal scan kiosk was, in part, an effort to increase the percentage of patients who are obtaining yearly eye exams

to detect diabetes effects, glaucoma, and other eye problems in an earliest possible stage.

46.     The kiosk includes a touchscreen which provides instructions to the user, and it accepts inputs by means of the user touching selected portions of the touchscreen on which appear input selections, including a keyboard display to enable a user to enter user demographics, such as name, address, phone number, age, weight, gender, and other information pertinent to a retinal exam.

47.     After the user inputs their demographic information into the unit via the touchscreen or other input interface, the user will sit in the chair attached to the kiosk and activate the apparatus.  The retinal camera, when fully operational, will then auto-focus the lens to the proper focal length and will take a digital retinal image of one of the user's eyes.  The user will then shift his or her relative position and will repeat this process to enable the retinal camera to take a digital retinal image of the user's other eye.

**B.     Origins of Dr. Lavery's Business Relationship with SoloHealth for the Marketing and Development of Retinal Screening Kiosks.**

48.     Beginning in February 2001, Dr. Lavery applied for a United States patent for a medical screening apparatus and method he invented to conduct a medical screening test using a retinal screening apparatus which uses a digital retinal camera in a medical kiosk (the "Application").  **Exhibit 1.**

49.     On February 14, 2001, the Application was filed, and United States Patent No. 6,594,607, dated July 15, 2003, was issued for the Invention.  **Exhibit 2.**

50.     Although the retinal scan kiosk came to be manufactured, marketed, and sold through a somewhat complex corporate structure and set of supply and licensing agreements, all relevant parties to these transactions repeatedly have acknowledged over the years that the Patent and the Intellectual Property was developed by Dr. Lavery.

51.      SoloHealth, pursuant to Section 1.2(a) of the Contribution Agreement, agreed to pay Dr. Lavery "a perpetual royalty (the "Royalty"), on a quarterly basis, of one percent (1%) (the "Royalty Percentage") of [SoloHealth's] Net Domestic Sales of Products for the prior quarter."  **Exhibit 3**.

52.     There is no provision in the Contribution Agreement — in Section 1.2 or otherwise — which provides for the termination of the one percent (1%) Royalty Percentage at the end of the Term.  **Exhibit 3.**

53.     Pursuant to Section 1.2(a) of the Contribution Agreement, Dr. Lavery and SoloHealth also agreed, "that at the time that [SoloHealth] first receives Net Domestic Sales from Retinal Camera Products, the Royalty Percentage shall be increased to three percent (3%) for the remainder of the Term."  **Exhibit 3**.

54.     Lavery and SoloHealth further agreed, in Section 1.2(a) of the Contribution Agreement, "no Royalty shall be payable pursuant to Section 1.2 or

Section 1.3 [of the Contribution Agreement] prior to the first anniversary of the Launch Date (and no Royalty shall accrue for any Net Domestic Sales of Products made prior to the first anniversary of the LaunchDate)." **Exhibit 3**.

55.     Pursuant to Section 1.2(c) of the Contribution Agreement, "'<u>Launch Date</u>' shall mean the date on which the Company first sells a Product (including the date on which the Company first leases or receives usage fees from a Product or recognizes revenue from sale of advertising or marketing associated with a Product), but not including any beta-testing, pilot project, or the like." **Exhibit 3.**

56.     Pursuant to Section 1.2(d) of the Contribution Agreement, "'<u>Net Domestic Sales</u>' shall mean the net revenues recognized by the Company for sales of the Products (including revenues from leasing or usage fees or revenues from sale of advertising or marketing associated therewith), in North America, as recognized and reported on the Company's financial statements in accordance with Generally Accepted Accounting Principles." **Exhibit 3.**

57.     Pursuant to Section 1.2(e) of the Contribution Agreement, "'<u>Products</u>' shall mean vision screening kiosks and any derivative or complementary applications." **Exhibit 3.**

58.     Pursuant to Section 1.2(f) of the Contribution Agreement, "'<u>Retinal Camera Products</u>' shall mean Products that incorporate a retinal camera." **Exhibit 3.**

59.     Pursuant to Section 1.2(g) of the Contribution Agreement, "'Term' shall mean the period from the Effective Date until the earlier of (i) the termination of this Agreement by mutual agreement of the parties, (ii) reversion of the Intellectual Property to Lavery under Section 4.1(a) and (iii) the expiration of the Patent." **Exhibit 3.**

60.     Pursuant to the Contribution Agreement, as set forth in its initial paragraph, the Effective Date of the Contribution Agreement was October 11, 2007. **Exhibit 3.**

61.     The Contribution Agreement has not been terminated by mutual agreement of the parties.

62.     The Intellectual Property has not reverted to Dr. Lavery under Section 4.1(a) of the Contribution Agreement.

63.     Pursuant Health claims the Patent expired, and the Contribution Agreement terminated, on May 23, 2021.

64.     The Perpetual Intellectual Property Royalty was specifically included in the Contribution Agreement, by counsel for SoloHealth, at the request of Dr. Lavery.  A copy of the email from Dr. Lavery's counsel, Tom Spillane, to SoloHealth's counsel, Brian Gordon, dated October 4, 2007 (sent at 9:41 a.m.) — which reflects Dr. Lavery's insistence on a "Royalty Percentage" as "1% on all Products *without a termination date* beginning 1 year after Launch date"   — is attached hereto and made part hereof as **Exhibit 4**. (Emphasis added).

65.    When the word "perpetual" was inserted into the Contribution Agreement for the first time on Saturday, October 6, 2007, it was inserted by Brian Gordon, of DLA Piper (counsel for SoloHealth), just two days after Tom Spillane, counsel for Dr. Lavery, requested a royalty percentage of 1% on all Products without a termination date.    **Exhibit 4.**    A copy of the draft of the Contribution Agreement prepared on October 6, 2007, and its accompanying document comparison done by Workshare Professional at 2:23:04 p.m. on October 6, 2007, is attached hereto and made part hereof as **Exhibit 5**.  The draft of the Contribution Agreement attached as **Exhibit 5** was labeled "DV_Comparison_#4362547v6_BALT1_-Lavery Contribution Agmt-#4362547v7_BALT1_-Lavery Contribution Agmt.doc".

66.    When the word "perpetual" was inserted into the Contribution Agreement for the first time on October 6, 2007 **(Exhibit 5)**, it was inserted by counsel for SoloHealth with the consent and agreement of Bart Foster, the only other member of SoloHealth.   A copy of the email from SoloHealth's counsel, Brian Gordon, to Dr. Lavery's counsel, Tom Spillane, sent at 2:41 p.m. on October 6, 2007 — which reflects SoloHealth's consent to Dr. Lavery's insistence on a perpetual royalty for the intellectual property — is attached hereto and made part hereof as **Exhibit 6**.

**C.**    **Agreement to Manufacture, Promote, Market, and Sell Products Under the Patent as a Retinal Scan Kiosk.**

67.    In order to pursue the development, marketing, and sale of products based on the Patent in the form of a retinal scan kiosk, SoloHealth formally

13

acknowledged Dr. Lavery's ownership of, and proprietary rights in, the Invention, the Patent, and the Intellectual Property.

68.     The purpose of the Contribution Agreement was to enable Dr. Lavery to contribute certain Intellectual Property to SoloHealth so SoloHealth could develop and distribute products under the Patent in the form of a retinal scan kiosk.  In exchange, (a) Dr. Lavery received a Ten percent (10%) interest in SoloHealth, LLC, (b) Dr. Lavery became a member of SoloHealth, LLC, pursuant to an Amended Operating Agreement attached to the Contribution Agreement as Exhibit A, (c) SoloHealth agreed to pay Dr. Lavery a perpetual royalty ("the Royalty"), on a quarterly basis, of One percent (1%) ("the Royalty Percentage") of SoloHealth's Net Domestic Sales of Products for the prior quarter, and (d) Dr. Lavery became the Chief Medical Officer of SoloHealth pursuant to the Consulting Agreement attached to the Contribution Agreement as Exhibit C. **Exhibit 3.**

69.     The Contribution Agreement, under which Dr. Lavery and SoloHealth expressly acknowledged that Dr. Lavery would be "contributing certain Intellectual Property" to SoloHealth, also provided that Dr. Lavery "will receive an equity interest in the company [SoloHealth] and a right to a royalty on the Company's net sales associated with the Intellectual Property."  **Exhibit 3.**

70.     The Contribution Agreement, in Recital A, provides, "Lavery, in exchange for contributing certain Intellectual Property to the Company [SoloHealth] (the

"Contribution"), will receive an equity interest in the Company and a right to a royalty on the Company's net sales associated with the Intellectual Property, as further set forth in this Agreement." **Exhibit 3.**

71.     The Contribution Agreement obligated SoloHealth to pay Dr. Lavery, as additional consideration for the Contribution, a perpetual royalty (the "Perpetual Royalty") equal to one percent (1%) of the Company's Net Domestic Sales of Products. **Exhibit 3.**

72.     The Perpetual Royalty included in the Contribution Agreement was provided as consideration to Dr. Lavery not only in exchange for his contribution of the Patent, but also in exchange for his contribution of all proprietary information, trade secrets, and other intellectual property rights attendant to the Patent.  **Exhibit 3.**

73.     The Contribution Agreement does not state that the Perpetual Royalty of one percent (1%) is limited in duration.  **Exhibit 3.**

74.     The Contribution Agreement does not state that the Perpetual Royalty expires at the end of the Term (as the word "Term" is defined in Section 1.2(g) of the Contribution Agreement).  **Exhibit 3.**

75.     The Contribution Agreement, in Section 1.2(a), does provide for an increase in the Royalty Percentage — from one percent (1%) to three percent (3%) for the remainder of the Term — at the time that the Company first received Net Domestic Sales from Retinal Camera Products.  **Exhibit 3.**

76.     The Contribution Agreement does not provide for a reduction of the Perpetual Royalty to zero percent; rather, it only limits the increase from one percent (1%) to three percent (3%) for the remainder of the Term.  **Exhibit 3.**

77.     Dr. Lavery and SoloHealth, when they agreed to include the Perpetual Royalty in the Contribution Agreement, knew that the royalty involved the Patent, trade secrets, and other Intellectual Property.

78.     Because the Perpetual Royalty contemplated in the Contribution Agreement is increased during the usage of the Patent, and is subject to a reduction at the expiration of the Patent, a post-patent-expiration royalty of one percent (1%), is legally permissible and was agreed to by Dr. Lavery and SoloHealth.

79.     Even though the Perpetual Intellectual Property Royalty is closely related to the Patent, the Perpetual Royalty is permissible after expiration of the patent because it is tied to non-patent rights.

**D.     <u>A New Initiative:  The Creation of Pursuant Health</u>**

80.     On the Pursuant Health website, accessed on March 21, 2022, Pursuant Health explains its beginnings and its evolution into its current status as a nationwide provider of health screening kiosks:

> a.     "Founded in 2007 as SoloHealth, our Company started with a mission to empower consumers with free and accessible healthcare. We began by launching our original product: a self-service vision

screening kiosk called EyeSite. After witnessing the success and impact of a self-service kiosk in the retail setting, we wanted to do more."

b.    "In 2010, we received a $1.2M grant from the National Institutes of Health (NIH) to develop a more comprehensive health kiosk and went on to introduce the new and improved Pursuant Health kiosk in 2011. This FDA-Cleared Class II Medical Device was released with the ability to perform visual acuity screenings as well as biometric screenings (weight, Body Mass Index (BMI), blood pressure and pulse) and various health assessments."

c.    "As millions of individuals used our kiosk each month, we again saw an opportunity to do more. In 2015, we decided to focus on one of the biggest challenges facing American adults: chronic condition management. During this time, we changed our name from SoloHealth to Pursuant Health and announced new clinical partnerships with Cleveland Clinic Wellness and the American Diabetes Association. With guidance from our clinical partners, we created the first NCQA-Certified Visual Health Age Assessment ("vHRA")."

d.   "We entered the managed care space in 2016 by introducing our population health platform as a solution for health plans to engage members, capture data and close gaps in care. After the launch of our first Medicaid Health Risk Assessment (HRA) program, we went on to contract with several of the leading national Medicaid and Medicare plans. To support these programs, our population health platform expanded to include multiple engagement mechanisms, data collection channels and incentive management capabilities."

e.   "Today, the Pursuant Health kiosk is in over 4,600 retail locations throughout the country and has performed over 275 million health screenings.   After completing a full rollout to Walmart stores in February 2019, we continue to grow our footprint and create more innovative technologies that will help more people get free and accessible healthcare."

81.   Pursuant Health has installed a Pursuant Health kiosk in every Walmart in the United States except for those locations situated in the State of Massachusetts.

82.   Pursuant Health has installed a Pursuant Health kiosk in each of the 94 Walmart stores located in the State of Michigan, including 49 Walmart stores located in the following cities situated within the Eastern District of Michigan:

a.      Alpena County — Alpena (Walmart Supercenter #2358), 1180 M 32 West, Alpena, Michigan 49707;

b.      Bay County — Bay City (Walmart Supercenter #1752), 3921 Wilder Road, Bay City, Michigan 48706;

c.      Cheboygan County — Cheboygan (Walmart Supercenter #2100), 1150 South Main Street, Cheboygan, Michigan 49721;

d.      Genesee County — Burton (Walmart Supercenter #2273), 5323 East Court Street North, Burton, Michigan 48509;

e.      Genesee County — Clio (Walmart Supercenter #4243), 11493 North Linden Road, Clio, Michigan 48420;

f.      Genesee County — Fenton (Walmart Supercenter #2693), 3700 Owen Road, Fenton, Michigan 48430;

g.      Genesee County — Flint (Walmart Supercenter #1928), 4313 Corunna Road, Flint, Michigan 48532;

h.      Genesee County — Grand Blanc (Walmart Supercenter #3726), 6170 South Saginaw Road, Grand Blanc, Michigan 48439;

i.      Gratiot County — Alma (Walmart Supercenter #1422), 7700 North Alger Road, Alma, Michigan 48801;

j.      Huron County — Bad Axe (Walmart Supercenter #1592), 901 North Van Dyke Road, Bad Axe, Michigan 48413;

k.      Iosco County — Tawas City (Walmart Supercenter #5376), 621 East Lake Street, Tawas City, Michigan 48763;

l.      Isabella County — Mount Pleasant (Walmart Supercenter #1428), 4730 Encore Boulevard, Mount Pleasant, Michigan 48858;

m.      Jackson County — Jackson (Walmart Supercenter #5160), 1700 West Michigan Avenue, Jackson, Michigan 49202;

n.      Lapeer County — Lapeer (Walmart Supercenter #1987), 555 East Genesee Street, Lapeer, Michigan 48446;

o.      Lenawee County — Adrian (Walmart Supercenter #1836), 1601 East US Highway 223, Adrian, Michigan 49221;

p.      Livingston County — Fowlerville (Walmart Supercenter #4540), 970 Gehringer Drive, Fowlerville, Michigan 48836;

q.      Livingston County — Howell (Walmart Supercenter #1754), 3850 East Grand River Avenue, Howell, Michigan 48843;

r.      Macomb County — Chesterfield (Walmart Supercenter #2692), 45400 Marketplace Boulevard, Chesterfield, Michigan 48051;

s.      Macomb County — Clinton Township (Walmart Supercenter #4660), 18400 Hall Road, Clinton Township, Michigan 48038;

t.      Macomb County — Roseville (Walmart Supercenter #2959), 28804 Gratiot Avenue, Roseville, Michigan 48066;

u.      Macomb County — Sterling Heights #1 (Walmart Supercenter #2558), 44575 Mound Road, Sterling Heights, Michigan 48314;

v.      Macomb County — Sterling Heights #2 (Walmart Supercenter #2559), 33201 Van Dyke Avenue, Sterling Heights, Michigan 48312;

w.      Macomb County — Warren (Walmart Supercenter #4424), 29176 Van Dyke Avenue, Warren, Michigan 48093;

x.      Midland County — Midland (Walmart Supercenter #2619), 910 Joe Mann Boulevard, Midland, Michigan 48642;

y.      Monroe County — Monroe (Walmart Supercenter #1790), 2150 North Telegraph Road, Monroe, Michigan 48162;

z.      Oakland County — Commerce (Walmart Supercenter #2618), 3301 North Pontiac Trail, Commerce, Michigan 48390;

aa.      Oakland County — New Hudson (Walmart Supercenter #5048), 30729 Lyon Center Drive, East, New Hudson, Michigan 48165;

bb.      Oakland County — Novi (Walmart Supercenter #5893), 26090 Ingersol Drive, Novi, Michigan 48375;

cc.      Oakland County — Rochester Hills (Walmart Supercenter #2354), 2500 South Adams Road, Rochester Hills, Michigan 48309;

dd.      Oakland County — Troy (Walmart Supercenter #2873), 2001 West Maple Road, Troy, Michigan 48084;

ee.     Oakland County —White Lake (Walmart Supercenter #2700), 9190 Highland Road, White Lake, Michigan 48386;

ff.     Ogemaw County — West Branch (Walmart Supercenter #5159), 2750 Cook Road, West Branch, Michigan 48661;

gg.     Otsego County — Gaylord (Walmart Supercenter #1542), 950 Edelweiss Parkway, Gaylord, Michigan 49735;

hh.     Roscommon — Houghton Lake (Walmart Supercenter #2014), 2129 West Houghton Lake Drive, Houghton Lake, Michigan 48629;

ii.     Saginaw — Saginaw #1 (Walmart Supercenter #2644), 5825 Brockway Road, Saginaw, Michigan 48638;

jj.     Saginaw — Saginaw #2 (Walmart Supercenter #5097), 5650 Bay Road, Saginaw, Michigan 48604;

kk.     St. Clair — Fort Gratiot (Walmart Supercenter #1611), 4845 24th Avenue, Fort Gratiot, Michigan 48059;

ll.     Shiawassee — Owosso (Walmart Supercenter #1733), 1621 East M 21, Owosso, Michigan 48867;

mm.     Tuscola — Caro (Walmart Supercenter #1798), 1121 East Caro Road, Caro, Michigan 48723;

nn.     Washtenaw — Saline (Walmart Supercenter #5472), 7000 East Michigan Avenue, Saline, Michigan 48176;

oo.     Wayne — Belleville (Walmart Supercenter #2872), 10562 Belleville Road, Van Buren Township, Michigan 48111;

pp.     Wayne — Canton #1 (Walmart Supercenter #3476), 39500 Ford Road, Canton, Michigan 48187;

qq.     Wayne — Canton #2 (Walmart Supercenter #5761), 45555 Michigan Ave., Canton, Michigan 48188;

rr.     Wayne — Dearborn (Walmart Supercenter #4383), 5851 Mercury Drive, Dearborn, Michigan 48126;

ss.     Wayne — Livonia #1 (Walmart Supercenter #2631), 29555 Plymouth Road, Livonia, Michigan 48150;

tt.     Wayne — Livonia #2 (Walmart Supercenter #5844), 29574 7 Mile Road, Livonia, Michigan 48152;

uu.     Wayne — Southgate (Walmart Supercenter #5842), 14900 Dix Toledo Road, Southgate, Michigan 48195;

vv.     Wayne — Taylor (Walmart Supercenter #2912), 7555 Telegraph Road, Taylor, Michigan 48180; and

ww.     Wayne — Woodhaven (Walmart Supercenter #3336), 23800 Allen Road, Woodhaven, Michigan 48183.

83.     According to information obtained from the Pursuant Health website on March 21, 2022, Pursuant Health has installed its health screening kiosk in 4,618 retailers across the United States.



## COUNT I

### DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

84.     Dr. Lavery adopts by reference each and every one of the foregoing factual allegations as if alleged in full in Count I, except as they may be inconsistent with the specific allegations contained in Count I.

85.     Pursuant Health is contesting and denying Dr. Lavery's rightful claims to the perpetual royalty as provided in the Contribution Agreement.

86.     The Patent reflects Dr. Lavery as the sole inventor and owner.  **Exhibit 2.**

87.     The Patent was assigned to SoloHealth, on October 11, 2007, pursuant to an Assignment of Patent.  **Exhibit 7.**

88.     The Assignment of Patent does not include an assignment of Dr. Lavery's trade secrets or other intellectual property rights attendant to the Patent.  **Exhibit 7.**

89.     Since Foster has been removed from the Pursuant Health Board of Directors, and the Patent has expired, Pursuant Health has now taken the position that Dr. Lavery is no longer entitled to his Perpetual Intellectual Property Royalty because the perpetual royalty has expired with the patent.  The Perpetual Intellectual Property Royalty, however, is related to the Patent but also includes intellectual property and trade secrets which have not expired.

90.     Dr. Lavery strongly disputes that he assigned, or agreed to assign, any of his rights in the intellectual property and trade secrets related to the Patent on October 11, 2007, or at any other time.

91.     By virtue of the foregoing facts, there is an actual and justiciable controversy, of sufficient immediacy and reality, between Dr. Lavery and Pursuant Health, with respect to who owns the intellectual property rights arising from or related to the Invention, including the aforementioned trade secrets.

92.     As alleged herein, this Court possesses an independent basis for subject matter jurisdiction over the parties — diversity of citizenship.

93.     Issuance of the declaratory judgment prayed for herein will serve a useful purpose in clarifying and settling Dr. Lavery's ownership of the intellectual property rights in the Patent and will terminate and afford relief from the uncertainty, insecurity,

and controversy giving rise to this proceeding.   Such uncertainty, insecurity, and controversy has already arisen because of the position taken by Pursuant Health, which Dr. Lavery vigorously contests.

## COUNT II

### BREACH OF CONTRACT — CONTRIBUTION AGREEMENT

94.    Dr. Lavery adopts by reference each and every one of the foregoing factual allegations as if alleged in full in Count II, except as they may be inconsistent with the specific allegations contained in Count II.

95.    The Contribution Agreement is a valid, binding, and enforceable contract between Dr. Lavery and Pursuant Health, the assignee of SoloHealth, supported by the consideration of the mutual promises and undertakings expressed therein.  **Exhibit 3.**

96.    Dr. Lavery has substantially performed all of his duties under the Contribution Agreement.

97.    The Contribution Agreement obligates Pursuant Health, as the assignee of SoloHealth, to pay Dr. Lavery a perpetual royalty (the "Perpetual Intellectual Property Royalty") equal to one percent (1%) of the Company's Net Domestic Sales of Products. **Exhibit 3.**

98.    Pursuant Health has wrongfully discontinued payments to Dr. Lavery for his royalties on its Net Domestic Sales of Products.

99.     Pursuant Health's failure to pay Dr. Lavery royalties on its Net Domestic Sales of Products is a material breach of Pursuant Health's obligations under Section 1.2(a) of the Contribution Agreement.  **Exhibit 3.**

100.    As a direct and proximate result of Pursuant Health's material breach of the Contribution Agreement, Dr. Lavery has suffered compensatory damages in an amount to be proven at trial but in no event less than $75,000.00.

## COUNT III

## <u>UNJUST ENRICHMENT</u>

101.    Dr. Lavery adopts by reference each and every one of the foregoing factual allegations as if alleged in full in Count III, except as they may be inconsistent with the specific allegations contained in Count III.

102.    Pursuant Health has wrongfully adopted the stance that Dr. Lavery's perpetual royalty, which is equal to one percent (1%) of the Company's Net Domestic Sales of Products, is no longer due and owing to Dr. Lavery because the Patent related to the perpetual royalty expired.

103.    By virtue of Pursuant Health's continuing and unauthorized marketing and use of its health screening kiosks, which use Dr. Lavery's intellectual property and trade secrets — neither of which have expired — Pursuant Health is realizing profits to which it is not entitled.

104.    SoloHealth's assignment of the Contribution Agreement to Pursuant Health, which Pursuant Health now claims to be terminated, means that Pursuant Health is accepting a valuable benefit under circumstances giving it reason to know that its continued use and enjoyment of Dr. Lavery's intellectual property and trade secrets creates an ongoing obligation to pay for their value.

105.    As a matter of equity and good conscience, Pursuant Health should be ordered to make restitution to Dr. Lavery equal to one percent (1%) of the Company's Net Domestic Sales of Products since the last date Pursuant Health paid a royalty payment to Dr. Lavery.

WHEREFORE, Kevin T. Lavery, M.D., demands judgment against Pursuant Health, Inc., as follows:

A.    On Count I (Declaratory Judgment), declaring that Dr. Lavery is the lawful and rightful owner of (i) a perpetual one percent (1%) royalty and (ii) all intellectual property rights arising from or related to the invention described in the Patent and all associated trade secrets;

B.    On Count II (Breach of Contract), awarding Dr. Lavery compensatory damages in an amount to be proven at trial but in no event less than $75,000.00;

C.    On Count III (Unjust Enrichment), ordering Pursuant Health to make restitution to Dr. Lavery for the value of the unpaid perpetual royalty due and owing to Dr. Lavery;

D.    Awarding such costs, interest, and attorney fees against Pursuant Health as may seem equitable and just; and

E.    Awarding such other, further, and general relief as the Court deems just and proper.

Dated:  March 22, 2022                    /s/ Bruce A. Inosencio, Jr.
                                          Bruce A. Inosencio, Jr., P-54705
                                          Inosencio & Fisk PLLC
                                          Attorney for Plaintiff
                                          740 West Michigan Avenue
                                          Jackson, Michigan 49201-1909
                                          Telephone:  (517) 796-1444
                                          Email:  bruce@inosencio.com

## <u>JURY DEMAND</u>

Plaintiff demands a jury trial in this case.


Date:   March 22, 2022                    <u>/s/ Bruce A. Inosencio, Jr.</u>
                                          Bruce A. Inosencio, Jr., P-54705
                                          Inosencio & Fisk PLLC
                                          Attorney for Plaintiff
                                          740 West Michigan Avenue
                                          Jackson, Michigan 49201-1909
                                          Telephone:  (517) 796-1444
                                          Email:  bruce@inosencio.com