*EXHIBIT 3*

# CONTRIBUTION AGREEMENT

**THIS CONTRIBUTION AGREEMENT** (this "Agreement") is made as of October 11, 2007 (the "Effective Date") by and among SoloHealth LLC, a Delaware limited liability company (the "Company"), and Kevin Lavery, M.D. ("Lavery").

## RECITALS

A.  Lavery, in exchange for contributing certain Intellectual Property to the Company (the "Contribution"), will receive an equity interest in the Company and a right to a royalty on the Company's net sales associated with the Intellectual Property, as further set forth in this Agreement.

B.  Concurrently with the execution of this Agreement and the Closing hereunder, the sole member of the Company, Bart Foster ("Foster"), will amend and restate the Company's Operating Agreement in the form attached hereto as Exhibit A (the "Amended Operating Agreement") and Lavery will become a party to the Amended Operating Agreement and a member of the Company.

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lavery and the Company hereby agree as follows:

1.  **Contribution and Issuance of Membership Interests; Royalty; Additional Consideration.**

    1.1.  Closing. Subject to the conditions set forth herein, the closing of the transaction contemplated hereby (the "Closing") shall take place at the offices of DLA Piper US LLP, 1201 West Peachtree Street, Suite 2800, Atlanta, GA 30309 on the date hereof and simultaneously with the execution and delivery of this Agreement. At the Closing:

    (a)  By execution and delivery of this Agreement by the Company and Lavery, all assets listed, described or referenced on Exhibit B hereto (the "Intellectual Property") shall be contributed in full to the Company;

    (b)  Foster shall deliver an executed Amended Operating Agreement, evidencing the issuance of membership interests constituting 10% of the membership interests of the Company (the "Interests"), to Lavery;

    (c)  Lavery shall execute and deliver the Amended Operating Agreement;

    (d)  Lavery shall execute and deliver such transfer instruments as reasonably requested by the Company in order to effect the Contribution, including a patent assignment.

1.2 Royalty.

(a) As additional consideration for the Contribution, subject to Section 1.2(b), the Company hereby agrees to pay Lavery, or his assignee, a perpetual royalty (the "Royalty"), on a quarterly basis, of one percent (1%) (the "Royalty Percentage") of the Company's Net Domestic Sales of Products for the prior quarter; provided, that at the time that the Company first receives Net Domestic Sales from Retinal Camera Products, the Royalty Percentage shall be increased to three percent (3%) for the remainder of the Term; and provided further, that no Royalty shall be payable pursuant to Section 1.2 or Section 1.3 prior to the first anniversary of the Launch Date (and no Royalty shall accrue for any Net Domestic Sales of Products made prior to the first anniversary of the Launch Date).

(b) If the Company is required to license additional intellectual property from one or more third parties in order to avoid infringing patents or other intellectual property held by such third parties or for any other reason necessary or reasonably related to the commercialization of the Products and related to the Intellectual Property, the Royalty shall be reduced by any license, royalty or other fees and expenses payable by the Company to such third party (the "Reduction Expenses"); provided, that (i) the Royalty shall not be reduced as a result of this Section 1.2(b) below two percent (2%) of the Company's Net Domestic Sales of Products in any quarter (but any unused Reduction Expenses shall carryover to offset such royalty during future quarters) and (ii) any reduction that may be applied both to the Royalty and to another royalty owed by the Company shall be applied to both the Royalty and such royalty on a pro rata basis so that no portion of the Reduction Expenses is used to reduce both the Royalty and such other royalty. For purposes of this Agreement:

(c) "Launch Date" shall mean the date on which the Company first sells a Product (including the date on which the Company first leases or receives usage fees from a Product or recognizes revenue from sale of advertising or marketing associated with a Product), but not including any beta-testing, pilot project, or the like.

(d) "Net Domestic Sales" shall mean the net revenues recognized by the Company for sales of the Products (including revenues from leasing or usage fees or revenues from sale of advertising or marketing associated therewith), in North America, as recognized and reported on the Company's financial statements in accordance with Generally Accepted Accounting Principles.

(e) "Products" shall mean vision screening kiosks and any derivative or complementary applications.

(f) "Retinal Camera Products" shall mean Products that incorporate a retinal camera.

(g) "Term" shall mean the period from the Effective Date until the earlier of (i) the termination of this Agreement by mutual agreement of the parties, (ii) reversion of the Intellectual Property to Lavery under Section 4.1(a) and (iii) the expiration of the Patent.

1.3 **Additional Royalty.**

(a) If the Company's Board of Managers determines in good faith that the Company is unable to license or acquire certain intellectual property from CIBAVision, the Royalty Percentage shall be increased to two percent (2%).

(b) If the Company licenses or acquires intellectual property from CIBAVision at a royalty rate of less than 3% of Net Domestic Sales of Products (such lesser royalty rate referred to as the "CIBA Royalty Percentage") (other than a reduction from 3% for similar reasons to those described in Section 1.2(b) of this Agreement), the Royalty Percentage shall be increased by the lesser of (i) one percent (1%) and (ii) 1/2 of the percentage obtained by subtracting the CIBA Royalty Percentage from three percent (3%); provided, that, until the end of the Term, there shall be no further increase in the Royalty Percentage pursuant to this Section 1.3(b) if the Royalty Percentage has already been increased pursuant to Section 1.2(a) due to the receipt of Net Domestic Sales from Retinal Camera Products.

1.4 **Value of Contribution.** For purposes of this Agreement and the determination of Lavery's initial Capital Account (as defined in the Amended Operating Agreement), Lavery and the Company agree that the value of the Intellectual Property on the date hereof is $10.00.

1.5 **Additional Consideration.** Upon execution of this Agreement, the Company shall pay Lavery $2,500 by check or wire transfer. Within ten (10) days of the completion of an equity or debt financing in which it raises Sufficient Funds, the Company shall pay Lavery an additional $7,500 by check or wire transfer.

1.6 **Consulting Agreement.** Lavery shall enter into a Consulting Agreement as Chief Medical Officer of the Company in the form of Exhibit C hereto.

2. **Representations and Warranties of the Company to Lavery.** The Company hereby represents and warrants to Lavery as follows:

2.1 **Organization and Authority.** The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as currently conducted

2.2 **No Defaults or Conflicts.** The Company is not in violation of any term or provision of its Certificate of Formation or Operating Agreement, or any term or provision of any indebtedness, mortgage, indenture, contract or agreement or judgment to which the Company is a party, by which it is bound in any respect or under which it has any rights.

2.3 **Capitalization.** Prior to the amendment and restatement of the Operating Agreement by the Amended Operating Agreement and the admittance of Lavery as a member of the Company, Foster is the sole member of the Company and holds 100% of the Interests.

2.4   Disclosure. The Company has made available to Lavery all the information reasonably available to the Company that Lavery has requested in writing.

3.   **Representations and Warranties of Lavery to the Company.** Lavery hereby represents and warrants to the Company as follows:

3.1   Conflicting Agreements. Lavery is not in violation of (i) any fiduciary or confidential relationship, (ii) any term of any contract or covenant (either with the Company or with another entity) relating to employment, patents, assignment of inventions, confidentiality, proprietary information disclosure, non-competition or non-solicitation, or (iii) any other contract or agreement, or any judgment, decree or order of any court or administrative agency binding on Lavery and relating to or affecting the right of Lavery to be employed by or serve as a consultant to the Company, or to become a member of the Company. No such relationship, term, contact, agreement, judgment, decree or order conflicts with Lavery's obligations to use his best efforts to promote the interests of the Company nor does the execution and delivery of this Agreement conflict with any such relationship, term, contract, agreement, judgment, decree or order. Notwithstanding the foregoing, the Company acknowledges that Lavery is only required to provid consulting services to the Company pursuant to the Consulting Agreement and that Lavery intends to continue to work on a full-time basis as a practicing ophthalmologist.

3.2   Litigation. There is no action, suit or proceeding, or governmental inquiry or investigation, pending or, to Lavery's knowledge, threatened against Lavery or relating to the Intellectual Property, and, to Lavery's knowledge, there is no basis for any such action, suit, proceeding, or governmental inquiry or investigation that would result in a Material Adverse Effect, after giving effect to the Contribution. "Material Adverse Effect" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of the Company.

3.3   Prior Legal Matters. Lavery has not been (a) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his business or property; (b) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses); (c) subject to any order, judgment, or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him from engaging, or otherwise imposing limits or conditions on his engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (d) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated any federal or state securities, commodities or unfair trade practices law, which such judgment or finding has not been subsequently reversed, suspended, or vacated.

3.4   Intellectual Property. To Lavery's knowledge, Lavery owns sufficient legal rights to the Intellectual Property without any conflict with, or infringement of, the rights of others. To Lavery's knowledge, no product or service licensed, manufactured, modified, adapted, translated, distributed (directly and indirectly), transmitted, displayed and performed publicly, rented, leased, assigned, marketed or sold (or proposed to be licensed, manufactured, modified,

adapted, translated, distributed (directly and indirectly), transmitted, displayed and performed publicly, rented, leased, assigned, marketed or sold) by Lavery violates or will violate any license, infringes or will infringe or misappropriates or will misappropriate any intellectual property rights of any other party. There are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Intellectual Property, nor is Lavery bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other person or entity. Lavery has not received any communications alleging that Lavery has violated or, by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets, mask works or other proprietary rights or processes of any other person or entity or threatening any assertion of such a claim. Lavery has not received any communications alleging that the validity, effectiveness or ownership by Lavery of any of the Intellectual Property is or will be challenged. To Lavery's knowledge, there is no unauthorized use, infringement or misappropriation of any of the Intellectual Property by any third party. Other than as set forth in this Agreement, there are no royalties, fees or other payments payable to Lavery by any person or entity by reason of the ownership, development, use, license, sale or disposition of the Intellectual Property.

4. **Covenants and Other Agreements of the Company.**

    4.1    Reversion of Certain Rights to Intellectual Property.

        (a)    If, prior to the first anniversary of the Effective Date, the Company has not raised, or has not entered into a term sheet to raise (in which case the transaction must be consummated within 90 days of the first anniversary of the Effective Date) Sufficient Funds, upon written request by Lavery, the Company and Lavery shall each use its or his respective commercially reasonable efforts to unwind the transactions set forth in this Agreement, such that Lavery shall no longer continue as a member of the Company and the Company shall no longer own, and Lavery shall reclaim ownership of, the Intellectual Property. For purposes hereof, "Sufficient Funds" shall mean a Qualified Financing Transaction (as defined in those certain Convertible Promissory Notes issued by the Company in September 2007) that results in at least $1,500,000 of gross capital for use by the Company for general working capital purposes (including by contribution of in-kind goods and/or services by a strategic investor other than CIBAVision; provided, that such goods and services comprise hardware, software and design fabrication for the purpose of building, testing or deploying vision screening kiosks). The date of the closing of the transaction in which the Company has raised Sufficient Funds is referred to herein as the "Fundraising Date".

        (b)    If the Launch Date has not occurred prior to the third anniversary of the Fundraising Date, the Company shall transfer the Patent to Lavery for the original consideration of $10 upon Lavery's written request.

    4.2    Operations.  After the Closing, Lavery shall have no obligation for manufacturing, marketing, advertising or promotional costs attendant to the Intellectual Property. During the Term, the Company agrees to keep accurate records of any and all such costs incurred by the Company (the "IP Costs") and to make such records, as well as any material information

used for the calculation of the Royalty, available for inspection by Lavery at reasonable times and upon reasonable prior notice.

5. **Miscellaneous**.

    5.1 **Survival of Warranties; Limitation on Liability**. The warranties and representations of the parties contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing for a period of one year. Notwithstanding anything herein to the contrary, other than in cases of fraud, willful misconduct or knowing misrepresentation, Lavery's liability hereunder for breach of a representation or warranty shall not exceed the sum of (a) the amount of the Royalty paid by the Company to Lavery, (b) the amounts paid by the Company to Lavery pursuant to Section 1.4 and (c) the fair market value of the Interests, in each case at the time of the claim of such breach.

    5.2 **Notices**. All notices, demands or other communications hereunder shall be in writing and shall be deemed given when delivered personally, mailed by certified mail, return receipt requested, sent by overnight courier service or telecopied, telegraphed or telexed (transmission confirmed), or otherwise actually delivered (i) if to the Company, at 7774 McGinnis Ferry Road, Suite 240, Suwanee, GA 30024, and (ii) if to Lavery, at 1116 W. Ganson, Jackson, MI 49202, or, in each case, such other address provided by one party to the other pursuant to this Section 5.2.

    5.3 **Severability and Governing Law**. Should any Section or any part of a Section within this Agreement be rendered void, invalid or unenforceable by any court of law for any reason, such invalidity or unenforceability shall not void or render invalid or unenforceable any other Section or part of a Section in this Agreement. This Agreement is made and entered into in the State of Delaware and the internal laws of the State of Delaware (without regard to the principles of conflicts of laws) shall govern the validity and interpretation hereof and the performance by the parties hereto of their respective duties and obligations hereunder.

    5.4 **Counterparts and Facsimile Signature**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement may be executed by facsimile signature.

    5.5 **Captions and Section Headings**. Section titles or captions contained in this Agreement are inserted as a matter of convenience and for reference purposes only, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

    5.6 **Singular and Plural, Etc**. Whenever the singular number is used herein and where required by the context, the same shall include the plural, and the neuter gender shall include the masculine and feminine genders.

    5.7 **Amendments and Waivers**. This Agreement may be amended only by a written instrument signed by the Company and Lavery. No failure to exercise and no delay in exercising, on the part of any party, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative

BALT1\4362547.8

6

and not exclusive of any rights, remedies, powers and privileges provided by law. No waiver by any party of any term or provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by such party.

5.8 Successors and Assigns. All rights, covenants and agreements of the parties contained in this Agreement shall, except as otherwise provided herein, be binding upon and inure to the benefit of their respective successors and assigns. Lavery may not assign this Agreement or his rights and obligations hereunder without the Company's written consent.

5.9 Expenses. The Company and Lavery will each bear its respective legal and other fees and expenses in connection with the transactions contemplated by this Agreement.

5.10 Further Assurances. Each party hereto agrees from and after the date hereof to do all acts and to make, execute and deliver such written instruments as shall from time to time be reasonably required to carry out the terms and provisions of this Agreement, including such instruments of transfer as may be necessary to assign the Intellectual Property to the Company.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have executed this Contribution Agreement as of the Effective Date.

**SOLOHEALTH LLC**

By: _____
Name: Bart Foster, Member and Manager

_____
Name: Kevin Lavery, M.D.

**IN WITNESS WHEREOF**, the parties hereto have executed this Contribution Agreement as of the Effective Date.

**SOLOHEALTH LLC**

By: _____
Name: Bart Foster, Member and Manager

_____ 10/11/07
Name: Kevin Lavery, M.D.

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A        Amended Operating Agreement

Exhibit B        Intellectual Property

Exhibit C        Consulting Agreement

**Exhibit A**

**Amended Operating Agreement**

Amended and Restated Operating Agreement

(See Tab 1)

## Exhibit B

## Intellectual Property

U.S. Patent No. 6,594,607 (the "Patent")

All proprietary information, trade secrets, and other intellectual property rights held by Lavery and attendant to the Patent.

# Exhibit C

## Consulting Agreement

Consulting Agreement

(See Tab 3)