# Exhibit 1

Kevin T. Lavery , MD    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4                 * * * * * * * * * *
 5
 6   KEVIN T. LAVERY, M.D.,
 7
          Plaintiff,
 8
                                     Case Number:
 9    vs.
                                     2:22-cv-10613-BAF-KGA
10
     PURSUANT HEALTH, INC.,
11
          Defendant.
12
     _____/
13
14
15
16   THE VIDEOTAPED DEPOSITION OF KEVIN LAVERY, M.D.
17
18           The videotaped deposition of Kevin
19   Lavery, M.D. taken at 740 West Michigan Avenue,
20   Jackson, Michigan, on Tuesday, January 31, 2023,
21   commencing at about 9:05 in the morning, pursuant
22   to notice.
23
24
25
```

Page 62

1 the contacts, the knowledge in medicine, he
2 wanted me at the table. He wanted access to
3 those ideas.
4 　　　And that's why we talked as much as we
5 did even after the closing and starting the
6 business. He ran most ideas by me before
7 implementing them.
8 　　　So you know, Bart saw in me an idea guy
9 that he didn't have to areas of medicine that he
10 didn't even know about. I had to explain
11 diabetic retinopathy to him.
12 　　　And so, you know, through those
13 interactions over the course of a relatively
14 short period was 'I want you as an owner and I
15 want you at the table.'
16 Q　And this first phone call that you described that
17 　you received from Bart Foster, do you remember
18 　when that phone call took place?
19 A　I do not.
20 Q　Sometime in 2007 before the date of the document
21 　we've marked as Exhibit 8?
22 A　Correct.
23 Q　Do you believe it was a couple of weeks before or
24 　a couple of months before? What's your best
25 　memory about the timing of that phone call from

Page 63

1 　Mr. Foster and the timing of the lunch you
2 　described that took place next to the tennis
3 　courts?
4 A　Dinner. Dinner by the tennis courts.
5 Q　Thank you.
6 A　Was -- we had dinner inside but we went out there
7 　to chat afterwards. It was sunny and warm. It
8 　was probably a spring day.
9 Q　A spring day in --
10 A　'07.
11 Q　The spring of 2007?
12 A　I would think so.
13 Q　And that was the first time you met Mr. Foster
14 　in person?
15 A　In person, correct.
16 Q　And prior to that meeting that was in person, you
17 　had had a telephone conversation with Mr. Foster,
18 　correct?
19 A　And perhaps some emails as well.
20 　　　MR. BUSH: We'll mark this as Exhibit 9.
21 　　　(Exhibit 9 is marked.)
22 BY MR. BUSH:
23 Q　Do you recognize the document we've marked as
24 　Exhibit 9, Dr. Lavery?
25 A　I do.

Page 64

1 Q　Can you identify Exhibit 9 for the record?
2 A　I think at closing this was the contribution
3 　agreement that was signed.
4 Q　Is it fair to say that Exhibit 9 is the
5 　definitive agreement that was contemplated by the
6 　Letter of Intent that we marked as Exhibit 8?
7 A　There's many, many differences between the Letter
8 　of Intent and the contribution agreement.
9 Q　I appreciate that. My question is, is it fair to
10 　say that the document we marked as Exhibit 9 is
11 　the agreement -- the final agreement that was
12 　contemplated by the Letter of Intent that we
13 　marked as Exhibit 8?
14 　　　MR. INOSENCIO: Objection, form.
15 　　　You may answer.
16 　　　THE WITNESS: So other than the fact
17 　that the document was changed between when I
18 　signed off on it with my lawyer on Saturday and
19 　the document that I signed on Thursday when there
20 　was an alteration made to the document without my
21 　knowledge, yes, this was the intent of the
22 　document.
23 BY MR. BUSH:
24 Q　This was the -- the document we marked as
25 　Exhibit 9 is the intent of the document that we

Page 65

1 　previously marked as Exhibit 8, correct?
2 A　Except for the alterations that I was unaware of.
3 Q　What are the alterations that were made to the
4 　document we marked as Exhibit 9 that you claim
5 　you had no knowledge of?
6 　　　MR. INOSENCIO: Objection. It misstates
7 　his testimony. Exhibit 9 is the signed
8 　agreement, right?
9 　　　THE WITNESS: Correct. Oh, and the
10 　Letter of Intent is 8.
11 BY MR. BUSH:
12 Q　Do you understand my question?
13 A　Apparently not.
14 Q　All right. We'll start over. I just asked you
15 　whether Exhibit 9 is the document that's
16 　contemplated by Exhibit 8. And I believe you
17 　told me that Exhibit 9 is the document that was
18 　the intent of Exhibit 8.
19 　　　Exhibit 9 is the final document of the
20 　document that's contemplated in the Letter of
21 　Intent we marked as Exhibit 8, correct?
22 A　Except for the change that was altered, yes.
23 Q　So tell me about the change that was altered that
24 　you just -- that you just referenced.
25 A　So in -- Version 7 of the document, I have the

Page 70

1 you had seen a version of this agreement that
2 included the words 'for remainder of the term,'
3 correct?
4 A After it was explained to me by counsel what it
5 meant in his mind that agreed with what it meant
6 in my mind.
7 Q And the explanation from counsel was an
8 explanation that was given to you by counsel for
9 SoloHealth?
10 A Correct.
11 Q Who else was at the closing that you described?
12 A I think Fred Baumbarner [sic] was there. I don't
13 remember the other participants.
14      MR. INOSENCIO: Do you mean Fred
15 Baumbach?
16      THE WITNESS: Baumbach, yes.
17      MR. INOSENCIO: It's okay.
18      THE WITNESS: Sorry.
19 BY MR. BUSH:
20 Q Do you remember roughly how many people attended
21 the closing?
22 A Seven or eight, perhaps.
23 Q And those seven or eight individuals were
24 representatives of SoloHealth or counsel for
25 SoloHealth or yourself?

Page 71

1 A I was there as an individual. So everybody else
2 would have been related to SoloHealth or counsel
3 for SoloHealth.
4 Q Was your counsel present?
5 A He was not.
6 Q And you were in person present for the closing of
7 the contribution agreement?
8 A Correct.
9 Q And that closing took place where?
10 A I believe at the offices of DLA Piper in Atlanta.
11 Q Now, at the closing, did you provide anything
12 other than the patent to SoloHealth?
13 A I'm not sure what you're asking.
14 Q Did you provide any intellectual property to
15 SoloHealth at the closing other than the
16 assignment of your patent?
17 A I thought the contribution agreement was I was
18 also giving them my intellectual property.
19 Q What intellectual property did you provide to
20 SoloHealth at the closing other than your patent?
21 A I did not provide them any documents or
22 material -- materials at the time of closing.
23 Q Did you provide other intellectual property to
24 SoloHealth after the closing?
25 A Absolutely.

Page 72

1 Q Focusing on the closing, at the time of the
2 closing, did you have a demonstration video at
3 that point in time of the concept that was
4 captured in your patent?
5 A I don't recall the dates as to where and when
6 that video was shown. It probably was -- I don't
7 know. I don't know. I don't remember when that
8 video was shown.
9 Q And the video that you're describing right now,
10 that's the video that you testified about earlier
11 that was prepared by Mr. Hiremath out of
12 Australia?
13 A Hiremath, yes.
14 Q Hiremath. There's not a different demonstration
15 video other than the one prepared by Mr. Hiremath
16 about which you testified earlier this morning,
17 correct?
18 A Correct. And again, we don't know if it's a
19 video or just a camera footage stream.
20 Q And whether it's a video or a footage stream,
21 that's not something that you presented to
22 SoloHealth at the closing of the contribution
23 agreement, correct?
24 A Correct.
25 Q Was there a business model for your idea of a

Page 73

1 medical screening kiosk that you provided to
2 SoloHealth at the closing of the contribution
3 agreement?
4 A I don't believe there was one at closing, no.
5 Q Did you come to work on a business model for
6 SoloHealth after the date of the closing of the
7 contribution agreement?
8 A It was certainly a big part of our focus. We
9 just started a new business, hopefully we've got
10 a business model. And it was changing.
11      But there was a document that I saw
12 relatively quickly after the closing. We were
13 discussing strategy and business models, and I
14 was referenced in that discussion.
15      So presumably I was at that meeting
16 and part of the discussions on the business
17 model.
18 Q But you didn't present a business model to
19 SoloHealth at the closing of the contribution
20 agreement that we marked as exhibit -- Exhibit 9,
21 correct?
22      MR. INOSENCIO: Asked and answered.
23      You may answer.
24      THE WITNESS: I don't believe so.
25 BY MR. BUSH:

Page 74

1 Q Now, at the closing did you present any sort of
2 　　method for developing or implementing a medical
3 　　screening kiosk to SoloHealth?
4 A At the closing?
5 Q At the closing.
6 A Not asked for, not provided.
7 Q Did you provide any software to SoloHealth at the
8 　　closing of the contribution agreement that we've
9 　　marked as Exhibit 9?
10 A I did not.
11 Q Did you insist upon any confidentiality
12 　　restrictions in your favor and on the part of
13 　　SoloHealth in connection with the execution of
14 　　the contribution agreement that we've marked as
15 　　Exhibit 9?
16 A I'm not sure what your question is asking, I'm
17 　　sorry.
18 Q Did you request any confidentiality obligations
19 　　in your favor on the part of SoloHealth at the
20 　　time of the closing of the contribution agreement
21 　　that we marked as Exhibit 9?
22 A No.
23 Q I'm going to give you a document that we will
24 　　mark as Exhibit 10.
25 　　　　(Exhibit 10 is marked.)

Page 75

1 BY MR. BUSH:
2 Q Do you recognize the document we've marked as
3 　　Exhibit 10, Dr. Lavery?
4 A I do.
5 Q And what is the document we've marked as
6 　　Exhibit 10?
7 A It's a consulting agreement made between myself
8 　　and SoloHealth.
9 Q And you executed the consulting agreement we
10 　　marked as Exhibit 10 at the closing of the
11 　　contribution agreement that we marked as
12 　　Exhibit 9, correct?
13 A Correct.
14 Q What kinds of services did you provide to
15 　　SoloHealth in your performing the consulting
16 　　agreement we've marked as Exhibit 10?
17 A So it's hard for me to differentiate, largely
18 　　because to the best of my recollection I never
19 　　submitted a bill and was never paid as a
20 　　consultant.
21 　　　　So I looked at this as I'm the founder
22 　　of a company, I'm the start-up, I want it to
23 　　succeed, I'm going to do whatever I can to make
24 　　them successful.
25 　　　　And so all of the calls and meetings and

Page 76

1 　　discussions and looking for partners was all done
2 　　to help the company not -- presumably under the
3 　　consulting agreement, but I was never paid.
4 　　　　If I was paid, I may have been paid once
5 　　but I don't recall that. But I was never paid
6 　　more than once, that I know of.
7 Q And during the time in which you were providing
8 　　services under the consulting agreement, did you
9 　　come to work on a business model with SoloHealth?
10 A A start-up is a very fluid thing. And so you're
11 　　always trying and failing and trying and failing.
12 　　　　Unfortunately SoloHealth has not
13 　　succeeded as much as I would have liked it to.
14 　　But that's always on your brain as a start-up
15 　　company. What are we going to do to drive
16 　　revenue? So that's never off your brain.
17 Q Did you provide a business model to SoloHealth in
18 　　connection with providing consulting services or
19 　　did you instead collaborate with SoloHealth
20 　　around different iterations or ideas for a
21 　　business model?
22 A So before we signed the contribution agreement, I
23 　　had laid out lots of different potential business
24 　　models for them to pursue and revenue sources.
25 　　　　Once we started rolling out the vision

Page 77

1 　　plan, the vision screening alone with no other
2 　　functionality on it, that required changing the
3 　　business model to focus on referrals and to see
4 　　who would pay for it.
5 　　　　So the business model continued to
6 　　evolve, and I helped them develop the changing
7 　　business model.
8 Q And you have alleged in this litigation that your
9 　　ideas for a business model is a protected trade
10 　　secret. Is that right? Is that your allegation?
11 A So I make the argument, it's such a great idea --
12 　　the answer is yes. But I think it's still what
13 　　SoloHealth should do. And nobody is doing it
14 　　yet. And so it's still, like, the answer. So
15 　　absolutely that's my business model that I hope
16 　　they employ.
17 Q And that's the business model that you worked on
18 　　with them in iterative form during your time of
19 　　providing services under the consulting
20 　　agreement?
21 A No. It was provided before I even signed the
22 　　consulting agreement. I outlined all of that to
23 　　them.
24 Q And in what way was that outlined?
25 A Bart and I had lots and lots of conversations and

Page 82

1  BY MR. BUSH:
2  Q   Going back on the record, Dr. Lavery. Your
3      counsel has also asserted in this lawsuit that
4      you provided to SoloHealth a method for
5      developing or implementing or expanding the
6      usage of a medical screening kiosk.
7          Are you familiar with that assertion?
8  A   I don't know specifically what you're asking or
9      what the assertion is.
10 Q   Your counsel has asserted that you claim as a
11     trade secret a method for developing or
12     implementing or expanding the usage of a medical
13     screening kiosk. Is that familiar to you?
14 A   Correct.
15 Q   At the closing of the contribution agreement,
16     did you provide to SoloHealth a method for
17     developing, implementing, or expanding the usage
18     of a medical screening kiosk?
19 A   Over the months leading up to that closing, the
20     possibilities of what the kiosk could do and how
21     it would be implemented were discussed many times
22     between Bart and myself.
23 Q   Those were in informal discussions between you
24     and Mr. Foster?
25 A   So one-on-one in person, on the phone. There may

Page 83

1      have been emails, I don't recall.
2  Q   And looking back at the document we marked as
3      Exhibit 11 --
4  A   I'm sorry. They're back --
5          MR. INOSENCIO: They are in order.
6          THE WITNESS: Can I have yours? Oh,
7      they're in order. Thank you.
8          MR. INOSENCIO: It's the very last
9      exhibit.
10         THE WITNESS: Thanks.
11         (Discussion off the record.)
12 BY MR. BUSH:
13 Q   Looking at Exhibit 11, and pages 13 and 14,
14     there's the request for production number 19,
15     it's at the bottom of page 13, that seeks
16     documents evidencing confidentiality agreements
17     around the secrecy of, quote, the method to be
18     used by Pursuant Health to develop, implement,
19     and expand the usage of the medical screening
20     kiosk; do you see that?
21 A   I do.
22 Q   And on the next page, your response to that
23     request is that Plaintiff is unaware of any
24     documents evidencing any efforts to maintain the
25     secrecy of the method to be used by Pursuant

Page 84

1      Health to develop, implement, and expand the
2      usage of the medical screening kiosk as described
3      in his response to interrogatory number 7; do you
4      see that?
5  A   I'm not aware that they did anything other than
6      the Letter of Intent and being part of the same
7      team to do anything. I don't know what they did
8      to protect my secrets.
9  Q   You didn't specifically ask that SoloHealth do
10     anything specific to protect any of the
11     information that you provided, correct?
12         MR. INOSENCIO: I'm going to object to
13     the extent that you're mentioning now SoloHealth
14     but the question related to Pursuant Health.
15 BY MR. BUSH:
16 Q   You can answer the question.
17 A   So I apologize. I'm not trying to be difficult.
18     Can you repeat that one more time?
19 Q   Yeah. First of all, the response at the top of
20     page 14, Plaintiff is unaware of any documents
21     evidencing any efforts to maintain the secrecy of
22     the method to be used by Pursuant Health to
23     develop, implement, and expand the usage of the
24     medical screening kiosk. Do you see that?
25 A   I do.

Page 85

1  Q   Is that a true statement?
2  A   Correct.
3  Q   Did you make any requests of SoloHealth at the
4      time of the contribution agreement to maintain
5      the secrecy of any information that you
6      contemplated providing to SoloHealth?
7  A   Unless it's in the document, I'm not aware of
8      it.
9  Q   And when you say document, you're talking about
10     the contribution agreement?
11 A   Correct.
12 Q   And just so our record is clear, you didn't
13     provide at the closing of the contribution
14     agreement any specific information about a method
15     for developing, implementing, or expanding usage
16     of a medical screening kiosk, correct?
17 A   I was not asked to do that.
18 Q   Okay. And looking back at the document we've
19     marked as exhibit -- I think it's Exhibit 9, the
20     contribution agreement.
21         MR. INOSENCIO: That is Exhibit 9.
22         MR. BUSH: Thank you.
23         MR. INOSENCIO: You're welcome.
24         MR. BUSH: I will butcher it if you
25     don't keep me straight.

Page 98

1  MR. INOSENCIO: It looks like this.
2  THE WITNESS: Yeah. No, it's just
3  where in the stack. Okay, I'm there with you.
4  BY MR. BUSH:
5  Q  Do you recognize the document, Dr. Lavery, that
6     we handed you that we've marked as Exhibit 12?
7  A  I do.
8  Q  And you recognize this document as amended
9     discovery responses that your counsel served on
10    January 4th of 2023?
11 A  I know they're responses. I don't remember if
12    they were amended or -- but yes, I recognize
13    these.
14 Q  And these were served on January 4th of 2023,
15    correct?
16 A  I don't know that, but --
17 Q  There's a date at the last page.
18 A  On the last page? Okay.
19 Q  You agree that these were served on January 4th?
20 A  Yes.
21 Q  And looking with me at pages six and seven, your
22    amended response to interrogatory number 7, and
23    this response itemizes the three general
24    categories of things that you allege to be trade
25    secrets; correct?

Page 99

1  MR. INOSENCIO: Can you give him a
2  minute to read the four pages that that
3  encompasses, or three pages that that encompasses
4  before he responds?
5  MR. BUSH: It's three sentences at the
6  bottom of page six and goes into the top of the
7  page seven.
8  MR. INOSENCIO: Well, I would like him
9  to read the complete response before he responds.
10 MR. BUSH: That's fine.
11 MR. INOSENCIO: Okay.
12 THE WITNESS: Okay, I think I've read
13 enough to hopefully be where you're at.
14 BY MR. BUSH:
15 Q  So you understand that this response to
16    interrogatory number 7 is your description of
17    the alleged trade secrets in this litigation,
18    correct?
19 A  Correct.
20 Q  Were any of the items that are described in this
21    response to interrogatory number 7, did you
22    provide any of this to SoloHealth at the closing
23    of the contribution agreement?
24 A  No.
25 Q  I'm giving you a document that we'll mark as

Page 100

1     Exhibit 13.
2     MR. INOSENCIO: Thank you.
3     (Exhibit 13 is marked.)
4  BY MR. BUSH:
5  Q  Do you recognize the document we've marked as
6     Exhibit 13, Dr. Lavery?
7  A  I do not.
8  Q  Have you ever seen this document before today?
9  A  Let me -- presumably, yes.
10 Q  And I'll represent to you that this is a document
11    that your counsel produced to us from your files
12    in connection with this litigation.
13 A  Okay.
14 Q  Does that appear to be true to you?
15 A  Yes.
16 Q  And looking at this document, it appears to be --
17    to have been prepared by a law firm in June of
18    2007, correct?
19 A  Yes.
20 Q  And this law firm is requesting that you complete
21    the attachments that are provided to itemize all
22    of your intellectual property. Do you see that?
23 A  Can you reference where that is?
24 Q  It's in the pages attached to the document we
25    marked as Exhibit 13.

Page 101

1  A  Okay. It's a long document, but --
2  Q  I'll give you a moment to look through it.
3  A  Okay. I see the document.
4  Q  Did you ever complete the forms that are included
5     in the document that's marked as Exhibit 13 and
6     submit the completed information back to the
7     person who requested it?
8  A  I would imagine I had to.
9  Q  Well, we don't have that. Do you have a memory
10    of doing that or is it just your speculation
11    sitting here today that you did that?
12 A  So the first blush is speculation that if I'm
13    moving forward with a legal deal and the lawyer
14    sends me documents to fill out to move forward, I
15    would think I would fill them out. So that would
16    be my presumption. If I read them or look at
17    these closer, let me see if it rings any bells.
18 Q  Please, thank you.
19 A  So I don't recall. I mean, the questions look
20    like good questions to ask and it looks sort of
21    familiar, but it also looks fairly lengthy and
22    onerous. And I don't know.
23 Q  Do you remember identifying any trade secrets in
24    response to the request for information that you
25    received that we've marked as Exhibit 13?

Page 158

1    MR. BUSH: This is a summary document --
2    MR. INOSENCIO: Okay.
3    MR. BUSH: -- that my firm created from
4  the materials that have been produced in the
5  litigation.
6  BY MR. BUSH:
7  Q  Dr. Lavery, do you recognize the entries on the
8     document we marked as Exhibit 22 as payments that
9     were made to you under the terms of the
10    contribution agreement?
11 A  I certainly don't recall the specific numbers.
12    But they're in the general ballpark of what I
13    expected.
14 Q  And this doesn't capture any payments before
15    April of 2014. Do you know whether there were
16    royalty payments made to you before April of
17    2014?
18 A  I believe there were.
19 Q  Okay. So those amounts would not be included
20    here. But this nonetheless includes all of the
21    payments that were made to you from April of 2014
22    through the last quarter of 2021, do you see
23    that?
24 A  I do.
25 Q  And the total amount reflected here is just north

Page 159

1     of $627,000. Do you see that?
2  A  Correct.
3  Q  Does that amount seem accurate to you?
4  A  Yes.
5  Q  It may be higher if we include the amounts from
6     before April of 2014, correct?
7  A  Correct.
8         MR. BUSH: I don't have any further
9     questions.
10        MR. INOSENCIO: Okay. We're finished,
11    thank you.
12        MR. BUSH: Thank you for your time.
13        THE VIDEOGRAPHER: This concludes
14    today's video deposition of Dr. Lavery.
15        The time is 3:06 p.m. and we are off the
16    record.
17        (Discussion off the record.)
18        MR. BUSH: My paralegal has our order,
19    Amy Mansfield, and I don't want to get crosswise
20    with her. So I need her to confirm our order. I
21    know we want a rough. Thank you.
22        MR. INOSENCIO: At this point I would
23    like the etrans and a video. Thank you.
24        THE VIDEOGRAPHER: And I'll be sending
25    the video to Veritext and they will get in

Page 160

1  contact with you probably. You have a standard
2  order, you said?
3        MR. BUSH: That's right.
4        THE VIDEOGRAPHER: For the video and
5  things?
6        MR. BUSH: That's right.
7        THE VIDEOGRAPHER: And as far as a video
8  for you folks?
9        MR. INOSENCIO: Yes, please.
10       THE VIDEOGRAPHER: A copy. Okay, I'll
11 let Veritext know you'd like a copy as well.
12       MR. INOSENCIO: All right.
13       MR. BUSH: Thank you.
14    (Proceedings concluded at 3:07 p.m.)
15         *****************

Page 161

1                C E R T I F I C A T E
2
3  STATE OF MICHIGAN
4  COUNTY OF CALHOUN
5
6
7        I, Marilyn J. Hubbard, Certified
8  Shorthand Reporter and Notary Public in and for
9  the State of Michigan, do hereby certify that the
10 foregoing transcript of the deposition of Kevin
11 Lavery, M.D. on January 31, 2023, is true and
12 accurate to the best of my knowledge, skill and
13 ability.
14       IN WITNESS WHEREOF, I have hereunto set my
15 hand and seal this 9th day of February, 2023.
16
17
18
         <%1308,Signature%>
19
20       Marilyn J. Hubbard, CSR
21
22
23 My commission expires:
24 07-25-24
25