# Exhibit 2

Page 1

```
 1              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF MICHIGAN
 2                    SOUTHERN DIVISION

    _____
 3

    KEVIN T. LAVERY, M.D.,            Case No:
 4                                    2:22-cv-10613-BAF-KGA

         Plaintiff,
 5

    vs.
 6

    PURSUANT HEALTH, INC.,
 7

         Defendant.
 8

    _____
 9

10         VIDEO-RECORDED DEPOSITION OF BART FOSTER
11                    January 13, 2023
12  _____
13
14              PURSUANT TO WRITTEN SUBPOENA and the
15  appropriate rules of civil procedure, the
16  video-recorded deposition of Bart Foster, called for
17  examination by the Defendant, was taken at Hotel
18  Boulderado, 2115 13th Street, Boulder, Colorado,
19  commencing at 10:48 a.m. on January 13, 2023, before
20  Jennifer Bajwa Melius, Verbatim Stenographic Reporter
21  and Registered Professional Reporter.
22
23
24
25
```

Page 2

```
 1  APPEARANCES
 2  ON BEHALF OF THE PLAINTIFF:
       BRUCE A. INOSENCIO, JR., ESQ. (via Zoom)
 3     Inosencio Fisk
       740 West Michigan Avenue
 4     Jackson, Michigan 49201
       (517)796-1444
 5     bruce@inosencio.com
 6
    ON BEHALF OF THE DEFENDANT:
 7     JOEL D. BUSH II, ESQ.
       Kilpatrick Stockton LLP
 8     1100 Peachtree Street NE, Suite 2800
       Atlanta, Georgia 30309
 9     (404)815-6500
       jbush@kilpatricktownsend.com
10
11  ALSO PRESENT:
       Quentin Malveaux, Jr. Videographer
12     John Jesser
       Peter Krivkovich (via Zoom)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  EXAMINATION:              PAGE
 3  By Mr. Bush           8, 159
 4  By Mr. Inosencio         129
 5
                INITIAL
 6  EXHIBITS:           REFERENCE
 7  Exhibit 1   United States District Court    10
                Subpoena to Testify at a Deposition
 8              in a Civil Action
 9  Exhibit 2   LinkedIn Profile of Bart Foster  10
10  Exhibit 3   United States Patent Number      13
                US 7,614,747 B2
11
    Exhibit 4   Letter from Moon to Foster dated 20
12              January 23, 2006
13  Exhibit 5   Letter from Foster to Moon dated 22
                February 24, 2006
14
    Exhibit 6   Confidential Business Plan       25
15
    Exhibit 7   Services and Collaboration       29
16              Agreement dated April 5, 2006
17  Exhibit 8   Snellen Chart                    32
18  Exhibit 9   EyeSite Project Log              33
                (EYESITE PROJECT: PRIVATE AND
19              CONFIDENTIAL)
20  Exhibit 10  Color Photographs                38
21  Exhibit 11  Interoffice Memorandum from Foster 40
                to Kehoe dated July 28, 2006,
22              Subject: EyeSite: Next Steps
                (Confidential)
23
    Exhibit 12  Interoffice Memorandum from Foster 45
24              to Meece dated August 23, 2006,
                Subject: EyeSite: Next Steps
25              (Confidential)
```

Page 4

```
 1  Exhibit 13  CIBA Vision EyeSite Kiosk Project: 48
                Phase 1 Morphology & Functional
 2              Breakdown
                (Strictly Confidential)
 3
    Exhibit 14  Protocol Document dated October 18, 51
 4              2006
                (Confidential)
 5
    Exhibit 15  Report Document dated February 22, 52
 6              2007
                (Confidential)
 7
    Exhibit 16  Implementation Planning of        53
 8              Initiatives
 9  Exhibit 17  Kiosk Information Systems Quote    54
                dated October 27, 2006
10
    Exhibit 18  Automated Eye Health Kiosk         63
11              Presentation dated November 2006
                (Confidential - Do Not Distribute)
12
    Exhibit 19  Request for Proposal: EyeSite      69
13              Kiosk Prototype Project
                (CONFIDENTIAL)
14
    Exhibit 20  CIBA Vision Self-Service Vision    72
15              Screen Kiosk, Phase 1:  Marketing
                Plan Development for Market
16              Verification
17  Exhibit 21  Strategic Milestones              74
18  Exhibit 22  Letter of Intent Draft dated      76
                6-05-07
19
    Exhibit 23  Business Recommendation dated July 81
20              2006
21  Exhibit 24  SoloHealth Development Plan IP     87
                Strategy dated August 15, 2007
22
    Exhibit 25  CIBA Vision Proof of Concept Kiosk 88
23              Designs by Eyemaginations dated
                August 27, 2007
24
    Exhibit 26  Contribution Agreement            90
25              (BALT1\4362547.8)
```

Page 5

```
 1  Exhibit 27  Complaint                          92
 2  Exhibit 28  Assignment of Patent               95
 3  Exhibit 29  Consulting Agreement               96
 4  Exhibit 30  EyeSite Design Concepts dated     104
                October 18, 2007
 5
    Exhibit 31  EyeSite Design and Development     106
 6              Kickoff Meeting Agenda,
                October 29-30, 2007
 7
    Exhibit 32  SoloHealth Advisory Board         107
 8              Presentation dated February 1, 2008
                (CONFIDENTIAL)
 9
    Exhibit 33  Handwritten note dated April 14,  110
10              2008
11  Exhibit 34  Forbes Article:  SoloHealth Wins  114
                Three Awards, Including 'Best in
12              Show' for EyeSite Innovation at
                KioskCom Expo and Digital Signage
13              Show in Las Vegas
14  Exhibit 35  CNBC Article:  First EyeSite Kiosk 115
                Debuts at Georgia Wal-Mart
15
    Exhibit 36  Software Architecture Meeting     117
16              Presentation dated September 2,
                2008
17
    Exhibit 37  SoloHealth Intellectual Property  118
18
    Exhibit 38  Patent Update by Stephen Kendig   119
19              dated October 23, 2008
20  Exhibit 39  United States Patent Number       120
                US 8,182,091 B2
21
    Exhibit 40  Stephen Kendig, VP of Operations  121
22              and Development, SoloHealth,
                Project Development and Management
23              Association Presentation, dated
                April 23, 2009
24
25
```

2 (Pages 2 - 5)

Page 6

1  Exhibit 41  Email                    148
2          Date:  July 6, 2007
           Subject:  Revised LOI from July 6th
3  Exhibit 42  Email Chain and Attachments  149
4          Date:  August 15, 2007, to
           August 19, 2007
5          Subject:  Revised Contribution
           Agreement
6  Exhibit 43  Email Chain              151
7          Date:  October 6, 2007, to
           October 8, 2007
           Subject:  Revised Agreements
8
   Exhibit 44  Contribution Agreement   155
9          (BALT1\4362547.7)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Good morning.  We are
3  going on the record at 10:48 a.m. on January 13, 2023.
4  Please note that the microphones are sensitive and may
5  pick up whispering and private conversations.  Please
6  mute your phones at this time.  Audio and video
7  recording will continue to take place unless all
8  parties agree to go off the record.
9          This is the beginning of Media Unit 1 in
10 the video-recorded deposition of Bart Foster taken by
11 the counsel for defendant in the matter of Kevin T.
12 Lavery, M.D. versus Pursuant Health, Inc., filed in
13 the United States District Court for the Eastern
14 District of Michigan, Southern Division, Case
15 Number 2:22-cv-10613-BAF-KGA.
16         The location of this deposition is 2115
17 13th Street, Boulder, Colorado 80302.  My name is
18 Quentin Malveaux representing Veritext, and I am the
19 videographer.  The court reporter is Jennifer Melius
20 from Veritext.
21         I am not authorized to give the or
22 administer the oath.  I am not related to any party in
23 this action, nor am I financially interested in the
24 outcome.  If there are any objections to the
25 proceeding, please state them at the time of your

Page 8

1  appearance.  Counsel and all present, including
2  remotely, will now state their appearances and
3  affiliations for the record, beginning with the
4  noticing attorney.
5          MR. BUSH:  Yes.  I'm the noticing
6  attorney, Joel Bush, counsel for Pursuant Health with
7  Kilpatrick Townsend.
8          MR. INOSENCIO:  Bruce Inosencio on
9  behalf of the plaintiff, Kevin Lavery.
10         BART FOSTER,
11 having been first duly sworn/affirmed, was examined
12 and testified as follows:
13         EXAMINATION
14 BY MR. BUSH:
15     Q.   Good morning, Mr. Foster.  Can you state
16 your full name for the record?
17     A.   Bart Benjamin Foster.
18     Q.   And can you state your address for the
19 record?
20     A.   3169 8th Street, Boulder, Colorado
21 80304.
22     Q.   And have you ever been deposed before?
23     A.   No.
24     Q.   Before we get started, I want to briefly
25 touch on some ground rules for this process.  We have

Page 9

1  a stenographer who is going to take down my questions
2  and your answers, so it's real important that we
3  answer orally and give a -- give a yes or a no or a
4  stated response rather than an uh-huh or an huh-uh.
5  And I'm guilty of violating that from time to time,
6  and I may correct myself and I may also correct you if
7  you don't mind.
8          If I ask you a question, I'm going to
9  assume that you understood it if you answer it.  But
10 if you don't understand my question, tell me that you
11 don't understand it, and I'll repeat it.
12         Is that fair?
13     A.   Yes.
14     Q.   This is not a process where we have a
15 normal conversation.  We can't speak over one another.
16 I'm guilty of that, and I'm going to try to correct
17 myself and speak slowly.
18         If we interrupt one another and speak
19 over one another, not only do we have a very bad
20 transcript, but we have a very stressed out court
21 reporter, and I don't want to cause that.  So I'm
22 going to not interrupt you.  I'm going to try very
23 hard not to interrupt you, and we'll invite you to
24 wait until I finish asking my question before you
25 respond; is that fair?

Page 10

1    A.  Yes.
2    Q.  I want to start by marking as Exhibit 1
3 the subpoena in this matter.
4       (Exhibit Number 1 was marked.)
5    Q.  (By Mr. Bush)  Do you recognize the
6 document we've marked as Exhibit 1?
7    A.  Yes.
8    Q.  And you're here today pursuant to this
9 subpoena, correct?
10    A.  Correct.
11    Q.  Moving to Exhibit 2, I'm going to hand
12 you Exhibit 2 and invite you to identify it for the
13 record.
14       (Exhibit Number 2 was marked.)
15    Q.  (By Mr. Bush)  Do you recognize
16 Exhibit 2 as your LinkedIn profile, Mr. Foster?
17    A.  Yes.
18    Q.  Can you walk us briefly through your
19 educational background, beginning with the year you
20 graduated from high school and then your matriculation
21 in college?
22    A.  High school, graduated in 1993 from
23 Satellite High School in Satellite, Florida.  I went
24 to the University of Florida where I graduated in 1997
25 and got an online MBA through the University of

Page 11

1 Phoenix.  I'm not sure the graduation date.  Probably
2 2000 -- I'm not sure.
3    Q.  And what was your degree that you
4 obtained from the University of Florida in 1997?
5    A.  A bachelor of science in --
6       THE STENOGRAPHER:  A bachelor of science
7 what?
8    A.  In marketing, BSBA.
9    Q.  (By Mr. Bush)  And then you subsequently
10 obtained an MBA.  You just don't remember what year
11 you received that degree?
12    A.  Correct.
13    Q.  And can you walk us through your
14 employment history following your graduation from the
15 University of Florida?
16    A.  I worked for Kellogg's until 2000 --
17 roughly 2002.  Peachtree Network, I think the dates --
18 nope.  I'll just give you the -- so it was Kellogg's,
19 Peachtree Network, CIBA Vision.  I founded SoloHealth
20 October 1 of 2007 -- or left the company at that point
21 and was no longer at CIBA Vision.
22    Q.  You left CIBA Vision October 1 of 2007;
23 is that correct?
24    A.  Uh-huh.
25    Q.  And founded SoloHealth?

Page 12

1    A.  Correct.
2    Q.  And what was your position at Kellogg's?
3    A.  It was in sales on the food service side
4 of the business.
5    Q.  And what was your position at Peachtree
6 Network?
7    A.  Also in sales.
8    Q.  And what year did you begin employment
9 at CIBA Vision?  Do you remember?
10    A.  Exhibit 2 would show that.  2001.
11    Q.  And can you describe the different roles
12 that you held at CIBA Vision from 2001 until the time
13 that you founded SoloHealth in 2007?
14    A.  I started as promotions manager in the
15 lens care division.  The international assignment in
16 the UK beginning in 2002.  Returned to the U.S. in
17 2004 as national account director over the distributor
18 channel.  Yeah.
19    Q.  And what was your position at CIBA
20 Vision at the time you separated to become the founder
21 of SoloHealth?
22    A.  National account director of the
23 distributor channel.
24    Q.  Let's turn to what I will have the court
25 reporter mark as Exhibit 3.

Page 13

1       (Exhibit Number 3 was marked.)
2    Q.  (By Mr. Bush)  Mr. Foster, do you
3 recognize the document we marked as Exhibit 3?
4    A.  I do.
5    Q.  Can you identify it for the record?
6    A.  It's the U.S. patent dated November 10,
7 2009, with a file date of November 10, 2004.
8    Q.  And who is the named inventor on this
9 patent?
10    A.  Myself, Bart Foster.
11    Q.  Can you describe how you came to
12 conceive of the concepts that are embodied in the
13 patent that we've marked as Exhibit 3?
14    A.  Can you be more specific?
15    Q.  Yeah.  You had an idea that resulted in
16 this patent filing, right?
17       Is that correct?
18    A.  Yes.
19    Q.  And that -- I just want to invite you to
20 describe a little more for our record about that idea
21 that you had that led to the filing of patent that's
22 embodied in Exhibit 3?
23    A.  Now, I just want to be efficient with
24 our time.  Are you talking about the technical
25 aspects?  The date that the idea was conceived?  Do

4 (Pages 10 - 13)

1 you want to know who else I talked to that was
2 involved in this?  I need -- I would love specifics so
3 we're not here --
4      Q.   Sure.
5      A.   -- for five hours.
6      Q.   I really am interested in hearing all of
7 that.  But I guess what I would really like to start
8 with is what's the earliest time that you can identify
9 that you --
10     A.   February 1 of 2004.
11     Q.   And what happened on February 1, 2004?
12     A.   There was a meeting in Birmingham,
13 England, and I was -- we were brainstorming on ways to
14 drive traffic from Asda, which is Walmart, into the
15 vision center.  And I raised my hand in the back of
16 the room and said that the idea is -- what if we had a
17 kiosk that would screen your vision and would tell you
18 if you're 20/20 or not.
19          And they wrote the idea down on a board,
20 and they thanked me for the idea and said, "That's
21 really cool."
22          And I said, "No, no," like, "that's the
23 idea."  And that -- that put me on a journey to create
24 this patent.
25     Q.   And the idea that you had at that

1 meeting on February 1 of 2004 was for a kiosk that
2 would screen the vision of a person, correct?
3      A.   Correct.
4      Q.   Who was in this meeting in Birmingham,
5 England, on February 1 of 2004?
6      A.   I can't recall.
7      Q.   Were -- was it a group of individuals --
8      A.   Yeah.
9      Q.   -- employed by CIBA Vision?
10     A.   Correct.
11     Q.   And the brainstorming objective of the
12 meeting, can you describe a little more about that?
13          You said that there was an effort to
14 talk about driving traffic from Walmart into a vision
15 center?  Can you talk more about that?
16     A.   So Walmart said that you're the leader
17 in contact lenses, which we were at the time.  And
18 they said, "Rising tide is going to float all boats,"
19 and they wanted a way to -- for some of their big
20 vendors, including us, to help them with one of their
21 challenges.
22          And the challenges for them were
23 awareness because very few people that shopped the
24 Walmart stores even know they have a vision center.
25 So the idea was to brainstorm ways that we could help

1 Walmart drive traffic because we knew that if that
2 happened, everyone wins.  And because we're the leader
3 in contact lenses, we stand to gain the most.
4      Q.   And your idea was to help Walmart drive
5 traffic by providing a kiosk for vision acuity?
6      A.   Correct.
7      Q.   Can you say a little more about your
8 idea as it became embodied in this patent we marked as
9 Exhibit 3 around a kiosk for vision acuity?
10          What in your mind did that entail at
11 this point in time?
12     A.   I think originally it was to actually
13 allow someone to assess their vision without
14 assistance.  And I remember very distinctly that when
15 I was in high school and I couldn't see the
16 blackboard -- and I think it was ninth grade -- and my
17 friend next to me said, "Why don't you try my
18 glasses?"  And I tried them on, and I had this ah-ha
19 and I was like, "Holy shit, I need glasses."
20          And I thought back to that moment and
21 said, "I wonder how many years before that I could
22 have benefitted from vision correction."  And so the
23 idea would be that you would be able to assess whether
24 you need vision correction or not without having to go
25 to an eye doctor.

1      Q.   And at this point in time, can you
2 describe your concept of the technical features of the
3 kiosk, how the kiosk would go about providing a vision
4 screening functionality for an individual?
5      A.   When you say "at this time," do you mean
6 that day in 2004?
7      Q.   I'm -- 2004, the -- either on that day
8 or up until the time that the patent filing occurred
9 on November 10 of 2004.
10     A.   I don't think I had a conception of
11 that -- the technical aspect of actually how it was
12 going to work.
13     Q.   And did you start collaborating with
14 other individuals around the technical aspects for a
15 vision acuity kiosk in?
16     A.   I --
17     Q.   -- 2004?
18     A.   I did.
19     Q.   And with whom did you begin
20 collaborating?
21     A.   It was Dr. David Thomson at the City
22 University in London.
23     Q.   And how did you meet Dr. David Thomson
24 at the City University in London?
25     A.   Do you mean who introduced us, or what

1 was the first meeting or what was the question?
2 Sorry.
3     Q. How did you meet him? How did you first
4 meet Dr. David Thomson?
5     A. I met him in person at his office in --
6 at the City University of London.
7     Q. And that was in 2004?
8     A. Correct.
9     Q. And how did you -- how did the
10 introduction to Mr. -- Dr. Thomson come about?
11     A. I found him -- I found some of the work
12 that he did online, and I called him.
13     Q. And when you decided to reach out to
14 Dr. Thomson in 2004, what was your reason for doing
15 so?
16     A. To understand more about how we would
17 accomplish a vision screening kiosk, because he had
18 vision screening software. He just didn't have it
19 automated in a kiosk. So I essentially wanted to see
20 is it possible to incorporate.
21     Q. And so after that first meeting with
22 Dr. Thomson, that led to subsequent collaboration
23 between you and Dr. Thomson around integrating his
24 software into a kiosk?
25     A. That's correct.

1     Q. Other than Dr. David Thomson, was there
2 anyone else involved in 2004 in your executing on this
3 idea for a vision acuity kiosk?
4     A. There were people I talked to, but not
5 about the technical aspects until -- other than
6 Dr. David Thomson, until I got back to the U.S. Yeah.
7     Q. And you returned to the U.S. in late
8 2004; is that right?
9     A. Correct.
10     Q. You were in England --
11     A. Correct.
12     Q. -- for roughly two years with CIBA
13 Vision?
14     A. Correct.
15     Q. And I know that your patent in
16 identifying you as a named inventor, the location on
17 the patent is Winchester, Great Britain, correct?
18     A. Correct.
19     Q. And that's because this idea came to you
20 while you were in the United Kingdom while working for
21 CIBA Vision, correct?
22     A. Correct.
23     Q. And was it your idea that the vision
24 acuity kiosk would provide test results to the
25 individual engaged in the vision screening through the

1 kiosk?
2     A. Yes. That's correct.
3     Q. And what was your idea about what those
4 test results would report?
5     A. Your prescription, whether you were
6 minus 2 or a minus 4. Yeah.
7     Q. And when you say "prescription," you're
8 talking about corrective lens prescription?
9     A. That's correct.
10     Q. In other words, to remedy whether a
11 person was nearsighted or farsighted or --
12     A. Yeah.
13     Q. -- any other sort of corrective lens
14 necessary to --
15     A. That's correct.
16     Q. -- to improve vision?
17     A. Yes.
18     Q. I'm going to handed you a document that
19 we will mark as Exhibit 4.
20     (Exhibit Number 4 was marked.)
21     Q. (By Mr. Bush) Mr. Foster, do you
22 recognize the document we've marked as Exhibit 4?
23     A. I do.
24     Q. Can you identify it for the record?
25     A. It's a document dated January 23, 2006,

1 from Panaseca, a guy named Jory Moon.
2     Q. And what is your memory about the
3 circumstances of your receipt of this letter from
4 Panasea in January of 2006?
5     A. Repeat that first part of the question.
6     Q. What's your memory about the
7 circumstances around --
8     A. They, I believe, had something similar
9 that they wanted to partner with us on.
10     Q. And when you say "something similar,"
11 you mean that Panaseca had some other iteration of a
12 vision screening --
13     A. Correct.
14     Q. -- functionality?
15     A. That's correct.
16     Q. Panaseca writes at the bottom of this
17 first page under pilot location that their research
18 and experience shows that the level of retail volume
19 traffic is a good predictor of the number of users who
20 will interact with the vision center.
21     Do you see that?
22     A. Uh-huh.
23     Q. Had you previously reached that same
24 conclusion, or was this new information to you?
25     A. I reached the same -- I mean, that's

Page 22

1 obvious.
2      Q.   In other words, when you first
3 articulated your idea in 2004 for driving traffic to
4 the Walmart Vision Center, it was your belief that
5 placing a vision screening kiosk in the -- in the
6 Walmart would help drive traffic?
7      A.   Correct.
8      Q.   I'm going to hand you a document we'll
9 mark as Exhibit 5.
10         (Exhibit Number 5 was marked.)
11      Q.   (By Mr. Bush)  Mr. Foster, do you
12 recognize the document we've marked as Exhibit 5?
13      A.   I do.
14      Q.   Can you identify Exhibit 5 for our
15 record?
16      A.   It's a document dated February 24, 2006,
17 from Jory Moon to Bart Foster -- sorry.  It's to Jory
18 Moon from Bart Foster with a copy to Scott Meece,
19 general counsel.
20      Q.   Is it fair to say that Exhibit 5 is a
21 letter that you drafted to Panaseca in response to the
22 letter that we marked as Exhibit 4?
23      A.   I don't know if it was in response to.
24      Q.   Is it fair to say that Exhibit 5 is a
25 letter that you drafted to Panaseca?

Page 23

1      A.   With Scott Meece's guidance, correct.
2      Q.   And who is Scott Meece?
3      A.   General counsel, CIBA Vision.
4      Q.   And you write in this letter to Panasea
5 on February 24 of 2006 you write, "As you know, CIBA
6 Vision has been working on its own vision screening
7 device over the past two years."
8         Do you see that?
9      A.   Correct.
10      Q.   Can you describe generally what CIBA
11 Vision had been doing with its own vision screening
12 device idea over the two years prior to this letter?
13      A.   Yes.  We had several meetings to discuss
14 the -- what would be in the patent.  We wanted to be
15 as broad as possible, yet cover what we were planning
16 to do.
17      Q.   And the patent filing was in November of
18 2004, correct?
19      A.   Correct.
20      Q.   And what efforts was CIBA vision engaged
21 in with respect to the vision screening kiosk after
22 November of 2004 and up until the date of this letter
23 in February of 2006, if you remember?
24      A.   So the 2004 date was the provisional
25 patent, and it was very broad in that it covered what

Page 24

1 we intended to do.  Over the coming years, we were
2 able to broaden that with a series of claims through
3 some meetings that we had internally.
4         And there was one specific meeting I
5 remember, just a brainstorming meeting, where we
6 uncovered, you know, a lot of things that we would put
7 into that.
8      Q.   What else do you remember about that
9 brainstorming meeting that you described in which you
10 uncovered additional potential claims for the patent?
11      A.   All the -- just how to broaden it and
12 how to -- all the different things it could test for.
13      Q.   And what were the different things that
14 the kiosk could test for that were under consideration
15 at this point in time?
16      A.   Can I look at the document myself?  I
17 can tell you.
18      Q.   Sure.  We'll just make it an exhibit, if
19 that's okay.
20      A.   We can.
21      Q.   Let's -- we'll need a copy of that for
22 our record.  Can we keep that and make a copy and --
23      A.   Sure.  If I get a copy back.
24      Q.   We'll make sure you get a copy back.
25         THE DEPONENT:  Tom [sic], this is the

Page 25

1 business plan from 2004.
2         MR. BUSH:  And we'll mark that as
3 Exhibit 6.
4         THE STENOGRAPHER:  Do you want this one
5 with the exhibit sticker or the copy with the exhibit
6 sticker?
7         MR. BUSH:  If Mr. Foster will indulge
8 us, let's put a sticker on that one --
9         THE DEPONENT:  That's fine.
10         MR. BUSH:  -- and we'll give that --
11         THE DEPONENT:  I just want it back.
12         MR. BUSH:  You will get it back.
13         (Exhibit Number 6 was marked.)
14         MR. INOSENCIO:  May I interrupt for one
15 second?
16         MR. BUSH:  Please.
17         MR. INOSENCIO:  Bart, you said the
18 EyeSite business plan was from 2004, correct?
19         THE DEPONENT:  I'm looking to see what
20 the date is, but it's got -- well, there's two
21 indications that it's 2004.  One, the paper size is
22 not the U.S. version of paper.  It's -- so it was
23 definitely printed in the UK.  And I moved back in
24 2004, so that would indicate -- yeah.  Actually, it
25 does have 2004 as the date on here.

7 (Pages 22 - 25)

Page 26

1    MR. INOSENCIO: Okay. Thank you. I
2  just wanted to be certain I heard you correctly.
3    THE DEPONENT: Yeah.
4    Q.  (By Mr. Bush) So before we talk more
5  generally about the document we marked as Exhibit 6, I
6  want to go back to my question about -- in response to
7  your comment about all the different things that the
8  kiosk could test for that were being contemplated up
9  until February of 2006.
10    A.  Yep. So some of the features -- so eye
11  health information, visual acuity, the need for new
12  prescription, strength of ready-readers, legal driving
13  requirements, tips on maintaining good vision, and
14  vision exams.
15    Q.  And just so our record is clear, you're
16  referring to Exhibit 6 --
17    A.  Correct.
18    Q.  -- in giving that testimony, correct?
19    A.  Correct. Exhibit 6, page 19.
20  "Enhancements and Follow-on Opportunities."
21    Clear vision: Automated vision
22  screening kiosk that also has the ability to show
23  consumers how they would see with corrected vision.
24    Provide a Prescription: Built-in
25  autorefractor provides consumer with a prescription.

Page 27

1  Consumer takes the prescription to the eye care
2  professional who completes a quick insertion removal.
3  Simple patients are given lenses. Difficult patients
4  that might include toric or progressive lenses are
5  then booked in for a follow-up appointment.
6    The third: Use barcode scanner to
7  accept payment. Consumer pays retailer at a till and
8  receives a barcoded slip.
9    Vending Plano FreshLook one-day contact
10  lenses. Allow consumers to see how they would look in
11  various colored contact lenses.
12    Visual eye care makeover and
13  autorefractor. Provide the consumer with color
14  recommendations and prescription. Consumer visits the
15  eye care professional for quick insertion removal
16  before purchasing lenses.
17    Allow consumers to order contact lenses
18  directly from the device.
19    Modified countertop design located near
20  ready-readers.
21    And then handwritten it has "Five-year
22  strategic plan. EyeSite is the entry product into
23  automated eye health and diagnostics. Our vision is
24  to expand into other areas including cholesterol
25  screening, diabetes, cough/cold, and DNA analysis."

Page 28

1    Q.  And all those things that you read into
2  the record, Mr. Foster, those are all ideas on your
3  part in the 2004 time frame?
4    A.  It was a mix of either myself and other
5  CIBA Vision employees.
6    Q.  And who were the other CIBA Vision
7  employees?
8    A.  It's hard to say at that time. I think
9  if we expanded to 2006 I could give you a couple
10  names.
11    Q.  Please.
12    A.  Rafael Andino would be a gentleman that
13  was in the -- one of the brainstorming meetings that
14  we expanded the intellectual property. His last name
15  would be A-n-d-i-n-o, Andino, I believe. He was in
16  the R&D department.
17    Q.  Anyone else?
18    A.  Not that I recall.
19    Q.  And just so our record is clear, you
20  made reference a couple of times in describing these
21  additional things that could be tested.
22    You made reference to a "built-in
23  autorefractor"?
24    A.  Correct.
25    Q.  Can you explain to the jury what is

Page 29

1  meant by a built-in autorefractor?
2    A.  Yeah. So an autorefractor is a common
3  piece of equipment that is in the optical industry
4  that allows you to assess someone's refraction, which
5  is how well you can see. And it gives you a pretty
6  accurate prescription.
7    Q.  You also made reference to "EyeSite,"
8  and I want to make sure our record is clear by about
9  what you meant by the name EyeSite.
10    A.  So EyeSite was the brand of kiosk that
11  would allow you to assess your vision or not, and it
12  was an internal name that we had -- or that I had come
13  up with.
14    Q.  So the brand name EyeSite was your idea
15  for characterizing the vision acuity kiosk that you
16  had conceived in 2004?
17    A.  Uh-huh.
18    Q.  Is that correct?
19    A.  Correct.
20    Q.  Let's take a look at what we will mark
21  as Exhibit 7.
22    (Exhibit Number 7 was marked.)
23    Q.  (By Mr. Bush) Mr. Foster, do you
24  recognize the document we marked as Exhibit 7?
25    A.  I do.

8 (Pages 26 - 29)

Page 30

1     Q.   Can you identify Exhibit 7 for the
2  record?
3     A.   A document dated April 5, 2006. It's
4  to -- it looks like it's a contract of some sort for a
5  services of collaboration agreement with signature
6  lines from CIBA Vision and the City University of
7  London, and it's unsigned.
8     Q.   Is it your memory that CIBA Vision
9  ultimately executed an agreement with the City
10  University of London so that CIBA Vision could
11  integrate software developed by Dr. David Thomson into
12  the vision acuity kiosk?
13     A.   That's correct.
14     Q.   Looking at the document we marked as
15  Exhibit 7 -- and if you'll look on page 7, there's a
16  color depiction on page 7 --
17     A.   Yes.
18     Q.   -- of Exhibit 7.
19          And the first -- the first heading is
20  "Overview of system."
21     A.   Yes.
22     Q.   Do you see that?
23     A.   I do.
24     Q.   Can you explain what is depicted in this
25  color drawing on page 7 of Exhibit 7?

Page 31

1     A.   I can. So there's two mirrors that are
2  simulating roughly a 15-foot optical path. So it
3  appears that you're looking down a long hallway as you
4  look into the device. And it's bouncing off an LCD on
5  the base of the device that's LCD 2. I don't know --
6  yeah. Anyway, that's it.
7     Q.   (By Mr. Bush) And --
8     A.   That's what it's depicting.
9     Q.   No. That's helpful.
10          And so the mirrors that are reflected in
11  this depiction on page 7 of Exhibit 7 are used to
12  simulate distance; is that correct?
13     A.   That's correct.
14     Q.   For purposes of providing vision
15  screening and an eye exam, correct?
16     A.   That's correct.
17     Q.   And so can you describe what the
18  individual engaged in the vision test would be seeing
19  through these mirrors that are depicted on page 7 of
20  Exhibit 7?
21     A.   So they would look through the device
22  and see a series of letters that then you could -- so
23  you would see letters on LCD screen 1 that's depicted
24  in the drawing, and you would compare what you'd see
25  on LCD 2. And you would input those responses on the

Page 32

1  response pad, and if the letters got -- if you got the
2  letters wrong, they'd get bigger.
3     Q.   And just so our record is clear, when
4  you describe letters that the individual would be
5  seeing, are you talking about an eye chart?
6     A.   That's correct.
7     Q.   Or something called a Snellen chart?
8     A.   That's right.
9     Q.   And just so our record is clear, let's
10  mark as Exhibit 8.
11          (Exhibit Number 8 was marked.)
12     Q.   (By Mr. Bush) Can you identify
13  Exhibit 8 for our record?
14     A.   I can. It's a Snellen chart.
15     Q.   And so the Snellen chart is simply an
16  eye chart that would be used in the mirror box that's
17  depicted in on page 7 of Exhibit 7, correct?
18     A.   Correct.
19     Q.   And I've referred to the depiction on
20  page 7 as Exhibit 7 as a "mirror box."
21          Am I correct with that characterization?
22     A.   Correct.
23     Q.   Who first came up with the
24  characterization of this functionality as a mirror
25  box?

Page 33

1     A.   Dr. Thomson.
2     Q.   I'm going to hand you a document we will
3  mark as Exhibit 9.
4          (Exhibit Number 9 was marked.)
5     Q.   (By Mr. Bush) Mr. Foster, do you
6  recognize the document we marked as Exhibit 9?
7     A.   I do.
8     Q.   Can you identify Exhibit 9 for the
9  record?
10     A.   It's a letter dated -- I don't know the
11  date. It doesn't say. But it's from Dr. Thomson. It
12  appears to be an EyeSite project log, and it's marked
13  "private and confidential."
14     Q.   And what is meant, in your
15  understanding, by the heading "EyeSite project log"?
16     A.   It's -- it looks to be his notes of what
17  he would do and some next steps and how he would
18  accomplish the project.
19     Q.   In other words, Dr. Thomson's notes and
20  next steps for integrating his software into the
21  vision acuity kiosk?
22     A.   I'm not sure.
23     Q.   From your perspective, what is reflected
24  in the document we've marked as Exhibit 9 in terms of
25  next steps or tasks to be performed by Dr. Thomson?

Page 34

1    A.   Next steps appear to be noted in the
2  document as the CIBA team is going to comment on
3  potential designs of a booth and in particular the
4  septum approach, general considerations, target
5  conditions, proposal for software development.
6        The City team is to develop a flowchart
7  for software and commence developing interface.
8        Agreement reached with CIBA Vision about
9  design to mock-up at City University.
10       Technical team at City construct
11 prototype framework.
12       And software developers produce
13 prototype program.
14       Implementation of software on mock-up.
15   Q.   Do you remember receiving this document
16 we marked as Exhibit 9 from Dr. Thomson?
17   A.   I do.
18   Q.   And if you'll look on the very last page
19 on the -- if you look on the back of the very last
20 page of the document we've marked as Exhibit 9, I
21 think it will give us the date of this document.  It's
22 in the very back of the document.
23       Do you see a picture of the metadata for
24 the document?
25   A.   Yes.

Page 35

1    Q.   Do you see that?
2    A.   I do.
3    Q.   Are you able to identify the date of
4  this document?
5    A.   I'm not.
6    Q.   Do you see at the very top it says
7  "Info"?
8    A.   Correct.
9    Q.   And under that it has "2006-04-20
10 EyeSite project log 4."
11   A.   Yeah.
12   Q.   Does that appear to you to be the date
13 of this document?
14   A.   I don't know.
15   Q.   But it nonetheless reflects a date of
16 2006, April 20, correct?
17   A.   Correct.
18   Q.   And you mentioned a moment ago in
19 reading through the tasks and next steps of
20 Dr. Thomson a septum approach.
21       Can you explain what you meant by a
22 "septum approach"?
23   A.   Well, I would have to refer to the
24 document.  It's not something I'm familiar with.  But
25 according to the notes -- I don't know what page it

Page 36

1  is.  Just give me a second.
2    Q.   Sure.  Take your time.
3    A.   I believe the septum approach refers to
4  having your head in a chin rest.
5    Q.   In other words, the individual engaging
6  in the vision screening in the kiosk would have a chin
7  rest for their head while participating in the vision
8  screening?
9    A.   Correct.
10   Q.   On the first page of this document, it
11 states "the intention is to produce a computer-based
12 system for self-administered vision screening."
13       Do you see that?
14   A.   Yes.
15   Q.   And so Dr. Thomson's role was to execute
16 on the development of a computer-based system for the
17 vision acuity kiosk, correct?
18   A.   That's correct.
19   Q.   And this also says in the next paragraph
20 that "City University agree in principle to
21 collaborate with Bart Foster to develop a prototype of
22 the system."
23       Do you see that?
24   A.   That's correct.
25   Q.   Does this document refresh your

Page 37

1  recollection as to when the first prototype was
2  developed for the vision acuity kiosk?
3    A.   I don't know.
4    Q.   You don't remember?
5    A.   I don't remember.
6    Q.   Does Exhibit 9 refresh your recollection
7  that one of the next steps for Dr. Thomson was to
8  assist in the development of a prototype of the vision
9  acuity kiosk?
10   A.   Yes.  Well, the -- it does state in here
11 the feedback is from April 24, 2006.  So I would
12 assume that this letter was prior to that.
13   Q.   Before -- dated before April 24 of 2006?
14   A.   Correct.
15   Q.   And if you'll look through briefly
16 Exhibit 9, there are a number of color depictions in
17 this document --
18   A.   Uh-huh.
19   Q.   -- of the vision acuity kiosk
20 functionality.
21       And my question for you, generally, is
22 did you prepare these depictions, or did Dr. Thomson
23 prepare these depictions?
24   A.   Dr. Thomson.
25   Q.   Did you collaborate with Dr. Thomson in

1 the development of the depictions that are reflected
2 in Exhibit 9?
3     A.   Yes.
4     Q.   I'm going to give you a document we'll
5 mark as Exhibit 10.
6         (Exhibit Number 10 was marked.)
7     A.   You get all the good stuff.  It's so
8 great.  Look at that.
9     Q.   (By Mr. Bush)  Do you recognize the
10 document we've marked as Exhibit 10, Mr. Foster?
11    A.   No.
12    Q.   Do you know what is depicted in the
13 photographs in the document we've marked as
14 Exhibit 10?
15    A.   Yes.
16    Q.   Can you identify those photographs?
17    A.   It's the first prototype of the EyeSite
18 kiosk.
19    Q.   So Exhibit 10 reflects photographs of
20 the first prototype of the EyeSite kiosk that was
21 develop by yourself in collaboration with Dr. Thomson,
22 correct?
23    A.   That's correct.
24    Q.   Does Exhibit 10 refresh your
25 recollection as to the year in which this first

1 prototype was developed?
2     A.   No.
3     Q.   Was this prototype that is depicted in
4 Exhibit 10, was this developed in the United Kingdom,
5 or was --
6     A.   Yes.
7     Q.   -- it developed -- it was developed in
8 the United Kingdom?
9     A.   Correct.  It's the City University of
10 London.
11    Q.   And did you travel from CIBA Vision in
12 the United States to the United Kingdom to participate
13 in the development of this prototype?
14    A.   No.
15    Q.   How did you come to be engaged in
16 collaborating with Dr. Thomson in the development of
17 the prototype?  By long distance?
18    A.   Correct.
19    Q.   You were in regular communication with
20 Dr. Thomson?
21    A.   Yes.
22    Q.   About the development of the prototype?
23    A.   Uh-huh.
24    Q.   Is that a yes?
25    A.   Yes.

1     Q.   I'm going to give you another document
2 we will mark as Exhibit 11.
3         (Exhibit Number 11 was marked.)
4     Q.   (By Mr. Bush)  Mr. Foster, do you
5 recognize the document that we have marked as
6 Exhibit 11?
7     A.   I do.  It's an interoffice memorandum
8 dated 2006 to Michael Kehoe, who was CEO of CIBA
9 Vision at the time.
10    Q.   And this is an interoffice memorandum
11 that you prepared while you were employed at CIBA
12 Vision?
13    A.   That's correct.
14    Q.   In July of 2006?
15    A.   That's correct.
16    Q.   And you said Michael Kehoe was the CEO
17 of CIBA Vision?
18    A.   That's correct.
19    Q.   And what was your objective in preparing
20 this interoffice memorandum that we've marked as
21 Exhibit 11?
22    A.   What was my -- I'm sorry?
23    Q.   Your objective.  Your reason.
24    A.   To gain clarity and commitment.
25    Q.   Gain clarity and commitment for . . .

1     A.   The next steps, which are identified in
2 the document.
3     Q.   For next steps of the evolution and
4 deployment of the vision acuity kiosk?
5     A.   That's accurate.
6     Q.   And this interoffice memorandum is cc'd
7 to Scott Meece.
8     A.   Correct.
9     Q.   And Scott Meece is the general counsel
10 of CIBA Vision?
11    A.   He is.
12    Q.   And it also is cc'd to Tariq Aziz.
13        Do you see that?
14    A.   I do.
15    Q.   Can you identify Tariq Aziz for the
16 record?
17    A.   He was head of business development at
18 the time.
19    Q.   And what role, if any, did Tariq Aziz
20 play in the development of the EyeSite vision kiosk?
21    A.   None.
22    Q.   And what role, if any, did Scott Meece
23 play in the development of the EyeSite vision acuity
24 kiosk?
25    A.   They both just provided guidance but not

11 (Pages 38 - 41)

Page 42

1  any substantive technical guidance or anything like
2  that.
3      Q.  Nothing substantive?
4      A.  No.
5      Q.  And what were the next steps for the
6  EyeSite vision acuity kiosk for which you were seeking
7  clarity and commitment in preparing this interoffice
8  memorandum we've marked as Exhibit 11?
9      A.  You're asking -- sorry?
10     Q.  Yeah.  What were the specific next steps
11 for which you wanted clarity and commitment?
12     A.  Well, identify the document is -- I
13 think it's listed.  Do you want me to read them now?
14     Q.  Yeah.  If you could identify them at a
15 high level, that would be great.
16     A.  Yeah.  They wanted to confirm that money
17 was available, in this case 350,000 in 2006 for
18 spending.
19         Head count and a transition plan with
20 KG, who is Karen Gough, who was head of North America
21 at the time.  So essentially getting her permission
22 for me to join Tariq underneath the business
23 development group.
24         Review compensation related to that.
25         And identify an executive committee

Page 43

1  member or function that will manage the EyeSite and
2  have Bart as a direct report, and it was suggested
3  that -- either Michael or Tariq.
4      Q.  So did you subsequently join the
5  business development division within CIBA Vision with
6  Tariq in pursuing next steps for the EyeSite vision
7  acuity kiosk?
8      A.  I did.
9      Q.  And did you subsequently identify an EC
10 member that would manage the project and have you as a
11 direct report?
12     A.  That would be Tariq.
13     Q.  And this all is in the second half of
14 2006, correct?
15     A.  Correct.
16     Q.  And you're full-time employed at CIBA
17 Vision at this point in time, correct?
18     A.  Yes.  My new role with Tariq was to
19 begin in January of 2007.
20     Q.  And can you say a little more about the
21 new role that you assumed in January of 2007?
22     A.  Yes.  I would be in -- I'd be managing a
23 special project internally named EyeSite, report
24 directly to Tariq, and have a budget that I would
25 control, and that would begin in January of 2007.

Page 44

1      Q.  And did that -- did you ultimately
2  assume that role in January 2007?
3      A.  Yes.
4      Q.  And what did you perceive your duties
5  and responsibilities to be when you assumed that new
6  role for the EyeSite project in January of 2007?
7      A.  To build a prototype and test it in the
8  U.S.
9      Q.  And when you say build and test a
10 prototype in the U.S., you're referring to a vision
11 acuity kiosk prototype?
12     A.  I'm not clear on that.  It was -- it
13 might have been broader than that.
14     Q.  What is your memory, sitting here today,
15 about the scope of the prototype that was envisioned
16 when you assumed the new role in January of 2007?
17     A.  It -- to start with visual acuity.  I
18 think that's accurate.
19         THE DEPONENT:  In probably the next
20 15 minutes, I'll want just a short -- just a bio
21 break, like ten minutes.
22         MR. BUSH:  Absolutely.  We can do that
23 right now.  Let's go off the record.
24         THE DEPONENT:  Yeah.  Is that all right?
25 You guys --

Page 45

1          MR. BUSH:  That's great.
2          THE VIDEOGRAPHER:  We're going off the
3  video record at 11:45 a.m.
4          (Recess from 11:45 a.m. to 11:56 a.m.)
5          THE VIDEOGRAPHER:  We are back on the
6  video record at 11:56 a.m.
7      Q.  (By Mr. Bush)  Going back on the record,
8  Mr. Foster, I'm going to hand you what we will mark as
9  Exhibit 12.
10         (Exhibit Number 12 was marked.)
11         THE DEPONENT:  Where did my Exhibit 6
12 go?
13         MR. BUSH:  I have it.
14     Q.  (By Mr. Bush)  Are you able to identify
15 Exhibit 12, Mr. Foster?
16     A.  Exhibit 12 is a memo, interoffice memo,
17 from Scott Meece, general counsel -- sorry -- to Scott
18 Meece, general counsel, from myself, Bart Foster,
19 dated August 23 of 2006.
20     Q.  And what was your objective in sending
21 the interoffice memorandum that we've marked as
22 Exhibit 12?
23     A.  To summarize previous discussions.
24     Q.  About next steps with the EyeSite vision
25 acuity kiosk?

12 (Pages 42 - 45)

Page 46

1      A.   Correct.
2      Q.   And what were the next steps that are
3   summarized in the interoffice memorandum that we've
4   marked as Exhibit 12?
5      A.   Proposed next steps were identified as
6   "management approval of one of the options above.
7           "Draft documents based on strategy
8   chosen and assign appropriate resources."
9      Q.   In looking under the heading
10  "Background," it says, "Therefore, CIBA Vision has
11  invested money and resources in the concept, including
12  filing a patent, developing the business plan, and
13  completing qualitative market research to demonstrate
14  viability."
15          Do you see that?
16     A.   Uh-huh.
17     Q.   And is the business plan that's
18  referenced in Exhibit 12 a reference to the document
19  we've marked previously as Exhibit 6?
20     A.   Most likely.
21     Q.   And Exhibit 6 is the business plan that
22  you prepared, correct?
23     A.   That's correct.
24     Q.   And the qualitative market research to
25  demonstrate viability, were you involved in that

Page 47

1   effort for market research and marketing plans?
2      A.   I was, yes.
3      Q.   Can you describe what steps you took in
4   2006 around market research and marketing plans?
5      A.   We did qualitative research with focus
6   groups in Chicago and London to assess whether --
7   which I don't know if it was London.  I knew -- I know
8   we did it in Chicago.  We did two different focus
9   groups.  I don't know the other location.
10     Q.   And what was the --
11     A.   The idea was --
12     Q.   Go ahead.
13     A.   The objective was to assess consumers'
14  reaction to the kiosk; specifically, would they use
15  it, would they expect to pay to use it, and would they
16  be willing to pay to use it?
17     Q.   Do you remember what were the
18  conclusions that resulted from the two focus groups?
19     A.   I do.  It was very positive from a
20  consumer standpoint saying that they would, in fact,
21  use it.  And it got significant -- helped get
22  significant traction internally.
23     Q.   There is also a reference on Exhibit 12
24  to a spinout option.  If you see a sentence under
25  background that says "to that end"?

Page 48

1      A.   Correct.  Option 3.
2      Q.   Option 3.  "CIBA Vision is interested in
3   seeing EyeSite succeed; and, therefore, would consider
4   an option which would allow EyeSite to be successful
5   outside of CIBA Vision."
6           Do you see that?
7      A.   That's correct.
8      Q.   Can you say more about that spinout
9   option that's referenced here in Exhibit 12?
10     A.   In what way?
11     Q.   What was being contemplated at the point
12  in time of the document that we've marked as
13  Exhibit 12 with respect to a potential spinout option?
14     A.   To do just that, to have a separate
15  business outside of the core that would have a
16  different management team run by me.
17     Q.   And that option was first conceived in
18  the second half of 2006?
19     A.   Correct.
20     Q.   I'm going to hand you a document we will
21  mark as Exhibit 13.
22          (Exhibit Number 13 was marked.)
23     Q.   (By Mr. Bush)  Do you recognize the
24  document that we have marked as Exhibit 13,
25  Mr. Foster?

Page 49

1      A.   I do.
2      Q.   Can you identify Exhibit 13 for the
3   record?
4      A.   It's a document written by Scott Hampton
5   of Can Do Medical dated October 15, 2006.
6      Q.   Who was Scott Hampton?
7      A.   He was a consultant to CIBA Vision.
8      Q.   Was Scott Hampton a consultant to CIBA
9   Vision in connection with the EyeSite vision acuity
10  kiosk project?
11     A.   Correct.
12     Q.   What was the role of Scott Hampton?
13  What was his consulting role with respect to the
14  vision acuity kiosk?
15     A.   Project manager.
16     Q.   And what did you understand Scott
17  Hampton's duties and responsibilities to be in
18  connection with serving as project manager?
19     A.   Interface between the software,
20  hardware, user design groups and -- yeah.
21     Q.   What is depicted in Exhibit 13 from your
22  perspective?
23     A.   It appears to be responsibilities
24  identified in buckets showing Dr. Thomson, the user
25  experience or user interface vendor, the kiosk vendor,

Page 50

1  which would be hardware, and a DB vendor, which I'm
2  not sure what that is.  Database, perhaps.
3      Q.   And these responsibilities that are
4  depicted on the chart on the first page of Exhibit 13,
5  are these responsibilities in connection with
6  developing a prototype or in connection with
7  developing a version of the kiosk that was subsequent
8  to the prototype?
9      A.   Prototype.
10      Q.   So Exhibit 13 is specific to the
11  development of the prototype kiosk?
12      A.   That's correct.
13      Q.   And the individuals involved in
14  developing the prototype kiosk in October of 2006 were
15  yourself, Scott Hampton, and Dr. Thomson, correct?
16      A.   Correct.  There -- yeah.  And there are
17  some other vendors that are involved too.
18      Q.   And can you identify the other vendors
19  that are involved at this point in time in 2006 in
20  developing the prototype vision acuity kiosk?
21      A.   It was a company called Eyemaginations.
22      Q.   And what was the role of Eyemaginations?
23      A.   Software, basically a user -- more user
24  friendly interface on top of Dr. Thomson's work, which
25  is more technical.

Page 51

1      Q.   Any other vendors come to mind in
2  reviewing Exhibit 13?
3      A.   The kiosk vendor would have been Kiosk
4  Information Systems based in Boulder, Colorado.
5      Q.   Any other vendor that comes to mind from
6  the late 2006 time frame?
7      A.   No.
8      Q.   I'll give you a document that we will
9  mark as Exhibit 14.
10          (Exhibit Number 14 was marked.)
11      Q.   (By Mr. Bush)  Mr. Foster, do you
12  recognize Exhibit 14?
13      A.   No.
14      Q.   Are you able to identify Exhibit 14?
15      A.   It appears to be an internal memo:
16  sponsor of CIBA Vision, protocol name the EyeSite
17  vision kiosk -- different protocols of some sort.  The
18  author is Rajni Singh, OD.
19      Q.   Are any of these names familiar to you
20  on the first page of Exhibit 14?
21      A.   Peter Bergenske sounds familiar.  Yeah.
22  These -- these were internal QA -- I think these were
23  internal people that were going to do testing to see
24  how accurate the kiosk was.
25      Q.   So Exhibit 14 reflects some internal

Page 52

1  quality assurance testing --
2      A.   That's right.
3      Q.   -- on the part of CIBA Vision in
4  connection with the prototype of the vision acuity
5  kiosk?
6      A.   Correct.
7      Q.   Do you know what conclusions were
8  reached as a consequence of this testing and
9  quality --
10      A.   They were --
11      Q.   -- assurance?
12      A.   They were favorable enough to move
13  forward.  I think there were some areas that might
14  have needed to be improved, but I don't recall exactly
15  what those were.  But it was enough to move forward.
16      Q.   And what role, if any, did you play in
17  the quality assurance testing that's reflected in
18  Exhibit 14?
19      A.   None.  Maybe project management or
20  something, but that's oversight.  But it wasn't
21  anything substantial.
22      Q.   Let's take a look at what we will mark
23  as Exhibit 15.
24          (Exhibit Number 15 was marked.)
25      Q.   (By Mr. Bush)  Do you recognize

Page 53

1  Exhibit 15, Mr. Foster?
2      A.   I don't.  It seems to be similar to the
3  last document, perhaps with data.
4      Q.   So Exhibit 15 appears to be another
5  report or output from the quality assurance testing
6  conducted by CIBA Vision?
7      A.   That's correct.
8      Q.   With respect to the prototype vision
9  acuity kiosk?
10      A.   Correct.
11      Q.   And Exhibit 15 is dated March 15 of
12  2007, correct?
13      A.   Yes.  February 2007.
14      Q.   I'm going give you a document we will
15  mark as Exhibit 16.
16          (Exhibit Number 16 was marked.)
17      Q.   (By Mr. Bush)  Do you recognize the
18  document we've marked as Exhibit 16?
19      A.   I do.
20      Q.   Can you identify Exhibit 16 for the
21  record?
22      A.   "Implementation Planning of
23  Initiatives."
24      Q.   Does Exhibit 16 refresh your
25  recollection as to the timing of the development of

14 (Pages 50 - 53)

1 the vision acuity prototype kiosk?
2　　A. No. Well, it says "Q4 2006."
3　　　THE STENOGRAPHER: It says what?
4　　A. "Q4 2006 Develop Beta prototype." It
5 says "completed."
6　　Q. (By Mr. Bush) Does this document we've
7 marked as Exhibit 16 refresh your recollection as to
8 the timing during which the prototype for the vision
9 acuity kiosk was completed?
10　　A. Yeah. It would have been July or --
11 actually, maybe September of 2006.
12　　Q. So by roughly September of 2006, CIBA
13 Vision had completed a prototype for the vision acuity
14 kiosk that had been part of the project in which you
15 had been engaged since 2004?
16　　A. That's correct.
17　　Q. I'll give you a document that we will
18 mark as Exhibit 17.
19　　　(Exhibit Number 17 was marked.)
20　　　THE DEPONENT: That's a pretty good
21 document right there.
22　　　MR. JESSER: Yeah.
23　　　THE DEPONENT: Yeah. I love this.
24　　Q. (By Mr. Bush) You're looking at
25 Exhibit 17?

1　　A. Yeah.
2　　Q. And what do you love about it?
3　　A. Just that I haven't looked at it in
4 20 years. It's the initial invoice for the first
5 prototype, I think, or part of it.
6　　Q. And who is the invoice from for the
7 first prototype in the document we've marked as
8 Exhibit 17?
9　　A. Kiosk Information Systems.
10　　Q. And what was the role of Kiosk
11 Information Systems in connection with the development
12 of the first vision acuity prototype?
13　　A. To develop the hardware for the kiosk
14 itself.
15　　Q. And what did that hardware include?
16　　A. It included the shell, the monitors, the
17 internal mirror configuration.
18　　Q. It included the mirror box?
19　　A. Correct.
20　　Q. And if you'll turn to the next-to-last
21 page, it's a full-page photograph of several
22 individuals standing next to --
23　　A. Yeah.
24　　Q. -- a kiosk.
25　　A. Sorry. I get excited. It's like when

1 my baby came to life.
2　　Q. You said this is a picture of when your
3 baby came to life?
4　　A. Yeah.
5　　Q. And what is your baby that's reflected
6 in this photograph that's a part of Exhibit 17?
7　　A. Which photo are you referring to?
8　　Q. (Indicating.)
9　　A. That's the first prototype in -- so
10 that's in their offices in Louisville, Colorado, and
11 that was the first prototype that we made here.
12　　　The prior one -- I don't remember the
13 exhibit we had that's pictures -- with Dr. Thomson
14 that was in the UK. That was in 2004, and that was --
15 I never touched that one.
16　　　This is the first one I actually felt.
17 And it was a little bit different, but yeah. And then
18 that other picture is the same unit. It's just
19 painted.
20　　Q. All right. Hang on. I want to make
21 sure our record is clear.
22　　A. And this is not referenced in anything.
23　　Q. Hang on. Looking at Exhibit 10 --
24　　A. 10.
25　　Q. -- the document we previously marked as

1 Exhibit 10 --
2　　A. Okay.
3　　Q. -- and when you were describing a moment
4 ago a prototype kiosk that you never were able to
5 touch, I just want to make sure that you were
6 referencing the kiosk that's --
7　　A. Number 10, correct.
8　　Q. -- in Exhibit 10?
9　　A. Correct. I saw these pictures, and this
10 was created after this.
11　　Q. In other words Exhibit --
12　　A. -- 17 -- Exhibit 17 was created after
13 Exhibit 10.
14　　Q. The photograph of the kiosk that's
15 reflected in Exhibit 17 was created after the kiosk
16 that's in the photograph in Exhibit 10, correct?
17　　A. That's correct.
18　　Q. And in Exhibit 17, I'm looking at the
19 third -- the backside of the third page of
20 Exhibit 17 --
21　　A. Let me see.
22　　Q. -- that is a photograph --
23　　A. Correct.
24　　Q. -- of six individuals standing next to a
25 kiosk.

Page 58

1        Do you see that?
2     A.    That's correct.
3     Q.    And you referenced earlier the idea that
4  the kiosk in this photograph was your baby, correct?
5     A.    Correct.
6     Q.    Who were the individuals who are
7  included in this photograph standing next to the
8  kiosk?
9     A.    The person to my right is Tom Weaver,
10 who is head of sales.  And the person to the left of
11 the kiosk is named Abby Boes, spelled B-o-e-s.  And
12 I'm not sure of the other people.
13    Q.    And that's yourself standing on the
14 opposite side of the kiosk on the other side of Abby
15 Boes, correct?
16    A.    That's correct.
17    Q.    And you and Tom Weaver and Abby Boes all
18 are employed by CIBA Vision?
19    A.    No.
20    Q.    Okay.  Who is the employer for Tom
21 Weaver?
22    A.    Kiosk Information Systems.
23    Q.    And who is Abby's employer?
24    A.    Kiosk Information Systems.  I'm the only
25 CIBA Vision employee pictured.

Page 59

1     Q.    So all the individuals in this picture,
2  other than yourself, are working for the manufacturer
3  of the prototype?
4     A.    That's correct.
5     Q.    And if you'll look at the very last page
6  of Exhibit 17, there is a picture of a kiosk that has
7  branding on it.
8        Do you see that --
9     A.    That's --
10    Q.    -- last page?
11    A.    -- correct, yes.
12    Q.    What's reflected in that photograph of
13 that kiosk?
14    A.    A prototype with branding of EyeSite
15 free vision test and SoloHealth.
16    Q.    And how did the name SoloHealth come
17 about in the time frame of October of 2006?
18    A.    I emailed 30 friends and gave them the
19 requirements of what I was looking for, and I got 50
20 ideas back and selected the one I liked the best.
21    Q.    And can you say a little more about the
22 requirements of what you were looking for?
23       What were you looking for?
24    A.    Something that represented
25 do-it-yourself healthcare.

Page 60

1     Q.    And you were looking for a brand name;
2  is that --
3     A.    Correct.
4     Q.    -- right?
5        And you provided ideas or some
6  guidelines around what you were looking for to,
7  roughly, 30 friends to invite their ideas?
8     A.    Correct.
9     Q.    And you got back ideas that put you at a
10 place of landing at SoloHealth?
11    A.    Yes.
12    Q.    And why did you pick SoloHealth?
13    A.    It sounded better than Pursuant Health.
14       That's a joke.  Sorry.
15    Q.    Was Pursuant Health an option?
16    A.    I had to say that because -- yeah.  It
17 was do-it-yourself healthcare.  "Solo," do it
18 yourself, "Health."
19    Q.    Is there any difference between the
20 kiosk that's reflected in the picture on the last page
21 of Exhibit 17 and the picture of the kiosk that's
22 reflected on the next-to-last page of Exhibit 17 that
23 has all the other individuals standing next to the
24 kiosk?
25    A.    (Indicating.)

Page 61

1     Q.    This is the last page of Exhibit 17.
2     A.    You're asking . . .
3     Q.    What is the difference between the last
4  page of Exhibit 17 and the next-to-last page?
5     A.    Clearly, the branding and the color.  So
6  it's -- there's a -- it was painted in a powder blue,
7  and then it was mocked up with some stickers in white.
8  And the software may have changed slightly since those
9  two, but it's hard to tell.
10    Q.    Now, when you landed upon the branding
11 SoloHealth, was this going to be the brand name for
12 the kiosk or the brand name for a company?
13    A.    A company.
14    Q.    And at what time did you first begin to
15 contemplate a separate company under the name
16 SoloHealth?
17    A.    It would have been in 2006.
18    Q.    And how did that contemplation come
19 about?  In other words, how did you come to decide
20 upon organizing a separate company to execute on the
21 vision acuity kiosk idea?
22    A.    Scott Meece, general counsel, and head
23 of business development, Tariq Aziz, we had a meeting
24 probably mid-2006.  And they informed me that
25 Novartis, who is the parent company of CIBA Vision,

Page 62

1 doesn't invest in things that plug into the wall.
2        And they said they would, unfortunately,
3 not support from a funding standpoint, and they
4 suggested that I go back to North America in my day
5 job.  And in the same meeting said that if I really
6 wanted to pursue it and stick with it that they would
7 support a spinout.
8        THE STENOGRAPHER:  Support a what?
9        THE DEPONENT:  Spinout.
10     Q.   (By Mr. Bush)  So Novartis told you that
11 because they didn't invest in things that plug into
12 the wall, you would have to go back to your prior role
13 within CIBA Vision, unless your chose to take the idea
14 to a separate company?
15     A.   That's correct.
16     Q.   What factored into your decision-making
17 around whether to go back to your prior role at CIBA
18 Vision or instead form a separate company?
19     A.   It wasn't a -- I had already made the
20 decision.
21     Q.   And when did you make that decision?
22     A.   The same day that I was in the focus
23 groups behind the two-way glass in Chicago.
24     Q.   Do you remember when that took place,
25 the focus group in Chicago?

Page 63

1     A.   I don't.
2     Q.   It was in 2006?
3     A.   It could have been '05.
4     Q.   But it was no later than 2006?
5     A.   Correct.
6     Q.   I'm going to give you a document,
7 Mr. Foster, that we will mark as Exhibit 18.
8        (Exhibit Number 18 was marked.)
9     Q.   (By Mr. Bush)  Do you recognize the
10 document we've marked as Exhibit 18 --
11     A.   Yes.
12     Q.   -- Mr. Foster?
13        Can you identify Exhibit 18 for the
14 record?
15     A.   It's a document dated November 2006.
16 "Automated Eye Health Kiosk EyeSite.  Confidential,
17 not to be distributed."  It's an internal document
18 inside CIBA Vision.
19     Q.   Did you prepare the document we marked
20 as Exhibit 18?
21     A.   I did.
22     Q.   And what was your objective in preparing
23 the document we marked as Exhibit 18?
24     A.   To gain support internally from
25 executive management and potential funding.

Page 64

1     Q.   Potential funding and support for the
2 EyeSite kiosk?
3     A.   Correct.
4     Q.   Was the document we marked as Exhibit 18
5 developed in connection with your decision to form a
6 separate company?
7     A.   Say that one more time.
8     Q.   Was the document -- did you create the
9 document we marked as Exhibit 18 in connection with
10 your decision to form a separate company to execute on
11 the vision acuity kiosk idea?
12     A.   It's hard to say.  I don't --
13     Q.   Looking --
14     A.   So this was actually -- so this document
15 here, if you look on page -- the last page in yellow,
16 this was a document to help companies -- it was for an
17 RFP.
18     Q.   So you prepared Exhibit 18 in -- to
19 assist CIBA Vision in developing an RFP for moving to
20 next steps for the vision acuity kiosk?
21     A.   That's correct.
22     Q.   And what was the reason for an RFP
23 process within CIBA Vision for the vision acuity
24 EyeSite kiosk?
25     A.   Because the procurement group wanted to

Page 65

1 make sure we were getting the best pricing from
2 potential vendors.
3     Q.   The RFP would be directed towards
4 identifying a vendor to develop the next iteration of
5 the vision acuity kiosk?
6     A.   I believe so.
7     Q.   And if you'll look with me at the second
8 page of the document we've marked as Exhibit 18.  It
9 incorrectly has "20" at the bottom on the right.
10     A.   Correct.
11     Q.   It's photographs of potential
12 locations --
13     A.   Yeah.
14     Q.   -- for the kiosks.
15        Can you explain what's being depicted on
16 this page with the heading "Potential Locations"?
17     A.   Sure.  Those are graphic renditions of
18 potential locations where we could find the kiosk.
19     Q.   And these are all high-traffic retail
20 locations?
21     A.   That's correct.
22     Q.   And looking on the opposite side of that
23 same page, the heading is "The EyeSite Kiosk
24 Printout."
25     A.   Yes.

1    Q.   Do you see that?
2    A.   Correct.
3    Q.   Can you say more about the EyeSite kiosk
4  printout and what is meant to be reported on the
5  EyeSite report --
6    A.   Sure.
7    Q.   -- printout?
8    A.   So vision results, near and distance.
9  There would be:  A disclaimer; general eye health
10  information, including legal driving requirements; the
11  nearest eye care provider; phone numbers; available
12  appointment times; manufacturer information discounts;
13  retailer or eye care provider discounts; and
14  advertising.
15    Q.   And looking at the photograph to the
16  right on this page with the heading "EyeSite Kiosk
17  Printout," that's a photograph of a sample or a
18  template for the kiosk printout; is that correct?
19    A.   That's correct.
20    Q.   And the kiosk printout is what an
21  individual would receive after engaging in the vision
22  screening functionality offered by the kiosk, correct?
23    A.   That's correct.
24    Q.   And the vision -- the EyeSite report
25  printout would allow an individual, then, to go

1  procure corrective lens based on the reports of the
2  test of the vision of that individual, correct?
3    A.   Correct.
4    Q.   Looking at the page with the heading
5  "EyeSite History:  Milestones Achieved," that has a
6  "4" at the bottom of the page.
7    A.   Yes.
8    Q.   Do you see the dates with the different
9  milestones on this page with the heading "EyeSite
10  History"?
11    A.   I do.
12    Q.   Are these dates all true and correct?
13    A.   I don't know if the top one is accurate.
14    Q.   And that's why I ask.  It says the
15  "EyeSite concept was conceived in the UK."
16        Do you see that?
17    A.   That's correct.
18    Q.   And you told me earlier the EyeSite
19  concept was conceived in February of 2004, correct?
20    A.   Correct.
21    Q.   And then CIBA Vision invests in the
22  market research in August of 2004, correct?
23    A.   Correct.
24    Q.   And those results were successful and
25  confirmed the value of the concept --

1    A.   That's right.
2    Q.   -- correct?
3        And then your patent was published for
4  the first time in February of 2006?
5    A.   That's right.
6    Q.   And the development of the prototype
7  started in May of 2006?
8    A.   Yes.
9    Q.   And the concept was presented to select
10  retailers in the summer of 2006, correct?
11    A.   Correct.
12    Q.   What were -- who were the retailers to
13  whom this concept was presented in 2006?
14    A.   Walmart.
15    Q.   And do you remember the reaction of
16  Walmart?
17    A.   No.
18    Q.   Were you involved in the presentation to
19  Walmart?
20    A.   No.
21    Q.   Who was involved in the presentation to
22  Walmart?
23    A.   Dennis Kane.
24    Q.   Oh, on behalf of CIBA Vision?
25    A.   Correct.  And likely Ray Pasco.

1    Q.   I'll give you a document we will mark as
2  19.
3        (Exhibit Number 19 was marked.)
4    Q.   (By Mr. Bush)  Mr. Foster, do you
5  recognize the document we've marked as Exhibit 19?
6    A.   I do.
7    Q.   Can you identify Exhibit 19 for the
8  record?
9    A.   It's a "Request For Proposal.  EyeSite
10  Kiosk Prototype Project" dated November 21, 2006.  No.
11  It's when responses are due.
12    Q.   So this RFP that we've marketed as
13  Exhibit 19 was prepared at some point before
14  November 21 of 2006?
15    A.   Correct.
16    Q.   And to whom did you send the RFP?
17    A.   I would reference -- actually, from
18  recollection, IBM, NCR, Kiosk Information Systems --
19    Q.   Do you --
20    A.   -- and likely three more.
21        I'm not sure.
22    Q.   I understand.  Do you remember which
23  company was selected, which response to the RFP was
24  chosen?
25    A.   Kiosk Information Systems for the

18 (Pages 66 - 69)

Page 70

1 hardware. Yeah.
2　　Q.　Was there a separate vendor for any
3 other components for the kiosk?
4　　A.　There was.
5　　Q.　And I know I'm testing your memory here.
6　　A.　Yeah.
7　　Q.　Whatever you remember.
8　　A.　I don't.
9　　Q.　You don't remember any other vendor, at
10 this point in time, other than Kiosk Information
11 Systems?
12　　A.　The software vendor -- so Eyemaginations
13 played a role. The CEO was Jeff Peres, P-e-r-e-s.
14 And --
15　　Q.　He was the CEO for the software vendor?
16　　A.　For the software company.
17　　Q.　And was Dr. David Thomson still involved
18 at this point in time?
19　　A.　Limited, if any. Yeah. Limited
20 probably.
21　　Q.　So as a consequence of submitting the
22 RFP we've marked as Exhibit 19, CIBA Vision selected
23 Kiosk Information Systems, Eyemagination, and a
24 software vendor, whose name you can't remember, but
25 the CEO was Jeff Peres?

Page 71

1　　A.　No. The CEO of the software vendor,
2 Jeff Peres, was at Eyemaginations.
3　　Q.　So Eyemaginations was the software
4 vendor that was selected?
5　　A.　Yes.
6　　Q.　And looking at the back of the first
7 page of the document we've marked as Exhibit 19, this
8 says that CIBA Vision wishes to engage suppliers to
9 assist in developing twelve eye care kiosks for the
10 U.S. and six for the UK.
11　　Do you see that?
12　　A.　I do.
13　　Q.　Did that ultimately happen?
14　　A.　No.
15　　Q.　What ultimately happened as a result of
16 this RFP process? How many kiosks were developed?
17　　A.　Five.
18　　Q.　Do you have a memory as to why a reduced
19 number of kiosks were developed?
20　　A.　I don't.
21　　Q.　And those five kiosks were developed in
22 late 2006 and 2007; is that correct?
23　　A.　Say the dates again.
24　　Q.　Late 2006 and 2007.
25　　A.　That's correct.

Page 72

1　　Q.　I want to give you a document we'll mark
2 as Exhibit 20.
3　　　(Exhibit Number 20 was marked.)
4　　Q.　(By Mr. Bush)　Mr. Foster, do you
5 recognize the document we've marked as Exhibit 20?
6　　A.　I don't.
7　　Q.　Do you believe this is a document in
8 which you were involved in preparing or developing?
9　　A.　Yes. Likely.
10　　Q.　And what is captured in the document
11 we've marked as Exhibit 20?
12　　A.　It looks to be key milestones with
13 responsibilities.
14　　Q.　Key milestones related to the marketing
15 and to implementation on the idea?
16　　A.　Correct.
17　　Q.　And on the second page of the document
18 we've marked as Exhibit 20, there's a list of
19 different methods for expanding the usage of the
20 kiosk; is that correct?
21　　A.　The back of the first page?
22　　A.　No. The second -- the second page. The
23 front of the second page?
24　　A.　It starts with 2.1?
25　　Q.　Correct.

Page 73

1　　A.　And what's the question?
2　　Q.　Does this identify methods for expanding
3 the usage of the kiosk by consumers?
4　　A.　No.
5　　Q.　At the top it says "Test Expansion
6 Marketing Support Plan."
7　　Do you see that?
8　　A.　Yes.
9　　Q.　Can you describe what is being reflected
10 on this page under "Phase 2: Test Expansion Marketing
11 Support Plan"?
12　　A.　Refining the target audience,
13 understanding what success looks like, testing various
14 messaging related to attracting people to use it,
15 understanding what partners -- the user interface
16 itself.
17　　Q.　So these are all ideas for growing the
18 use of the kiosk by consumers, correct?
19　　A.　No.
20　　Q.　Then how would you describe these
21 examples?
22　　A.　Things that we want to learn about the
23 market and the consumers. It has to do with in-store
24 awareness, promotional messaging.
25　　Q.　And did you ultimately gain the

1 intelligence and data points that you were looking to
2 learn about how to market to the consumers?
3    A.   Yes.  There was another firm called
4 MAYA.  MAYA Design that was instrumental, and the
5 principal there was Nick McManus.
6    Q.   And --
7    A.   And he probably had a role in this
8 document too.
9    Q.   And what was the role of MAYA Design?
10 They had a marketing role?
11    A.   No.  MAYA Design was for usability and
12 human-centered design.
13    Q.   And you found them helpful?
14    A.   Very.  Yeah.
15    Q.   I'll give you a document we'll mark as
16 Exhibit 21.
17        (Exhibit Number 21 was marked.)
18    Q.   (By Mr. Bush)  Do you recognize the
19 document we've marked as Exhibit 21, Mr. Foster?
20    A.   I do.
21    Q.   Can you identify it for the record?
22    A.   Strategic Milestones starting with
23 June 20, 2007.
24    Q.   And are these dates true and correct to
25 the best of your memory, the dates that are reflected

1 on Exhibit 21?
2    A.   I don't know.
3    Q.   And the first task is to "Provide CV
4 Term Sheet" by June 20, 2007.
5        Do you see that?
6    A.   Yes.
7    Q.   What's being referenced by that task, a
8 "CV Term Sheet"?
9    A.   A CIBA Vision Term Sheet would
10 contemplate an assignment of the intellectual property
11 to new co.
12    Q.   And when you say "new co.," you're
13 talking about the new company to be known as
14 SoloHealth?
15    A.   Correct.
16    Q.   And what was the intellectual property
17 to be assigned from CIBA Vision to SoloHealth?
18    A.   The patent named in Exhibit -- whatever.
19    Q.   The patent for which you were the named
20 inventor?
21    A.   Correct.
22    Q.   Because that patent had been assigned to
23 CIBA Vision, correct?
24    A.   Correct.
25    Q.   And did CIBA Vision ultimately assign

1 the Foster patent to SoloHealth?
2    A.   They did.
3    Q.   And let's look at what we will mark as
4 Exhibit 22.
5        (Exhibit Number 22 was marked.)
6    Q.   (By Mr. Bush)  Do you recognize the
7 document we've marked as Exhibit 22?
8    A.   I do.
9    Q.   And this is a letter of intent between
10 yourself and Dr. Kevin Lavery correct?
11    A.   That's correct.
12    Q.   And how did you first come to learn of
13 Dr. Kevin Lavery?
14    A.   The Novartis patent department in
15 Switzerland called and told me about him.
16    Q.   And when did that phone call from the
17 Novartis patent department take place?
18    A.   I'm not sure.
19    Q.   Sometime in 2006?
20    A.   Likely.
21    Q.   You likely learned about Dr. Lavery in
22 2006, but you can't say for certain?
23    A.   Correct.
24    Q.   When was the first time you interacted
25 with Dr. Lavery?

1    A.   On the phone around -- within a week of
2 learning about him from Novartis.
3    Q.   And what was your reason for reaching
4 out to Dr. Lavery by phone after you learned about him
5 from Novartis?
6    A.   Our attorneys said that he had a patent
7 that wasn't exactly what we were doing, but it was
8 written very broadly.  And there was potential
9 infringement, and they wanted to make me aware and
10 asked if I was aware and I said no.
11    Q.   Did you subsequently review Dr. Lavery's
12 patent?
13    A.   I did.
14    Q.   And what were your conclusions after you
15 read Dr. Lavery's patent?
16    A.   It wasn't what we were doing.
17    Q.   And when you say "it wasn't what we were
18 doing," you're talking about the EyeSite vision acuity
19 kiosk?
20    A.   Correct.
21    Q.   And how is the conception embedded in
22 Dr. Lavery's patent different from the EyeSite vision
23 acuity kiosk in which you were engaged?
24    A.   I don't know.
25    Q.   But it's your testimony you concluded at

Page 78

1 the time that Dr. Lavery's patent was different from
2 what you were doing with the EyeSite vision acuity
3 kiosk, correct?
4     A.  I don't know.
5     Q.  I'm just -- followed up on your
6 testimony.
7     A.  I'm not a patent attorney.  I have no
8 idea.  I just know what they told me, which was, Hey,
9 we could potentially be infringing, so you might want
10 to learn more.
11     Q.  And you told me earlier that
12 Dr. Lavery's patent was different from what we were
13 doing, and I just want to understand what you meant by
14 that statement.
15     A.  It contemplated a retinal camera in the
16 device that wasn't -- not in my -- it wasn't in the
17 opportunity set that I had considered.
18     Q.  Did you have the objective of including
19 a retinal camera in the kiosk that you had developed?
20     A.  No.
21     Q.  What was your objective in entering into
22 the letter of intent with Dr. Lavery that we've marked
23 as Exhibit 22?
24     A.  To have leverage with CIBA Vision and
25 Novartis.

Page 79

1     Q.  And what do you mean by that?  What kind
2 of leverage were you looking for with CIBA Vision and
3 Novartis?
4     A.  To be able to acquire the intellectual
5 property that they had on the EyeSite kiosk.
6     Q.  In other words, leverage to acquire from
7 CIBA Vision the patent for which you were the named
8 inventor?
9     A.  Correct.
10     Q.  And that was your objective in entering
11 into the letter of intent with Dr. Lavery?
12     A.  Yes.
13     Q.  Was there any other objective that you
14 had in mind when you entered into the letter of intent
15 with Dr. Lavery?
16     A.  I don't think so.
17     Q.  And how did acquiring -- how did the
18 letter of intent that you executed with Dr. Lavery,
19 how did that provide leverage to you in your
20 negotiations with CIBA Vision and Novartis?
21     A.  Dr. Lavery had an issued patent, which
22 was much stronger than -- in my view was much stronger
23 than a patent pending.
24     Q.  Okay.  And the patent for which you were
25 a named inventor, at least at this point in time, was

Page 80

1 not an issued patent?
2     A.  Correct.
3     Q.  When you entered into the letter of
4 intent with Dr. Lavery, did you have the objective of
5 obtaining any other intellectual property from
6 Dr. Lavery, other than his issued patent?
7     A.  Maybe a little strategic guidance or
8 consultation because he's an ophthalmologist.
9     Q.  Did you ultimately enter into a
10 consulting agreement with Dr. Lavery in order to
11 obtain that strategic guidance and consultation?
12     A.  We did.  We did.
13     Q.  Was there any other specific
14 intellectual property that you hoped to obtain from
15 Dr. Lavery, other than his issued patent?
16     A.  No, not that I'm aware of.
17     MR. BUSH:  All right.  Let's go off the
18 record.  I'm at a great stopping place for lunch.
19     THE VIDEOGRAPHER:  We are going off the
20 video record at 12:49 p.m.
21     (Recess from 12:49 p.m. to 1:58 p.m.)
22     (Mr. Jesser was not present.)
23     THE VIDEOGRAPHER:  This is Media
24 Number 2 in the continuing deposition of Bart Foster.
25 We are back on the record at 1:58 p.m.

Page 81

1     Q.  (By Mr. Bush)  Mr. Foster, going back on
2 the record, you mentioned you have an additional
3 document with you that we might want to mark as an
4 exhibit; is that correct?
5     A.  Yeah.  This is a business recommendation
6 dated July -- July of 2006 that I had -- that I just
7 found at home.
8     THE DEPONENT:  Bruce, it looks like that
9 on the cover.
10     MR. INOSENCIO:  Okay.
11     Q.  (By Mr. Bush)  And we will mark this
12 July 2006 business recommendation as Exhibit 23.  And
13 with your indulgence, we'll take that original and
14 make copies and return that original to you --
15     A.  Great.
16     Q.  -- next week.
17     (Exhibit Number 23 was marked.)
18     A.  It's similar to Exhibit --
19     Q.  (By Mr. Bush)  6?
20     A.  No.  18.  It's similar to Exhibit 18,
21 and it's dated July of 2006.
22     And this was a meeting that was actually
23 fairly significant in that it was a meeting between
24 Tariq Aziz, Scott Meece, and Michael Kehoe, the CEO.
25 And this was to request permission to spin out the

21 (Pages 78 - 81)

1 business.
2 And what happened in that meeting was
3 Michael actually said, "No, I don't want to spin it
4 out, at least not yet. I'd like to give you a
5 full-time job to work on it and what's the budget that
6 you need?"
7 And so that put -- that put it on a
8 little bit different path. So the November document
9 was really more of an extension of that. It made it
10 more of an internal project, at least for a period of
11 time.
12 Q. And the November document to which you
13 refer is what we marked as Exhibit 18, correct?
14 A. That's correct.
15 Q. So the meeting in July of 2006 that's
16 the subject of Exhibit 23 resulted in a few more
17 months of the whole EyeSite visual acuity kiosk being
18 inside CIBA Vision? A little --
19 A. It was supposed to be for a year at
20 least, beginning in July -- of January of 2007. And
21 on January, roughly, 6, 7, somewhere like that, after
22 I came back, I was informed from the head of HR that
23 the project was going to be cut because of a recall on
24 a big contact lens product.
25 Q. So you were informed -- who gave you the

1 report in early 2007?
2 A. The head of HR. Her name was Michelle
3 Prince.
4 Q. And what did she report to you?
5 A. That there had been a recall on a
6 contact lens product and all noncritical spending was
7 frozen. And then I had a choice to either go back
8 into the North American sales team or -- actually, I
9 think that was my only option.
10 Q. That was your only option in early 2007?
11 A. Correct.
12 Q. And how did it come to be that after you
13 were presented with that being your only option, in
14 January of 2007, that then a few months later you came
15 to form the separate company known as SoloHealth?
16 A. So this is when -- and the timing is a
17 little bit fuzzy, but it's all going to be in the same
18 kind of eight months here, which is -- I remember
19 talking to my father about this and how upset I was
20 that I couldn't -- you know, I could have spun the
21 company out earlier, and they gave me an opportunity
22 to -- and I felt like I wasted a year.
23 And what he said was, "Put your head
24 down for 90 days and do exactly what they want you to
25 do." And I did that. And after roughly 90 days, it

1 would have been probably in the April or May time
2 frame, I set up a dinner with Michael Kehoe. Prior to
3 that is when -- and this is where I think it started
4 to get into your question about when did I engage with
5 Dr. Lavery. So my recollection would have been either
6 late 2006 or certainly early 2007 and . . .
7 Q. When you say early -- either late 2006
8 or early 2007, you're describing --
9 A. -- the first phone call.
10 Q. -- the first phone call with Dr. Lavery?
11 A. Yeah. And then the trip up to Jackson,
12 Michigan, and we had a dinner at his country club. I
13 don't recall the date of that, but it would have been
14 obviously prior to Exhibit 22, which is the letter of
15 intent with Dr. Lavery.
16 So it would have been, you know, roughly
17 a month or two ahead of that, so likely in the March,
18 April time frame.
19 Q. And tell me again the document we marked
20 as Exhibit 23, how do you describe that document?
21 Business recommendation?
22 A. 23 is the business recommendation -- it
23 was essentially the backup material that I used to try
24 to convince the CEO that this was a business that we
25 should spin out. And I -- and I essentially oversold

1 it because he said to his colleagues, "This is exactly
2 the stuff we should be working on. I would prefer not
3 to spin it out right now. Let's work on it a little
4 bit more internally, and we'll give you the support."
5 Q. And that -- that was the conversation
6 that you described that took place in January of 2007?
7 That they would give you the support to remain within
8 CIBA Vision?
9 A. No. That would have been -- that would
10 have been this document -- this would have been -- so
11 coming out of this meeting, July --
12 Q. 2006?
13 A. Yep. Coming out of that meeting, Scott
14 Meece pulled me aside and said, "Hey, you know, even
15 though Michael wants to move forward, it has to get
16 approved by the budget committee. It's got to go
17 through the budget process."
18 And there was a meeting coming up at the
19 end of September, I believe it was, September,
20 October, where you will have the opportunity to
21 present. He said, "Anything over $750,000 has to get
22 approved by that budget committee."
23 And it's during that time frame that I
24 decided that wouldn't it be beneficial to have a
25 prototype built prior to that meeting, but I didn't

1 have a budget.
2      Q.   Understood.  Okay.  Thank you for that
3 clarification.
4           And then you described a trip to
5 Jackson, Michigan, to meet Dr. Lavery in person that
6 took place, you believe, in April or May of 2007?
7      A.   That sounds right, yes.
8      Q.   And what was your reason for traveling
9 to meet Dr. Lavery in person?
10      A.   I wanted to build rapport and I wanted
11 him to understand what I was building and, I think,
12 persuade him to assign his intellectual property over
13 and be part of what I was building.
14      Q.   And when you say "persuade him to assign
15 his intellectual property," you're referring to his
16 patent?
17      A.   That's correct.
18      Q.   Are you referring to anything, other
19 than his patent?
20      A.   No.
21      Q.   Tell me what you remember about that
22 dinner meeting with Dr. Lavery that took place in
23 Jackson, Michigan.
24      A.   It -- we were just -- you know, hit it
25 off.  We were friends, and it felt like he -- I think

1 he was proud of what he had come up with.  And he was
2 surprised that a big company, being CIBA Vision, would
3 be interested in what he had.  And I had the
4 impression that because it had just been sitting there
5 and really no work had been done, this was a way to,
6 at least, extract some value for what he had -- the
7 initial light bulb moment or whatever he had years
8 ago.
9      Q.   And following that dinner meeting, you
10 came to prepare the letter of intent that we marked as
11 Exhibit 22?
12      A.   Correct.  There was -- yeah, that's
13 correct.
14      Q.   Let's look at what we will mark as
15 Exhibit 24.
16           (Exhibit Number 24 was marked.)
17      Q.   (By Mr. Bush)  Do you recognize the
18 document we've marked as Exhibit 24, Mr. Foster?
19      A.   A little bit, but not -- I mean, not
20 that familiar with it.
21      Q.   Does it appear to be a document that you
22 drafted or do you remember?
23      A.   Likely.
24      Q.   You think it's likely that you created
25 Exhibit 24?

1      A.   Yes.
2      Q.   And the document we marked as Exhibit 24
3 is on the first page, at least, labeled as a
4 "Development plan" and an "IP Strategy."
5           Do you see that?
6      A.   On page what?  I'm sorry.
7      Q.   On the very first page.
8      A.   Correct.
9      Q.   And on page 5 with the heading "IP
10 strategy"; do you see that?
11      A.   I do.
12      Q.   The first bullet point is "Agreements
13 with CV and Lavery" --
14      A.   Yes.
15      Q.   -- do you see that?
16           Can you describe what's being referenced
17 by that phrase?
18      A.   That would be the assignment agreement
19 with CIBA Vision and the Lavery either letter of
20 intent or the assignment of the IP.
21      Q.   The assignment of Lavery's patent?
22      A.   Correct.
23      Q.   I'm going to give you a document we'll
24 mark as 25.
25           (Exhibit Number 25 was marked.)

1      Q.   (By Mr. Bush)  Do you recognize the
2 document we've marked as Exhibit 25, Mr. Foster?
3      A.   Yes.
4      Q.   Can you identify Exhibit 25 for the
5 record?
6      A.   It appears to be a document from
7 Eyemaginations that says "Proof of Concept Kiosk
8 Designs."
9      Q.   And what's referenced by these different
10 Sit Down Number 1, Sit Down Number 2, all the way
11 through Sit Down Number 3?
12      A.   These are different drawings that would
13 be a kiosk or a booth that you would screen your
14 vision, different options.
15      Q.   Different options.  And at the point in
16 time of the document we marked as Exhibit 25, you had
17 not landed on a specific option?
18      A.   Correct.  I'm not sure actually.
19      Q.   And what is it about what you're not
20 sure?
21      A.   Well, you asked the question -- I don't
22 know if the first part is -- it started to be built
23 and these are options.
24      Q.   Understood.  But this document we marked
25 as Exhibit 25 came to you from Eyemaginations,

Page 90

1  correct?
2      A.  It appears so, yes.
3      Q.  Let's look at Exhibit 26.
4      (Exhibit Number 26 was marked.)
5      A.  "Contribution Agreement"?
6      Q.  (By Mr. Bush)  Yes, sir.  Do you
7  recognize the document we marked as Exhibit 26?
8      A.  Yes.
9      Q.  And the document we marked as Exhibit 26
10 is the final agreement that was contemplated by the
11 letter of intent we marked as Exhibit 22?
12     A.  Okay.
13     Q.  Is that correct?
14     A.  I would presume, yes.
15     Q.  And as you said earlier, your objective,
16 in entering into the contribution agreement with
17 Dr. Lavery, was to obtain an assignment of
18 Dr. Lavery's patent?
19     A.  That's correct.
20     Q.  There's a reference to a closing at
21 paragraph 1.1 on the first page.  It says a closing
22 shall take place at the offices of DLA Piper U.S. on
23 West Peachtree Street in Atlanta.
24     Do you see that?
25     A.  Yes.

Page 91

1      Q.  Did you personally attend a closing of
2  this transaction?
3      A.  I don't recall.
4      Q.  And in connection with the execution of
5  this contribution agreement, you obtained a patent
6  assignment from Dr. Lavery, correct?
7      A.  Correct.
8      Q.  In connection with the execution of this
9  contribution agreement, did you obtain anything else
10 from Dr. Lavery, other than an assignment of the
11 patent?
12     A.  I don't know.
13     Q.  Do you remember obtaining from
14 Dr. Lavery at the time of the execution of this
15 agreement anything other than a consulting agreement
16 and a patent assignment?
17     A.  No.
18     Q.  In connection with execution of this
19 contribution agreement, did you obtain a demonstration
20 video from Dr. Lavery?
21     A.  I don't recall.
22     Q.  In connection with the execution of this
23 contribution agreement with Dr. Lavery, did you obtain
24 any form of a business model from Dr. Lavery?
25     A.  No.

Page 92

1      Q.  In connection with execution of this
2  contribution agreements with Dr. Lavery, did you
3  obtain any form of a method for developing and
4  implementing the vision acuity kiosk?
5      A.  I don't recall.
6      Q.  In connection with executing this
7  contribution agreement with Dr. Lavery, did you obtain
8  any software from Dr. Lavery?
9      A.  No.
10     Q.  In connection with the execution of this
11 contribution agreement, did Dr. Lavery request any
12 confidentiality restrictions or nondisclosure
13 restrictions?
14     A.  No.  Not that wouldn't be already part
15 of the agreement.
16     Q.  Understood.
17     I want to look for a moment at what we
18 will mark as Exhibit 27.
19     (Exhibit Number 27 was marked.)
20     Q.  (By Mr. Bush)  The document I've handed
21 you that we've marked as Exhibit 27 is Dr. Lavery's
22 lawsuit against Pursuant Health?
23     A.  Okay.
24     Q.  And I'll invite you to turn to
25 paragraph 68.  This is on page 14.

Page 93

1      A.  Page 14, paragraph 68.
2      Q.  Yes.  In the first sentence of
3  paragraph 68 is Dr. Lavery's allegation that "The
4  purpose of the contribution agreement was to enable
5  Dr. Lavery to contribute certain intellectual property
6  to SoloHealth so that SoloHealth could develop and
7  distribute products under the patent in the form of a
8  retinal scan kiosk."
9      Do you see that?
10     A.  I do.
11     Q.  Do you have a view as to whether this
12 allegation of Dr. Lavery is true or factually correct?
13     A.  I don't.
14     Q.  At the time of the execution of the
15 contribution agreement, was SoloHealth planning to
16 distribute products in the form of a retinal scan
17 kiosk?
18     A.  No.
19     Q.  So --
20     A.  It's hard to --
21     Q.  Go ahead.
22     A.  If you put a timeline on it -- so, you
23 know, if you said, Are you planning to do it in the
24 next five years?  Not sure.  Planning to do it in the
25 next two years?  No.  The next ten years?  Possibly.

24 (Pages 90 - 93)

Page 94

1  Is that why we acquired the patent?  No.  But you
2  could argue -- anyway, you get it.
3        Q.   Well, so your testimony is at the time
4  of the contribution agreement, there was no intent to
5  distribute products in the form of a retinal scan
6  kiosk?
7        A.   I can't say either way.
8        Q.   Well, you told me earlier there was no
9  plan to do it within two years of the contribution
10  agreement; is that correct?
11        A.   Correct.
12        Q.   Look at paragraph 22 on page 5.
13        A.   Paragraph 22 on page 5.  Okay.
14        Q.   And the second sentence says that
15  Pursuant Health "kiosk is based on highly secret,
16  proprietary information that Dr. Lavery developed and
17  which is a valuable trade secret."
18             Do you see that?
19        A.   I do.
20        Q.   Do you believe that allegation is
21  factually accurate during the time period that you
22  served as CEO of SoloHealth?
23        A.   No.
24        Q.   You believe this allegation is
25  inaccurate?

Page 95

1        A.   The kiosk is based on highly secret,
2  proprietary information that Dr. Kevin Lavery
3  developed.  That's not accurate.
4        Q.   And why is that not accurate?
5        A.   What did he develop?  I just -- it would
6  be more of a question.  I don't know what that is.
7        Q.   But in any event, you don't agree that
8  this allegation of paragraph 22 is true --
9        A.   No.
10        Q.   -- and correct.  No?
11        A.   No.
12        MR. BUSH:  Is this Exhibit 26?
13        THE STENOGRAPHER:  27, I believe.
14             Can you look at the sticker on the
15  front?
16        THE DEPONENT:  27.
17        MR. BUSH:  Got it.
18             This will be Exhibit 28.
19             (Exhibit Number 28 was marked.)
20        Q.   (By Mr. Bush)  I'll give you a moment to
21  take a look at Exhibit 28.
22        A.   28.  "Assignment of Patent" dated
23  October 11, 2007.
24        Q.   And Exhibit 28 is Dr. Lavery's
25  assignment of his patent to SoloHealth that was

Page 96

1  executed in connection with the contribution
2  agreement --
3        A.   Okay.
4        Q.   -- is that correct?
5        A.   I don't know.
6        Q.   Do you remember receiving an assignment
7  of patent from Dr. Lavery --
8        A.   Yes.
9        Q.   -- in connection with the contribution
10  agreement?
11        A.   Yes.
12        Q.   And your objective in entering into the
13  contribution agreement was to obtain from Dr. Lavery a
14  patent assignment, correct?
15        A.   Correct.
16        Q.   And Exhibit 28 reflects that patent --
17        A.   Correct.
18        Q.   -- assignment?
19        A.   Yes.
20        Q.   We've got to be careful not to talk over
21  one another.
22             I'm going to give you now a document
23  we're going to mark as Exhibit 29.
24             (Exhibit Number 29 was marked.)
25        THE STENOGRAPHER:  Give me a moment to

Page 97

1  check who that is.
2             Peter Krivkovich entered the room.
3        MR. BUSH:  Yes.
4        THE DEPONENT:  I've got to say hi.
5        MR. BUSH:  Can -- let's go off the
6  record.
7        THE DEPONENT:  No.  Don't go off the
8  record.  I'll say hey.
9             Hey, Peter.
10        MR. KRIVKOVICH:  Hi, Bart.  What's
11  happening?
12        THE DEPONENT:  Hey, buddy.  We're on the
13  record.
14        MR. KRIVKOVICH:  On the record.  I got
15  it.  I got it.  Well, good to see you.
16        THE DEPONENT:  Good to see you too.
17        MR. BUSH:  Are we back on?
18        THE VIDEOGRAPHER:  Yes.
19        Q.   (By Mr. Bush)  Looking at the document
20  we marked as Exhibit 29, do you recognize this to be
21  the consulting agreement that Dr. Lavery executed in
22  connection with the contribution agreement?
23        A.   Yes.
24        Q.   And you remember Dr. Lavery executing a
25  consulting agreement --

25 (Pages 94 - 97)

Page 98

1    A.   Yes.
2    Q.   -- in connection with the contribution
3  agreement?
4         Can you describe what sorts of services
5  or information Dr. Lavery provided to SoloHealth in
6  connection with his performing the consulting
7  agreement we've marked as Exhibit 29?
8    A.   Can you repeat the question?
9    Q.   Yeah.  Can you remember what services or
10  other information that Dr. Lavery might have provided
11  to SoloHealth after execution of the consulting
12  agreement and during Dr. Lavery's performance of the
13  consulting agreement?
14    A.   Just likely general consultation, likely
15  discussions around potential business model.  Yeah.
16    Q.   You say likely he provided potential
17  business model options?
18    A.   Correct.
19    Q.   Do you remember any specific business
20  model options that he provided to SoloHealth in
21  performing the consulting agreement?
22    A.   It would have been just a referral --
23  you know, referral model or what doctors -- how
24  doctors were -- ophthalmologists would, you know,
25  perceive the units or potentially with the American

Page 99

1  Optometric Association, but nothing technical.
2         MR. INOSENCIO:  Joel?
3         MR. BUSH:  Yes, sir.
4         MR. INOSENCIO:  Before we go forward
5  further, can we have Peter identify himself and his
6  role?
7         MR. BUSH:  Yes.  He's a board member of
8  Pursuant Health.  I'll let him introduce himself.
9         MR. KRIVKOVICH:  Yeah.  Hi.  Peter
10  Krivkovich, board member of Pursuant Health, and I've
11  been on the board for -- I forget the exact date, but
12  for a while.  Current all the way back to when Bart
13  was operating CEO.
14         MR. BUSH:  And --
15         MR. INOSENCIO:  Thank you.  I just want
16  the record to reflect that we had someone join the
17  deposition and the person's role.
18         Joel, are they -- is Peter appearing as
19  the corporate representative today or . . .
20         MR. BUSH:  Peter is appearing as a
21  corporate rep.  John Jesser had to depart.
22         MR. INOSENCIO:  Okay.
23         MR. BUSH:  And so Peter is in lieu of
24  John Jesser's participation.
25         MR. INOSENCIO:  Okay.  Not a problem.

Page 100

1         Peter, nice to meet you.
2         MR. KRIVKOVICH:  Nice to meet you.
3    Q.   (By Mr. Bush)  Mr. Foster, you describe
4  this referral model about -- from Dr. Lavery about
5  what doctors -- what ophthalmologists would be
6  thinking.
7         Was this information provided to
8  SoloHealth by Dr. Lavery in any tangible form?
9    A.   There may have been emails or -- but,
10  no, I wouldn't think any documents of material
11  importance.
12    Q.   Other than the referral model that
13  you've described that Dr. Lavery might have provided
14  to SoloHealth in connection with performing the
15  consulting agreement, can you think of anything else
16  that Dr. Lavery provided to SoloHealth in performing
17  the consulting agreement?
18    A.   Potentially vendors to work with or
19  consultants.  Maybe things on the regulatory path or
20  clinical validation, eye health information related to
21  some of the content, perhaps, in a kiosk.
22    Q.   And all of these things that you
23  described including this referral model, did
24  Dr. Lavery characterize any of these things as trade
25  secrets during that time period?

Page 101

1    A.   Not outside of what would be considered
2  SoloHealth property.
3    Q.   And what do you mean by that?
4    A.   There was no mention of, "Hey, this is a
5  trade secret that's mine," or anything like that.  It
6  was more we would just have conversations.
7    Q.   In other words, Dr. Lavery provided
8  information to you, but he didn't label it as a trade
9  secret?
10    A.   Correct.
11    Q.   Do you have a memory of Dr. Lavery
12  providing any sort of demonstration video to
13  SoloHealth in connection with his performing
14  consulting services, under the consulting agreement we
15  marked as Exhibit 29?
16    A.   What type of video?
17    Q.   Demonstration --
18    A.   I don't --
19    Q.   -- videos.
20    A.   A demonstration of what?
21    Q.   Dr. Lavery has alleged that he provided
22  a demonstration video about the kiosk, and I'm asking
23  whether you remember anything about a demonstration
24  video prepared by Dr. Lavery that he provided to
25  SoloHealth.

26 (Pages 98 - 101)

Page 102

1      A.   I don't recall.
2      Q.   Dr. Lavery has also alleged that he
3  provided a method to develop and expand the usage of
4  the kiosk.
5           Do you remember Dr. Lavery providing any
6  kind of method for developing or implementing or
7  expanding the usage of the kiosk, after the execution
8  of the contribution agreement and in connection with
9  his performing the consulting agreement?
10     A.   Yes.
11     Q.   And what do you remember about that?
12     A.   Just the importance of putting a retinal
13  camera in the device.  That was his -- that's what he
14  wanted, and he thought it would really strengthen the
15  business model.
16     Q.   Did you agree with his recommendation
17  for putting a retinal camera into the device?
18     A.   I don't think I agreed nor disagreed.
19  It was more of a timing and funding and priority.
20     Q.   After Dr. Lavery stressed to you the
21  importance of putting a retinal camera into the device
22  in connection with his performing the consulting
23  agreement, did you take any steps to implement that
24  idea provided by Dr. Lavery?
25     A.   It wouldn't have been until late -- you

Page 103

1  know, late 2013 probably, if I had to guess.  It
2  wasn't in the first five years.
3      Q.   And the idea of putting retinal cameras
4  into the device, was that recommendation provided to
5  you in any tangible form, or was this emails and
6  informal conversations?
7           THE STENOGRAPHER:  Formal or informal?
8           MR. BUSH:  Informal.
9      A.   I would say the latter.  There was
10  likely some emails and some communication.  I don't
11  recall any documents that were produced.
12     Q.   (By Mr. Bush)  After the execution of
13  the contribution agreement, did you undertake to
14  modify the kiosk as it had been developed?
15          Did you undertake to modify it in any
16  way in order to account for anything that you had
17  received from Dr. Lavery?
18     A.   Possibly.  Not sure.
19     Q.   And when you say "possibly," what are
20  you potentially referring to?
21     A.   Well, we would talk frequently.  And
22  there was all kinds of things we talked about and
23  ideas, so I can't be certain of that.
24     Q.   So sitting here today, can you identify
25  any specific modification to the kiosk that was

Page 104

1  implemented in the months following the execution of
2  contribution agreement with Dr. Lavery and based on
3  something you received --
4      A.   No.
5      Q.   -- from Dr. Lavery?
6      A.   In the months after, no.  No.  That
7  prototype, everything was in motion.
8      Q.   Let's take a look at what we will mark
9  as Exhibit 30.
10          (Exhibit Number 30 was marked.)
11     A.   Oh, look at these, man.
12     Q.   (By Mr. Bush)  And what are you looking
13  at in Exhibit 30?
14     A.   Just old pictures and mock-ups I haven't
15  seen in 20 years.
16     Q.   Can you --
17     A.   I wish you could see this, you guys.
18  This is good stuff.
19     Q.   Can you identify Exhibit 30 for the
20  record?
21     A.   It's Design Concepts October 18, 2007,
22  Kiosk Information Systems, and there's little
23  cardboard mock-ups and concepts and stuff.
24     Q.   Is this a document that you prepared,
25  the one we marked as Exhibit 30?

Page 105

1      A.   No.  Actually, it could be.  It was --
2  but the pictures would have come from -- yeah.  Sorry.
3  It is a document I likely put together.  Kiosk
4  Information Systems -- bear with me a second.
5           No.  This is -- I don't know who put
6  this together actually.  But the -- it's basically
7  describing various mockups from the RFP that we
8  received.  So some of these are NCR.  The cardboard
9  ones are MAYA Design.  Concept 3 is NCR.  Concept 4 is
10  likely the Panaseca kiosk.  And the current version
11  without the scan is Kiosk Information Systems, which
12  has already been depicted in a prior --
13     Q.   The last page, this says "Current
14  version without the skin."
15     A.   Correct.
16     Q.   That's just -- that's a picture of the
17  prototype --
18     A.   Correct.
19     Q.   -- we've been talking about, correct?
20     A.   Correct.
21     Q.   Do any of the concepts that are depicted
22  in the photographs in Exhibit 30 reflect any of the
23  ideas from Dr. Lavery?
24     A.   No.
25     Q.   Now, you talked earlier about Dr. Lavery

27 (Pages 102 - 105)

1 stressing the importance of putting a retinal camera
2 into the device.
3     A.  Uh-huh.
4     Q.  Did Dr. Lavery characterize that idea on
5 his part as a trade secret?
6     A.  No.
7     Q.  From your perspective, did Dr. Lavery's
8 recommendation of putting a retinal camera into the
9 device, was that a follow-on idea from the ideas
10 embedded in his patent?
11     Likely.
12     Q.  Do you remember at any time Dr. Lavery
13 characterizing anything at all to you as a trade
14 secret that was owned by Dr. Lavery?
15     A.  I'm not sure.
16     Q.  Do you remember either way --
17     A.  No.
18     Q.  -- Dr. Lavery using the word "trade
19 secret" in his communications --
20     A.  I'm sure --
21     Q.  -- with you?
22     A.  -- he used that word, yes.  But in what
23 context, I have no idea.
24     Q.  Let's look at 31.
25     (Exhibit Number 31 was marked.)

1     Q.  (By Mr. Bush)  Mr. Foster, do you
2 recognize the document we marked as Exhibit 31?
3     A.  Yeah.
4     Q.  Can you identify it for the record?
5     A.  This is the "Design and Development
6 Kickoff meeting," October 29, 2007.  And the
7 participants include myself, Nick McManus, and John
8 Crowley of MAYA design and Stephen Kendig.
9     Q.  And who was Stephen Kendig?
10     A.  At the time he would have been a
11 director -- like a project manager.  But he was the --
12 yeah, one of the first employees.
13     Q.  And Stephen Kendig came over to
14 SoloHealth from CIBA Vision?
15     A.  Correct.
16     Q.  Did Dr. Lavery participate in this
17 meeting that is reflected in Exhibit 31?
18     A.  It doesn't appear so.
19     Q.  I'll give you a document we'll mark as
20 Exhibit 32.
21     (Exhibit Number 32 was marked.)
22     A.  Man, you guys got all of it.  This is
23 good.
24     Q.  (By Mr. Bush)  Do you recognize the
25 document we've marked as Exhibit 32, Mr. Foster?

1     A.  Sort of.
2     Q.  Can you identify Exhibit 32 --
3     A.  "SoloHealth --
4     Q.  -- for the record?
5     A.  -- Advisory Board, February 1, 2008."
6     Q.  Did you prepare the document that we've
7 marked as Exhibit 32?
8     A.  Yes.
9     Q.  And what was your objective in preparing
10 Exhibit 32?
11     A.  I don't know.
12     Q.  Let's look at what is marked as page 9
13 of Exhibit 32.  Top page says "EyeSite Printed
14 Results."
15     A.  Yes.
16     Q.  And this is another photographic
17 depiction of the vision test report template?
18     A.  Correct.
19     Q.  And beginning on page 13, there's a
20 slide that says "Business Model."  And there are
21 several pages of text, depictions, graphics,
22 information describing the business model.
23     Do you see that?
24     A.  I do.
25     Q.  And from your perspective, what

1 information is being conveyed in these pages about the
2 SoloHealth business model as of February 2008?
3     A.  How if you can educate people on the
4 importance of eye health and visual acuity needs, that
5 you can grow the overall market and drive revenue.
6     Q.  And this -- these are business model
7 concepts for SoloHealth that you prepared?
8     A.  That's correct.
9     Q.  Did anybody assist you in your
10 preparation of this business model planning --
11     A.  Many.
12     Q.  -- for SoloHealth?
13     A.  Many.
14     Q.  And who helped you?
15     A.  Stephen Kendig, maybe Peter Krivkovich,
16 I don't know.  You know, whoever the advisory board
17 members were.  There's a guy, Gary Gerber, some of the
18 early investors likely.  Yeah.  It was very
19 collaborative.  Just asked a lot of questions, so I'm
20 sure there were many people that provided input.
21     Q.  Did Dr. Lavery provide input to you in
22 his performing his responsibilities under the
23 consulting agreement?
24     A.  Yeah.  Likely.
25     Q.  Do you remember any specific

1 contributions from Dr. Lavery in connection with his
2 performance of the consulting agreement?
3     A. Not specific. It might have been market
4 size or how many ophthalmologists there were or an
5 ophthalmologist's role versus an optometrist's role,
6 things like that.
7     Q. I'll give you a document we've marked as
8 Exhibit 33.
9     (Exhibit Number 33 was marked.)
10     Q. (By Mr. Bush) Do you recognize the
11 document we've marked as Exhibit 33, Mr. Foster?
12     A. I do.
13     Q. And can you identify Exhibit 33 for the
14 record?
15     A. It's a thank you note to Andrea Saia,
16 who was current CEO of CIBA Vision on April 14 of
17 2008.
18     Q. And what was your reasoning in sending
19 this thank you note to Andrea Saia?
20     A. To build rapport so we could get the IP
21 signed over from CIBA Vision.
22     Q. Do you remember when you received the IP
23 from CIBA Vision?
24     A. I don't.
25     Q. And you're referring to the patent --

1     A. Correct.
2     Q. -- owned by CIBA Vision for which you
3 were the named inventor --
4     A. Correct.
5     Q. -- correct?
6     A. There was a document of when that was
7 signed over. I just don't know the date.
8     This is so good. Did you get this from
9 her?
10     Q. That's from SoloHealth files.
11     A. I would have copied this?
12     Q. If you want to look at Exhibit 21 that
13 we marked earlier today.
14     A. Okay. Yes.
15     Q. And Exhibit 21 reflects the assignment
16 of the patent from CIBA Vision on August 20 of 2007,
17 correct?
18     A. Yes.
19     Q. Does that refresh your recollection as
20 to the date of the patent assignment in favor of
21 SoloHealth from CIBA Vision?
22     A. No. It's hard to say. So the -- can
23 I -- I'll just talk freely, and then you can --
24     Q. Go ahead.
25     A. -- put the dates together.

1     Q. That's fair. Go ahead.
2     A. So the patent was -- you know, I left
3 October 1.
4     Q. 2007?
5     A. Correct. The agreement stipulated that
6 I had to raise $1.5 million within six months for the
7 patent to be signed over.
8     And I raised that amount, of which Peter
9 Krivkovich and his family were part of that initial
10 seed round. And one of the investors asked questions
11 about the IP and when they did diligence, they
12 realized that the IP wasn't signed over until we
13 raised that money. So they chose to have an escrow
14 agreement that essentially said that their money would
15 go into escrow until which time that the CIBA Vision
16 IP was signed over.
17     In that process, Michael Kehoe, who made
18 the original agreement, who was the CEO of CIBA
19 Vision, got let go. Andrea Saia, who was the chief
20 marketing officer, assumed the CEO responsibility.
21     Andrea learned of Stephen Kendig coming
22 over to join and -- yeah. I'll pause there. I'm --
23 the -- I guess the part that I would say that you
24 could find the dates, but it was quite a bit -- it was
25 after we had already raised the capital, but it took

1 another considerable while to get the IP signed over.
2 Because what happened -- CIBA Vision actually didn't
3 have the authority -- it wasn't their IP. It was
4 Novartis'.
5     Q. In other words, the patent for which you
6 were the named inventor that was filed in 2004 is a --
7 was a patent at that point in time that was owned by
8 Novartis, not CIBA Vision?
9     A. Correct.
10     Q. Is that your testimony?
11     A. CIBA Vision was the parent company of
12 Novartis.
13     Q. CIBA was the parent of Novartis, or was
14 it the other way around?
15     A. No. Sorry. Novartis was the parent of
16 CIBA Vision. And so because of that, Novartis had to
17 approve the IP transfer.
18     Q. And that took some time?
19     A. Yeah.
20     Q. Okay. Understood. All right. Thank
21 you for that clarification.
22     Let's move to Exhibit 33.
23     THE STENOGRAPHER: I believe this is 34.
24     MR. INOSENCIO: 34.
25     MR. BUSH: 34. Thank you.

Page 114

1    (Exhibit Number 34 was marked.)
2    Q.   (By Mr. Bush)  Do you recognize the
3  document we've marked as Exhibit 34?
4    A.   I do.
5    Q.   Can you identify it for the record?
6    A.   It's an article in Forbes titled:
7  "SoloHealth Wins Three Awards, Including 'Best in
8  Show' for EyeSite Innovation at KioskCom Expo."
9    Q.   And what's the date of these awards
10  being handed out in favor of SoloHealth?
11    A.   It was the date of -- the article is
12  April 17 of 2008.
13    Q.   And does this document, we've marked as
14  Exhibit 34, refresh your recollection as to the timing
15  of the first public deployments of the vision acuity
16  kiosk, the EyeSite kiosk?
17    A.   It would have been around the same time.
18    Q.   So sometime in the first quarter of
19  2008, the EyeSite kiosk began to be placed in public
20  retail locations for consumer use?
21    A.   Correct.
22    Q.   And the photograph that is included in
23  Exhibit 34 is a photograph of yourself and Stephen
24  Kendig with the EyeSite kiosk?
25    A.   That's correct.

Page 115

1    Q.   Is there anything from Dr. Lavery that
2  is reflected in this version of the kiosk that is in
3  the photograph in Exhibit 34?
4    A.   No.
5    Q.   We're going to look at Exhibit 35.
6    (Exhibit Number 35 was marked.)
7    Q.   (By Mr. Bush)  Do you recognize the
8  document we've marked as Exhibit 35, Mr. Foster?
9    A.   I do.
10    Q.   Can you identify it for the record?
11    A.   It's the CNBC article entitled:  "First
12  EyeSite Kiosk Debuts in Georgia Walmart" dated 26th of
13  June 2008.
14    Q.   Does Exhibit 35 refresh your
15  recollection as to the date of the first public
16  EyeSite kiosk in a public retail location?
17    A.   It would have been Q2 of 2008.
18    Q.   And that's at a Walmart in Cumming,
19  Georgia, correct?
20    A.   That's correct.
21    Q.   And there's a photograph of the kiosk on
22  Exhibit 35, correct?
23    A.   Yes.
24    Q.   Does that kiosk reflect any ideas or
25  contributions from Dr. Lavery?

Page 116

1    A.   I'm not sure.
2    Q.   Is there any difference between the
3  kiosk that's reflected in Exhibit 35 from the kiosk
4  that's reflected in Exhibit 34?
5    A.   Yes.
6    Q.   And what are the differences?
7    A.   The modular design, the hardware is
8  different.  The -- actually, let me think.
9    No.  Maybe -- it could be the same
10  actually.
11    Q.   I perceive them to be the same.  That's
12  why I asked the question.
13    A.   Yeah.  No.  That's fair.  It's been
14  20 years.  Yeah.  I think they're the same.  We made
15  five, and they were all made by Kiosk Information
16  Systems.  One went to the show so we could win those
17  awards.  That one's in Cumming, Georgia.
18    Q.   The one that went to the show?
19    A.   No.  I think it was a different one.
20  That one has an adjustable seat.  I don't know if the
21  one in the show did or not.
22    Q.   The one that went to Cumming, Georgia
23  went to the Walmart, right?
24    A.   Correct.
25    Q.   And then where did the other three go?

Page 117

1    A.   I'm not sure.
2    Q.   You don't remember?
3    A.   Well, eventually we had five -- in 2008
4  we had five -- roughly five in Walmarts in and around
5  Georgia -- in and around Atlanta.
6    Q.   And looking at the third paragraph of
7  the press article in Exhibit 35, there's a statement
8  that "The EyeSite kiosk is the brainchild of Atlanta
9  entrepreneur Bart Foster."
10    Do you see that?
11    A.   Correct.
12    Q.   Is that a true and correct statement?
13    A.   Yes.
14    Q.   This will be 36.
15    (Exhibit Number 36 was marked.)
16    Q.   (By Mr. Bush)  I'll give you a moment,
17  Dr. -- I'm sorry -- Mr. Foster to look at Exhibit 36.
18    A.   Got it.
19    Q.   Are you able to identify -- do you
20  recognize Exhibit 36?
21    A.   It's dated September 2 of 2008,
22  "Software Architecture Meeting."
23    Q.   Did you prepare the document we've
24  marked as Exhibit 36?
25    A.   No.

1    Q.   Have you seen Exhibit 36 before today?
2    A.   Yes.
3    Q.   Do you know why it was prepared?
4    A.   I don't.
5    Q.   And looking through what we've marked as
6  Exhibit 36, this appears to reflect the current status
7  of the software, perhaps some bug fixes, and version
8  updates to the software in the kiosk as of
9  September 2008; is that correct?
10   A.   It appears so, yes.
11   Q.   And who all was involved in the software
12 architecture upgrades at the point in time of the
13 document we've marked as Exhibit 36?
14   A.   Stephen Kendig and potentially Eric
15 Hoel, spelled O -- sorry -- H-o-e-l.
16   Q.   Any others that you can remember?
17   A.   I'm not aware.  There -- I'm sure there
18 were -- if there was, I'm not sure.
19   Q.   Was Dr. Lavery ever involved in software
20 architecture meetings to your knowledge?
21   A.   No.
22   Q.   Let's look at Exhibit 37.
23       (Exhibit Number 37 was marked.)
24   Q.   (By Mr. Bush)  Do you recognize
25 Exhibit 37, Mr. Foster?

1    A.   No.
2    Q.   Do you believe you've seen this document
3  before today?
4    A.   Yes.
5    Q.   And this document itemizes the
6  SoloHealth Intellectual Property, correct?
7    A.   It appears so, yes.
8    Q.   Do you remember any intellectual
9  property owned by SoloHealth that's not reflected in
10 the descriptive information on Exhibit 37?
11   A.   Can you repeat that?
12   Q.   Do you remember any intellectual
13 property owned by SoloHealth in the 2008 time period
14 that's not reflected in this description information
15 and information on Exhibit 37?
16   A.   No.
17   Q.   To your knowledge, Exhibit 37 is a true
18 and complete listing of the intellectual property
19 owned by SoloHealth in 2008?
20   A.   Yes.
21   Q.   38.
22       (Exhibit Number 38 was marked.)
23   Q.   (By Mr. Bush)  Do you recognize
24 Exhibit 38, Mr. Foster?
25   A.   I do.

1    Q.   And what is this document?
2    A.   It's a "Patent Update" likely intended
3  for investors.
4    Q.   And this document -- dated October 23,
5  2008, correct?
6    A.   Correct.
7    Q.   And it describes SoloHealth as having
8  two main intellectual property assets, correct?
9    A.   That's correct.
10   Q.   And the first is the Lavery patent and
11 the second is the Foster patent?
12   A.   That's correct.
13   Q.   This will be 39.
14       (Exhibit Number 39 was marked.)
15   Q.   (By Mr. Bush)  Do you recognize
16 Exhibit 39, Mr. Foster?
17   A.   Yes.
18   Q.   And this is a continuation to your
19 original patent that was filed in 2004, correct?
20   A.   Correct.
21   Q.   And the continuation that's embedded in
22 Exhibit 39 was filed in February of 2009, correct?
23   A.   That's correct.
24   Q.   And the patent that's marked as
25 Exhibit 39 ultimately issued in May of 2012, correct?

1    A.   Correct.
2    Q.   And you are the named inventor for the
3  patent in the claims that are reflected --
4    A.   Correct.
5    Q.   -- in Exhibit 39, correct?
6    A.   Yes.
7    Q.   This will be 40.
8       (Exhibit Number 40 was marked.)
9    Q.   (By Mr. Bush)  Do you recognize the
10 document we've marked as Exhibit 40?
11   A.   When you say "do you recognize," I'm not
12 sure what you mean.
13   Q.   Have you ever seen the document we've
14 marked as Exhibit 40 before today?
15   A.   I'm sure at some point.
16   Q.   Are you able to identify the document
17 we've marked as Exhibit 40?
18   A.   It appears to be a document written by
19 Stephen Kendig April 23, 2009.
20   Q.   And looking at the third page, it's got
21 a 3 in the bottom right, it describes the "SoloHealth
22 Overview"?
23   A.   Page 3?
24   Q.   Page 3.
25   A.   Yep.

Page 122

1     Q.    With a reference to the 1.8 million in
2  seed capital --
3     A.    Correct.
4     Q.    -- that you testified about earlier --
5     A.    Yeah.
6     Q.    -- correct?
7           And on page 5 is the version of the
8  EyeSite kiosk as of April of 2009, correct?
9     A.    Correct.
10     Q.    And there's a photographic depiction of
11  the kiosk as of April 2009, correct?
12     A.    Yes.
13     Q.    Does that version of the kiosk include
14  any intellectual property or ideas of Dr. Kevin
15  Lavery?
16     A.    I don't know.
17     Q.    And why is it you can't give a clear
18  answer to that?
19     A.    I think I did give a clear answer.
20     Q.    Well, do you remember Dr. Lavery
21  providing any information to you that you used to
22  modify the kiosk --
23     A.    I don't know.
24     Q.    -- in or around early 2009?
25     A.    I don't think so.  I don't know.

Page 123

1     Q.    When you say "I don't know," is it that
2  you don't remember making a modification to the kiosk
3  to account for any information from Dr. Lavery?
4     A.    Yeah.
5           MR. INOSENCIO:  I'm going to object.
6  You're assuming the fact that it would have had to
7  have been modified at some point to include
8  information from Dr. Lavery.
9           And he's already testified he doesn't
10  know.
11           MR. BUSH:  I'm asking whether he
12  remembers, but your objection is noted.
13     Q.    (By Mr. Bush)  Do you remember,
14  Mr. Foster, making any modifications to the kiosk in
15  late 2008 or early 2009 --
16     A.    There were -- there were a ton of
17  modifications made.
18     Q.    I need to finish my question so that our
19  record is clear, and I apologize for that.
20           And I'm asking specifically for your
21  memory about any modifications to the kiosk,
22  specifically to incorporate any information received
23  from Dr. Lavery.
24           Do you have a memory of making any
25  modifications to the kiosk in late 2008 or early 2009

Page 124

1  as a consequence of any information received --
2     A.    Yeah.
3     Q.    -- from Dr. Lavery?
4     A.    Absolutely.
5     Q.    What did you do?
6     A.    I have no idea.
7     Q.    You believe you made modifications based
8  on information from Dr. Lavery, but you don't know
9  what you did?
10     A.    Correct.
11     Q.    How is it that you remember doing it,
12  and you can't describe what you did?
13     A.    It's real easy.  I bet we made 100
14  little modifications.  And it could have been
15  everything from change the button from green to
16  orange.  It could have been make sure the sign is --
17  says free.  Modify the hardware this way.
18           Dr. Lavery and I would talk sometimes
19  every couple weeks; sometimes a couple months would go
20  by.  I didn't take detailed notes of who said what.
21  We were just moving.  We were moving fast.  So I can't
22  clearly determine who said what and what modifications
23  were made.
24     Q.    Understood.  That's fair.
25           And these conversations that you

Page 125

1  describe that you remember having with Dr. Lavery in
2  which he made -- he gave information to you, these are
3  conversations that took place in connection with
4  Dr. Lavery's performance of the consulting agreement;
5  is that correct?
6     A.    Yeah.
7           Could I get copies of all this stuff,
8  Joel?
9     Q.    Sure.  Not a problem.
10     A.    I like the color ones.
11     Q.    All right.
12           MR. INOSENCIO:  Can I just say I wish
13  every witness was this enthusiastic about being in a
14  deposition.
15           THE DEPONENT:  Dude, it's something I
16  invented 20 years ago, and it's like --
17           MR. INOSENCIO:  I get it.  I get it.
18           THE DEPONENT:  It's crazy, man.  Like,
19  you should see this shit.  It's like 20 years ago.  We
20  were 15 years too early.  This shit still should be
21  out there right now.
22           MR. INOSENCIO:  I agree with you.  It
23  should be.
24           THE DEPONENT:  It will be.  It's just we
25  were too early.

32 (Pages 122 - 125)

1    Q.   (By Mr. Bush)  Mr. Foster, while you
2  served as the CEO at SoloHealth, did the company
3  generate revenue from the optical or vision
4  functionality of the kiosk?
5    A.   Yes.
6    Q.   And while you served as CEO at
7  SoloHealth, was Dr. Lavery always paid a 1 percent
8  royalty based on total revenue?
9    A.   I don't recall.
10    Q.   From your perspective and while you were
11  employed as the CEO of SoloHealth, did the company
12  derive any profits from practicing any of the ideas in
13  Dr. Lavery's patent?
14    A.   Indirectly.
15    Q.   And how is that the case?
16    A.   Well, because his patent was written so
17  broadly it covered -- it was -- it was just assumed
18  that, you know, it's part of our intellectual
19  property.  So we never -- we never said, oh, that's
20  covered by that patent, or this is covered by this
21  patent.  It's just -- it's owned by SoloHealth, so it
22  doesn't matter.  We just kept moving.
23    Q.   How would you describe the profitability
24  of SoloHealth while you served as the CEO?
25    A.   Can you be more specific?

1    Q.   I'm just looking for your description of
2  the profitability of the company, the financial state
3  of the company, during the time period that you served
4  as CEO?
5        MR. INOSENCIO:  Objection.  Compound.
6    Q.   (By Mr. Bush)  Was the company
7  profitable during the time period --
8    A.   Yeah.
9    Q.   -- that you served as CEO?
10        Were there time periods during your
11  service of CEO during which the company was unable to
12  make payroll?
13    A.   No.  We were damn close a lot of times,
14  but we never missed a payroll.
15    Q.   And when did you separate from
16  SoloHealth?
17    A.   2014.
18    Q.   And what were the circumstances of your
19  separation from SoloHealth?
20    A.   Say that again.
21    Q.   What were the circumstances -- what were
22  the reasons for your separation from SoloHealth?
23    A.   Peter told me I had to go.  No.  Don't
24  put that on the record.  Sorry.  I mean, that was
25  maybe part of it, but it's -- I needed some levity

1  there.
2        The circumstances -- I'm not sure what
3  you're looking for.
4    Q.   The reasons you came to no longer be
5  employed at SoloHealth.
6        Did it have anything to do with
7  Dr. Lavery's intellectual property --
8    A.   No.
9    Q.   -- or patent?
10    A.   No.
11        MR. BUSH:  I have no further questions
12  at this time.  I've got a couple of additional
13  documents in my room that I'll come back to, but I'll
14  stop here, Bruce.
15        MR. INOSENCIO:  Okay.  Can we take about
16  a ten-minute break so I can kind of go through my
17  notes and see what questions I was planning to ask
18  that you've already covered?
19        MR. BUSH:  Sure.
20        MR. INOSENCIO:  I just want to be more
21  efficient.
22        THE VIDEOGRAPHER:  We are going off the
23  video record at 3:10 p.m.
24        (Recess from 3:10 p.m. to 3:22 p.m.)
25        THE VIDEOGRAPHER:  We are back on the

1  video record at 3:22 p.m.
2        EXAMINATION
3  BY MR. INOSENCIO:
4    Q.   Mr. Foster, you know that I'm the
5  attorney for Kevin Lavery, correct?
6    A.   Correct.
7    Q.   And do you recall speaking to me
8  approximately one year ago relative to this case?
9    A.   Yes.
10    Q.   Before the lawsuit was filed, right?
11    A.   I don't know when the lawsuit was filed.
12    Q.   Okay.  But you do recall speaking to me
13  one time prior to today on the phone, right?
14    A.   Correct.
15    Q.   And we have not spoken since?
16    A.   No.
17    Q.   Can you tell me what you did to prepare
18  for your deposition today, if anything?
19    A.   I found my -- I found two documents last
20  night, which were Exhibit 23 and Exhibit 6 that I
21  brought with me today.  And I looked through a hard
22  drive to see if I had anything else that was relevant,
23  and that was 7:00 a.m. this morning.  And that's it.
24    Q.   Did you have any discussions with either
25  Joel Bush or Ben Richardson or Steve Susser, counsel

Page 130

1   for Pursuant Health, prior to your deposition?
2      A.   Pause a second.  I'm just trying to get
3   a mic hooked up.
4      THE DEPONENT:  This one?
5      Is that all right?  You got it?  Okay.
6   Cool.
7      A.   Will you say that again?  Sorry, Bruce.
8      Q.   (By Mr. Inosencio)  Sure.  Prior to your
9   deposition, did you have any discussions with either
10   Joel Bush, who was taking your deposition today on
11   behalf of the company, or his associate Ben Richardson
12   or their local co-counsel Steve Susser, relative to
13   the topics that would be addressed in the deposition
14   today?
15      A.   Limited.
16      Q.   When did you first speak with them?
17      A.   I want to -- you know, I think Joel may
18   have reached out three months ago to schedule this
19   meeting.  It could have been November.  Ben Richardson
20   doesn't ring a bell.  There might have been some email
21   correspondence.
22      And who was the other person?
23      Q.   Steve Susser.
24      A.   That doesn't -- name doesn't ring a
25   bell.

Page 131

1      Q.   How many telephone conferences did you
2   have with Mr. Bush prior to your deposition today?
3      A.   Two.
4      Q.   And when were those?
5      A.   One was probably November, and one was
6   last night.
7      Q.   And how long did you speak with Mr. Bush
8   approximately the first time you spoke with him back
9   in November?
10      A.   Six minutes.
11      Q.   That seems like a pretty specific
12   answer.  How do you know it was six minutes?
13      A.   Because you gave me the opportunity to
14   say approximately.
15      Q.   Good response.
16      So do you know specifically how much it
17   was, how long it was?
18      A.   No.
19      Q.   Okay.  What about your call with
20   Mr. Bush last night.  Approximately, how long did you
21   speak with Mr. Bush?
22      A.   Four minutes.
23      Q.   Okay.  Did you share any documents with
24   Mr. Bush via email in the last three months?
25      A.   I did not.

Page 132

1      Q.   Did he send you any documents to review?
2      A.   Not that I'm aware, except that subpoena
3   that was delivered.
4      Q.   But no documents to get your input on,
5   correct?
6      A.   Correct.
7      Q.   Were there any documents that you wanted
8   to see, prior to your deposition today, that you
9   either could not find or you asked for and you were
10   denied access to?
11      A.   No.
12      Q.   Did anyone tell you what topics would be
13   discussed in your deposition today, prior to the
14   deposition starting?
15      A.   I don't think so, no.
16      Q.   I'm going to have you take a look at
17   Exhibit 21.  That's the document that you showed me,
18   and I took a screenshot of.  If you could pull that up
19   and take a look at it.
20      A.   Yep.  Got it.
21      Q.   Thank you.  So I'm looking at the
22   document, and in the fourth row it says "Develop full
23   project plan, including timeline resources, budget,
24   et cetera," correct?
25      A.   Correct.

Page 133

1      Q.   Does that date -- it's a little fuzzy on
2   my end, but does that date say July 30, 2007?
3      A.   It does.
4      Q.   And that's shortly after you signed the
5   letter of intent with Dr. Lavery, correct?
6      A.   That date is shortly after I signed the
7   agreement, correct.
8      Q.   Do you have the letter of intent there
9   in front of you?  Could you pull that back up?
10      A.   Which exhibit was that?
11      MR. BUSH:  It's 22.
12      Q.   (By Mr. Inosencio)  22.
13      A.   If I would have kept these in order,
14   we'd be good.
15      Q.   I get it.
16      A.   Sorry.  Hold on.
17      Q.   Not a problem.  Take your time.
18      THE DEPONENT:  Can I get the
19   videographer to help me?  Can you help organize these
20   back in -- the number?  That would be awesome.
21      A.   We're looking for 22?
22      Q.   (By Mr. Inosencio)  Yes, please.
23      MR. BUSH:  It's this one.
24      Q.   (By Mr. Inosencio)  It's the letter of
25   intent that says draft July -- or June 5, 2007, in the

Page 134

1 upper right-hand corner.
2      A.   Yeah.  He found it.
3          THE DEPONENT:  All right.  Thank you.
4      Q.   (By Mr. Inosencio)  Okay.  Great.
5          THE DEPONENT:  Here's the -- thanks.  I
6 appreciate your help.
7      A.   Got it.
8      Q.   (By Mr. Inosencio)  Thank you.
9      A.   Okay.
10     Q.   So in this document, this was a document
11 that you prepared, correct?
12     A.   Either me or my attorneys, but yes.
13     Q.   In looking at --
14     A.   With consultation from Dr. Lavery, it
15 took several iterations, I believe.
16     Q.   So in the letter of intent, there's no
17 reference here to the leverage that you were hoping to
18 gain with CIBA Vision, correct?
19     A.   There's no mention of anything like
20 that, no.
21     Q.   And you also testified earlier today
22 that there was leverage that you were hoping to gain
23 through this process with Dr. Lavery regarding another
24 entity, if I remember correctly; is that correct?
25     A.   I don't recall that.  What was that?

Page 135

1 Another entity?
2      Q.   You testified -- and maybe my notes are
3 incorrect.  But you testified that as part of your
4 efforts to engage Dr. Lavery that you were hoping that
5 this would provide leverage.
6          And I thought you said that there was
7 leverage that you were hoping to obtain relative to
8 CIBA Vision.  I thought you said there was some other
9 aspect of the leverage.  Am I --
10     A.   So --
11     Q.   -- remembering that correctly?
12     A.   So shortly after -- so in January of
13 2007, I was informed that -- in which point I just
14 started my new job, I was informed that -- shortly
15 thereafter that my project had gotten cut, and it was
16 on hold, basically, indefinitely.
17         And during that time I started working
18 on the business plan in earnest and also was flying
19 around the country trying to help CIBA Vision.
20         And it was at that time that I met
21 Dr. Lavery.  And my intention was, if we could do an
22 agreement, I could go back to CIBA Vision and -- with
23 an issued patent and say, Look, I'm going to go do
24 this with this issued patent.  CIBA Vision, I would
25 love you to be part of this.  You contribute your

Page 136

1 patent also, and that's what happened.
2      Q.   Okay.  And the reason I ask the question
3 is because I don't want it to come across in the
4 record as though your use of the word "leverage" had
5 some type of nefarious or underhanded meaning.  That's
6 what I was trying to understand, because that's not
7 how I took it, and I wanted to make sure that the
8 record was clear in that regard.
9      A.   Yeah.  Thank you for clarifying.
10 There's no underhanded -- and I think that -- yeah.
11 That's right.
12     Q.   Okay.  So you meet with Dr. Lavery and
13 you have a discussion with him up here in Jackson,
14 Michigan at the Country Club of Jackson, and you hit
15 it off, right?
16     A.   Yes.
17     Q.   And you had a discussion about maybe
18 what he could bring to the table by way of the patent
19 and other ideas, correct?
20     A.   Correct.
21     Q.   And there's been a significant number of
22 questions that have been lobbed at you relative to
23 whether or not Dr. Lavery brought anything other than
24 the patent, okay?
25     A.   Correct.

Page 137

1      Q.   And you've testified that he had other
2 ideas.  And what I'm trying to understand here is the
3 timing of when those ideas were provided to you and
4 what ideas those encompassed.
5          And the reason that's important is
6 because the questions that you've been asked relate to
7 the consulting agreement, and the information that he
8 provided after he signed the contribution agreement.
9          But he also provided information to you
10 prior to signing the contribution agreement relative
11 to plans for the kiosk, correct?
12     A.   Not much.  It's pretty limited.
13     Q.   Well, he --
14     A.   It was --
15     Q.   In his patent, he had an idea for a
16 retinal scan, right?
17     A.   Yep.
18     Q.   And you knew that prior to entering into
19 the contribution agreement with him --
20     A.   Correct.
21     Q.   -- right?
22         And that's referenced, even in the
23 contribution agreement, as potentially giving him a
24 bump up to 3 percent in the royalty in the event that
25 the retinal scan was developed, right?

Page 138

1    A.   That's correct.
2    Q.   And the retinal scan was never part of
3  any kiosk concept that you had with, quote/unquote,
4  you know, "your baby," as you termed it.  And I -- and
5  I understand the use of the term.
6         But your baby, your version of the
7  kiosk, did not include a retinal scan, right?
8    A.   That's correct.
9    Q.   And the plan was at some point to
10  develop that the retinal scan, if the funding was
11  available and the timing worked out, to be able to do
12  more than what was originally consummated -- or
13  contemplated, with the idea that you had relative to
14  the kiosk and the visual acuity screening aspects of
15  it, correct?
16    A.   There was potential to do that.  That
17  was never my passion.
18    Q.   That was his?
19    A.   Correct.
20    Q.   He was hoping to use a retinal scan
21  feature to scan the same patients that you were hoping
22  to scan for purposes of determining whether or not
23  they had glaucoma --
24    A.   That's right.
25    Q.   -- for example --

Page 139

1    A.   That's right.
2    Q.   -- right?
3    A.   Yes.
4    Q.   And that's not in any of the documents
5  that you have in your patents or your application for
6  patents?  That's not anything that you were bringing
7  to the table?  That was his -- that was his
8  contribution, right?
9    A.   Correct.
10    Q.   And he told you that before you signed
11  any agreements with him relative to the contribution
12  agreements or the consulting agreement, right?
13    A.   Correct.
14    Q.   The discussions that you had with
15  Dr. Lavery after you entered into the letter of
16  intent, those were all subject to the confidentiality,
17  publicity, and nondisclosure provision in paragraph 10
18  of Exhibit 22, right?
19         MR. BUSH:  Object to form.
20    A.   What paragraph?  Sorry.
21    Q.   (By Mr. Inosencio)  Paragraph 10.
22    A.   "Confidentiality, publicity, and
23  nondisclosure."  Correct.  Yes.
24    Q.   Okay.  And so the whole idea of this
25  letter of intent -- well, not the whole idea.  But

Page 140

1  part of the idea of this letter of intent is that the
2  two of you wanted to share information and determine
3  whether or not you can go forward as a team with you
4  holding 90 percent of the company and him holding
5  10 percent of the company in exchange for him
6  providing you with information in addition to what's
7  contained in the patent, right?
8    A.   Correct.
9    Q.   And those are his trade secrets and
10  confidential information, and you treated it as such,
11  right?
12         MR. BUSH:  Object to form.
13    A.   I don't know what that means.
14    Q.   (By Mr. Inosencio)  Well, you weren't
15  taking his information and sharing it with other
16  people that might potentially compete with --
17    A.   No.
18    Q.   -- SoloHealth, right?
19    A.   No.
20    Q.   That would certainly be detrimental to
21  the business, right?
22    A.   Yeah.  Correct.
23    Q.   So anyone that you talked to about these
24  ideas that Dr. Lavery had would have been only in your
25  circle of trust, also subject to some other type of

Page 141

1  confidentiality restriction, right?
2    A.   Most likely, yes.
3    Q.   When you first met with Dr. Lavery, do
4  you recall whether you told him that you had a
5  patent -- or that you had applied for a patent?
6    A.   I do.
7    Q.   What did you -- what's your
8  recollection?
9    A.   That we applied for a patent.  I shared
10  with him the business plan that I had, and he got
11  excited.  He realized that I took it way farther than
12  I think than he ever contemplated, and he was excited
13  to be part of it.
14    Q.   In a nutshell, what was your business
15  plan relative to generating revenue with the visual
16  acuity kiosk when you first met with Dr. Lavery?
17    A.   Initially, it was to obtain referrals --
18  referral fees from doctors and get large retailers,
19  including Walmart and Luxottica, to pay for us to
20  generate referrals or leads to them.
21    Q.   Did he have a similar business model
22  that he discussed with you --
23    A.   No.
24    Q.   -- at the time you were having these
25  initial discussions?

36 (Pages 138 - 141)

Page 142

1      A.   No.
2      Q.   He had a business model -- right? --
3  relative to generating revenue from the kiosk?
4      A.   What was it?
5      Q.   Well, I'm asking you if you recall --
6      A.   No.
7      Q.   -- discussions with him relative to what
8  he intended to do with the retinal scan aspect of the
9  kiosk?
10      A.   I think he contemplated charging to get
11  your, you know, retinal scan, but that was never in my
12  plans or business model.  So if he did project that,
13  it was more future state, and he realized that it
14  would take significant funding and more time to
15  develop what he wanted to.
16      Q.   You said earlier, quote, "I had the
17  impression that because it had been sitting there and
18  no work had been done," and then you went on from
19  there, and you were referring to Dr. Lavery's patent.
20           What did you mean by that?
21      A.   I meant that -- what was the year that
22  he had his patent filed?
23      Q.   Oh, hold on.  I'm looking at all of
24  yours right now.  I'd have to look back.
25      A.   Hold on.

Page 143

1      Q.   I don't have that one in front of me.
2  I've got all yours in front of me.
3           MR. BUSH:  We haven't made that an
4  exhibit.
5           MR. INOSENCIO:  Yeah.  I don't want to
6  misstate it.
7           THE DEPONENT:  Lavery's patent is not in
8  the exhibits?
9           MR. BUSH:  No.  I have it, but it's not
10  an exhibit.
11           THE DEPONENT:  That's all right.
12      A.   I want to say it was eight years or so
13  prior.  So my comment was the first question I asked
14  him on the phone, when we talked before I went to
15  Jackson was:  Have you done anything with this patent?
16           And he said, Well, I've been working
17  with a group out of -- I think it was Australia, but
18  they haven't really gotten any farther.
19           And I asked him some follow-up
20  questions, and to me at least it was clear, that very
21  little, if anything, had been done since the patent
22  was filed.  So my comment was literally nothing had
23  been done relative to commercializing or expanding on
24  that idea further.
25      Q.   (By Mr. Inosencio)  When you received a

Page 144

1  call from Novartis' lawyers in Switzerland, relative
2  to the potential patent infringement, what was the
3  discussion there?
4      A.   "We understand that you are the inventor
5  of the EyeSite patent.  In doing our diligence, we
6  found that there's a patent from an ophthalmologist
7  named Kevin Lavery in Jackson, Michigan.  The patent
8  is not exactly what you intend to do.  However, it's
9  written so broadly that we potentially could be
10  infringing on that patent.  Were you aware?"
11           And that was the extent of that
12  conversation.
13      Q.   And so that concerned you enough to
14  maybe reach out to Dr. Lavery?
15      A.   Two days later.
16      Q.   Did you explain to him, when you first
17  spoke with him or at any time, that the reason you
18  became aware of him was that phone call with Novartis
19  which was alerting you to a potential patent
20  infringement?
21      A.   I did not.
22      Q.   Is there a reason that you did not?
23      A.   I didn't think it was necessary.
24      Q.   Dr. Lavery had discussions with you
25  along the way, prior to entering into the contribution

Page 145

1  agreement that related to the capabilities of the
2  kiosk that were beyond what you initially
3  contemplated, correct?
4      A.   Correct.
5      Q.   He had ideas different from yours,
6  right?
7      A.   Correct.
8      Q.   One of the ideas that Dr. Lavery had
9  related to the internet connectivity aspect of the
10  kiosk, right?
11      A.   Correct.
12      Q.   The kiosk that you developed, either on
13  your own or in connection with these other vendors and
14  with CIBA Vision, was more of a stand-alone that was
15  not going to generate reports that would send data to
16  SoloHealth, then potentially to be distributed on from
17  there to medical providers; is that accurate?
18      A.   That's not correct.
19      Q.   Okay.  Can you explain why it's not
20  correct?
21      A.   Yeah.  We had a software provider early
22  on called Netkey that was introduced to us from Kiosk
23  Information Systems, and their software enabled us to
24  remotely connect into the kiosk.
25           And it did two functions.  One, it

37 (Pages 142 - 145)

Page 146

1 provided realtime reports on if the kiosk was running
2 or not, and we also could update the software
3 remotely. And it enabled us to create a database
4 where we could collect patient identifiable
5 information and then transfer information to a doctor
6 for referrals.
7     Q. But the information that was being
8 gathered under that premise did not include anything
9 for scanning for glaucoma, diabetes, anything of that
10 nature like Dr. Lavery was suggesting; is that
11 correct?
12     A. Correct.
13     Q. So that aspect of what he was offering
14 was different from the concept that you had relative
15 to the visual acuity?
16     A. That's correct.
17         MR. INOSENCIO: Okay. So what I'd like
18 to do, Joel, is share my screen and discuss a couple
19 different documents and make them exhibits that I can
20 forward to you via email.
21         Are you opposed to that at all?
22         MR. BUSH: Yeah. Let me see if I can
23 get into the Zoom so that I can see them.
24         THE DEPONENT: Are we still okay on the
25 video? I'm pulling the screen closer.

Page 147

1         THE VIDEOGRAPHER: It's in the shot, but
2 it's fine.
3         THE DEPONENT: It's good? Okay. Go
4 ahead Joel -- sorry -- Bruce, whenever you're ready.
5         MR. INOSENCIO: Oh, the host has
6 disabled participant screen sharing, so I'll need the
7 host to enable that.
8         THE DEPONENT: I'm working on that.
9         MR. INOSENCIO: Okay.
10         THE STENOGRAPHER: Can we go off the
11 record?
12         MR. BUSH: Yeah.
13         MR. INOSENCIO: Let's go off record,
14 sure. Let's take -- yeah, let's take the time to do
15 that off record.
16         THE VIDEOGRAPHER: We are going off the
17 video record at 3:48 p.m.
18         (Recess from 3:48 p.m. to 3:50 p.m.)
19         THE VIDEOGRAPHER: We are back on the
20 record at 3:50 p.m.
21     A. So I'm looking at a document shared on
22 my screen dated July 6, 2007, at 3:39 p.m. from
23 myself, Bart Foster, to presumably Kevin Lavery, yes.
24         "Hi, Kevin. It was good to catch up
25 with you this afternoon. Attached is a revised LOI

Page 148

1 based on our discussion. Hopefully, we are almost
2 there.
3         "Notice that I left the second part of
4 Clause 5 'as is.' After further reflection, I want to
5 keep things simple. Bottom line is that if we are not
6 going to use your IP, then you should not be prevented
7 from taking it elsewhere.
8         "Please call me if you want to discuss
9 further.
10         "Regards, Bart."
11         MR. INOSENCIO: Joel, I've marked that
12 as Exhibit 41, so I'll be certain to email you a copy
13 of that when we wrap up today, okay?
14         MR. BUSH: Great.
15         (Exhibit Number 41 was marked.)
16     Q. (By Mr. Inosencio) So my question to
17 you relative to Exhibit 41, Mr. Foster, is there were
18 discussions between the two of you that led to
19 modifications to the letter of intent, correct?
20     A. Yes.
21     Q. In other words, you didn't just sign the
22 first version. You were having discussions back and
23 forth about what the letter of intent should or should
24 not include --
25     A. That's --

Page 149

1     Q. -- right?
2     A. -- correct.
3     Q. And eventually you settled on a letter
4 of intent that reflected the requirement of
5 confidentiality and nondisclosure, right?
6     A. Correct.
7     Q. And there's a reference in this
8 document, Exhibit 41, to Kevin Lavery's IP, right?
9     A. Yes.
10     Q. And from an intellectual property
11 standpoint, you understood that there was more to what
12 Kevin Lavery was bringing to the table than just his
13 patent, right?
14     A. I'm not sure what you're referring to.
15     Q. Well, he's sharing ideas with you
16 relative to how he sees the kiosk rolling out,
17 regardless of whether those ideas were implemented or
18 approved at some point or funded at some point.
19     A. Sure.
20     Q. He was bringing other ideas to you,
21 right?
22     A. He had tons of ideas.
23     Q. Let's go to 42.
24         (Exhibit Number 42 was marked.)
25     A. Okay.

38 (Pages 146 - 149)

Page 150

1    Q.  (By Mr. Inosencio)  So let me read this
2  to you.  Let me read this in the record.
3    A.  Great.
4    Q.  So -- and I want to make sure you can
5  see it, and if not, I can expand it.
6       But this is an email from you to
7  Dr. Lavery and his attorney, Tom Spillane, and copied
8  on it is Jeffrey Leavitt and Brian Gordon.  And they
9  were your attorneys at DLA Piper; is that fair?
10   A.  That's correct.
11   Q.  And this is an email from you with a
12  subject line of "Revised Contribution Agreement,"
13  right?
14   A.  Correct.
15   Q.  Dated Sunday, August 19, 2007, at
16  5:00 p.m., right?
17   A.  Yes.
18   Q.  And in here you are saying to Tom and
19  Kevin "please find attached a revised contribution
20  agreement," right?
21   A.  Yes.
22   Q.  Okay.  And attached to that email is an
23  agreement, contribution agreement.
24      Do you see that here?
25   A.  Yes.

Page 151

1    Q.  In the upper right corner, there's a
2  reference to DLA Piper Draft August 15, 2007.
3      Do you see that?
4    A.  I do, yes.
5    Q.  And in the bottom left corner of that
6  document, there's a reference to the file name BALT,
7  as in Baltimore, 1\4362547.2.
8      Do you see that?
9    A.  Yes, I do.
10   Q.  Do you see also up here at the very top
11  of Exhibit 42, the document that's referenced as being
12  attached is number 4362547v2?
13   A.  Yes.
14   Q.  Which would suggest to you that this is
15  the email and attachment that go together, correct?
16   A.  I don't know.
17      MR. INOSENCIO:  By the way, Joel, that
18  is Exhibit 42.  I'll send that to you via email as
19  well.
20      MR. BUSH:  Thank you.
21      MR. INOSENCIO:  It's 12 -- yeah, 12
22  pages long there.
23      Let's go to Number 43.
24      (Exhibit Number 43 was marked.)
25   Q.  (By Mr. Inosencio)  Mr. Gordon,

Page 152

1  Mr. Brian Gordon, was your attorney through this
2  transaction, right?
3    A.  DLA Piper was our attorney.
4    Q.  And Mr. Gordon was your primary contact?
5    A.  Either him or Jeff Leavitt.
6    Q.  And they were working at your direction,
7  right?
8    A.  That's correct.
9    Q.  So this -- part of this, there's a
10  document up here that was forwarded on to -- it's
11  another email account.  But this says Brian Gordon
12  sent this email on October 6, 2007, at 2:41 p.m.
13      Do you see that?
14   A.  I do, yes.
15   Q.  And it was sent to Mr. Lavery -- or,
16  excuse me, Dr. Lavery, Tom Spillane, and to
17  Dr. Lavery, and you were copied on it and so was Jeff
18  Leavitt, the other attorney at DLA Piper that was
19  working with you, correct?
20   A.  Correct.
21   Q.  And this is Saturday, October 6, 2007,
22  and the email states:  "Please find attached revised
23  agreements reflecting all comments to date which
24  should be final."
25      Do you see that?

Page 153

1    A.  Yes.
2    Q.  Were you aware of any further changes
3  that needed to be made between Saturday, October 6 and
4  the following week when the documents were signed?
5    A.  I don't know.
6    Q.  If you go to the consulting agreement,
7  Exhibit 29 --
8    A.  Exhibit 29.  Got it.
9    Q.  -- you signed that document, right?
10   A.  Just a second.
11      Correct.  Yes.
12   Q.  And what's the date of your signature?
13   A.  I don't see a date.
14   Q.  Okay.  What's the date -- is
15  Dr. Lavery's signature on the version of the document
16  you're looking at in Exhibit 29?
17   A.  Yes.  October --
18   Q.  Is Dr. --
19   A.  -- 11, 2007.
20   Q.  October 11, which was a Thursday, so
21  five days later.
22      So what I'm wondering here is if this
23  email in Exhibit 43 is sent in an attached and revised
24  agreement that are reflecting all comments to date
25  which should be final, would you expect your attorney

Page 154

1 to alert you to additional revisions before anyone
2 signed the document?
3      A.  Of course.
4      Q.  Okay.  In this document, there's a
5 reference to the contribution agreement.
6          Can you see that right here?  I'm
7 putting my cursor under . . .
8      A.  Yes.
9      Q.  And it's Number 4362547, version 7.
10      A.  Okay.
11      Q.  Is there a reference to the document
12 that you have in front of you as Exhibit 29 in the
13 bottom left corner of the consulting agreement?
14      A.  There is.
15      Q.  And can you read that number into the
16 record?
17      A.  It's BALT --
18      Q.  1?
19      A.  -- 1\4389946.3.
20      Q.  Okay.  And you're looking at the
21 contribution agreement or consulting agreement?
22      A.  Consulting agreement.
23      Q.  Okay.
24      A.  Exhibit 29.
25      Q.  Okay.  Now let's look at the

Page 155

1 contribution agreement, Exhibit 26.
2      A.  Okay.
3      Q.  If the contribution agreement was part
4 of this email as well, which suggests that these are
5 the revised agreements reflecting all comments to date
6 which should be final, if there were changes made
7 between the time that this was sent on October 6 until
8 the time that the closing was held, October 11, five
9 days later in Atlanta, would you expect your attorney
10 to alert you to those revisions as well?
11      A.  Yes.
12      Q.  The document that you're looking at
13 right now, what's the title of that document?
14      A.  Contribution agreement.
15      Q.  That's Exhibit 26, right?
16      A.  Correct.
17      Q.  And does it have a document number in
18 the bottom-left corner?
19      A.  It does.
20      Q.  And can you read that into the report?
21      A.  Balt1, backslash, 4362547.8.
22      Q.  Thank you.
23          Showing you know Exhibit 44.
24          (Exhibit Number 44 was marked.)
25      Q.  (By Mr. Inosencio)  This is the

Page 156

1 contribution agreement.  I'll scroll through here
2 quickly just so you can see.  We'll get to the
3 signature page here.
4          Okay.  This is the version bottom left
5 corner BALT1/4362547.7?
6      A.  Yeah.
7      Q.  Do you see that?
8      A.  I do.
9      Q.  Bottom left corner here?
10      A.  Yes, I do.
11      Q.  Okay.  Thank you.
12          I would like to direct your attention to
13 page 2 of the contribution agreement, which I have on
14 the screen here.
15      A.  Okay.
16      Q.  In Section 1.2 there's a discussion
17 regarding the royalty associated with the intellectual
18 property.
19          Do you see that?
20      A.  I do.
21      Q.  And in this document in Section 1.2 (a),
22 do you see that it states, quote, "As additional
23 consideration for the contribution, subject to
24 Section 1.2 (b), the company hereby agrees to pay
25 Lavery, or his assignee, a perpetual royalty (the

Page 157

1 'royalty') on a quarterly basis of 1 percent (the
2 'royalty percentage') of the company's net domestic
3 sales of products for the prior quarter; provided that
4 at the time that the company first receives net
5 domestic sales from retinal camera products, the
6 royalty percentage shall be increased to 3 percent;
7 and provided further that no royalties shall be
8 payable pursuant to Section 1.2 or Section 1.3 prior
9 to the first anniversary of the launch date (and no
10 royalty shall accrue for any net domestic sales of
11 products made prior to the first anniversary of the
12 launch date)."
13          Did I read that into the record properly
14 relative to what's on the screen here in Exhibit 44?
15      A.  Yes.
16      Q.  There was a discussion, wasn't there,
17 before this document was signed relative to the
18 1 percent royalty and the 3 percent royalty, correct?
19      A.  Correct.
20      Q.  And the 3 percent royalty was tied
21 specifically to whether or not the retinal camera
22 scan -- excuse me -- the retinal camera products would
23 become part of the kiosks, right?
24      A.  Correct.
25      Q.  The reason I showed you the earlier

40 (Pages 154 - 157)

1 email is because you referenced that in the event
2 Dr. Lavery's IP wasn't used that he should be able to
3 take it back.  Is that part of what was happening here
4 with this 3 percent, the retinal scan, and that
5 percentage?
6      A.   I don't know.
7      Q.   Okay.  With respect to the 1 percent
8 royalty, the word "perpetual" is included in this
9 version of the agreement on the screen.
10         Do you see that?
11     A.   Yes.
12     Q.   Right here?
13     A.   Yes.
14     Q.   Is the word "perpetual" included in the
15 version that you have in front of you?
16     A.   Exhibit 26?
17     Q.   Yes.
18     A.   Yes.
19     Q.   What does the word "perpetual" mean to
20 you?
21     A.   Ongoing.
22     Q.   Okay.  And that's what you thought it
23 meant when Mr. Gordon inserted the word "perpetual"
24 into the agreement after Kevin Lavery wanted a forever
25 royalty, right?

1      A.   Correct.
2           MR. INOSENCIO:  I have no further
3 questions.
4           MR. BUSH:  Just a quick follow-up on my
5 part.
6           FURTHER EXAMINATION
7 BY MR. BUSH:
8      Q.   Mr. Inosencio asked you some questions,
9 Mr. Foster, about ideas that Lavery had before
10 execution of the contribution agreement.
11         Do you remember those questions?
12     A.   Yes.
13     Q.   Are you able to identify today --
14 specifically identify any ideas that Dr. Lavery
15 provided to you before the execution of the
16 contribution agreement?
17     A.   No.
18         MR. BUSH:  No further questions.
19         MR. INOSENCIO:  I have no further
20 questions.  I will send Exhibits 41 through 44
21 directly to you, Joel.  Do you want the court reporter
22 to have copies also?
23         MR. BUSH:  Yeah.  That would really be
24 best because we'll want to make them a part of this --
25         MR. INOSENCIO:  Right.

1           MR. BUSH:  -- transcript, so --
2           MR. INOSENCIO:  Yeah.
3           MR. BUSH:  -- I'll make sure she gets
4 them if you send them to me.
5           But if you've got her contact
6 information, that will save me the hassle since I'm
7 traveling.
8           MR. INOSENCIO:  Let's go ahead and end
9 the record.
10          THE VIDEOGRAPHER:  We are off the record
11 at 4:06 p.m., and this concludes today's testimony
12 given by Bart Foster.
13          (Discussion held off the record.)
14          THE STENOGRAPHER:  Mr. Bush, you have a
15 standing order that you've submitted to Veritext,
16 correct, and you'd like a rough draft?
17          MR. BUSH:  I'd like a rough.  I need to
18 confirm with my paralegal about our standing order.
19          (Discussion held off the record.)
20          THE STENOGRAPHER:  Would you like to
21 order the transcript?
22          MR. INOSENCIO:  Oh, yes, please.
23          THE STENOGRAPHER:  And would you like a
24 rough draft as well?
25          MR. INOSENCIO:  Yes, please.

1           (Signature not requested.)
2              *  *  *  *  *  *  *
3           WHEREUPON, the foregoing deposition was
4 concluded at the hour of 4:08 p.m. on
5 January 13, 2023.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

41 (Pages 158 - 161)

Page 162

1    REPORTER'S CERTIFICATE

2

3        I, Jennifer Bajwa Melius, a Verbatim

4  Stenographic Reporter and Registered Professional

5  Reporter, do hereby certify that previous to the

6  commencement of the examination, the witness was duly

7  sworn by me to testify the truth in relation to

8  matters in controversy between the said parties; that

9  the said deposition was taken in stenotype by me at

10  the time and place aforesaid and was thereafter

11  reduced to typewritten form by me; and that the

12  foregoing is a true and correct transcript of my

13  stenotype notes thereof.

14        That I am not an attorney nor counsel

15  nor in any way connected with any attorney or counsel

16  for any of the parties to said action nor otherwise

17  interested in the outcome of this action.

18        IN WITNESS WHEREOF, I have hereunto set

19  my hand on this day, January 27, 2023.

20

21

22        *Jennifer Melius*

          Jennifer Bajwa Melius

23        Registered Professional Reporter

24

25

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Bart Foster January 13, 2023
Lavery, MD., Kevin T. Vs. Pursuant Health, Inc.

[& - 2006] Page 1

| & | 10:48 1:19 7:3 | 148 6:1 | 2 |
|---|---|---|---|

**&** 4:1

**0**

**05** 63:3

**1**

**1** 3:7 4:1,15 5:8
7:9 10:2,4,6
11:20,22 14:10
14:11 15:1,5
31:23 89:10
108:5 112:3
126:7 151:7
154:18,19
157:1,18 158:7
**1.1** 90:21
**1.2** 156:16,21
156:24 157:8
**1.3** 157:8
**1.5** 112:6
**1.8** 122:1
**10** 3:7,9,20
13:6,7 17:9
38:5,6,10,14,19
38:24 39:4
56:23,24 57:1
57:7,8,13,16
139:17,21
140:5
**100** 124:13
**104** 5:4
**106** 5:5
**10613** 1:4 7:15
**107** 5:7

**11** 3:21 40:2,3
40:6,21 42:8
95:23 153:19
153:20 155:8
**110** 5:9
**1100** 2:8
**114** 5:11
**115** 5:14
**117** 5:15
**118** 5:17
**119** 5:18
**11:45** 45:3,4
**11:56** 45:4,6
**12** 3:23 45:9,10
45:15,16,22
46:4,18 47:23
48:9,13 151:21
151:21
**120** 5:20
**121** 5:21
**129** 3:4
**12:49** 80:20,21
**13** 1:11,19 3:10
4:1 7:3 48:21
48:22,24 49:2
49:21 50:4,10
51:2 108:19
161:5
**13th** 1:18 7:17
**14** 4:3 5:9 51:9
51:10,12,14,20
51:25 52:18
92:25 93:1
110:16

**148** 6:1
**149** 6:3
**15** 4:5,21 6:3
31:2 44:20
49:5 52:23,24
53:1,4,11,11
125:20 151:2
**151** 6:6
**155** 6:8
**159** 3:3
**16** 4:7 53:15,16
53:18,20,24
54:7
**17** 4:9 54:18,19
54:25 55:8
56:6 57:12,12
57:15,18,20
59:6 60:21,22
61:1,4 114:12
**18** 4:3,10 5:4
63:7,8,10,13,20
63:23 64:4,9
64:18 65:8
81:20,20 82:13
104:21
**19** 4:12 6:4
26:19 69:2,3,5
69:7,13 70:22
71:7 150:15
**1993** 10:22
**1997** 10:24
11:4
**1:58** 80:21,25

**2** 3:9 5:16
10:11,12,14,16
12:10 20:6
31:5,25 73:10
80:24 89:10
117:21 156:13
**2.1** 72:24
**20** 3:11 4:14
35:16 55:4
65:9 72:2,3,5
72:11,18 74:23
75:4 104:15
111:16 116:14
125:16,19
**20/20** 14:18
**2000** 11:2,16
**2001** 12:10,12
**2002** 11:17
12:16
**2004** 12:17
13:7 14:10,11
15:1,5 17:6,7,9
17:17 18:7,14
19:2,8 22:3
23:18,22,24
25:1,18,21,24
25:25 28:3
29:16 54:15
56:14 67:19,22
113:6 120:19
**2006** 3:12,13,16
3:21,24 4:4,9
4:11,20 20:25
21:4 22:16

23:5,23 26:9
28:9 30:3
35:16 37:11,13
40:8,14 42:17
43:14 45:19
47:4 48:18
49:5 50:14,19
51:6 54:2,4,11
54:12 59:17
61:17,24 63:2
63:4,15 68:4,7
68:10,13 69:10
69:14 71:22,24
76:19,22 81:6
81:12,21 82:15
84:6,7 85:12
**2006-04-20**
35:9
**2007** 4:6,21,23
5:4,6 6:1,3,4,6
6:7 11:20,22
12:13 43:19,21
43:25 44:2,6
44:16 53:12,13
71:22,24 74:23
75:4 82:20
83:1,10,14
84:6,8 85:6
86:6 95:23
104:21 107:6
111:16 112:4
133:2,25
135:13 147:22
150:15 151:2
152:12,21

153:19
**2008** 5:8,10,16
5:19 108:5
109:2 110:17
114:12,19
115:13,17
117:3,21 118:9
119:13,19
120:5 123:15
123:25
**2009** 5:23 13:7
120:22 121:19
122:8,11,24
123:15,25
**2012** 120:25
**2013** 103:1
**2014** 127:17
**2023** 1:11,19
7:3 161:5
162:19
**21** 4:17 69:10
69:14 74:16,17
74:19 75:1
111:12,15
132:17
**2115** 1:18 7:16
**22** 3:13 4:5,18
76:4,5,7 78:23
84:14 87:11
90:11 94:12,13
95:8 133:11,12
133:21 139:18
**23** 3:12,24 4:19
5:19,23 20:25
45:19 81:12,17

82:16 84:20,22
120:4 121:19
129:20
**24** 3:13 4:21
22:16 23:5
37:11,13 87:15
87:16,18,25
88:2
**24173** 162:22
**25** 3:14 4:22
88:24,25 89:2
89:4,16,25
**26** 4:24 90:3,4
90:7,9 95:12
155:1,15
158:16
**26th** 115:12
**27** 4:9,23 5:1
92:18,19,21
95:13,16
162:19
**28** 3:21 5:2
95:18,19,21,22
95:24 96:16
**2800** 2:8
**29** 3:15 5:3
96:23,24 97:20
98:7 101:15
107:6 153:7,8
153:16 154:12
154:24
**29-30** 5:6
**2:22** 1:4 7:15
**2:41** 152:12

| **3** |
|---|

**3** 3:10 12:25
13:1,3,13,22
16:9 48:1,2
89:11 105:9
121:21,23,24
137:24 157:6
157:18,20
158:4
**30** 5:4 59:18
60:7 104:9,10
104:13,19,25
105:22 133:2
**30309** 2:8
**31** 5:5 106:24
106:25 107:2
107:17
**3169** 8:20
**32** 3:17 5:7
107:20,21,25
108:2,7,10,13
**33** 3:18 5:9
110:8,9,11,13
113:22
**34** 5:11 113:23
113:24,25
114:1,3,14,23
115:3 116:4
**35** 5:14 115:5,6
115:8,14,22
116:3 117:7
**350,000** 42:17
**36** 5:15 117:14
117:15,17,20
117:24 118:1,6

Bart Foster | January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

[36 - access] | Page 3

118:13
**37** 5:17 118:22
118:23,25
119:10,15,17
**38** 3:20 5:18
119:21,22,24
**39** 5:20 120:13
120:14,16,22
120:25 121:5
**3:10** 128:23,24
**3:22** 128:24
129:1
**3:39** 147:22
**3:48** 147:17,18
**3:50** 147:18,20

**4**

**4** 3:11 20:6,19
20:20,22 22:22
35:10 67:6
105:9
**40** 3:21 5:21
121:7,8,10,14
121:17
**404** 2:9
**41** 6:1 148:12
148:15,17
149:8 159:20
**42** 6:3 149:23
149:24 151:11
151:18
**43** 6:6 151:23
151:24 153:23
**4362547** 154:9
**4362547.2.**
151:7

**4362547.7** 6:9
**4362547.8** 4:25
**4362547.8.**
155:21
**4362547v2**
151:12
**4389946.3.**
154:19
**44** 6:8 155:23
155:24 157:14
159:20
**45** 3:23
**48** 4:1
**49201** 2:4
**4:06** 160:11
**4:08** 161:4

**5**

**5** 3:13,16 22:9
22:10,12,14,20
22:24 30:3
88:9 94:12,13
122:7 133:25
148:4
**50** 59:19
**51** 4:3
**517** 2:4
**52** 4:5
**53** 4:7
**54** 4:9
**5:00** 150:16

**6**

**6** 3:14 6:1,6
25:3,13 26:5
26:16,19 45:11

46:19,21 81:19
82:21 129:20
147:22 152:12
152:21 153:3
155:7
**6-05-07** 4:18
**63** 4:10
**68** 92:25 93:1,3
**69** 4:12
**6th** 6:2

**7**

**7** 3:15 29:21,22
29:24 30:1,15
30:15,16,18,25
30:25 31:11,11
31:19,20 32:17
32:17,20,20
82:21 154:9
**7,614,747** 3:10
**72** 4:14
**74** 4:17
**740** 2:3
**750,000** 85:21
**76** 4:18
**796-1444** 2:4
**7:00** 129:23

**8**

**8** 3:3,17 6:7
32:10,11,13
**8,182,091** 5:20
**80302** 7:17
**80304** 8:21
**81** 4:19

**815-6500** 2:9
**87** 4:21
**88** 4:22
**8th** 8:20

**9**

**9** 3:18 33:3,4,6
33:8,24 34:16
34:20 37:6,16
38:2 108:12
**90** 4:24 83:24
83:25 140:4
**92** 5:1
**95** 5:2
**96** 5:3

**a**

**a.m.** 1:19 7:3
45:3,4,4,6
129:23
**abby** 58:11,14
58:17
**abby's** 58:23
**ability** 26:22
**able** 16:23 24:2
35:3 45:14
51:14 57:4
79:4 117:19
121:16 138:11
158:2 159:13
**above** 46:6
**absolutely**
44:22 124:4
**accept** 27:7
**access** 132:10

**accomplish** 18:17 33:18

**account** 12:17 12:22 103:16 123:3 152:11

**accrue** 157:10

**accurate** 29:6 41:5 44:18 51:24 67:13 94:21 95:3,4 145:17

**achieved** 67:5

**acquire** 79:4,6

**acquired** 94:1

**acquiring** 79:17

**action** 3:8 7:23 162:16,17

**actually** 16:12 17:11 25:24 54:11 56:16 64:14 69:17 81:22 82:3 83:8 89:18 105:1,6 113:2 116:8,10

**acuity** 16:5,9 17:15 19:3,24 26:11 29:15 30:12 33:21 36:17 37:2,9 37:19 41:4,23 42:6 43:7 44:11,17 45:25 49:9,14 50:20

52:4 53:9 54:1 54:9,13 55:12 61:21 64:11,20 64:23 65:5 77:18,23 78:2 82:17 92:4 109:4 114:15 138:14 141:16 146:15

**addition** 140:6

**additional** 24:10 28:21 81:2 128:12 154:1 156:22

**address** 8:18

**addressed** 130:13

**adjustable** 116:20

**administer** 7:22

**administered** 36:12

**advertising** 66:14

**advisory** 5:7 108:5 109:16

**affiliations** 8:3

**affirmed** 8:11

**aforesaid** 162:10

**afternoon** 147:25

**agenda** 5:6

**ago** 35:18 57:4 87:8 125:16,19 129:8 130:18

**agree** 7:8 36:20 95:7 102:16 125:22

**agreed** 102:18

**agreement** 3:16 4:24 5:3 6:5,8 30:5,9 34:8 80:10 88:18 90:5,10,16 91:5,9,15,15,19 91:23 92:7,11 92:15 93:4,15 94:4,10 96:2 96:10,13 97:21 97:22,25 98:3 98:7,12,13,21 100:15,17 101:14 102:8,9 102:23 103:13 104:2 109:23 110:2 112:5,14 112:18 125:4 133:7 135:22 137:7,8,10,19 137:23 139:12 145:1 150:12 150:20,23,23 153:6,24 154:5 154:13,21,21 154:22 155:1,3 155:14 156:1 156:13 158:9

158:24 159:10 159:16

**agreements** 6:7 88:12 92:2 139:11,12 152:23 155:5

**agrees** 156:24

**ah** 16:18

**ahead** 47:12 84:17 93:21 111:24 112:1 147:4 160:8

**alert** 154:1 155:10

**alerting** 144:19

**allegation** 93:3 93:12 94:20,24 95:8

**alleged** 101:21 102:2

**allow** 16:13 27:10,17 29:11 48:4 66:25

**allows** 29:4

**america** 42:20 62:4

**american** 83:8 98:25

**amount** 112:8

**analysis** 27:25

**andino** 28:12 28:15

**andrea** 110:15 110:19 112:19 112:21

**anniversary** 157:9,11

**answer** 9:3,9 122:18,19 131:12

**answers** 9:2

**anybody** 109:9

**anyway** 31:6 94:2

**apologize** 123:19

**appear** 34:1 35:12 87:21 107:18

**appearance** 8:1

**appearances** 2:1 8:2

**appearing** 99:18,20

**appears** 31:3 33:12 49:23 51:15 53:4 89:6 90:2 118:6,10 119:7 121:18

**application** 139:5

**applied** 141:5,9

**appointment** 27:5 66:12

**appreciate** 134:6

**approach** 34:4 35:20,22 36:3

**appropriate** 1:15 46:8

**approval** 46:6

**approve** 113:17

**approved** 85:16,22 149:18

**approximately** 129:8 131:8,14 131:20

**april** 3:16 5:9 5:23 30:3 35:16 37:11,13 84:1,18 86:6 110:16 114:12 121:19 122:8 122:11

**architecture** 5:15 117:22 118:12,20

**areas** 27:24 52:13

**argue** 94:2

**article** 5:11,14 114:6,11 115:11 117:7

**articulated** 22:3

**asda** 14:14

**aside** 85:14

**asked** 77:10 89:21 109:19 112:10 116:12 132:9 137:6 143:13,19

159:8

**asking** 9:24 42:9 61:2 101:22 123:11 123:20 142:5

**aspect** 17:11 135:9 142:8 145:9 146:13

**aspects** 13:25 17:14 19:5 138:14

**assess** 16:13,23 29:4,11 47:6 47:13

**assets** 120:8

**assign** 46:8 75:25 86:12,14

**assigned** 75:17 75:22

**assignee** 156:25

**assignment** 5:2 12:15 75:10 88:18,20,21 90:17 91:6,10 91:16 95:22,25 96:6,14,18 111:15,20

**assist** 37:8 64:19 71:9 109:9

**assistance** 16:14

**associate** 130:11

**associated** 156:17

**association** 5:23 99:1

**assume** 9:9 37:12 44:2

**assumed** 43:21 44:5,16 112:20 126:17

**assuming** 123:6

**assurance** 52:1 52:11,17 53:5

**atlanta** 2:8 90:23 117:5,8 155:9

**attached** 147:25 150:19 150:22 151:12 152:22 153:23

**attachment** 151:15

**attachments** 6:3

**attend** 91:1

**attention** 156:12

**attorney** 8:4,6 78:7 129:5 150:7 152:1,3 152:18 153:25 155:9 162:14 162:15

**attorneys** 77:6 134:12 150:9

**attracting**
73:14
**audience** 73:12
**audio** 7:6
**august** 3:24
4:21,23 6:3,4
45:19 67:22
111:16 150:15
151:2
**australia**
143:17
**author** 51:18
**authority** 113:3
**authorized**
7:21
**automated**
4:10 18:19
26:21 27:23
63:16
**autorefractor**
26:25 27:13
28:23 29:1,2
**available** 42:17
66:11 138:11
**avenue** 2:3
**awards** 5:11
114:7,9 116:17
**aware** 77:9,10
80:16 118:17
132:2 144:10
144:18 153:2
**awareness**
15:23 73:24
**awesome**
133:20

**aziz** 41:12,15
41:19 61:23
81:24

**b**

**b** 58:11 156:24
**b2** 3:10 5:20
**baby** 56:1,3,5
58:4 138:4,6
**bachelor** 11:5,6
**back** 14:15
16:20 19:6
24:23,24 25:11
25:12,23 26:6
34:19,22 45:5
45:7 59:20
60:9 62:4,12
62:17 71:6
72:21 80:25
81:1 82:22
83:7 97:17
99:12 128:13
128:25 131:8
133:9,20
135:22 142:24
147:19 148:22
158:3
**background**
10:19 46:10
47:25
**backside** 57:19
**backslash**
155:21
**backup** 84:23
**bad** 9:19

**baf** 1:4 7:15
**bajwa** 1:20
162:3,22
**balt** 151:6
154:17
**balt1** 4:25 6:9
155:21
**balt1/436254...**
156:5
**baltimore**
151:7
**barcode** 27:6
**barcoded** 27:8
**bart** 1:10,16
3:9 7:10 8:10
8:17 13:10
22:17,18 25:17
36:21 43:2
45:18 80:24
97:10 99:12
117:9 147:23
148:10 160:12
**base** 31:5
**based** 36:11,16
46:7 51:4 67:1
94:15 95:1
104:2 124:7
126:8 148:1
**basically** 50:23
105:6 135:16
**basis** 157:1
**bear** 105:4
**began** 114:19
**beginning** 7:9
8:3 10:19

12:16 82:20
108:19
**behalf** 2:2,6 8:9
68:24 130:11
**belief** 22:4
**believe** 21:8
28:15 36:3
65:6 72:7
85:19 86:6
94:20,24 95:13
113:23 119:2
124:7 134:15
**bell** 130:20,25
**ben** 129:25
130:11,19
**beneficial**
85:24
**benefitted**
16:22
**benjamin** 8:17
**bergenske**
51:21
**best** 5:11 59:20
65:1 74:25
114:7 159:24
**bet** 124:13
**beta** 54:4
**better** 60:13
**beyond** 145:2
**big** 15:19 82:24
87:2
**bigger** 32:2
**bio** 44:20
**birmingham**
14:12 15:4

**bit**  56:17 82:8
   83:17 85:4
   87:19 112:24
**blackboard**
   16:16
**blue**  61:6
**board**  5:7
   14:19 99:7,10
   99:11 108:5
   109:16
**boats**  15:18
**boes**  58:11,15
   58:17
**booked**  27:5
**booth**  34:3
   89:13
**bottom**  21:16
   65:9 67:6
   121:21 148:5
   151:5 154:13
   155:18 156:4,9
**boulder**  1:18
   7:17 8:20 51:4
**boulderado**
   1:18
**bouncing**  31:4
**box**  32:16,20
   32:25 55:18
**brainchild**
   117:8
**brainstorm**
   15:25
**brainstorming**
   14:13 15:11
   24:5,9 28:13

**brand**  29:10,14
   60:1 61:11,12
**branding**  59:7
   59:14 61:5,10
**break**  44:21
   128:16
**breakdown**  4:2
**brian**  150:8
   152:1,11
**briefly**  8:24
   10:18 37:15
**bring**  136:18
**bringing**  139:6
   149:12,20
**britain**  19:17
**broad**  23:15,25
**broaden**  24:2
   24:11
**broader**  44:13
**broadly**  77:8
   126:17 144:9
**brought**  129:21
   136:23
**bruce**  2:2,5 8:8
   81:8 128:14
   130:7 147:4
**bsba**  11:8
**buckets**  49:24
**buddy**  97:12
**budget**  43:24
   82:5 85:16,17
   85:22 86:1
   132:23
**bug**  118:7

**build**  44:7,9
   86:10 110:20
**building**  86:11
   86:13
**built**  26:24
   28:22 29:1
   85:25 89:22
**bulb**  87:7
**bullet**  88:12
**bump**  137:24
**bush**  2:7 3:3
   8:5,6,14 10:5
   10:15 11:9
   13:2 20:21
   22:11 25:2,7
   25:10,12,16
   26:4 29:23
   31:7 32:12
   33:5 38:9 40:4
   44:22 45:1,7
   45:13,14 48:23
   51:11 52:25
   53:17 54:6,24
   62:10 63:9
   69:4 72:4
   74:18 76:6
   80:17 81:1,11
   81:19 87:17
   89:1 90:6
   92:20 95:12,17
   95:20 97:3,5
   97:17,19 99:3
   99:7,14,20,23
   100:3 103:8,12
   104:12 107:1

   107:24 110:10
   113:25 114:2
   115:7 117:16
   118:24 119:23
   120:15 121:9
   123:11,13
   126:1 127:6
   128:11,19
   129:25 130:10
   131:2,7,20,21
   131:24 133:11
   133:23 139:19
   140:12 143:3,9
   146:22 147:12
   148:14 151:20
   159:4,7,18,23
   160:1,3,14,17
**business**  3:14
   4:19 12:4 25:1
   25:18 41:17
   42:22 43:5
   46:12,17,21
   48:15 61:23
   81:5,12 82:1
   84:21,22,24
   91:24 98:15,17
   98:19 102:15
   108:20,22
   109:2,6,10
   135:18 140:21
   141:10,14,21
   142:2,12
**button**  124:15

## c

**c** 7:1
**call** 76:16 84:9
  84:10 131:19
  144:1,18 148:8
**called** 1:16
  18:12 32:7
  50:21 74:3
  76:15 145:22
**camera** 78:15
  78:19 102:13
  102:17,21
  106:1,8 157:5
  157:21,22
**cameras** 103:3
**capabilities**
  145:1
**capital** 112:25
  122:2
**captured** 72:10
**cardboard**
  104:23 105:8
**care** 12:15 27:1
  27:12,15 66:11
  66:13 71:9
**careful** 96:20
**case** 1:3 7:14
  42:17 126:15
  129:8
**catch** 147:24
**cause** 9:21
**cc'd** 41:6,12
**center** 14:15
  15:15,24 21:20
  22:4

**centered** 74:12
**ceo** 40:8,16
  70:13,15,25
  71:1 81:24
  84:24 94:22
  99:13 110:16
  112:18,20
  126:2,6,11,24
  127:4,9,11
**certain** 26:2
  76:22 93:5
  103:23 148:12
**certainly** 84:6
  140:20
**certificate**
  162:1
**certify** 162:5
**cetera** 132:24
**chain** 6:3,6
**challenges**
  15:21,22
**change** 124:15
**changed** 61:8
**changes** 153:2
  155:6
**channel** 12:18
  12:23
**characterizati...**
  32:21,24
**characterize**
  100:24 106:4
**characterizing**
  29:15 106:13
**charging**
  142:10

**chart** 3:17 32:5
  32:7,14,15,16
  50:4
**check** 97:1
**chicago** 47:6,8
  62:23,25
**chief** 112:19
**chin** 36:4,6
**choice** 83:7
**cholesterol**
  27:24
**chose** 62:13
  112:13
**chosen** 46:8
  69:24
**ciba** 4:1,14,22
  11:19,21,22
  12:9,12,19
  15:9 19:12,21
  23:3,5,10,20
  28:5,6 30:6,8
  30:10 34:2,8
  39:11 40:8,11
  40:17 41:10
  43:5,16 46:10
  48:2,5 49:7,8
  51:16 52:3
  53:6 54:12
  58:18,25 61:25
  62:13,17 63:18
  64:19,23 67:21
  68:24 70:22
  71:8 75:9,17
  75:23,25 78:24
  79:2,7,20

  82:18 85:8
  87:2 88:19
  107:14 110:16
  110:21,23
  111:2,16,21
  112:15,18
  113:2,8,11,13
  113:16 134:18
  135:8,19,22,24
  145:14
**circle** 140:25
**circumstances**
  21:3,7 127:18
  127:21 128:2
**city** 17:21,24
  18:6 30:6,9
  34:6,9,10
  36:20 39:9
**civil** 1:15 3:8
**claims** 24:2,10
  121:3
**clarification**
  86:3 113:21
**clarifying**
  136:9
**clarity** 40:24,25
  42:7,11
**clause** 148:4
**clear** 26:15,21
  28:19 29:8
  32:3,9 44:12
  56:21 122:17
  122:19 123:19
  136:8 143:20

clearly 61:5
124:22
clinical 100:20
close 127:13
closer 146:25
closing 90:20
90:21 91:1
155:8
club 84:12
136:14
cnbc 5:14
115:11
cold 27:25
collaborate
36:21 37:25
collaborating
17:13,20 39:16
collaboration
3:15 18:22
30:5 38:21
collaborative
109:19
colleagues 85:1
collect 146:4
college 10:21
color 3:20
27:13 30:16,25
37:16 61:5
125:10
colorado 1:18
7:17 8:20 51:4
56:10
colored 27:11
come 18:10
29:12 39:15

51:1 59:16
61:18,19 76:12
83:12 87:1
105:2 128:13
136:3
comes 51:5
coming 24:1
85:11,13,18
112:21
commence 34:7
commencem...
162:6
commencing
1:19
comment 26:7
34:2 143:13,22
comments
152:23 153:24
155:5
commercializ...
143:23
commitment
40:24,25 42:7
42:11
committee
42:25 85:16,22
common 29:2
communication
39:19 103:10
communicati...
106:19
companies
64:16
company 11:20
50:21 61:12,13

61:15,20,25
62:14,18 64:6
64:10 69:23
70:16 75:13
83:15,21 87:2
113:11 126:2
126:11 127:2,3
127:6,11
130:11 140:4,5
156:24 157:4
company's
157:2
compare 31:24
compensation
42:24
compete 140:16
complaint 5:1
complete
119:18
completed 54:5
54:9,13
completes 27:2
completing
46:13
components
70:3
compound
127:5
computer
36:11,16
conceive 13:12
conceived
13:25 29:16
48:17 67:15,19

concept 4:22
17:2 46:11
67:15,19,25
68:9,13 89:7
105:9,9 138:3
146:14
conception
17:10 77:21
concepts 5:4
13:12 104:21
104:23 105:21
109:7
concerned
144:13
concluded
77:25 161:4
concludes
160:11
conclusion
21:24
conclusions
47:18 52:7
77:14
conditions 34:5
conducted 53:6
conferences
131:1
confidential
3:14,19,22,25
4:2,4,6,11,13
5:8 33:13
63:16 140:10
confidentiality
92:12 139:16
139:22 141:1

Bart Foster
January 13, 2023
Lavery, MD., Kevin T. Vs. Pursuant Health, Inc.

[confidentiality - correct]
Page 10

149:5
**configuration**
55:17
**confirm** 42:16
160:18
**confirmed**
67:25
**connect** 145:24
**connected**
162:15
**connection**
49:9,18 50:5,6
52:4 55:11
64:5,9 91:4,8
91:18,22 92:1
92:6,10 96:1,9
97:22 98:2,6
100:14 101:13
102:8,22 110:1
125:3 145:13
**connectivity**
145:9
**consequence**
52:8 70:21
124:1
**consider** 48:3
**considerable**
113:1
**consideration**
24:14 156:23
**considerations**
34:4
**considered**
78:17 101:1

**construct** 34:10
**consultant** 49:7
49:8
**consultants**
100:19
**consultation**
80:8,11 98:14
134:14
**consulting** 5:3
49:13 80:10
91:15 97:21,25
98:6,11,13,21
100:15,17
101:14,14
102:9,22
109:23 110:2
125:4 137:7
139:12 153:6
154:13,21,22
**consumer**
26:25 27:1,7
27:13,14 47:20
114:20
**consumers**
26:23 27:10,17
47:13 73:3,18
73:23 74:2
**consummated**
138:12
**contact** 15:17
16:3 27:9,11
27:17 82:24
83:6 152:4
160:5

**contained**
140:7
**contemplate**
61:15 75:10
**contemplated**
26:8 48:11
78:15 90:10
138:13 141:12
142:10 145:3
**contemplation**
61:18
**content** 100:21
**context** 106:23
**continuation**
120:18,21
**continue** 7:7
**continuing**
80:24
**contract** 30:4
**contribute** 93:5
135:25
**contribution**
4:24 6:4,8 90:5
90:16 91:5,9
91:19,23 92:2
92:7,11 93:4
93:15 94:4,9
96:1,9,13
97:22 98:2
102:8 103:13
104:2 137:8,10
137:19,23
139:8,11
144:25 150:12
150:19,23

154:5,21 155:1
155:3,14 156:1
156:13,23
159:10,16
**contributions**
110:1 115:25
**control** 43:25
**controversy**
162:8
**conversation**
9:15 85:5
144:12
**conversations**
7:5 101:6
103:6 124:25
125:3
**conveyed** 109:1
**convince** 84:24
**cool** 14:21
130:6
**copied** 111:11
150:7 152:17
**copies** 81:14
125:7 159:22
**copy** 22:18
24:21,22,23,24
25:5 148:12
**core** 48:15
**corner** 134:1
151:1,5 154:13
155:18 156:5,9
**corporate**
99:19,21
**correct** 9:6,6,16
10:9,10 11:12

11:23 12:1
13:17 15:2,3
15:10 16:6
18:8,25 19:9
19:11,14,17,18
19:21,22 20:2
20:9,15 21:13
21:15 22:7
23:1,9,18,19
25:18 26:17,18
26:19 28:24
29:18,19 30:13
31:12,13,15,16
32:6,17,18,21
32:22 35:8,16
35:17 36:9,17
36:18,24 37:14
38:22,23 39:9
39:18 40:13,15
40:18 41:8
43:14,15,17
46:1,22,23
48:1,7,19
49:11 50:12,15
50:16 52:6
53:7,10,12
54:16 55:19
57:7,9,16,17,23
58:2,4,5,15,16
59:4,11 60:3,8
62:15 63:5
64:3,21 65:10
65:21 66:2,18
66:19,22,23
67:2,3,12,17,19

67:20,22,23
68:2,10,11,25
69:15 71:22,25
72:16,20,25
73:18 74:24
75:15,21,23,24
76:10,11,23
77:20 78:3
79:9 80:2 81:4
82:13,14 83:11
86:17 87:12,13
88:8,22 89:18
90:1,13,19
91:6,7 93:12
94:10,11 95:10
96:4,14,15,17
98:18 101:10
105:15,18,19
105:20 107:15
108:18 109:8
111:1,4,5,17
112:5 113:9
114:21,25
115:19,20,22
116:24 117:11
117:12 118:9
119:6 120:5,6
120:8,9,12,19
120:20,22,23
120:25 121:1,4
121:5 122:3,6
122:8,9,11
124:10 125:5
129:5,6,14
132:5,6,24,25

133:5,7 134:11
134:18,24
136:19,20,25
137:11,20
138:1,8,15,19
139:9,13,23
140:8,22 145:3
145:4,7,11,18
145:20 146:11
146:12,16
148:19 149:2,6
150:10,14
151:15 152:8
152:19,20
153:11 155:16
157:18,19,24
159:1 160:16
162:12
**corrected** 26:23
**correction**
16:22,24
**corrective** 20:8
20:13 67:1
**correctly** 26:2
134:24 135:11
**corresponden...**
130:21
**cough** 27:25
**counsel** 7:11
8:1,6 22:19
23:3 41:9
45:17,18 61:22
129:25 130:12
162:14,15

**count** 42:19
**countertop**
27:19
**country** 84:12
135:19 136:14
**couple** 28:9,20
124:19,19
128:12 146:18
**course** 154:3
**court** 1:1 3:7
7:13,19 9:20
12:24 159:21
**cover** 23:15
81:9
**covered** 23:25
126:17,20,20
128:18
**crazy** 125:18
**create** 14:23
64:8 146:3
**created** 57:10
57:12,15 87:24
**crowley** 107:8
**cumming**
115:18 116:17
116:22
**current** 99:12
105:10,13
110:16 118:6
**cursor** 154:7
**cut** 82:23
135:15
**cv** 1:4 7:15 75:3
75:8 88:13

Bart Foster
January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

[d - design]
Page 12

| d | | | |
|---|---|---|---|
| **d**  2:7 3:1 7:1 28:15 | 150:15 | **dennis**  68:23 | **deposition**  1:10 1:16 3:7 7:10 |
| **damn**  127:13 | **dates**  11:17 67:8,12 71:23 74:24,25 111:25 112:24 | **depart**  99:21 | 7:16 80:24 99:17 125:14 |
| **data**  53:3 74:1 145:15 | | **department** 28:16 76:14,17 | 129:18 130:1,9 130:10,13 |
| **database**  50:2 146:3 | **david**  17:21,23 18:4 19:1,6 30:11 70:17 | **depicted**  30:24 31:19,23 32:17 | 131:2 132:8,13 132:14 161:3 162:9 |
| **date**  6:1,3,6 11:1 13:7,25 | | 38:12 39:3 49:21 50:4 | **derive**  126:12 |
| 23:22,24 25:20 25:25 33:11 | **day**  17:6,7 27:9 62:4,22 162:19 | 65:15 105:12 105:21 | **describe**  12:11 13:11,20 15:12 |
| 34:21 35:3,12 35:15 84:13 | **days**  83:24,25 144:15 153:21 155:9 | **depicting**  31:8 | 17:2 23:10 31:17 32:4 |
| 99:11 111:7,20 114:9,11 | | **depiction**  30:16 31:11 32:19 108:17 122:10 | 47:3 73:9,20 84:20 88:16 |
| 115:15 133:1,2 133:6 152:23 | **db**  50:1 | | 98:4 100:3 124:12 125:1 |
| 153:12,13,14 153:24 155:5 | **debuts**  5:14 115:12 | **depictions** 37:16,22,23 38:1 108:21 | 126:23 |
| 157:9,12 | **decide**  61:19 | **deployment** 41:4 | **described**  24:9 85:6 86:4 |
| **dated**  3:11,13 3:16,21,24 4:3 | **decided**  18:13 85:24 | **deployments** 114:15 | 100:13,23 |
| 4:5,9,11,18,19 4:21,23 5:4,8,9 | **decision**  62:16 62:20,21 64:5 64:10 | **deponent**  24:25 25:9,11,19 | **describes**  120:7 121:21 |
| 5:16,19,23 13:6 20:25 | | 26:3 44:19,24 45:11 54:20,23 | **describing** 28:20 57:3 |
| 22:16 30:3 33:10 37:13 | **defendant**  1:7 1:17 2:6 7:11 | 62:9 81:8 95:16 97:4,7 | 84:8 105:7 108:22 |
| 40:8 45:19 49:5 53:11 | **definitely**  25:23 | 97:12,16 125:15,18,24 | **description** 119:14 127:1 |
| 63:15 69:10 81:6,21 95:22 | **degree**  11:3,11 **delivered**  132:3 | 130:4 133:18 134:3,5 143:7 | **descriptive** 119:10 |
| 115:12 117:21 120:4 147:22 | **demonstrate** 46:13,25 | 143:11 146:24 147:3,8 | **design**  5:4,5 27:19 34:9 |
| | **demonstration** 91:19 101:12 101:17,20,22 101:23 | **deposed**  8:22 | 49:20 74:4,9 |
| | **denied**  132:10 | | |

74:11,12
104:21 105:9
107:5,8 116:7
**designs** 4:23
34:3 89:8
**detailed** 124:20
**determine**
124:22 140:2
**determining**
138:22
**detrimental**
140:20
**develop** 34:6
36:21 38:21
54:4 55:13
65:4 93:6 95:5
102:3 132:22
138:10 142:15
**developed**
30:11 37:2
39:1,4,7,7 64:5
71:16,19,21
78:19 94:16
95:3 103:14
137:25 145:12
**developers**
34:12
**developing**
34:7 46:12
50:6,7,14,20
64:19 71:9
72:8 92:3
102:6
**development**
4:15,21 5:5,22

5:22 34:5
36:16 37:8
38:1 39:13,16
39:22 41:17,20
41:23 42:23
43:5 50:11
53:25 55:11
61:23 68:6
88:4 107:5
**device** 23:7,12
27:18 31:4,5
31:21 78:16
102:13,17,21
103:4 106:2,9
**diabetes** 27:25
146:9
**diagnostics**
27:23
**difference**
60:19 61:3
116:2
**differences**
116:6
**different** 12:11
24:12,13 26:7
47:8 48:16
51:17 56:17
67:8 72:19
77:22 78:1,12
82:8 89:9,12
89:14,15 116:8
116:19 145:5
146:14,19
**difficult** 27:3

**digital** 5:12
**diligence**
112:11 144:5
**dinner** 84:2,12
86:22 87:9
**direct** 43:2,11
156:12
**directed** 65:3
**direction** 152:6
**directly** 27:18
43:24 159:21
**director** 12:17
12:22 107:11
**disabled** 147:6
**disagreed**
102:18
**disclaimer** 66:9
**discounts** 66:12
66:13
**discuss** 23:13
146:18 148:8
**discussed**
132:13 141:22
**discussion**
136:13,17
144:3 148:1
156:16 157:16
160:13,19
**discussions**
45:23 98:15
129:24 130:9
139:14 141:25
142:7 144:24
148:18,22

**distance** 31:12
39:17 66:8
**distinctly** 16:14
**distribute** 4:11
93:7,16 94:5
**distributed**
63:17 145:16
**distributor**
12:17,23
**district** 1:1,1
3:7 7:13,14
**division** 1:2
7:14 12:15
43:5
**dla** 90:22 150:9
151:2 152:3,18
**dna** 27:25
**doctor** 16:25
146:5
**doctors** 98:23
98:24 100:5
141:18
**document** 4:3,5
10:6 13:3
20:18,22,25
22:8,12,16
24:16 26:5
29:24 30:3,14
33:2,6,24 34:2
34:15,20,21,22
34:24 35:4,13
35:24 36:10,25
37:17 38:4,10
38:13 40:1,5
41:2 42:12

Bart Foster
January 13, 2023
Lavery, MD., Kevin T. Vs. Pursuant Health, Inc.

[document - early]
Page 14

46:18 48:12,20
48:24 49:4
51:8 53:3,14
53:18 54:6,17
54:21 55:7
56:25 63:6,10
63:15,17,19,23
64:4,8,9,14,16
65:8 69:1,5
71:7 72:1,5,7
72:10,17 74:8
74:15,19 76:7
81:3 82:8,12
84:19,20 85:10
87:18,21 88:2
88:23 89:2,6
89:16,24 90:7
90:9 92:20
96:22 97:19
104:24 105:3
107:2,19,25
108:6 110:7,11
111:6 114:3,13
115:8 117:23
118:13 119:2,5
120:1,4 121:10
121:13,16,18
132:17,22
134:10,10
147:21 149:8
151:6,11
152:10 153:9
153:15 154:2,4
154:11 155:12
155:13,17

156:21 157:17
**documents**
46:7 100:10
103:11 128:13
129:19 131:23
132:1,4,7
139:4 146:19
153:4
**doing** 18:14
23:11 77:7,16
77:18 78:2,13
124:11 144:5
**domestic** 157:2
157:5,10
**dr** 17:21,23
18:4,10,14,22
18:23 19:1,6
30:11 33:1,11
33:19,25 34:16
35:20 36:15
37:7,22,24,25
38:21 39:16,20
49:24 50:15,24
56:13 70:17
76:10,13,21,25
77:4,11,15,22
78:1,12,22
79:11,15,18,21
80:4,6,10,15
84:5,10,15
86:5,9,22
90:17,18 91:6
91:10,14,20,23
91:24 92:2,7,8
92:11,21 93:3

93:5,12 94:16
95:2,24 96:7
96:13 97:21,24
98:5,10,12
100:4,8,13,16
100:24 101:7
101:11,21,24
102:2,5,20,24
103:17 104:2,5
105:23,25
106:4,7,12,14
106:18 107:16
109:21 110:1
115:1,25
117:17 118:19
122:14,20
123:3,8,23
124:3,8,18
125:1,4 126:7
126:13 128:7
133:5 134:14
134:23 135:4
135:21 136:12
136:23 139:15
140:24 141:3
141:16 142:19
144:14,24
145:8 146:10
150:7 152:16
152:17 153:15
153:18 158:2
159:14
**draft** 4:18 46:7
133:25 151:2
160:16,24

**drafted** 22:21
22:25 87:22
**drawing** 30:25
31:24
**drawings** 89:12
**drive** 14:14
16:1,4 22:6
109:5 129:22
**driving** 15:14
22:3 26:12
66:10
**dude** 125:15
**due** 69:11
**duly** 8:11 162:6
**duties** 44:4
49:17

**e**

**e** 3:1 7:1,1
58:11 70:13,13
118:15
**earlier** 58:3
67:18 78:11
83:21 90:15
94:8 105:25
111:13 122:4
134:21 142:16
157:25
**earliest** 14:8
**early** 83:1,10
84:6,7,8
109:18 122:24
123:15,25
125:20,25
145:21

earnest 135:18
eastern 1:1
  7:13
easy 124:13
ec 43:9
educate 109:3
educational
  10:19
efficient 13:23
  128:21
effort 15:13
  47:1
efforts 23:20
  135:4
eight 83:18
  143:12
either 17:7 28:4
  43:3 83:7 84:5
  84:7 88:19
  94:7 106:16
  129:24 130:9
  132:9 134:12
  145:12 152:5
email 6:1,3,6
  130:20 131:24
  146:20 148:12
  150:6,11,22
  151:15,18
  152:11,12,22
  153:23 155:4
  158:1
emailed 59:18
emails 100:9
  103:5,10

embedded
  77:21 106:10
  120:21
embodied
  13:12,22 16:8
employed 15:9
  40:11 43:16
  58:18 126:11
  128:5
employee 58:25
employees 28:5
  28:7 107:12
employer 58:20
  58:23
employment
  11:14 12:8
enable 93:4
  147:7
enabled 145:23
  146:3
encompassed
  137:4
engage 71:8
  84:4 135:4
engaged 19:25
  23:20 31:18
  39:15 54:15
  77:23
engaging 36:5
  66:21
england 14:13
  15:5 19:10
enhancements
  26:20

entail 16:10
enter 80:9
entered 79:14
  80:3 97:2
  139:15
entering 78:21
  79:10 90:16
  96:12 137:18
  144:25
enthusiastic
  125:13
entitled 115:11
entity 134:24
  135:1
entrepreneur
  117:9
entry 27:22
envisioned
  44:15
equipment
  29:3
eric 118:14
escrow 112:13
  112:15
esq 2:2,7
essentially
  18:19 42:21
  84:23,25
  112:14
et 132:24
event 95:7
  137:24 158:1
eventually
  117:3 149:3

evolution 41:3
exact 99:11
exactly 52:14
  77:7 83:24
  85:1 144:8
exam 31:15
examination
  1:17 3:2 8:13
  129:2 159:6
  162:6
examined 8:11
example
  138:25
examples 73:21
exams 26:14
except 132:2
exchange 140:5
excited 55:25
  141:11,12
excuse 152:16
  157:22
execute 36:15
  61:20 64:10
executed 30:9
  79:18 96:1
  97:21
executing 19:2
  92:6 97:24
execution 91:4
  91:8,14,18,22
  92:1,10 93:14
  98:11 102:7
  103:12 104:1
  159:10,15

executive 42:25
63:25
exhibit 3:7,9,10
3:11,13,14,15
3:17,18,20,21
3:23 4:1,3,5,7,9
4:10,12,14,17
4:18,19,21,22
4:24 5:1,2,3,4,5
5:7,9,11,14,15
5:17,18,20,21
6:1,3,6,8 10:2,4
10:6,11,12,14
10:16 12:10,25
13:1,3,13,22
16:9 20:19,20
20:22 22:9,10
22:12,14,20,22
22:24 24:18
25:3,5,5,13
26:5,16,19
29:21,22,24
30:1,15,18,25
31:11,20 32:10
32:11,13,17,20
33:3,4,6,8,24
34:16,20 37:6
37:16 38:2,5,6
38:10,14,19,24
39:4 40:2,3,6
40:21 42:8
45:9,10,11,15
45:16,22 46:4
46:18,19,21
47:23 48:9,13

48:21,22,24
49:2,21 50:4
50:10 51:2,9
51:10,12,14,20
51:25 52:18,23
52:24 53:1,4
53:11,15,16,18
53:20,24 54:7
54:18,19,25
55:8 56:6,13
56:23 57:1,8
57:11,12,13,15
57:16,18,20
59:6 60:21,22
61:1,4 63:7,8
63:10,13,20,23
64:4,9,18 65:8
69:3,5,7,13
70:22 71:7
72:2,3,5,11,18
74:16,17,19
75:1,18 76:4,5
76:7 78:23
81:4,12,17,18
81:20 82:13,16
84:14,20 87:11
87:15,16,18,25
88:2,25 89:2,4
89:16,25 90:3
90:4,7,9,11
92:18,19,21
95:12,18,19,21
95:24 96:16,23
96:24 97:20
98:7 101:15

104:9,10,13,19
104:25 105:22
106:25 107:2
107:17,20,21
107:25 108:2,7
108:10,13
110:8,9,11,13
111:12,15
113:22 114:1,3
114:14,23
115:3,5,6,8,14
115:22 116:3,4
117:7,15,17,20
117:24 118:1,6
118:13,22,23
118:25 119:10
119:15,17,22
119:24 120:14
120:16,22,25
121:5,8,10,14
121:17 129:20
129:20 132:17
133:10 139:18
143:4,10
148:12,15,17
149:8,24
151:11,18,24
153:7,8,16,23
154:12,24
155:1,15,23,24
157:14 158:16
exhibits 3:6
143:8 146:19
159:20

expand 27:24
102:3 150:5
expanded 28:9
28:14
expanding
72:19 73:2
102:7 143:23
expansion 73:5
73:10
expect 47:15
153:25 155:9
experience
21:18 49:25
explain 28:25
30:24 35:21
65:15 144:16
145:19
expo 5:12
114:8
extension 82:9
extent 144:11
extract 87:6
eye 4:10 16:25
26:10 27:1,12
27:15,23 31:15
32:5,16 63:16
66:9,11,13
71:9 100:20
109:4
eyemagination
70:23
eyemaginatio...
4:23 50:21,22
70:12 71:2,3
89:7,25

eyesite 3:18,18
  3:22,24 4:1,12
  5:4,5,12,14
  25:18 27:22
  29:7,9,10,14
  33:12,15 35:10
  38:17,20 41:20
  41:23 42:6
  43:1,6,23 44:6
  45:24 48:3,4
  49:9 51:16
  59:14 63:16
  64:2,24 65:23
  66:3,5,16,24
  67:5,9,15,18
  69:9 77:18,22
  78:2 79:5
  82:17 108:13
  114:8,16,19,24
  115:12,16
  117:8 122:8
  144:5

**f**

fact 47:20
  123:6
factored 62:16
factually 93:12
  94:21
fair 9:12,25
  22:20,24 112:1
  116:13 124:24
  150:9
fairly 81:23
familiar 35:24
  51:19,21 87:20

family 112:9
farsighted
  20:11
farther 141:11
  143:18
fast 124:21
father 83:19
favor 111:20
  114:10
favorable
  52:12
feature 138:21
features 17:2
  26:10
february 3:13
  4:5 5:8 14:10
  14:11 15:1,5
  22:16 23:5,23
  26:9 53:13
  67:19 68:4
  108:5 109:2
  120:22
feedback 37:11
fees 141:18
felt 56:16 83:22
  86:25
file 13:7 151:6
filed 7:12 113:6
  120:19,22
  129:10,11
  142:22 143:22
files 111:10
filing 13:16,21
  17:8 23:17
  46:12

final 90:10
  152:24 153:25
  155:6
financial 127:2
financially 7:23
find 65:18
  112:24 132:9
  150:19 152:22
fine 25:9 147:2
finish 9:24
  123:18
firm 74:3
first 5:14 8:11
  18:1,3,21 21:5
  21:17 22:2
  30:19,19 32:23
  36:10 37:1
  38:17,20,25
  48:17 50:4
  51:20 55:4,7
  55:12 56:9,11
  56:16 61:14
  68:4 71:6
  72:21 75:3
  76:12,24 84:9
  84:10 88:3,7
  88:12 89:22
  90:21 93:2
  103:2 107:12
  114:15,18
  115:11,15
  120:10 130:16
  131:8 141:3,16
  143:13 144:16
  148:22 157:4,9

157:11
fisk 2:3
five 14:5 27:21
  71:17,21 93:24
  103:2 116:15
  117:3,4,4
  153:21 155:8
fixes 118:7
float 15:18
florida 10:23
  10:24 11:4,15
flowchart 34:6
flying 135:18
focus 47:5,8,18
  62:22,25
follow 26:20
  27:5 106:9
  143:19 159:4
followed 78:5
following 11:14
  87:9 104:1
  153:4
follows 8:12
food 12:3
foot 31:2
forbes 5:11
  114:6
foregoing
  161:3 162:12
forever 158:24
forget 99:11
form 62:18
  64:5,10 83:15
  91:24 92:3
  93:7,16 94:5

100:8 103:5
139:19 140:12
162:11
**formal** 103:7
**forth** 148:23
**forward** 52:13
52:15 85:15
99:4 140:3
146:20
**forwarded**
152:10
**foster** 1:10,16
3:9,11,13,21,23
7:10 8:10,15
8:17 10:16
13:2,10 20:21
22:11,17,18
25:7 28:2
29:23 33:5
36:21 38:10
40:4 45:8,15
45:18 48:25
51:11 53:1
63:7,12 69:4
72:4 74:19
76:1 80:24
81:1 87:18
89:2 100:3
107:1,25
110:11 115:8
117:9,17
118:25 119:24
120:11,16
123:14 126:1
129:4 147:23

148:17 159:9
160:12
**found** 18:11,11
74:13 81:7
129:19,19
134:2 144:6
**founded** 11:19
11:25 12:13
**founder** 12:20
**four** 131:22
**fourth** 132:22
**frame** 28:3
51:6 59:17
84:2,18 85:23
**framework**
34:11
**free** 59:15
124:17
**freely** 111:23
**frequently**
103:21
**freshlook** 27:9
**friend** 16:17
**friendly** 50:24
**friends** 59:18
60:7 86:25
**front** 72:23
95:15 133:9
143:1,2 154:12
158:15
**frozen** 83:7
**full** 8:16 43:16
55:21 82:5
132:22

**function** 43:1
**functional** 4:1
**functionality**
17:4 21:14
32:24 37:20
66:22 126:4
**functions**
145:25
**funded** 149:18
**funding** 62:3
63:25 64:1
102:19 138:10
142:14
**further** 99:5
128:11 143:24
148:4,9 153:2
157:7 159:2,6
159:18,19
**future** 142:13
**fuzzy** 83:17
133:1

**g**

**g** 7:1
**gain** 16:3 40:24
40:25 63:24
73:25 134:18
134:22
**gary** 109:17
**gathered** 146:8
**general** 22:19
23:3 34:4 41:9
45:17,18 61:22
66:9 98:14
**generally** 23:10
26:5 37:21

**generate** 126:3
141:20 145:15
**generating**
141:15 142:3
**gentleman**
28:12
**georgia** 2:8
5:14 115:12,19
116:17,22
117:5
**gerber** 109:17
**getting** 42:21
65:1
**give** 7:21 9:3,3
11:18 25:10
28:9 34:21
36:1 38:4 40:1
51:8 53:14
54:17 63:6
69:1 72:1
74:15 82:4
85:4,7 88:23
95:20 96:22,25
107:19 110:7
117:16 122:17
122:19
**given** 27:3
160:12
**gives** 29:5
**giving** 26:18
137:23
**glass** 62:23
**glasses** 16:18
16:19

Bart Foster
January 13, 2023
Lavery, MD., Kevin T. Vs. Pursuant Health, Inc.

[glaucoma - healthcare]
Page 19

**glaucoma**
138:23 146:9
**go** 7:8 16:24
17:3 26:6
44:23 45:12
47:12 62:4,12
62:17 66:25
80:17 83:7
85:16 93:21
97:5,7 99:4
111:24 112:1
112:15,19
116:25 124:19
127:23 128:16
135:22,23
140:3 147:3,10
147:13 149:23
151:15,23
153:6 160:8
**going** 7:3 9:1,8
9:16,22,22
10:11 15:18
17:12 20:18
22:8 33:2 34:2
38:4 40:1 45:2
45:7,8 48:20
51:23 53:14
61:11 63:6
80:19 81:1
82:23 83:17
88:23 96:22,23
115:5 123:5
128:22 132:16
135:23 145:15
147:16 148:6

**good** 7:2 8:15
21:19 26:13
38:7 54:20
97:15,16
104:18 107:23
111:8 131:15
133:14 147:3
147:24
**gordon** 150:8
151:25 152:1,4
152:11 158:23
**gotten** 135:15
143:18
**gough** 42:20
**grade** 16:16
**graduated**
10:20,22,24
**graduation**
11:1,14
**graphic** 65:17
**graphics**
108:21
**great** 19:17
38:8 42:15
45:1 80:18
81:15 134:4
148:14 150:3
**green** 124:15
**ground** 8:25
**group** 15:7
42:23 62:25
64:25 143:17
**groups** 47:6,9
47:18 49:20
62:23

**grow** 109:5
**growing** 73:17
**guess** 14:7
103:1 112:23
**guidance** 23:1
41:25 42:1
80:7,11
**guidelines** 60:6
**guilty** 9:5,16
**guy** 21:1
109:17
**guys** 44:25
104:17 107:22

**h**

**h** 118:15
**ha** 16:18
**half** 43:13
48:18
**hallway** 31:3
**hampton** 49:4
49:6,8,12
50:15
**hampton's**
49:17
**hand** 10:11
14:15 22:8
33:2 45:8
48:20 134:1
162:19
**handed** 20:18
92:20 114:10
**handwritten**
5:9 27:21
**hang** 56:20,23

**happen** 71:13
**happened**
14:11 16:2
71:15 82:2
113:2 136:1
**happening**
97:11 158:3
**hard** 9:23 28:8
61:9 64:12
93:20 111:22
129:21
**hardware**
49:20 50:1
55:13,15 70:1
116:7 124:17
**hassle** 160:6
**head** 36:4,7
41:17 42:19,20
58:10 61:22
82:22 83:2,23
**heading** 30:19
33:15 46:9
65:16,23 66:16
67:4,9 88:9
**health** 1:6 4:10
7:12 8:6 26:11
27:23 60:13,15
60:18 63:16
66:9 92:22
94:15 99:8,10
100:20 109:4
130:1
**healthcare**
59:25 60:17

heard 26:2
hearing 14:6
held 12:12
  155:8 160:13
  160:19
help 15:20,25
  16:4 22:6
  64:16 133:19
  133:19 134:6
  135:19
helped 47:21
  109:14
helpful 31:9
  74:13
hereunto
  162:18
hey 78:8 85:14
  97:8,9,12
  101:4
hi 97:4,10 99:9
  147:24
high 10:20,22
  10:23 16:15
  42:15 65:19
highly 94:15
  95:1
history 11:14
  67:5,10
hit 86:24
  136:14
hoel 118:15
hold 133:16
  135:16 142:23
  142:25

holding 140:4,4
holy 16:19
home 81:7
hooked 130:3
hoped 80:14
hopefully 148:1
hoping 134:17
  134:22 135:4,7
  138:20,21
host 147:5,7
hotel 1:17
hour 161:4
hours 14:5
hr 82:22 83:2
huh 9:4,4 11:24
  21:22 29:17
  37:18 39:23
  46:16 106:3
human 74:12

i

ibm 69:18
idea 13:15,20
  13:25 14:16,19
  14:20,23,25
  15:25 16:4,8
  16:23 19:3,19
  19:23 20:3
  22:3 23:12
  29:14 47:11
  58:3 61:21
  62:13 64:11
  72:15 78:8
  102:24 103:3
  106:4,9,23
  124:6 137:15

138:13 139:24
139:25 140:1
143:24
ideas 28:2
  59:20 60:5,7,9
  73:17 103:23
  105:23 106:9
  115:24 122:14
  126:12 136:19
  137:2,3,4
  140:24 145:5,8
  149:15,17,20
  149:22 159:9
  159:14
identifiable
  146:4
identified 41:1
  46:5 49:24
identify 10:12
  13:5 14:8
  20:24 22:14
  30:1 32:12
  33:8 35:3
  38:16 41:15
  42:12,14,25
  43:9 45:14
  49:2 50:18
  51:14 53:20
  63:13 69:7
  73:2 74:21
  89:4 99:5
  103:24 104:19
  107:4 108:2
  110:13 114:5
  115:10 117:19

121:16 159:13
159:14
identifying
  19:16 65:4
ii 2:7
implement
  102:23
implementati...
  4:7 34:14
  53:22 72:15
implemented
  104:1 149:17
implementing
  92:4 102:6
importance
  100:11 102:12
  102:21 106:1
  109:4
important 9:2
  137:5
impression
  87:4 142:17
improve 20:16
improved
  52:14
inaccurate
  94:25
include 27:4
  55:15 107:7
  122:13 123:7
  138:7 146:8
  148:24
included 55:16
  55:18 58:7
  114:22 158:8

158:14
**including** 5:11
8:1 15:20
27:24 46:11
66:10 78:18
100:23 114:7
132:23 141:19
**incorporate**
18:20 123:22
**incorrect** 135:3
**incorrectly**
65:9
**increased**
157:6
**indefinitely**
135:16
**indicate** 25:24
**indicating** 56:8
60:25
**indications**
25:21
**indirectly**
126:14
**individual** 17:4
19:25 31:18
32:4 36:5
66:21,25 67:2
**individuals**
15:7 17:14
50:13 55:22
57:24 58:6
59:1 60:23
**indulge** 25:7
**indulgence**
81:13

**industry** 29:3
**info** 35:7
**informal** 103:6
103:7,8
**information**
4:9 21:24
26:11 51:4
55:9,11 58:22
58:24 66:10,12
69:18,25 70:10
70:23 94:16
95:2 98:5,10
100:7,20 101:8
104:22 105:4
105:11 108:22
109:1 116:15
119:10,14,15
122:21 123:3,8
123:22 124:1,8
125:2 137:7,9
140:2,6,10,15
145:23 146:5,5
146:7 160:6
**informed** 61:24
82:22,25
135:13,14
**infringement**
77:9 144:2,20
**infringing** 78:9
144:10
**initial** 3:5 55:4
87:7 112:9
141:25
**initially** 141:17
145:2

**initiatives** 4:8
53:23
**innovation**
5:12 114:8
**inosencio** 2:2,3
3:4 8:8,8 25:14
25:17 26:1
81:10 99:2,4
99:15,22,25
113:24 123:5
125:12,17,22
127:5 128:15
128:20 129:3
130:8 133:12
133:22,24
134:4,8 139:21
140:14 143:5
143:25 146:17
147:5,9,13
148:11,16
150:1 151:17
151:21,25
155:25 159:2,8
159:19,25
160:2,8,22,25
**inosencio.com**
2:5
**input** 31:25
109:20,21
132:4
**inserted** 158:23
**insertion** 27:2
27:15
**inside** 63:18
82:18

**instrumental**
74:4
**integrate** 30:11
**integrating**
18:23 33:20
**intellectual**
5:17 28:14
75:10,16 79:4
80:5,14 86:12
86:15 93:5
119:6,8,12,18
120:8 122:14
126:18 128:7
149:10 156:17
**intelligence**
74:1
**intend** 144:8
**intended** 24:1
120:2 142:8
**intent** 4:18
76:9 78:22
79:11,14,18
80:4 84:15
87:10 88:20
90:11 94:4
133:5,8,25
134:16 139:16
139:25 140:1
148:19,23
149:4
**intention** 36:11
135:21
**interact** 21:20
**interacted**
76:24

**interested** 7:23
14:6 48:2 87:3
162:17
**interface** 34:7
49:19,25 50:24
73:15
**internal** 29:12
51:15,22,23,25
55:17 63:17
82:10
**internally** 24:3
43:23 47:22
63:24 85:4
**international**
12:15
**internet** 145:9
**interoffice** 3:21
3:23 40:7,10
40:20 41:6
42:7 45:16,21
46:3
**interrupt** 9:18
9:22,23 25:14
**introduce** 99:8
**introduced**
17:25 145:22
**introduction**
18:10
**invented**
125:16
**inventor** 13:8
19:16 75:20
79:8,25 111:3
113:6 121:2
144:4

**invest** 62:1,11
**invested** 46:11
**investors**
109:18 112:10
120:3
**invests** 67:21
**invite** 9:23
10:12 13:19
60:7 92:24
**invoice** 55:4,6
**involved** 14:2
19:2 46:25
50:13,17,19
68:18,21 70:17
72:8 118:11,19
**ip** 4:21 88:4,9
88:20 110:20
110:22 112:11
112:12,16
113:1,3,17
148:6 149:8
158:2
**issued** 79:21
80:1,6,15
120:25 135:23
135:24
**itemizes** 119:5
**iteration** 21:11
65:4
**iterations**
134:15

**j**

**jackson** 2:4
84:11 86:5,23
136:13,14

143:15 144:7
**january** 1:11
1:19 3:12 7:3
20:25 21:4
43:19,21,25
44:2,6,16
82:20,21 83:14
85:6 135:12
161:5 162:19
**jbush** 2:9
**jeff** 70:13,25
71:2 152:5,17
**jeffrey** 150:8
**jennifer** 1:20
7:19 162:3,22
**jesser** 2:12
54:22 80:22
99:21
**jesser's** 99:24
**job** 62:5 82:5
135:14
**joel** 2:7 8:6
99:2,18 125:8
129:25 130:10
130:17 146:18
147:4 148:11
151:17 159:21
**john** 2:12 99:21
99:24 107:7
**join** 42:22 43:4
99:16 112:22
**joke** 60:14
**jory** 21:1 22:17
22:17

**journey** 14:23
**jr** 2:2,11
**july** 3:21 4:19
6:1,2 40:14
54:10 81:6,6
81:12,21 82:15
82:20 85:11
133:2,25
147:22
**june** 74:23 75:4
115:13 133:25
**jury** 28:25

**k**

**kane** 68:23
**karen** 42:20
**keep** 24:22
148:5
**kehoe** 3:21 40:8
40:16 81:24
84:2 112:17
**kellogg's** 11:16
11:18 12:2
**kendig** 5:18,21
107:8,9,13
109:15 112:21
114:24 118:14
121:19
**kept** 126:22
133:13
**kevin** 1:3 7:11
8:9 76:10,13
95:2 122:14
129:5 144:7
147:23,24
149:8,12

Bart Foster
January 13, 2023
Lavery, MD., Kevin T. Vs. Pursuant Health, Inc.

[kevin - lavery]
Page 23

150:19 158:24
**key** 72:12,14
**kg** 42:20
**kga** 1:4 7:15
**kickoff** 5:6
107:6
**kilpatrick** 2:7
8:7
**kilpatricktow...**
2:9
**kind** 79:1 83:18
102:6 128:16
**kinds** 103:22
**kingdom** 19:20
39:4,8,12
**kiosk** 4:1,9,10
4:13,15,22
5:14 14:17
15:1 16:5,9
17:3,3,15
18:17,19,24
19:3,24 20:1
22:5 23:21
24:14 26:8,22
29:10,15 30:12
33:21 36:6,17
37:2,9,19
38:18,20 41:4
41:20,24 42:6
43:7 44:11
45:25 47:14
49:10,14,25
50:7,11,14,20
51:3,3,17,24
52:5 53:9 54:1

54:9,14 55:9
55:10,13,24
57:4,6,14,15,25
58:4,8,11,14,22
58:24 59:6,13
60:20,21,24
61:12,21 63:16
64:2,11,20,24
65:5,18,23
66:3,16,18,20
66:22 69:10,18
69:25 70:3,10
70:23 72:20
73:3,18 77:19
77:23 78:3,19
79:5 82:17
89:7,13 92:4
93:8,17 94:6
94:15 95:1
100:21 101:22
102:4,7 103:14
103:25 104:22
105:3,10,11
114:16,16,19
114:24 115:2
115:12,16,21
115:24 116:3,3
116:15 117:8
118:8 122:8,11
122:13,22
123:2,14,21,25
126:4 137:11
138:3,7,14
141:16 142:3,9
145:2,10,12,22

145:24 146:1
149:16
**kioskcom** 5:12
114:8
**kiosks** 65:14
71:9,16,19,21
157:23
**knew** 16:1 47:7
137:18
**know** 14:1
15:24 19:15
22:23 23:5
24:6 31:5
33:10 35:14,25
37:3 38:12
47:7,7,9 52:7
67:13 70:5
75:2 77:24
78:4,8 83:20
84:16 85:14
86:24 89:22
91:12 93:23
95:6 96:5
98:23,24 103:1
105:5 108:11
109:16,16
111:7 112:2
116:20 118:3
122:16,23,25
123:1,10 124:8
126:18 129:4
129:11 130:17
131:12,16
138:4 140:13
142:11 151:16

153:5 155:23
158:6
**knowledge**
118:20 119:17
**known** 75:13
83:15
**krivkovich**
2:12 97:2,10
97:14 99:9,10
100:2 109:15
112:9

**l**

**l** 118:15
**label** 101:8
**labeled** 88:3
**landed** 61:10
89:17
**landing** 60:10
**large** 141:18
**las** 5:13
**late** 19:7 51:6
71:22,24 84:6
84:7 102:25
103:1 123:15
123:25
**launch** 157:9
157:12
**lavery** 1:3 7:12
8:9 76:10,13
76:21,25 77:4
78:22 79:11,15
79:18,21 80:4
80:6,10,15
84:5,10,15
86:5,9,22

88:13,19 90:17
91:6,10,14,20
91:23,24 92:2
92:7,8,11 93:5
93:12 94:16
95:2 96:7,13
97:21,24 98:5
98:10 100:4,8
100:13,16,24
101:7,11,21,24
102:2,5,20,24
103:17 104:2,5
105:23,25
106:4,12,14,18
107:16 109:21
110:1 115:1,25
118:19 120:10
122:15,20
123:3,8,23
124:3,8,18
125:1 126:7
129:5 133:5
134:14,23
135:4,21
136:12,23
139:15 140:24
141:3,16 144:7
144:14,24
145:8 146:10
147:23 149:12
150:7 152:15
152:16,17
156:25 158:24
159:9,14

**lavery's** 77:11
77:15,22 78:1
78:12 88:21
90:18 92:21
93:3 95:24
98:12 106:7
125:4 126:13
128:7 142:19
143:7 149:8
153:15 158:2
**lawsuit** 92:22
129:10,11
**lawyers** 144:1
**lcd** 31:4,5,23,25
**leader** 15:16
16:2
**leads** 141:20
**learn** 73:22
74:2 76:12
78:10
**learned** 76:21
77:4 112:21
**learning** 77:2
**leavitt** 150:8
152:5,18
**led** 13:21 18:22
148:18
**left** 11:20,22
58:10 112:2
148:3 151:5
154:13 155:18
156:4,9
**legal** 26:12
66:10

**lens** 12:15 20:8
20:13 67:1
82:24 83:6
**lenses** 15:17
16:3 27:3,4,10
27:11,16,17
**letter** 3:11,13
4:18 21:3
22:21,22,25
23:4,12,22
33:10 37:12
76:9 78:22
79:11,14,18
80:3 84:14
87:10 88:19
90:11 133:5,8
133:24 134:16
139:15,25
140:1 148:19
148:23 149:3
**letters** 31:22,23
32:1,2,4
**level** 21:18
42:15
**leverage** 78:24
79:2,6,19
134:17,22
135:5,7,9
136:4
**levity** 127:25
**lieu** 99:23
**life** 56:1,3
**light** 87:7
**liked** 59:20

**likely** 46:20
68:25 69:20
72:9 76:20,21
84:17 87:23,24
98:14,14,16
103:10 105:3
105:10 106:11
109:18,24
120:2 141:2
**limited** 70:19
70:19 130:15
137:12
**line** 148:5
150:12
**lines** 30:6
**linkedin** 3:9
10:16
**list** 72:18
**listed** 42:13
**listing** 119:18
**literally** 143:22
**little** 13:20
15:12 16:7
43:20 56:17
59:21 80:7
82:8,18 83:17
85:3 87:19
104:22 124:14
133:1 143:21
**llp** 2:7
**lobbed** 136:22
**local** 130:12
**located** 27:19
**location** 7:16
19:16 21:17

Bart Foster                                    January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

[location - marked]                                    Page 25

47:9 115:16

**locations** 65:12
65:16,18,20
114:20

**log** 3:18 33:12
33:15 35:10

**loi** 6:2 147:25

**london** 17:22
17:24 18:6
30:7,10 39:10
47:6,7

**long** 31:3 39:17
131:7,17,20
151:22

**longer** 11:21
128:4

**look** 24:16
27:10 29:20
30:15 31:4,21
34:18,19 37:15
38:8 52:22
59:5 64:15
65:7 76:3
87:14 90:3
92:17 94:12
95:14,21 104:8
104:11 106:24
108:12 111:12
115:5 117:17
118:22 132:16
132:19 135:23
142:24 154:25

**looked** 55:3
129:21

**looking** 25:19
30:14 31:3
46:9 54:24
56:23 57:18
59:19,22,23
60:1,6 64:13
65:22 66:15
67:4 71:6 74:1
79:2 97:19
104:12 117:6
118:5 121:20
127:1 128:3
132:21 133:21
134:13 142:23
147:21 153:16
154:20 155:12

**looks** 30:4
33:16 72:12
73:13 81:8

**lot** 24:6 109:19
127:13

**louisville** 56:10

**love** 14:2 54:23
55:2 135:25

**lunch** 80:18

**luxottica**
141:19

**m**

**m.d.** 1:3 7:12

**made** 28:20,22
29:7 56:11
62:19 82:9
112:17 116:14
116:15 123:17
124:7,13,23

125:2 143:3
153:3 155:6
157:11

**main** 120:8

**maintaining**
26:13

**make** 24:18,22
24:24 29:8
56:20 57:5
62:21 65:1
77:9 81:14
124:16 127:12
136:7 146:19
150:4 159:24
160:3

**makeover**
27:12

**making** 62:16
123:2,14,24

**malveaux** 2:11
7:18

**man** 104:11
107:22 125:18

**manage** 43:1
43:10

**management**
5:22 46:6
48:16 52:19
63:25

**manager** 12:14
49:15,18
107:11

**managing**
43:22

**manufacturer**
59:2 66:12

**march** 53:11
84:17

**mark** 12:25
20:19 22:9
25:2 29:20
32:10 33:3
38:5 40:2 45:8
48:21 51:9
52:22 53:15
54:18 63:7
69:1 72:1
74:15 76:3
81:3,11 87:14
88:24 92:18
96:23 104:8
107:19

**marked** 10:4,6
10:14 13:1,3
13:13 16:8
20:20,22 22:10
22:12,22 25:13
26:5 29:22,24
30:14 32:11
33:4,6,12,24
34:16,20 38:6
38:10,13 40:3
40:5,20 42:8
45:10,21 46:4
46:19 48:12,22
48:24 51:10
52:24 53:16,18
54:7,19 55:7
56:25 63:8,10

63:19,23 64:4
64:9 65:8 69:3
69:5 70:22
71:7 72:3,5,11
72:18 74:17,19
76:5,7 78:22
81:17 82:13
84:19 87:10,16
87:18 88:2,25
89:2,16,24
90:4,7,9,11
92:19,21 95:19
96:24 97:20
98:7 101:15
104:10,25
106:25 107:2
107:21,25
108:7,12 110:7
110:9,11
111:13 114:1,3
114:13 115:6,8
117:15,24
118:5,13,23
119:22 120:14
120:24 121:8
121:10,14,17
148:11,15
149:24 151:24
155:24
**market** 4:15
46:13,24 47:1
47:4 67:22
73:23 74:2
109:5 110:3

**marketed**
69:12
**marketing** 4:15
11:8 47:1,4
72:14 73:6,10
74:10 112:20
**marking** 10:2
**mart** 5:14
**material** 84:23
100:10
**matriculation**
10:20
**matter** 7:11
10:3 126:22
**matters** 162:8
**maya** 74:4,4,9
74:11 105:9
107:8
**mba** 10:25
11:10
**mcmanus** 74:5
107:7
**mean** 17:5,25
21:11,25 79:1
87:19 101:3
121:12 127:24
142:20 158:19
**meaning** 136:5
**means** 140:13
**meant** 29:1,9
33:14 35:21
66:4 78:13
142:21 158:23
**media** 7:9
80:23

**medical** 49:5
145:17
**meece** 3:24
22:18 23:2
41:7,9,22
45:17,18 61:22
81:24 85:14
**meece's** 23:1
**meet** 17:23
18:3,4 86:5,9
100:1,2 136:12
**meeting** 5:6,15
14:12 15:1,4
15:12 18:1,21
24:4,5,9 61:23
62:5 81:22,23
82:2,15 85:11
85:13,18,25
86:22 87:9
107:6,17
117:22 130:19
**meetings** 23:13
24:3 28:13
118:20
**melius** 1:20
7:19 162:3,22
**member** 43:1
43:10 99:7,10
**members**
109:17
**memo** 45:16,16
51:15
**memorandum**
3:21,23 40:7
40:10,20 41:6

42:8 45:21
46:3
**memory** 21:2,6
30:8 44:14
70:5 71:18
74:25 101:11
123:21,24
**mention** 101:4
134:19
**mentioned**
35:18 81:2
**messaging**
73:14,24
**met** 18:5
135:20 141:3
141:16
**metadata** 34:23
**method** 92:3
102:3,6
**methods** 72:19
73:2
**mic** 130:3
**michael** 40:8
40:16 43:3
81:24 82:3
84:2 85:15
112:17
**michelle** 83:2
**michigan** 1:1
2:3,4 7:14
84:12 86:5,23
136:14 144:7
**microphones**
7:4

mid 61:24
milestones 4:17
  67:5,9 72:12
  72:14 74:22
million 112:6
  122:1
mind 9:7 16:10
  51:1,5 79:14
mine 101:5
minus 20:6,6
minute 128:16
minutes 44:20
  44:21 131:10
  131:12,22
mirror 32:16
  32:20,24 55:17
  55:18
mirrors 31:1
  31:10,19
missed 127:14
misstate 143:6
mix 28:4
mock 34:9,14
  104:14,23
mocked 61:7
mockups 105:7
model 91:24
  98:15,17,20,23
  100:4,12,23
  102:15 108:20
  108:22 109:2,6
  109:10 141:21
  142:2,12
modification
  103:25 123:2

modifications
  123:14,17,21
  123:25 124:7
  124:14,22
  148:19
modified 27:19
  123:7
modify 103:14
  103:15 122:22
  124:17
modular 116:7
moment 16:20
  35:18 57:3
  87:7 92:17
  95:20 96:25
  117:16
money 42:16
  46:11 112:13
  112:14
monitors 55:16
month 84:17
months 82:17
  83:14,18 104:1
  104:6 112:6
  124:19 130:18
  131:24
moon 3:11,13
  21:1 22:17,18
morning 7:2
  8:15 129:23
morphology
  4:1
motion 104:7
move 52:12,15
  85:15 113:22

moved 25:23
moving 10:11
  64:19 124:21
  124:21 126:22
mute 7:6

**n**

n 3:1 7:1 28:15
  28:15
name 7:17 8:16
  28:14 29:9,12
  29:14 51:16
  59:16 60:1
  61:11,12,15
  70:24 83:2
  130:24 151:6
named 13:8
  19:16 21:1
  43:23 58:11
  75:18,19 79:7
  79:25 111:3
  113:6 121:2
  144:7
names 28:10
  51:19
national 12:17
  12:22
nature 146:10
ncr 69:18 105:8
  105:9
ne 2:8
near 27:19 66:8
nearest 66:11
nearsighted
  20:11

necessary
  20:14 144:23
need 14:2 16:19
  16:24 24:21
  26:11 82:6
  123:18 147:6
  160:17
needed 52:14
  127:25 153:3
needs 109:4
nefarious 136:5
negotiations
  79:20
net 157:2,4,10
netkey 145:22
network 11:17
  11:19 12:6
never 56:15
  57:4 126:19,19
  127:14 138:2
  138:17 142:11
new 21:24
  26:11 43:18,21
  44:5,16 75:11
  75:12,13
  135:14
nice 100:1,2
nick 74:5 107:7
night 129:20
  131:6,20
ninth 16:16
noncritical
  83:6
nondisclosure
  92:12 139:17

139:23 149:5
nope 11:18
normal 9:15
north 42:20
62:4 83:8
note 5:9 7:4
110:15,19
noted 34:1
123:12
notes 33:16,19
35:25 124:20
128:17 135:2
162:13
notice 148:3
noticing 8:4,5
novartis 61:25
62:10 76:14,17
77:2,5 78:25
79:3,20 113:4
113:8,12,13,15
113:16 144:1
144:18
november 4:11
13:6,7 17:9
23:17,22 63:15
69:10,14 82:8
82:12 130:19
131:5,9
number 3:10
5:20 7:15 10:4
10:14 13:1
20:20 21:19
22:10 25:13
29:22 32:11
33:4 37:16

38:6 40:3
45:10 48:22
51:10 52:24
53:16 54:19
57:7 63:8 69:3
71:19 72:3
74:17 76:5
80:24 81:17
87:16 88:25
89:10,10,11
90:4 92:19
95:19 96:24
104:10 106:25
107:21 110:9
114:1 115:6
117:15 118:23
119:22 120:14
121:8 133:20
136:21 148:15
149:24 151:12
151:23,24
154:9,15
155:17,24
numbers 66:11
nutshell 141:14

o

o 7:1 28:15
58:11 118:15
118:15
oath 7:22
object 123:5
139:19 140:12
objection
123:12 127:5

objections 7:24
objective 15:11
40:19,23 45:20
47:13 63:22
78:18,21 79:10
79:13 80:4
90:15 96:12
108:9
obtain 80:11,14
90:17 91:9,19
91:23 92:3,7
96:13 135:7
141:17
obtained 11:4
11:10 91:5
obtaining 80:5
91:13
obvious 22:1
obviously
84:14
occurred 17:8
october 4:3,9
5:4,6,19 6:6,7
11:20,22 49:5
50:14 59:17
85:20 95:23
104:21 107:6
112:3 120:4
152:12,21
153:3,17,20
155:7,8
od 51:18
offered 66:22
offering 146:13

office 18:5
officer 112:20
offices 56:10
90:22
oh 68:24
104:11 126:19
142:23 147:5
160:22
okay 24:19
26:1 57:2
58:20 79:24
81:10 86:2
90:12 92:23
94:13 96:3
99:22,25
111:14 113:20
128:15 129:12
130:5 131:19
131:23 134:4,9
136:2,12,24
139:24 145:19
146:17,24
147:3,9 148:13
149:25 150:22
153:14 154:4
154:10,20,23
154:25 155:2
156:4,11,15
158:7,22
old 104:14
one's 116:17
ones 105:9
125:10
ongoing 158:21

online 10:25
18:12
operating
99:13
operations 5:21
ophthalmolo...
80:8 144:6
ophthalmolo...
110:5
ophthalmolo...
98:24 100:5
110:4
opportunities
26:20
opportunity
78:17 83:21
85:20 131:13
opposed 146:21
opposite 58:14
65:22
optical 29:3
31:2 126:3
option 47:24
48:1,2,4,9,13
48:17 60:15
83:9,10,13
89:17
options 46:6
89:14,15,23
98:17,20
optometric
99:1
optometrist's
110:5

orally 9:3
orange 124:16
order 27:17
80:10 103:16
133:13 160:15
160:18,21
organize
133:19
organizing
61:20
original 81:13
81:14 112:18
120:19
originally
16:12 138:12
outcome 7:24
162:17
output 53:5
outside 48:5,15
101:1
overall 109:5
oversight 52:20
oversold 84:25
overview 30:20
121:22
own 23:6,11
145:13
owned 106:14
111:2 113:7
119:9,13,19
126:21

**p**

p 7:1 70:13
p.m. 80:20,21
80:21,25

128:23,24,24
129:1 147:17
147:18,18,20
147:22 150:16
152:12 160:11
161:4
pad 32:1
page 3:2 21:17
26:19 30:15,16
30:25 31:11,19
32:17,20 34:18
34:20 35:25
36:10 50:4
51:20 55:21,21
57:19 59:5,10
60:20,22 61:1
61:4,4 64:15
64:15 65:8,16
65:23 66:16
67:4,6,9 71:7
72:17,21,22,23
73:10 88:3,6,7
88:9 90:21
92:25 93:1
94:12,13
105:13 108:12
108:13,19
121:20,23,24
122:7 156:3,13
pages 108:21
109:1 151:22
paid 126:7
painted 56:19
61:6

panaseca 21:1
21:4,11,16
22:21,25 23:4
105:10
paper 25:21,22
paragraph
36:19 90:21
92:25 93:1,3
94:12,13 95:8
117:6 139:17
139:20,21
paralegal
160:18
parent 61:25
113:11,13,15
part 21:5 28:3
52:3 54:14
55:5 56:6
86:13 89:22
92:14 106:5
112:9,23
126:18 127:25
135:3,25 138:2
140:1 141:13
148:3 152:9
155:3 157:23
158:3 159:5,24
participant
147:6
participants
107:7
participate
39:12 107:16
participating
36:7

Bart Foster
January 13, 2023
Lavery, MD., Kevin T. Vs. Pursuant Health, Inc.

[participation - photographs]
Page 30

**participation**
99:24
**particular** 34:3
**parties** 7:8
162:8,16
**partner** 21:9
**partners** 73:15
**party** 7:22
**pasco** 68:25
**passion** 138:17
**past** 23:7
**patent** 3:10 5:2
5:18,20 13:6,9
13:13,16,21
14:24 16:8
17:8 19:15,17
23:14,17,25
24:10 46:12
68:3 75:18,19
75:22 76:1,14
76:17 77:6,12
77:15,22 78:1
78:7,12 79:7
79:21,23,24
80:1,6,15
86:16,19 88:21
90:18 91:5,11
91:16 93:7
94:1 95:22,25
96:7,14,16
106:10 110:25
111:16,20
112:2,7 113:5
113:7 120:2,10
120:11,19,24

121:3 126:13
126:16,20,21
128:9 135:23
135:24 136:1
136:18,24
137:15 140:7
141:5,5,9
142:19,22
143:7,15,21
144:2,5,6,7,10
144:19 149:13
**patents** 139:5,6
**path** 31:2 82:8
100:19
**patient** 146:4
**patients** 27:3,3
138:21
**pause** 112:22
130:2
**pay** 47:15,16
141:19 156:24
**payable** 157:8
**payment** 27:7
**payroll** 127:12
127:14
**pays** 27:7
**peachtree** 2:8
11:17,19 12:5
90:23
**pending** 79:23
**people** 15:23
19:4 51:23
58:12 73:14
109:3,20
140:16

**perceive** 44:4
98:25 116:11
**percent** 126:7
137:24 140:4,5
157:1,6,18,18
157:20 158:4,7
**percentage**
157:2,6 158:5
**peres** 70:13,25
71:2
**performance**
98:12 110:2
125:4
**performed**
33:25
**performing**
98:6,21 100:14
100:16 101:13
102:9,22
109:22
**period** 82:10
94:21 100:25
119:13 127:3,7
**periods** 127:10
**permission**
42:21 81:25
**perpetual**
156:25 158:8
158:14,19,23
**person** 15:2
18:5 20:11
58:9,10 86:5,9
130:22
**person's** 99:17

**personally** 91:1
**perspective**
33:23 49:22
106:7 108:25
126:10
**persuade** 86:12
86:14
**peter** 2:12
51:21 97:2,9
99:5,9,18,20,23
100:1 109:15
112:8 127:23
**phase** 4:1,15
73:10
**phoenix** 11:1
**phone** 66:11
76:16 77:1,4
84:9,10 129:13
143:14 144:18
**phones** 7:6
**photo** 56:7
**photograph**
55:21 56:6
57:14,16,22
58:4,7 59:12
66:15,17
114:22,23
115:3,21
**photographic**
108:16 122:10
**photographs**
3:20 38:13,16
38:19 65:11
105:22

phrase 88:17
pick 7:5 60:12
picture 34:23
 56:2,18 59:1,6
 60:20,21
 105:16
pictured 58:25
pictures 56:13
 57:9 104:14
 105:2
piece 29:3
pilot 21:17
piper 90:22
 150:9 151:2
 152:3,18
place 7:7 60:10
 62:24 76:17
 80:18 85:6
 86:6,22 90:22
 125:3 162:10
placed 114:19
placing 22:5
plaintiff 1:4 2:2
 8:9
plan 3:14 4:15
 4:21 25:1,18
 27:22 42:19
 46:12,17,21
 73:6,11 88:4
 94:9 132:23
 135:18 138:9
 141:10,15
planning 4:7
 23:15 53:22
 93:15,23,24

109:10 128:17
plano 27:9
plans 47:1,4
 137:11 142:12
play 41:20,23
 52:16
played 70:13
please 7:4,5,25
 25:16 28:11
 133:22 148:8
 150:19 152:22
 160:22,25
plug 62:1,11
point 11:20
 16:11 17:1
 24:15 43:17
 48:11 50:19
 69:13 70:10,18
 79:25 88:12
 89:15 113:7
 118:12 121:15
 123:7 135:13
 138:9 149:18
 149:18
points 74:1
position 12:2,5
 12:19
positive 47:19
possible 18:20
 23:15
possibly 93:25
 103:18,19
potential 24:10
 34:3 48:13
 63:25 64:1

65:2,11,16,18
 77:8 98:15,16
 138:16 144:2
 144:19
potentially
 78:9 98:25
 100:18 103:20
 118:14 137:23
 140:16 144:9
 145:16
powder 61:6
practicing
 126:12
predictor 21:19
prefer 85:2
premise 146:8
preparation
 109:10
prepare 37:22
 37:23 63:19
 87:10 108:6
 117:23 129:17
prepared 40:11
 46:22 64:18
 69:13 101:24
 104:24 109:7
 118:3 134:11
preparing
 40:19 42:7
 63:22 72:8
 108:9
prescription
 20:5,7,8 26:12
 26:24,25 27:1
 27:14 29:6

present 2:11
 8:1 80:22
 85:21
presentation
 4:11 5:8,16,23
 68:18,21
presented 68:9
 68:13 83:13
press 117:7
presumably
 147:23
presume 90:14
pretty 29:5
 54:20 131:11
 137:12
prevented
 148:6
previous 45:23
 162:5
previously
 21:23 46:19
 56:25
pricing 65:1
primary 152:4
prince 83:3
principal 74:5
principle 36:20
printed 25:23
 108:13
printout 65:24
 66:4,7,17,18,20
 66:25
prior 23:12
 37:12 56:12
 62:12,17 84:2

84:14 85:25
105:12 129:13
130:1,8 131:2
132:8,13
137:10,18
143:13 144:25
157:3,8,11
**priority** 102:19
**private** 3:18
7:5 33:13
**probably** 11:1
44:19 61:24
70:20 74:7
84:1 103:1
131:5
**problem** 99:25
125:9 133:17
**procedure** 1:15
**proceeding**
7:25
**process** 8:25
9:14 64:23
71:16 85:17
112:17 134:23
**procure** 67:1
**procurement**
64:25
**produce** 34:12
36:11
**produced**
103:11
**product** 27:22
82:24 83:6
**products** 93:7
93:16 94:5

157:3,5,11,22
**professional**
1:21 27:2,15
162:4,23
**profile** 3:9
10:16
**profitability**
126:23 127:2
**profitable**
127:7
**profits** 126:12
**program** 34:13
**progressive**
27:4
**project** 3:18,18
4:1,13 5:22
33:12,15,18
35:10 43:10,23
44:6 49:10,15
49:18 52:19
54:14 69:10
82:10,23
107:11 132:23
135:15 142:12
**promotional**
73:24
**promotions**
12:14
**proof** 4:22 89:7
**properly**
157:13
**property** 5:17
28:14 75:10,16
79:5 80:5,14
86:12,15 93:5

101:2 119:6,9
119:13,18
120:8 122:14
126:19 128:7
149:10 156:18
**proposal** 4:12
34:5 69:9
**proposed** 46:5
**proprietary**
94:16 95:2
**protocol** 4:3
51:16
**protocols** 51:17
**prototype** 4:13
34:11,13 36:21
37:1,8 38:17
38:20 39:1,3
39:13,17,22
44:7,10,11,15
50:6,8,9,11,14
50:20 52:4
53:8 54:1,4,8
54:13 55:5,7
55:12 56:9,11
57:4 59:3,14
68:6 69:10
85:25 104:7
105:17
**proud** 87:1
**provide** 19:24
26:24 27:13
75:3 79:19
109:21 135:5
**provided** 41:25
60:5 98:5,10

98:16,20 100:7
100:13,16
101:7,21,24
102:3,24 103:4
109:20 137:3,8
137:9 146:1
157:3,7 159:15
**provider** 66:11
66:13 145:21
**providers**
145:17
**provides** 26:25
**providing** 16:5
17:3 31:14
101:12 102:5
122:21 140:6
**provision**
139:17
**provisional**
23:24
**public** 114:15
114:19 115:15
115:16
**publicity**
139:17,22
**published** 68:3
**pull** 132:18
133:9
**pulled** 85:14
**pulling** 146:25
**purchasing**
27:16
**purpose** 93:4
**purposes** 31:14
138:22

pursuant 1:6
1:14 7:12 8:6
10:8 60:13,15
92:22 94:15
99:8,10 130:1
157:8
pursue 62:6
pursuing 43:6
put 14:23 24:6
25:8 60:9 82:7
82:7 83:23
93:22 105:3,5
111:25 127:24
putting 102:12
102:17,21
103:3 106:1,8
154:7

**q**

q2 115:17
q4 54:2,4
qa 51:22
qualitative
46:13,24 47:5
quality 52:1,9
52:17 53:5
quarter 114:18
157:3
quarterly
157:1
quentin 2:11
7:18
question 9:8,10
9:24 18:1 21:5
26:6 37:21
73:1 84:4

89:21 95:6
98:8 116:12
123:18 136:2
143:13 148:16
questions 9:1
109:19 112:10
128:11,17
136:22 137:6
143:20 159:3,8
159:11,18,20
quick 27:2,15
159:4
quickly 156:2
quite 112:24
quote 4:9 138:3
142:16 156:22

**r**

r 7:1 70:13
r&d 28:16
rafael 28:12
raise 112:6
raised 14:15
112:8,13,25
rajni 51:18
rapport 86:10
110:20
rather 9:4
ray 68:25
reach 18:13
144:14
reached 21:23
21:25 34:8
52:8 130:18
reaching 77:3

reaction 47:14
68:15
read 28:1 42:13
77:15 150:1,2
154:15 155:20
157:13
readers 26:12
27:20
reading 35:19
ready 26:12
27:20 147:4
real 9:2 124:13
realized 112:12
141:11 142:13
really 14:6,7,21
62:5 82:9 87:5
102:14 143:18
159:23
realtime 146:1
reason 18:14
40:23 64:22
77:3 86:8
136:2 137:5
144:17,22
157:25
reasoning
110:18
reasons 127:22
128:4
recall 15:6
28:18 52:14
82:23 83:5
84:13 91:3,21
92:5 102:1
103:11 126:9

129:7,12
134:25 141:4
142:5
receipt 21:3
receive 66:21
received 11:11
103:17 104:3
105:8 110:22
123:22 124:1
143:25
receives 27:8
157:4
receiving 34:15
96:6
recess 45:4
80:21 128:24
147:18
recognize 10:5
10:15 13:3
20:22 22:12
29:24 33:6
38:9 40:5
48:23 51:12
52:25 53:17
63:9 69:5 72:5
74:18 76:6
87:17 89:1
90:7 97:20
107:2,24
110:10 114:2
115:7 117:20
118:24 119:23
120:15 121:9
121:11

**recollection**
37:1,6 38:25
53:25 54:7
69:18 84:5
111:19 114:14
115:15 141:8
**recommendat...**
4:19 81:5,12
84:21,22
102:16 103:4
106:8
**recommendat...**
27:14
**record** 7:3,8
8:3,16,19
10:13 13:5,20
20:24 22:15
24:22 26:15
28:2,19 29:8
30:2 32:3,9,13
33:9 41:16
44:23 45:3,6,7
49:3 53:21
56:21 63:14
69:8 74:21
80:18,20,25
81:2 89:5 97:6
97:8,13,14
99:16 104:20
107:4 108:4
110:14 114:5
115:10 123:19
127:24 128:23
129:1 136:4,8
147:11,13,15

147:17,20
150:2 154:16
157:13 160:9
160:10,13,19
**recorded** 1:10
1:16 7:10
**recording** 7:7
**reduced** 71:18
162:11
**refer** 35:23
82:13
**reference** 3:6
28:20,22 29:7
46:18 47:23
69:17 90:20
122:1 134:17
149:7 151:2,6
154:5,11
**referenced**
46:18 48:9
56:22 58:3
75:7 88:16
89:9 137:22
151:11 158:1
**referencing**
57:6
**referral** 98:22
98:23 100:4,12
100:23 141:18
**referrals**
141:17,20
146:6
**referred** 32:19
**referring** 26:16
44:10 56:7

86:15,18
103:20 110:25
142:19 149:14
**refers** 36:3
**refining** 73:12
**reflect** 99:16
105:22 115:24
118:6
**reflected** 31:10
33:23 38:1
52:17 56:5
57:15 59:12
60:20,22 73:9
74:25 107:17
115:2 116:3,4
119:9,14 121:3
149:4
**reflecting**
152:23 153:24
155:5
**reflection**
148:4
**reflects** 35:15
38:19 51:25
96:16 111:15
**refraction** 29:4
**refresh** 36:25
37:6 38:24
53:24 54:7
111:19 114:14
115:14
**regard** 136:8
**regarding**
134:23 156:17

**regardless**
149:17
**regards** 148:10
**registered** 1:21
162:4,23
**regular** 39:19
**regulatory**
100:19
**relate** 137:6
**related** 7:22
42:24 72:14
73:14 100:20
145:1,9
**relation** 162:7
**relative** 129:8
130:12 135:7
136:22 137:10
138:13 139:11
141:15 142:3,7
143:23 144:1
146:14 148:17
149:16 157:14
157:17
**relevant** 129:22
**remain** 85:7
**remedy** 20:10
**remember**
11:10 12:9
16:14 23:23
24:5,8 34:15
37:4,5 47:17
56:12 62:24
68:15 69:22
70:7,9,24
83:18 86:21

Bart Foster
January 13, 2023
Lavery, MD., Kevin T. Vs. Pursuant Health, Inc.

[remember - right]
Page 35

87:22 91:13
96:6 97:24
98:9,19 101:23
102:5,11
106:12,16
109:25 110:22
117:2 118:16
119:8,12
122:20 123:2
123:13 124:11
125:1 134:24
159:11
**remembering**
135:11
**remembers**
123:12
**remotely** 8:2
145:24 146:3
**removal** 27:2
27:15
**renditions**
65:17
**rep** 99:21
**repeat** 9:11
21:5 98:8
119:11
**report** 4:5 20:4
43:2,11,23
53:5 66:5,24
83:1,4 108:17
155:20
**reported** 66:4
**reporter** 1:20
1:21 7:19 9:21
12:25 159:21

162:4,5,23
**reporter's**
162:1
**reports** 67:1
145:15 146:1
**representative**
99:19
**represented**
59:24
**representing**
7:18
**request** 4:12
69:9 81:25
92:11
**requested**
161:1
**requirement**
149:4
**requirements**
26:13 59:19,22
66:10
**research** 21:17
46:13,24 47:1
47:4,5 67:22
**resources** 46:8
46:11 132:23
**respect** 23:21
48:13 49:13
53:8 158:7
**respond** 9:25
**response** 9:4
22:21,23 26:6
32:1 69:23
131:15

**responses**
31:25 69:11
**responsibilities**
44:5 49:17,23
50:3,5 72:13
109:22
**responsibility**
112:20
**rest** 36:4,7
**restriction**
141:1
**restrictions**
92:12,13
**result** 71:15
**resulted** 13:15
47:18 82:16
**results** 19:24
20:4 66:8
67:24 108:14
**retail** 21:18
65:19 114:20
115:16
**retailer** 27:7
66:13
**retailers** 68:10
68:12 141:18
**retinal** 78:15
78:19 93:8,16
94:5 102:12,17
102:21 103:3
106:1,8 137:16
137:25 138:2,7
138:10,20
142:8,11 157:5
157:21,22

158:4
**return** 81:14
**returned** 12:16
19:7
**revenue** 109:5
126:3,8 141:15
142:3
**review** 42:24
77:11 132:1
**reviewing** 51:2
**revised** 6:2,4,7
147:25 150:12
150:19 152:22
153:23 155:5
**revisions** 154:1
155:10
**rfp** 64:17,19,22
65:3 69:12,16
69:23 70:22
71:16 105:7
**richardson**
129:25 130:11
130:19
**right** 13:16
19:8 32:8
44:23,24 52:2
54:21 56:20
58:9 60:4 65:9
66:16 68:1,5
80:17 85:3
86:7 113:20
116:23 121:21
125:11,21
129:10,13
130:5 134:1,3

136:11,15
137:16,21,25
138:7,24 139:1
139:2,8,12,18
140:7,11,18,21
141:1 142:2,24
143:11 145:6
145:10 149:1,5
149:8,13,21
150:13,16,20
151:1 152:2,7
153:9 154:6
155:13,15
157:23 158:12
158:25 159:25
**ring** 130:20,24
**rising** 15:18
**role** 36:15
41:19,22 43:18
43:21 44:2,6
44:16 49:12,13
50:22 52:16
55:10 62:12,17
70:13 74:7,9
74:10 99:6,17
110:5,5
**roles** 12:11
**rolling** 149:16
**room** 14:16
97:2 128:13
**rough** 160:16
160:17,24
**roughly** 11:17
19:12 31:2
54:12 60:7

82:21 83:25
84:16 117:4
**round** 112:10
**row** 132:22
**royalties** 157:7
**royalty** 126:8
137:24 156:17
156:25 157:1,2
157:6,10,18,18
157:20 158:8
158:25
**rules** 1:15 8:25
**run** 48:16
**running** 146:1

**s**

**s** 7:1 58:11
70:13
**saia** 110:15,19
112:19
**sales** 12:3,7
58:10 83:8
157:3,5,10
**sample** 66:17
**satellite** 10:23
10:23
**saturday**
152:21 153:3
**save** 160:6
**saw** 57:9
**saying** 47:20
150:18
**says** 35:6 36:19
46:10 47:25
54:2,3,5 67:14
71:8 73:5 89:7

90:21 94:14
105:13 108:13
108:20 124:17
132:22 133:25
152:11
**scan** 93:8,16
94:5 105:11
137:16,25
138:2,7,10,20
138:21,22
142:8,11
157:22 158:4
**scanner** 27:6
**scanning** 146:9
**schedule**
130:18
**school** 10:20,22
10:23 16:15
**science** 11:5,6
**scope** 44:15
**scott** 22:18
23:1,2 41:7,9
41:22 45:17,17
49:4,6,8,12,16
50:15 61:22
81:24 85:13
**screen** 4:15
14:17 15:2
31:23 89:13
146:18,25
147:6,22
156:14 157:14
158:9
**screening** 17:4
18:17,18 19:25

21:12 22:5
23:6,11,21
26:22 27:25
31:15 36:6,8
36:12 66:22
138:14
**screenshot**
132:18
**scroll** 156:1
**seat** 116:20
**second** 25:15
36:1 43:13
48:18 65:7
72:17,22,22,23
94:14 105:4
120:11 130:2
148:3 153:10
**secret** 94:15,17
95:1 101:5,9
106:5,14,19
**secrets** 100:25
140:9
**section** 156:16
156:21,24
157:8,8
**see** 16:15 18:19
21:21 23:8
25:19 26:23
27:10 29:5
30:22 31:22,23
31:24 34:23
35:1,6 36:13
36:23 41:13
46:15 47:24
48:6 51:23

57:21 58:1
59:8 66:1 67:8
67:16 71:11
73:7 75:5 88:5
88:10,15 90:24
93:9 94:18
97:15,16
104:17 108:23
117:10 125:19
128:17 129:22
132:8 146:22
146:23 150:5
150:24 151:3,8
151:10 152:13
152:25 153:13
154:6 156:2,7
156:19,22
158:10
**seed** 112:10
122:2
**seeing** 31:18
32:5 48:3
**seeking** 42:6
**seems** 53:2
131:11
**seen** 104:15
118:1 119:2
121:13
**sees** 149:16
**select** 68:9
**selected** 59:20
69:23 70:22
71:4
**self** 4:14 36:12

**send** 69:16
132:1 145:15
151:18 159:20
160:4
**sending** 45:20
110:18
**sensitive** 7:4
**sent** 152:12,15
153:23 155:7
**sentence** 47:24
93:2 94:14
**separate** 48:14
61:15,20 62:14
62:18 64:6,10
70:2 83:15
127:15
**separated**
12:20
**separation**
127:19,22
**september** 5:16
54:11,12 85:19
85:19 117:21
118:9
**septum** 34:4
35:20,22 36:3
**series** 24:2
31:22
**served** 94:22
126:2,6,24
127:3,9
**service** 4:14
12:3 127:11
**services** 3:15
30:5 98:4,9

101:14
**serving** 49:18
**set** 78:17 84:2
162:18
**settled** 149:3
**several** 23:13
55:21 108:21
134:15
**share** 131:23
140:2 146:18
**shared** 141:9
147:21
**sharing** 140:15
147:6 149:15
**sheet** 75:4,8,9
**shell** 55:16
**shit** 16:19
125:19,20
**shopped** 15:23
**short** 44:20
**shortly** 133:4,6
135:12,14
**shot** 147:1
**show** 5:12,13
12:10 26:22
114:8 116:16
116:18,21
**showed** 132:17
157:25
**showing** 49:24
155:23
**shows** 21:18
**sic** 24:25
**side** 12:3 58:14
58:14 65:22

**sign** 124:16
148:21
**signage** 5:12
**signature** 30:5
153:12,15
156:3 161:1
162:22
**signed** 110:21
111:7 112:7,12
112:16 113:1
133:4,6 137:8
139:10 153:4,9
154:2 157:17
**significant**
47:21,22 81:23
136:21 142:14
**signing** 137:10
**similar** 21:8,10
53:2 81:18,20
141:21
**simple** 27:3
148:5
**simply** 32:15
**simulate** 31:12
**simulating** 31:2
**singh** 51:18
**sir** 90:6 99:3
**sit** 89:10,10,11
**sitting** 44:14
87:4 103:24
142:17
**six** 57:24 71:10
112:6 131:10
131:12

size  25:21
  110:4
skin  105:14
slide  108:20
slightly  61:8
slip  27:8
slowly  9:17
snellen  3:17
  32:7,14,15
software  5:15
  18:18,24 30:11
  33:20 34:5,7
  34:12,14 49:19
  50:23 61:8
  70:12,15,16,24
  71:1,3 92:8
  117:22 118:7,8
  118:11,19
  145:21,23
  146:2
solo  60:17
solohealth  4:21
  5:7,11,17,22
  11:19,25 12:13
  12:21 59:15,16
  60:10,12 61:11
  61:16 75:14,17
  76:1 83:15
  93:6,6,15
  94:22 95:25
  98:5,11,20
  100:8,14,16
  101:2,13,25
  107:14 108:3
  109:2,7,12

111:10,21
  114:7,10 119:6
  119:9,13,19
  120:7 121:21
  126:2,7,11,21
  126:24 127:16
  127:19,22
  128:5 140:18
  145:16
someone's  29:4
sorry  18:2
  22:17 40:22
  42:9 45:17
  55:25 60:14
  88:6 105:2
  113:15 117:17
  118:15 127:24
  130:7 133:16
  139:20 147:4
sort  20:13 30:4
  51:17 101:12
  108:1
sorts  98:4
sounded  60:13
sounds  51:21
  86:7
southern  1:2
  7:14
speak  9:15,17
  9:18 130:16
  131:7,21
speaking  129:7
  129:12
special  43:23

specific  13:14
  24:4 42:10
  50:10 80:13
  89:17 98:19
  103:25 109:25
  110:3 126:25
  131:11
specifically
  47:14 123:20
  123:22 131:16
  157:21 159:14
specifics  14:2
spelled  58:11
  118:15
spending  42:18
  83:6
spillane  150:7
  152:16
spin  81:25 82:3
  84:25 85:3
spinout  47:24
  48:8,13 62:7,9
spoke  131:8
  144:17
spoken  129:15
sponsor  51:16
spun  83:20
stand  16:3
  145:14
standing  55:22
  57:24 58:7,13
  60:23 160:15
  160:18
standpoint
  47:20 62:3

149:11
start  10:2 14:7
  17:13 44:17
started  8:24
  12:14 68:7
  84:3 89:22
  135:14,17
starting  74:22
  132:14
starts  72:24
state  7:25 8:2
  8:15,18 37:10
  127:2 142:13
stated  9:4
statement
  78:14 117:7,12
states  1:1 3:7
  3:10 5:20 7:13
  36:11 39:12
  152:22 156:22
status  118:6
stenographer
  9:1 11:6 25:4
  54:3 62:8
  95:13 96:25
  103:7 113:23
  147:10 160:14
  160:20,23
stenographic
  1:20 162:4
stenotype
  162:9,13
stephen  5:18,21
  107:8,9,13
  109:15 112:21

Bart Foster January 13, 2023
Lavery, MD., Kevin T. Vs. Pursuant Health, Inc.

[stephen - taken] Page 39

114:23 118:14
121:19
**steps** 3:22,24
33:17,20,25
34:1 35:19
37:7 41:1,3
42:5,10 43:6
45:24 46:2,5
47:3 64:20
102:23
**steve** 129:25
130:12,23
**stick** 62:6
**sticker** 25:5,6,8
95:14
**stickers** 61:7
**stipulated**
112:5
**stockton** 2:7
**stop** 128:14
**stopping** 80:18
**store** 73:23
**stores** 15:24
**strategic** 4:17
27:22 74:22
80:7,11
**strategy** 4:21
46:7 88:4,10
**street** 1:18 2:8
7:17 8:20
90:23
**strength** 26:12
**strengthen**
102:14

**stressed** 9:20
102:20
**stressing** 106:1
**strictly** 4:2
**stronger** 79:22
79:22
**stuff** 38:7 85:2
104:18,23
125:7
**subject** 3:22,24
6:2,4,7 82:16
139:16 140:25
150:12 156:23
**submitted**
160:15
**submitting**
70:21
**subpoena** 1:14
3:7 10:3,9
132:2
**subsequent**
18:22 50:7
**subsequently**
11:9 43:4,9
77:11
**substantial**
52:21
**substantive**
42:1,3
**succeed** 48:3
**success** 73:13
**successful** 48:4
67:24
**suggest** 151:14

**suggested** 43:2
62:4
**suggesting**
146:10
**suggests** 155:4
**suite** 2:8
**summarize**
45:23
**summarized**
46:3
**summer** 68:10
**sunday** 150:15
**suppliers** 71:8
**support** 62:3,7
62:8 63:24
64:1 73:6,11
85:4,7
**supposed** 82:19
**sure** 11:1,2
14:4 24:18,23
24:24 29:8
33:22 36:2
50:2 56:21
57:5 58:12
65:1,17 66:6
69:21 76:18
89:18,20 93:24
103:18 106:15
106:20 109:20
116:1 117:1
118:17,18
121:12,15
124:16 125:9
128:2,19 130:8
136:7 147:14

149:14,19
150:4 160:3
**surprised** 87:2
**susser** 129:25
130:12,23
**switzerland**
76:15 144:1
**sworn** 8:11
162:7
**system** 30:20
36:12,16,22
**systems** 4:9
51:4 55:9,11
58:22,24 69:18
69:25 70:11,23
104:22 105:4
105:11 116:16
145:23

**t**

**t** 1:3 7:11
**table** 136:18
139:7 149:12
**take** 7:7 9:1
29:20 36:2
52:22 62:13
76:17 81:13
90:22 95:21
102:23 104:8
124:20 128:15
132:16,19
133:17 142:14
147:14,14
158:3
**taken** 1:17 7:10
162:9

Bart Foster
January 13, 2023
Lavery, MD., Kevin T. Vs. Pursuant Health, Inc.

**[takes - time]**
Page 40

**takes** 27:1
**talk** 15:14,15
  26:4 96:20
  103:21 111:23
  124:18
**talked** 14:1
  19:4 103:22
  105:25 140:23
  143:14
**talking** 13:24
  20:8 32:5
  75:13 77:18
  83:19 105:19
**tangible** 100:8
  103:5
**target** 34:4
  73:12
**tariq** 41:12,15
  41:19 42:22
  43:3,6,12,18,24
  61:23 81:24
**task** 75:3,7
**tasks** 33:25
  35:19
**team** 34:2,6,10
  48:16 83:8
  140:3
**technical** 13:24
  17:2,11,14
  19:5 34:10
  42:1 50:25
  99:1
**telephone**
  131:1

**tell** 9:10 14:17
  24:17 61:9
  84:19 86:21
  129:17 132:12
**template** 66:18
  108:17
**ten** 44:21 93:25
  128:16
**term** 75:4,8,9
  138:5
**termed** 138:4
**terms** 33:24
**test** 19:24 20:4
  24:12,14 26:8
  31:18 44:7,9
  59:15 67:2
  73:5,10 108:17
**tested** 28:21
**testified** 8:12
  122:4 123:9
  134:21 135:2,3
  137:1
**testify** 3:7
  162:7
**testimony**
  26:18 77:25
  78:6 94:3
  113:10 160:11
**testing** 51:23
  52:1,8,17 53:5
  70:5 73:13
**text** 108:21
**thank** 26:1 86:2
  99:15 110:15
  110:19 113:20

113:25 132:21
  134:3,8 136:9
  151:20 155:22
  156:11
**thanked** 14:20
**thanks** 134:5
**thereof** 162:13
**things** 24:6,12
  24:13 26:7
  28:1,21 62:1
  62:11 73:22
  100:19,22,24
  103:22 110:6
  148:5
**think** 11:17
  16:12,16 17:10
  28:8 34:21
  42:13 44:18
  51:22 52:13
  55:5 79:16
  83:9 84:3
  86:11,25 87:24
  100:10,15
  102:18 116:8
  116:14,19
  122:19,25
  130:17 132:15
  136:10 141:12
  142:10 143:17
  144:23
**thinking** 100:6
**third** 27:6
  57:19,19 117:6
  121:20

**thomson** 17:21
  17:23 18:4,10
  18:14,22,23
  19:1,6 30:11
  33:1,11,25
  34:16 35:20
  37:7,22,24,25
  38:21 39:16,20
  49:24 50:15
  56:13 70:17
**thomson's**
  33:19 36:15
  50:24
**thought** 16:20
  102:14 135:6,8
  158:22
**three** 5:11
  69:20 114:7
  116:25 130:18
  131:24
**thursday**
  153:20
**tide** 15:18
**tied** 157:20
**till** 27:7
**time** 7:6,25 9:5
  9:5 12:12,20
  13:24 14:8
  15:17 16:11
  17:1,5,8 24:15
  28:3,8 36:2
  40:9 41:18
  42:21 43:16,17
  48:12 50:19
  51:6 59:17

61:14 64:7
68:4 70:10,18
76:24 78:1
79:25 82:5,11
84:1,18 85:23
89:16 91:14
93:14 94:3,21
100:25 106:12
107:10 112:15
113:7,18
114:17 118:12
119:13 127:3,7
127:10 128:12
129:13 131:8
133:17 135:17
135:20 141:24
142:14 144:17
147:14 155:7,8
157:4 162:10
**timeline** 93:22
132:23
**times** 28:20
66:12 127:13
**timing** 53:25
54:8 83:16
102:19 114:14
137:3 138:11
**tips** 26:13
**title** 155:13
**titled** 114:6
**today** 10:8
44:14 99:19
103:24 111:13
118:1 119:3
121:14 129:13

129:18,21
130:10,14
131:2 132:8,13
134:21 148:13
159:13
**today's** 160:11
**together** 105:3
105:6 111:25
151:15
**told** 62:10
67:18 76:15
78:8,11 94:8
127:23 139:10
141:4
**tom** 24:25 58:9
58:17,20 150:7
150:18 152:16
**ton** 123:16
**tons** 149:22
**took** 47:3 62:24
85:6 86:6,22
112:25 113:18
125:3 132:18
134:15 136:7
141:11
**top** 35:6 50:24
67:13 73:5
108:13 151:10
**topics** 130:13
132:12
**toric** 27:4
**total** 126:8
**touch** 8:25 57:5
**touched** 56:15

**towards** 65:3
**townsend** 8:7
**traction** 47:22
**trade** 94:17
100:24 101:5,8
106:5,13,18
140:9
**traffic** 14:14
15:14 16:1,5
21:19 22:3,6
65:19
**transaction**
91:2 152:2
**transcript** 9:20
160:1,21
162:12
**transfer** 113:17
146:5
**transition**
42:19
**travel** 39:11
**traveling** 86:8
160:7
**treated** 140:10
**tried** 16:18
**trip** 84:11 86:4
**true** 67:12
74:24 93:12
95:8 117:12
119:17 162:12
**trust** 140:25
**truth** 162:7
**try** 9:16,22
16:17 84:23

**trying** 130:2
135:19 136:6
137:2
**turn** 12:24
55:20 92:24
**twelve** 71:9
**two** 19:12 23:7
23:12 25:20
31:1 47:8,18
61:9 62:23
84:17 93:25
94:9 120:8
129:19 131:3
140:2 144:15
145:25 148:18
**type** 101:16
136:5 140:25
**typewritten**
162:11

### u

**u.s.** 12:16 13:6
19:6,7 25:22
44:8,10 71:10
90:22
**uh** 9:4,4 11:24
21:22 29:17
37:18 39:23
46:16 106:3
**uk** 12:16 25:23
56:14 67:15
71:10
**ultimately** 30:9
44:1 71:13,15
73:25 75:25
80:9 120:25

| | | | |
|---|---|---|---|
| **unable** 127:11 | **units** 98:25 | **using** 106:18 | **viability** 46:14 |
| **uncovered** 24:6 | **university** | **v** | 46:25 |
| 24:10 | 10:24,25 11:4 | **validation** | **video** 1:10,16 |
| **under** 21:17 | 11:15 17:22,24 | 100:20 | 7:6,10 45:3,6 |
| 24:14 35:9 | 18:6 30:6,10 | **valuable** 94:17 | 80:20 91:20 |
| 46:9 47:24 | 34:9 36:20 | **value** 67:25 | 101:12,16,22 |
| 61:15 73:10 | 39:9 | 87:6 | 101:24 128:23 |
| 93:7 101:14 | **unquote** 138:3 | **various** 27:11 | 129:1 146:25 |
| 109:22 146:8 | **unsigned** 30:7 | 73:13 105:7 | 147:17 |
| 154:7 | **update** 5:18 | **vegas** 5:13 | **videographer** |
| **underhanded** | 120:2 146:2 | **vending** 27:9 | 2:11 7:2,19 |
| 136:5,10 | **updates** 118:8 | **vendor** 49:25 | 45:2,5 80:19 |
| **underneath** | **upgrades** | 49:25 50:1 | 80:23 97:18 |
| 42:22 | 118:12 | 51:3,5 65:4 | 128:22,25 |
| **understand** | **upper** 134:1 | 70:2,9,12,15,24 | 133:19 147:1 |
| 9:10,11 18:16 | 151:1 | 71:1,4 | 147:16,19 |
| 49:16 69:22 | **ups** 104:14,23 | **vendors** 15:20 | 160:10 |
| 78:13 86:11 | **upset** 83:19 | 50:17,18 51:1 | **videos** 101:19 |
| 136:6 137:2 | **usability** 74:11 | 65:2 100:18 | **view** 79:22 |
| 138:5 144:4 | **usage** 72:19 | 145:13 | 93:11 |
| **understanding** | 73:3 102:3,7 | **verbatim** 1:20 | **violating** 9:5 |
| 33:15 73:13,15 | **use** 27:6 47:14 | 162:3 | **vision** 4:1,14,14 |
| **understood** 9:9 | 47:15,16,21 | **verification** | 4:22 11:19,21 |
| 86:2 89:24 | 73:14,18 | 4:16 | 11:22 12:9,12 |
| 92:16 113:20 | 114:20 136:4 | **veritext** 7:18,20 | 12:20 14:15,17 |
| 124:24 149:11 | 138:5,20 148:6 | 160:15 | 15:2,9,14,24 |
| **undertake** | **used** 31:11 | **version** 25:22 | 16:5,9,13,22,24 |
| 103:13,15 | 32:16 84:23 | 50:7 105:10,14 | 17:3,15 18:17 |
| **unfortunately** | 106:22 122:21 | 115:2 118:7 | 18:18 19:3,13 |
| 62:2 | 158:2 | 122:7,13 138:6 | 19:21,23,25 |
| **unit** 7:9 56:18 | **user** 49:20,24 | 148:22 153:15 | 20:16 21:12,20 |
| **united** 1:1 3:7 | 49:25 50:23,23 | 154:9 156:4 | 22:4,5 23:3,6,6 |
| 3:10 5:20 7:13 | 73:15 | 158:9,15 | 23:11,11,20,21 |
| 19:20 39:4,8 | **users** 21:19 | **versus** 7:12 | 26:13,14,21,21 |
| 39:12,12 | | 110:5 | 26:23 27:23 |

28:5,6 29:11
29:15 30:6,8
30:10,12 31:14
31:18 33:21
34:8 36:6,7,12
36:17 37:2,8
37:19 39:11
40:9,12,17
41:4,10,20,23
42:6 43:5,6,17
44:10 45:24
46:10 48:2,5
49:7,9,9,14
50:20 51:16,17
52:3,4 53:6,8
54:1,8,13,13
55:12 58:18,25
59:15 61:21,25
62:13,18 63:18
64:11,19,20,23
64:23 65:5
66:8,21,24
67:2,21 68:24
70:22 71:8
75:9,17,23,25
77:18,22 78:2
78:24 79:2,7
79:20 82:18
85:8 87:2
88:19 89:14
92:4 107:14
108:17 110:16
110:21,23
111:2,16,21
112:15,19

113:2,8,11,16
114:15 126:3
134:18 135:8
135:19,22,24
145:14
**visits** 27:14
**visual** 26:11
27:12 44:17
82:17 109:4
138:14 141:15
146:15
**volume** 21:18
**vp** 5:21
**vs** 1:5

| w |
| --- |

**wait** 9:24
**wal** 5:14
**walk** 10:18
11:13
**wall** 62:1,12
**walmart** 14:14
15:14,16,24
16:1,4 22:4,6
68:14,16,19,22
115:12,18
116:23 141:19
**walmarts** 117:4
**want** 8:24 9:21
10:2 13:19,23
14:1 25:4,11
26:6 29:8
42:13 44:20
56:20 57:5
72:1 73:22
78:9,13 81:3

82:3 83:24
92:17 99:15
111:12 128:20
130:17 136:3
143:5,12 148:4
148:8 150:4
159:21,24
**wanted** 15:19
18:19 21:9
23:14 26:2
42:11,16 62:6
64:25 77:9
86:10,10
102:14 132:7
136:7 140:2
142:15 158:24
**wants** 85:15
**wasted** 83:22
**way** 15:19
48:10 62:23
87:5 89:10
94:7 99:12
103:16 106:16
113:14 124:17
136:18 141:11
144:25 151:17
162:15
**ways** 14:13
15:25
**we've** 10:6
13:13 20:22
22:12 33:24
34:20 38:10,13
40:20 42:8
45:21 46:3,19

48:12 53:18
54:6 55:7
63:10 65:8
69:5,12 70:22
71:7 72:5,11
72:18 74:19
76:7 78:22
87:18 89:2
92:21 96:20
98:7 105:19
107:25 108:6
110:7,11 114:3
114:13 115:8
117:23 118:5
118:13 121:10
121:13,17
**weaver** 58:9,17
58:21
**week** 77:1
81:16 153:4
**weeks** 124:19
**went** 10:23
116:16,18,22
116:23 142:18
143:14
**west** 2:3 90:23
**whereof** 162:18
**whispering** 7:5
**white** 61:7
**willing** 47:16
**win** 116:16
**winchester**
19:17
**wins** 5:11 16:2
114:7

| | | |
|---|---|---|
| **wish** 104:17 125:12 | **wrong** 32:2 | **year** 10:19 11:10 12:8 |
| **wishes** 71:8 | **wrote** 14:19 | 27:21 38:25 |
| **witness** 125:13 162:6,18 | **x** | 82:19 83:22 129:8 142:21 |
| **wonder** 16:21 | **x** 3:1 | **years** 16:21 |
| **wondering** 153:22 | **y** | 19:12 23:7,12 24:1 55:4 87:7 |
| **word** 106:18,22 136:4 158:8,14 158:19,23 | **yeah** 12:18 13:15 15:8 19:6 20:6,12 | 93:24,25,25 94:9 103:2 104:15 116:14 |
| **words** 20:10 22:2 33:19 36:5 57:11 61:19 79:6 101:7 113:5 148:21 | 25:24 26:3 29:2 31:6 35:11 42:10,14 42:16 44:24 49:20 50:16 51:21 54:10,22 | 125:16,19,20 143:12 |
| **work** 17:12 18:11 50:24 82:5 85:3 87:5 100:18 142:18 | 54:23 55:1,23 56:4,17 60:16 65:13 70:1,6 70:19 74:14 | **yellow** 64:15 **yep** 26:10 85:13 121:25 132:20 137:17 |
| **worked** 11:16 138:11 | 81:5 84:11 87:12 98:9,15 | **z** |
| **working** 19:20 23:6 59:2 85:2 135:17 143:16 147:8 152:6,19 | 99:9 105:2 107:3,12 109:18,24 112:22 113:19 116:13,14 | **zoom** 2:2,12 146:23 |
| **wrap** 148:13 **write** 23:4,5 **writes** 21:16 **written** 1:14 49:4 77:8 121:18 126:16 144:9 | 122:5 123:4 124:2 125:6 127:8 134:2 136:9,10 140:22 143:5 145:21 146:22 147:12,14 151:21 156:6 159:23 160:2 | |

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.