IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KEVIN T. LAVERY, M.D.,                          Case No. 22-CV-10613

                    Plaintiff,                  Hon. Bernard A. Friedman

v.

PURSUANT HEALTH, INC.,

                    Defendant.

_____

# EXHIBIT 1

# REDACTED VERSION OF DOCUMENT TO BE SEALED

# EXHIBIT 1

Page 1

1            UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4              * * * * * * * * * *

5

6    KEVIN T. LAVERY, M.D.,

7            Plaintiff,

8                              Case Number:

9     vs.
                              2:22-cv-10613-BAF-KGA

10

    PURSUANT HEALTH, INC.,

11

            Defendant.

12

    _____/

13

14

15

16    THE VIDEOTAPED DEPOSITION OF KEVIN LAVERY, M.D.

17

18            The videotaped deposition of Kevin

19    Lavery, M.D. taken at 740 West Michigan Avenue,

20    Jackson, Michigan, on Tuesday, January 31, 2023,

21    commencing at about 9:05 in the morning, pursuant

22    to notice.

23

24

25

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 23

1     going to replace a full eye exam.  And they

2     didn't want to give up their full eye exam and

3     the charge and the fee and the patient.

4             And so I proposed that we only screen

5     people who hadn't been seen in two years, and

6     they still objected.

7             And at that point the idea came to me,

8     let's just take them all out of the equation.

9     Let's change how we provide this and really make

10    a difference and put these in malls and

11    pharmacies and grocery stores and make it

12    accessible to people and what would it take to

13    do that.

14            So how can we bring a

15    exam out to people to make a difference in the

16    community from a community health perspective.

17    And that was -- that was the original genesis of

18    the idea.

19  Q   And this is helpful.  What's the timeframe for --

20      you described the idea of doing a screening on

21      the square and 2,000 people showed up.  Do you

22      remember roughly when that -- when that took

23      place?

24  A   That was probably in 1995, '6.

25  Q   So the ideas that you've described with the

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 24

1       screening on the square, wanting to make

2       screening more accessible, the sort of

3       disagreement you had with other ophthalmologists,

4       that was all in the mid-to-late '90s?

5    A  So that would have been -- correct.  So some --

6       the application -- the application was submitted,

7       I believe, in 2000 for the patent.  So it was

8       somewhere probably in the year, year-and-a-half,

9       two years before that 2000 date.  So late '90s

10      would be my guess.  I hate to guess.

11   Q  And when you say application, you're talking

12      about the original patent application with your

13      invention was submitted in 2000, is that correct?

14   A  I believe that's when it was submitted.

15   Q  And in your own words, what was the idea that was

16      submitted in the application to the patent office

17      in 2000?  What was -- what was the original idea

18      that you -- for which you sought a patent?

19              MR. INOSENCIO:  Objection, form.

20              You may answer.

21              THE WITNESS:  To create a medical kiosk

22      that could obtain all sorts of information and

23      communicate that directly to the doctors' offices

24      that were involved.  Trying to get more patients

25      to get early diagnoses of eye disease.  Not just

Kevin T. Lavery, MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 25

1      eye diseases, of diseases.

2   BY MR. BUSH:

3   Q   And you said to █████████████████████████

4   █████████████████████████████████████████████

5      offices.   What kind of information was embodied

6      in your patent for capturing from a potential

7      patient through the medical kiosk?

8   A   So obviously the primary one was having the

9      retinal camera built in.   A retinal camera gives

10      you all sorts of information.   It allows you to

11      ████████████████████████████████████████

12      ██████████████████████████████████████████████

13      ████████████████

14          It allows you to ██████████████████

15      changes.   And again, early intervention to

16      prevent vision loss.   ███████████████████████████

17      ████████████████████████████████

18          But in addition to just the eye health,

19      the patent included the ability to put a blood

20      pressure cuff on the unit.   It talked about

21      having spirometry, checking emphysemic patients.

22          So you have to sort of flash back that,

23      you know, the internet wasn't that old at this

24      point.   And so, you know, the iPhone -- if you

25      can imagine 2007.   This was kind of early on with

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 26

1    things.

2              And so one of the big ones with

3    diabetics was glucose testing.  So maybe we would

4    do some glucose testing on the side of the

5    machine.

6              We talked about the need to get

7

8    them.  Getting their

9

10             So it was open broadly enough -- it

11   wasn't in the patent,

12

13

14             So we could add on a lot of

15   functionality to that original platform.

16   Q   And all that you described, this is part of your

17       original idea that was essentially the patent

18       application, correct?

19             MR. INOSENCIO:  I didn't catch the

20       question.  That was what?

21             MR. BUSH:  That was part of the original

22       patent application.  The idea that was a part of

23       the original patent application.

24             MR. INOSENCIO:  Thank you.

25             THE WITNESS:  Can you ask that question

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 27

 1         one more time?
 2     BY MR. BUSH:
 3     Q     I just want to understand everything that you've
 4           told me about the sorts of information that could
 5           be captured. ████████████████████████████
 6           ████████
 7     A     I didn't mention ████████████████
 8     Q     That's what you said when you were describing the
 9           vision screening that could take place for the
10           patient utilizing the medical kiosk.  And you
11           described a blood pressure cuff, glucose testing,
12           potentially capturing different demographics, the
13           weight of the patient, potentially hearing
14           testing.
15                 And my question is, all of those
16           different potential functionalities of the
17           medical kiosk, that was captured in the idea that
18           was the subject of the patent application,
19           correct?
20     A     Well, the hearing was not mentioned in the
21           patent.  I did mention in the patent spirometry
22           for emphysemic patients.
23                 And in the patent itself, we didn't
24           mention all of the -- some of those things like
25           the macular degeneration and some of those things

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 28

1           were not mentioned in the patent.

2    Q      Okay.

3    A      So we talked in the patent mostly, I believe,

4           about diabetic retinopathy and glaucoma.  I was

5           alluding to what a retinal picture could provide

6           for you.  Not all of those things were mentioned

7           in the patent.

8    Q      But some of the things you mentioned were

9           specifically itemized in the patent, correct?

10   A      Some of the things absolutely were.

11   Q      And you also said that the idea that was the

12          subject of the patent application could capture

13          the different sorts of information and

14          communicate that information to doctors' offices.

15                 How would that information be

16          communicated to doctors' offices in the idea that

17          was submitted in the patent application?

18   A      So there would be a computer on -- you know,

19          internally in the unit.  There was a number of

20          different pathways for communication.

21

22

23

24

25                 If the patient knew their doctor's

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 31

1       reads, 'The entire operation of the apparatus is

2       automated so as to simplify its use by numerous

3       users when the apparatus is placed in a public

4       location such as a shopping mall, et cetera.'

5               Do you see that?

6   A   Yes.

7   Q   And is that a reference to what you described

8       earlier as having -- based on your idea to place

9       these kiosks in high traffic public locations?

10  A   Well, it was more than that.  So from a business

11      model, ███████████████████████████████████████

12      ████████████████████████████████████████████████

13      ████████████████████████████████████████████████

14      ████████████████████████████████████████████

15      ██████████████████

16              And so part of the genesis of this was

17      ████████████████████████████████████       So if

18      I could ████████████████████████████████████

19      ████████████████████████████████████████████████

20      I like that business a lot better.

21  Q   And you used the word ████████████     What was

22      your conception of ████████████████████████

23      ████████████████████████████████████████

24  A   So there's lots of aspects to ████████████████

25      And ultimately that's what got Bart so excited.

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 32

1          So there's a lot of ways to make money

2      off of this retinal camera.  The most obvious is

3      ████████████████████████████████████████████

4      ██████████  And that's easy to do.  I'm just going to

5      look for something here.  And that could work.

6                ██████████████████████████████████████

7      █████████████████████████████████████      And so

8      one of the things that our business really strove

9      to do was ██████████████████████████████████

10     the work, and have -- ████████████████████████

11     ████████████████████████████████████████████

12     ████████████████

13          So we didn't need ███████████████████████

14     ████████████████████  for glasses.  And so you're

15     trying to find out ██████████████████████████████

16     █████████████████████████

17          And so if I hypothetically owned this

18     machine at █████████████████████████████████

19     parked at malls around the area, I'm looking now

20     for ███████████████████████████

21          So whether or not they have early

22     diabetic retinopathy or wether they have glaucoma

23     ████████████████████████████████████████████

24     ████████████████████████████████████████████

25     █████████████████████████████████

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 33

1          And so as I'm looking at those screened

2     images, and I own that, I'm going to read those

3     images.  I may be able to get -- and we talked

4     about ███████████████████████████████████

5     ████████████████████████████████████████████

6     of ways to leverage ████████████████ to this.

7          But now that I have that picture and

8     I've read it, I can do several things with it.  I

9     can look at a reasonably healthy eye exam and say

10    ██████████████████████████████████████████

11    ███████████████  ██████████████████████████████

12    ██████████████████████████████

13          So ███████████████████████ now is

14    thrilled because ████████████████████████████

15    ██████████████████████████████████████  or

16    whatever.

17          And if the patient has pathology, I can

18    ██████████████████████████████  So the diabetic who

19    just hasn't been able to get into the eye exam,

20    ████████████████████████████  saying, you

21    know, ██████████████████████████████████████

22    really think you should come in, chances are

23    they're going to take that bus and get in or get

24    a ride or do the things that are really hard for

25    them to actually come in for their eye exam.

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 34

1          And so we could screen for the

2

3     treatments and the diabetics and the glaucoma.



4

5

6

7          I also thought with insurance, though --

8

9

10

11

12

13

14

15

16

17

18     I can't remember the name of the word for that.

19

20          And so it was difficult for them to get

21     diabetic patients, which was a simple exam, into

22     a medical doctor to get that testing done.  But

23     it was needed.

24          And so if we could provide this out in

25     a remote location, and it's now approved, you

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 35

1    know, telecommunication has taken off of late.

14   patient's vision.   And I think that would work.

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 36

1    again, there could be a ████████████

2    ████████████

3         You know, if we created ████████

4    ████████████████████████████████████

5    ████████████████████████████████████

6    ████████████████████████████████████

7    ████████████████████████████████████

8    ████████████████████████████████████

9    ████████████████████████████████████

10   ████████████████████████████████████

11   ████████████████████████████████████

12   Q   And all of these dimensions for this idea of a

13       business model about which you've given

14       testimony, these were all ideas that you had at

15       the time of the patent --

16   A   Correct.

17   Q   -- when the patent was issued?  And these ideas

18       that you had for these different ways of

19       capturing the business model that you've

20       described, these were all part of the ideas that

21       were embodied in the application that became the

22       patent that we've marked as Exhibit 3?

23   A   So this is -- these are the things that were

24       going to bring, in my mind, the patent to life.

25   Q   But they were related to and part of the things

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 37

1      that were the inventions in the patent itself,

2      correct?

3  A   The patent played a key central role in making

4      all of these things happen.

5  Q   And when you say these things, you're talking

6      about the business model dimensions that you

7      testified about earlier?

8  A   Well, the business model.  But creating a way to

9      save vision and change the world.  To change

10     health care.  To make eye exams more accessible

11     to people around the world.  To make a

12     difference.

13  Q  Are there any other key aspects of the patented

14     invention that you haven't yet described in your

15     testimony so far this morning?

16         MR. INOSENCIO:  Objection, vague.

17  BY MR. BUSH:

18  Q  Do you understand my question?

19  A  Omissions are really hard to see.

20  Q  I understand.  But sitting here today, are you --

21     are you comfortable that you've described to the

22     best of your knowledge the concept, the patented

23     idea, the invention, the novel and unique concept

24     that you arrived at in the late '90s or early

25     2000s, is there anything else about it that you

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 52

1    Q    And what is -- this reference to a ████████,

2         what does that -- what does that mean to you as

3         an ophthalmologist?

4    A    So a ██████████████████████████████████████

5         specifically ████████████████████████ to look

6         at ████████████ to look at the retina, to look at

7         the film in the camera, as it were, that takes a

8         picture ██████████████████.

9    Q    And in your understanding, what is the difference

10        between a ██████████████████████████

11   A    In general, there isn't any.  However, I don't

12        know if a ██████████████████████████

13        ████████████████████████████████████████████

14        ████████████████████████████████████████████

15        ████████████████████████████████████████████

16        ████████████████████████████████████████████

17   Q    And looking at that same paragraph in

18        Mr. Foster's patent, the last sentence reads,

19        'In still another embodiment the results are

20        reported at the user kiosk or via the internet

21        to a third party.'  Do you see that?

22   A    I do.

23   Q    And did you come to understand at the time that

24        you first interacted with Bart Foster that Bart

25        Foster's patent included the concept of a

Kevin T. Lavery , MD    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 53

1        communication via the internet?

2    A   That was not mentioned to me, no.

3    Q   When was the very first time that you reviewed

4        Mr. Foster's patent that we've marked as

5        Exhibit 4?

6    A   Yesterday.

7    Q   And did you reach any conclusions yesterday when

8        you read Mr. Foster's patent for the first time?

9    A   The striking one is that he applied for his

10       patent after mine was already issued.  So mine

11       was already in the public domain when he applied

12       for his.

13   Q   Did you ever discuss that issue with Mr. Foster?

14   A   No.  The other feature was that it was really

15       driven towards vision.  So while some things are

16       mentioned, it was really a vision screening

17       device.

18   Q   As opposed to a retinal camera device?

19   A   Correct.

20   Q   Let's look at what we will mark as Exhibit 5.

21                (Exhibit 5 is marked.)

22   BY MR. BUSH:

23   Q   I've handed you, Dr. Lavery, a document we've

24       marked as Exhibit 5.  And I'll represent to you

25       that this is a document generated by Bart Foster

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 58

```
 1   BY MR. BUSH:
 2   Q   Dr. Lavery, do you recognize the document we've
 3       marked as Exhibit 8?
 4   A   I saw a redline version yesterday in preparation
 5       for this today, yes.
 6   Q   And Exhibit 8 is an executed version of a ████
 7       ████████ between yourself and Bart Foster, is
 8       that correct?
 9   A   It says draft.  Does that impact the --
10   Q   If you'll look at page five of the document,
11       there are signatures on this version.  Do you see
12       that?
13   A   I do.
14   Q   And you agree that this is an executed ████
15       ████ between yourself and Mr. Foster?
16   A   I agree it's a ██████████ and there are
17       signatures.  But I don't know legally what draft
18       means.  If that somehow invalidates it somehow?
19       I don't know.
20   Q   So you question whether the document we marked as
21       Exhibit 8 is legally binding because it says
22       draft at the top of the first page?
23   A   I'm not -- I'm just raising -- I'm stating what I
24       don't know.  I'm not a lawyer and I don't know
25       what that means.  So that's all I'm saying.
```

Kevin T. Lavery , MD                                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 59

1    Q    Can you tell me your memory as to how this ▇▇▇▇

2         ▇▇▇▇▇▇ came about in 2007?

3    A    Yes.

4    Q    How did it come about?

5    A    Bart had contacted me and reached out to me by

6         phone, told me what he was doing.  He was trying

7         to start a company.  He saw my patent.  Really

8         loved what my patent would do.  And we started

9         having discussions.

10             And so he wanted to come up and meet

11        with me.  It was a -- unlike today, a wonderful

12        day in Michigan where we could sit outside.  We

13        sat by the tennis courts at the country club of

14        Jackson.

15             We absolutely hit it off.  Bart, as you

16        know, is very charismatic, very energized, very

17        bright, very engaging.

18             And because of that meeting and through

19        discussions, I was able to show Bart that he was

20        looking at the universe too small by just doing

21        vision screening alone with the hope of maybe

22        selling contact lenses and having obstruction in

23        the industry fighting him at every step of the

24        way.

25             And I shared with him my vision of being

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 60

1    disruptive in the field of eye care and

2    ophthalmology, and Bart got really excited.

3            So when we first had the conversations,

4    Bart never stated this, but wanted to get access

5    to my patent.  After reading his deposition, I

6    know why.  Because he needed it to get the other

7    ██████████████████████████████████████████

8            But at the time, he bought into my plan

9    to change how eye care is delivered.  And through

10   lots of discussions about how we could change

11   the world, he decided not to just have me as a

12   royalty owner that he just wrote a check to on a

13   quarterly basis, but he said let's start a

14   business together.



20           And I never touted that.  I never,

21   like, celebrated that.  Bart was always the

22   perfect front person.  And I was kind of the

23   quiet guy in the background.

24           But I sold Bart on what we could do in

25   the universe of health care and where we could go

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 61

1    after ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2    the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and the

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    that ▮▮▮▮▮ was going to pay you for -- ▮▮▮▮

6    doesn't want to pay anybody for anything.

7            So through a process of those

8    discussions, Bart wanted me at the table with my

9    ideas.  And as he said at his deposition, Kevin

10   had tons of ideas.  And we worked together.

11           And so we -- I founded SoloHealth.  I'm

12   one of the founders in my mind.  And I think the

13   documents support that.

14           And so Bart saw that I had contacts in

15   the industry, that I had been talking to lens

16   manufacturers, that I knew optometry well.  I had

17   been speaking at big optometric national

18   meetings.  I had a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   network.

20           I knew ophthalmology.  They didn't know

21   ophthalmology.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24           And so between all of the different

25   things that -- you know, the businesses I've run,

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 62

1      the contacts, the knowledge in medicine, he

2      wanted me at the table.  He wanted access to

3      those ideas.

4             And that's why we talked as much as we

5      did even after the closing and starting the

6      business.  He ran most ideas by me before

7      implementing them.

8             So you know, Bart saw in me an idea guy

9      that he didn't have to areas of medicine that he

10     didn't even know about.  I had to explain

11     diabetic retinopathy to him.

12            And so, you know, through those

13     interactions over the course of a relatively

14     short period was 'I want you as an owner and I

15     want you at the table.'

16  Q  And this first phone call that you described that

17     you received from Bart Foster, do you remember

18     when that phone call took place?

19  A  I do not.

20  Q  Sometime in 2007 before the date of the document

21     we've marked as Exhibit 8?

22  A  Correct.

23  Q  Do you believe it was a couple of weeks before or

24     a couple of months before?  What's your best

25     memory about the timing of that phone call from

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 64

1    Q    Can you identify Exhibit 9 for the record?

2    A    I think at closing this was the ███████████

3         agreement that was signed.

4    Q    Is it fair to say that Exhibit 9 is the

5         definitive agreement that was contemplated by the

6         ██████████████ that we marked as Exhibit 8?

7    A    ██████████████████████████████████████████████

8         ██████████████████████████████████████████████

9    Q    I appreciate that.  My question is, is it fair to

10        say that the document we marked as Exhibit 9 is

11        the agreement -- the final agreement that was

12        contemplated by the ███████████████ that we

13        marked as Exhibit 8?

14            MR. INOSENCIO:  Objection, form.

15            You may answer.

16            THE WITNESS:  So other than the fact

17        that the document was changed between when I

18        signed off on it with my lawyer on Saturday and

19        the document that I signed on Thursday when there

20        was an alteration made to the document without my

21        knowledge, yes, this was the intent of the

22        document.

23    BY MR. BUSH:

24    Q    This was the -- the document we marked as

25         Exhibit 9 is the intent of the document that we

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 65

1          previously marked as Exhibit 8, correct?

2     A    Except for the alterations that I was unaware of.

3     Q    What are the alterations that were made to the

4          document we marked as Exhibit 9 that you claim

5          you had no knowledge of?

6               MR. INOSENCIO:  Objection.  It misstates

7          his testimony.  Exhibit 9 is the signed

8          agreement, right?

9               THE WITNESS:  Correct.  Oh, and the

10         Letter of Intent is 8.

11    BY MR. BUSH:

12    Q    Do you understand my question?

13    A    Apparently not.

14    Q    All right.  We'll start over.  I just asked you

15         whether Exhibit 9 is the document that's

16         contemplated by Exhibit 8.  And I believe you

17         told me that Exhibit 9 is the document that was

18         the intent of Exhibit 8.

19              Exhibit 9 is the final document of the

20         document that's contemplated in the ████████

21         ████████ we marked as Exhibit 8, correct?

22    A    Except for the change that was altered, yes.

23    Q    So tell me about the change that was altered that

24         you just -- that you just referenced.

25    A    So in -- Version 7 of the document, I have the

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 66

1    numbers here, was sent out by Brian Gordon on a

2    Saturday at two something in the afternoon.  A

3    redline agreement saying -- so let me back up a

4    little bit.

5         So earlier that week, one of my sort of

6    deal breakers was when we went from the ▮▮▮▮▮

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮    And it got all

9    sorts of convoluted with add-ons and subtract

10   backs.  And you had to have a retinal camera.

11        And so at the end of the day, I didn't

12   know what was really going to happen with all of

13   that.  And so I said I want a one percent

14   perpetual agreement.  You know, an intellectual

15   property payment.  And so on October 4th that was

16   agreed to.

17        There was an email I've seen which

18   delineates between Brian Gordon and Tom Spillane

19   exactly what the agreement was supposed to say.

20   And it states clearly that there will be a one

21   percent perpetual IP payment.

22        And then the three percent was only when

23   the retinal camera was there, it was only for the

24   life of the patent, and the three percent went

25   away when the patent expired.  I'd revert back to

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 67

1      a one percent forever.  And that was all spelled

2      out really nicely in that email exchange.

3              Brian Gordon put in the word perpetual.

4      I believe on, like, October 4th.  And that was

5      inserted.

6              And Version 7 here shows the word

7      perpetual for the first time in the

8

9      Section A, the word perpetual was inserted on

10     page two to delineate that this was a perpetual

11     royalty on the one percent.

12             Everybody signed off on that.  And the

13     note -- the email says if this is the final

14     document, we will sign this, and it may have been

15     alluded to as a Monday.  The closing didn't take

16     place until Thursday.

17             So my lawyer said I've signed off on the

18     agreements, I don't need to be at the table.  You

19     know, everything is approved and clean.

20             During the discovery process, I came to

21     realize the document that I signed, Version 8,

22     had words inserted that were not in the final

23     agreed-upon version, Version 7.

24             And they inserted the words in -- on

25     page two, under royalty, 1.2, after the increase

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 68

1    of the three percent they inserted the words 'for

2    the remainder of the term.'

3         Those words, 'for the remainder of the

4    term' were not in the agreement that I had agreed

5    to on Saturday before the closing and which my

6    lawyer had agreed to.

7         And so that's the reason we're here

8    today, is we're debating over the one percent

9    because of words that were put in that nobody is

10   owning to.  Brian Gordon doesn't remember it,

11   Bart Foster doesn't remember, other legal counsel

12   doesn't remember.

13        But those words were put in without any

14   approval by me, by my lawyer.  I'm some doc from

15   a hillbilly town in Michigan who's sitting down

16   to sign a document and I felt like I was tricked.

17   Q   And when in your memory did you first come to

18       believe that these words, 'for the remainder of

19       the term' had been added to the agreement without

20       your -- without your knowledge?

21   A   So at closure when I looked at that statement, I

22       asked Brian Gordon -- I said Brian, this is --

23       this is the crux of what we're discussing here

24       today.  Everything else about whether or not I

25       get the three percent and this and that, but the

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 69

1    crux of it is this one percent.  Can you walk me

2    through this one percent?

3              And Brian took me through line by line.

4    And what he said -- because I saw that when I

5    read that there.  And I didn't remember it, but

6    you know, I've got six, seven, eight people

7    around the table at closing.

8              And he said, oh, that term only applies

9    to the patent portion of the three percent, the

10   retinal camera.  That does not affect the one

11   percent royalty perpetual.  And those were his

12   words that I definitely remember.

13             Because I was not going to sign that

14   document until he was clear to me that that one

15   percent was perpetual.  And he fully assured me

16   that that was perpetual.

17             And unfortunately we're here today

18   because of alterations made to the document,

19   sadly.

20   Q    So you had this conversation that you described,

21        this conversation that took place with

22        Mr. Gordon, you had that conversation before you

23        agreed to sign the final version, correct?

24   A    Correct.  It was at closing.

25   Q    And you agreed to sign the final version after

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 70

1        you had seen a version of this agreement that

2        included the words 'for remainder of the term,'

3        correct?

4    A   After it was explained to me by counsel what it

5        meant in his mind that agreed with what it meant

6        in my mind.

7    Q   And the explanation from counsel was an

8        explanation that was given to you by counsel for

9        SoloHealth?

10   A   Correct.

11   Q   Who else was at the closing that you described?

12   A   I think Fred Baumbarner [sic] was there.  I don't

13       remember the other participants.

14              MR. INOSENCIO:  Do you mean Fred

15       Baumbach?

16              THE WITNESS:  Baumbach, yes.

17              MR. INOSENCIO:  It's okay.

18              THE WITNESS:  Sorry.

19   BY MR. BUSH:

20   Q   Do you remember roughly how many people attended

21       the closing?

22   A   Seven or eight, perhaps.

23   Q   And those seven or eight individuals were

24       representatives of SoloHealth or counsel for

25       SoloHealth or yourself?

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 71

1    A    I was there as an individual.  So everybody else

2         would have been related to SoloHealth or counsel

3         for SoloHealth.

4    Q    Was your counsel present?

5    A    He was not.

6    Q    And you were in person present for the closing of

7         ███████████████████████████

8    A    Correct.

9    Q    And that closing took place where?

10   A    I believe at the offices of DLA Piper in Atlanta.

11   Q    Now, at the closing, did you provide anything

12        other than the patent to SoloHealth?

13   A    I'm not sure what you're asking.

14   Q    Did you provide any intellectual property to

15        SoloHealth at the closing other than the

16        assignment of your patent?

17   A    ████████████████████████████████████████

18        ████████████████████████████████████████

19   Q    ████████████████████████████████████████

20        ████████████████████████████████████████

21   A    ████████████████████████████████████████

22        ████████████████████████████████████████

23   Q    ████████████████████████████████████████

24        ████████████████████████████████████████

25   A    ████████████████████████████████████████

Kevin T. Lavery , MD      January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 73



1

2

3

4   A   I don't believe there was one at closing, no.

5   Q   Did you come to work on a business model for

6

7

8   A

9

10

11

12

13

14

15

16

17

18   Q

19

20

21

22          MR. INOSENCIO:   Asked and answered.

23          You may answer.

24          THE WITNESS:   I don't believe so.

25   BY MR. BUSH:

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 74

1    Q        Now, at the closing did you present any sort of



4    A

5    Q

6    A        Not asked for, not provided.

7    Q

10   A

11   Q

16   A        I'm not sure what your question is asking, I'm

17            sorry.

18   Q

22   A

23   Q        I'm going to give you a document that we will

24            mark as Exhibit 10.

25                    (Exhibit 10 is marked.)

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 76

1        discussions and looking for partners was all done

2        to help the company not -- presumably under the

3

4

5

6

7   Q   And during the time in which you were providing

8

9

10  A   A start-up is a very fluid thing.  And so you're

11       always trying and failing and trying and failing.

12

13

14       But that's always on your brain as a start-up

15       company.  What are we going to do to drive

16       revenue?  So that's never off your brain.

17  Q                                                    in

18       connection with providing consulting services or

19

20

21       business model?

22  A

23

24       models for them to pursue and revenue sources.

25               Once we started rolling out the vision

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 77

1    plan, the vision screening alone with no other

8    Q   And you have alleged in this litigation that your

9        ideas for a business model is a protected trade

10       secret.  Is that right?  Is that your allegation?

11   A

12       the answer is yes.  But I think it's still what

13       SoloHealth should do.  And nobody is doing it

14       yet.  And so it's still, like, the answer.  So

15       absolutely that's my business model that I hope

16       they employ.

17   Q

21   A

24   Q   And in what way was that outlined?

25   A   Bart and I had lots and lots of conversations and

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 78

1          I walked him through how to make that work.

2                    Unfortunately, having read his

3          deposition, I now know that wasn't his priority.

4          His priority was getting the vision screening and

5          what he refers to as his baby out there.

6                    I was trying to get my baby out there.

7          And my baby is still retinal camera screening and

8          doing all of this other stuff.

9                    And I'm still hoping it's going to

10         happen.

11                   MR. BUSH:  We'll mark Exhibit 11.

12                   (Exhibit 11 is marked.)

13    BY MR. BUSH:

14    Q    Do you recognize the document we've marked as

15         Exhibit 11?

16    A    Yes, I do.

17    Q    And do you recognize Exhibit 11 to be responses

18         on your behalf to document requests that were

19         served as discovery in this litigation matter?

20    A    Correct.

21    Q    And looking at page 11 and 12, the request for

22         production 16 and your response to that on page

23         12.  This is a request for any documents

24         evidencing confidentiality agreements specific

25         to a business model.  Do you see that?

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 79

1   A    Yes.

2   Q    And your response is that you're unaware of any

3        documents evidencing any efforts to maintain the

4        secrecy of the business model that's described in

5        your response to interrogatory number 7, do you

6        see that?

7   A    Yes.

8   Q    Is that a true statement?

9   A    Yes.

10  Q    And looking at page 10 of the same exhibit,

11       there's the request for production 13 that seeks

12       documents evidencing confidentiality agreements

13       around efforts to maintain the secrecy of the

14       demonstration video.  Do you see that?

15  A    I do.

16  Q    And your response is that Plaintiff is unaware of

17       any documents evidencing any efforts to maintain

18       the secrecy of the demonstration video which was

19       used for proof of concept as described in your

20       response to interrogatory number 7; do you see

21       that?

22  A    Yes.

23  Q    Is that a true statement?

24  A    Yes.

25  Q    And you testified earlier that you believe that

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 80

1          the business model ideas that you provided to

2          Bart Foster are protectable trade secrets.

3                    Did I remember that correctly?

4     A     I don't believe we talked about -- I don't think

5          we've addressed that, have we?

6     Q     My memory is that we did.  I may -- I may have

7          it wrong.

8                    Do you allege in this litigation that

9          the ideas that you collaborated with Bart Foster

10         around a business model and iterations for a

11         business model, that those ideas on your part are

12         protectable trade secrets?

13    A     Yes.

14    Q     And what's your basis for asserting that your

15         ideas around a business model for a medical

16         screening kiosk are protectable trade secrets?

17                   MR. INOSENCIO:  I'm objecting to the

18         extent you're asking him to provide a legal

19         conclusion.

20                   You may answer.

21                   THE WITNESS:  So if it was easy and

22         self-evident, other people would be doing it by

23         now.

24                   And the fact that it's still the right

25         answer and nobody is doing it, I think I've kept

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 81

1          my secret pretty well, apparently.

2     BY MR. BUSH:

3     Q    What steps have you taken to keep your ideas a

4          secret?

5     A    When I dealt with the camera companies, I had

6          them sign nondisclosure agreements.

7               With Bart, partly because of the ▮▮▮▮▮▮

8          ▮▮▮▮▮▮▮▮ I opened up with him.  I mean, there

9          wasn't anything I was -- so that was game on,

10         let's get this happening if we can.

11              And so I didn't -- you know, other than

12         the ▮▮▮▮▮▮▮▮▮▮▮▮ there wasn't a specific

13         document regarding trade secrets with Bart that I

14         know of.

15              MR. INOSENCIO:  Joel, I'm not trying to

16         cut off your line of questioning here, but when

17         you get to a good stopping point, can we take a

18         restroom break?

19              MR. BUSH:  Sure.  Now is good.

20              MR. INOSENCIO:  Okay.

21              THE VIDEOGRAPHER:  We are off the record

22         and the time is 11:16 a.m.

23              (Break from 11:16 a.m. to 11:31 a.m.)

24              THE VIDEOGRAPHER:  We are back on the

25         record and the time is 11:31 a.m.

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 82

1    BY MR. BUSH:

2    Q    Going back on the record, Dr. Lavery.  Your

3         counsel has also asserted in this lawsuit that

4         you provided to SoloHealth a method for

5         developing or implementing or expanding the

6         usage of a medical screening kiosk.

7              Are you familiar with that assertion?

8    A    I don't know specifically what you're asking or

9         what the assertion is.

10   Q    Your counsel has asserted that you claim as a

11        trade secret a method for developing or

12        implementing or expanding the usage of a medical

13        screening kiosk.  Is that familiar to you?

14   A    Correct.

15   Q

16

17

18

19   A

20

21

22        between Bart and myself.

23   Q    Those were in informal discussions between you

24        and Mr. Foster?

25   A    So one-on-one in person, on the phone.  There may

Page 83

1      have been emails, I don't recall.

2   Q    And looking back at the document we marked as

3        Exhibit 11 --

4   A    I'm sorry.  They're back --

5              MR. INOSENCIO:  They are in order.

6              THE WITNESS:  Can I have yours?  Oh,

7        they're in order.  Thank you.

8              MR. INOSENCIO:  It's the very last

9        exhibit.

10             THE WITNESS:  Thanks.

11             (Discussion off the record.)

12  BY MR. BUSH:

13  Q    Looking at Exhibit 11, and pages 13 and 14,

14       there's the request for production number 19,

15       it's at the bottom of page 13, that seeks

16

17

18

19

20       kiosk; do you see that?

21  A    I do.

22  Q    And on the next page, your response to that

23       request is that Plaintiff is unaware of any

24

25

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 84



```
 1
 2
 3
 4
 5    A
 6
 7
 8
```

 9   Q   You didn't specifically ask that SoloHealth do

10       anything specific to protect any of the

11       information that you provided, correct?

12              MR. INOSENCIO:  I'm going to object to

13       the extent that you're mentioning now SoloHealth

14       but the question related to Pursuant Health.

15   BY MR. BUSH:

16   Q   You can answer the question.

17   A   So I apologize.  I'm not trying to be difficult.

18       Can you repeat that one more time?

19   Q   Yeah.  First of all, the response at the top of

20

21

22

23

24       medical screening kiosk.  Do you see that?

25   A   I do.

Kevin T. Lavery , MD                January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

                                                    Page 87

1                MR. INOSENCIO:   -- easier for the court

2          reporter.

3                THE WITNESS:  Sorry.

4    BY MR. BUSH:

5    Q

6

7

8

9

10   A

11   Q

12

13          Bart Foster around ideas for a method for

14          developing, implementing, or expanding the usage

15          of the medical screening kiosk?

16   A    There's a lot of words there.  Can you repeat

17          that again, please?

18   Q    Yeah, we've talked a bit about this -- this

19          notion that you had ideas around a method --

20   A    Yes.

21   Q    -- for implementing, developing, or expanding the

22          usage of a medical screening kiosk.

23                And my question for you is did you

24          collaborate around your ideas on that method

25

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 91

1      day was, the thought of the day, the plan for the

2      day, getting ready for his board meetings.

3   Q  What do you understand to be a trade secret?

4      What does trade secret mean to you?

5              MR. INOSENCIO:  Objection to the extent

6      you're asking him to provide a legal conclusion.

7   BY MR. BUSH:

8   Q  I'm asking for your understanding.

9   A  A trade secret would be an idea that other people

10     haven't thought of yet.  Or a mechanism to make

11     something work or how to integrate certain things

12     that hasn't been thought of before.

13  Q  Do you have any understanding as to the

14     requirements for maintaining a trade secret?

15  A  I do not.

16  Q  Going back to Exhibit 9, the contribution

17     agreement, and I want to make sure I understand

18     your prior testimony about the words that you

19     believe were inserted at the end of the

20     negotiations without your knowledge.

21              Do you remember that testimony?

22  A  I do.

23  Q  And look with me at the top of page two under

24     paragraph 1.2, royalty.  Can you point me to

25     where the language appears in that paragraph that

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 92

1      you believe was inserted into the final agreement

2      without your knowledge?

3   A   Absolutely.  So after the parentheses.  So

4      halfway down the paragraph, increased to three

5      percent, parentheses, 3%.  And then the words

6      that were inserted were 'for the remainder of the

7      term, semicolon.'

8   Q   And those are the words that you saw for the

9      first time at the closing and about which you had

10     the conversation with counsel for SoloHealth,

11     correct?

12  A   Correct.

13  Q   And looking down at the definition of products,

14     it's 1.2 subsection (e).

15  A   Uh-hmm.

16  Q   Do you see that?

17  A   Yes.

18  Q   And what is the definition of products under

19     this agreement?

20  A   Do you want me to read it to you?

21  Q   Please.

22  A   'Products underlined, in parentheses, shall mean

23     vision screening kiosks and any derivative or

24     complimentary applications.'

25  Q   And you understand that your one percent royalty

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 93

1       is tied to this definition of products as it

2       appears in the contribution agreement, correct?

3    A  I thought it was related to net domestic sales.

4    Q  If you'll look at the top paragraph, 1.2(a).

5    A  Uh-hmm.

6    Q  It says, 'A royalty, on a quarterly basis, of

7       one percent of the company's net domestic sales

8       of products for the prior quarter.' Correct?

9    A  Yes.

10   Q  And products is limited to a vision screening

11      kiosk, correct?

12              MR. INOSENCIO:  Objection.  The

13      document speaks for itself.  Are you asking him

14      to interpret --

15              MR. BUSH:  I'm asking him his

16      understanding of this document.

17              THE WITNESS:  It was all a derivative.

18      So if they had apps or things on their website

19      that, you know, related to that, that was all

20      part of it.  So it was any complimentary

21      application and any derivative.

22   BY MR. BUSH:

23   Q  So if Pursuant Health is no longer offering a

24      vision screening kiosk --

25   A  Uh-hmm.

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 94

1   Q      -- you understand that you're not owed a one

2          percent royalty on a kiosk that does not

3          incorporate vision screening, correct?

4                 MR. INOSENCIO:  Objection, it calls for

5          a legal conclusion.

6   BY MR. BUSH:

7   Q      You can answer.

8   A      If they did a vision screening on a phone and it

9          used the same sort of information that we did at

10         the kiosk, I would expect it to be covered as a

11         derivative of what they initially created in a

12         kiosk.

13                As technologies change and things morph,

14         it's still a derivative of the kiosk.  And I

15         would still expect the one percent.

16                (Discussion off the record.)

17  BY MR. BUSH:

18  Q      Before we mark and talk about Exhibit 12, can you

19         tell me what documents you brought with you here

20         today that you're referring to while you're

21         giving testimony?

22  A      I have the original document that SoloHealth

23         would have signed that includes the contribution

24         agreement, the operating agreement, and the

25         consulting agreement.

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 95

1           I have a redline of Version 7 of the

2      operating agreement that was agreed to on

3      Saturday.  I believe that was -- I'm not sure.

4      What day did we sign this?  It was the Saturday

5      before the Thursday.

6           Let me see the date of that.  It was the

7      13th.  So it was Saturday, I think it was the --

8      I can't do the math -- the 7th or 8th.  I may be

9      off on the date.  So any way, this is a redline

10     from that date.

11          I have a redline of the ██████████

12     ██████████    And I have a note page -- to digress, I

13     had a significant stroke in August of '21 and it

14     wiped out my verbal center.

15          (Court reporter seeks clarification.)

16          THE WITNESS:  My speech center.  And so

17     I'm sort of a medical miracle, but I use other

18     parts of my brain to find words now.

19          And so I have some notes just in terms

20     of things that might be good to talk about.

21          MR. BUSH:  Okay.  Can I see those

22     notes?

23          THE WITNESS:  Is he allowed to see

24     those?

25          MR. INOSENCIO:  Yes.  Actually, we can

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 98

1          MR. INOSENCIO:  It looks like this.

2          THE WITNESS:  Yeah.  No, it's just

3     where in the stack.  Okay, I'm there with you.

4  BY MR. BUSH:

5  Q     Do you recognize the document, Dr. Lavery, that

6     we handed you that we've marked as Exhibit 12?

7  A     I do.

8  Q     And you recognize this document as amended

9     discovery responses that your counsel served on

10    January 4th of 2023?

11 A     I know they're responses.  I don't remember if

12    they were amended or -- but yes, I recognize

13    these.

14 Q     And these were served on January 4th of 2023,

15    correct?

16 A     I don't know that, but --

17 Q     There's a date at the last page.

18 A     On the last page?  Okay.

19 Q     You agree that these were served on January 4th?

20 A     Yes.

21 Q     And looking with me at pages six and seven, your

22    amended response to interrogatory number 7, and

23    this response itemizes the three general

24    categories of things that you allege to be trade

25    secrets; correct?

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 99

1           MR. INOSENCIO:  Can you give him a

2       minute to read the four pages that that

3       encompasses, or three pages that that encompasses

4       before he responds?

5           MR. BUSH:  It's three sentences at the

6       bottom of page six and goes into the top of the

7       page seven.

8           MR. INOSENCIO:  Well, I would like him

9       to read the complete response before he responds.

10          MR. BUSH:  That's fine.

11          MR. INOSENCIO:  Okay.

12          THE WITNESS:  Okay, I think I've read

13      enough to hopefully be where you're at.

14  BY MR. BUSH:

15  Q   So you understand that this response to

16  ███████████████████████████████████████████

17  ███████████████████████████████████████████

18      correct?

19  A   Correct.

20  Q   Were any of the items that are described in this

21  ███████████████████████████████████████████

22      provide any of this to SoloHealth at the closing

23      of the contribution agreement?

24  A   No.

25  Q   I'm giving you a document that we'll mark as

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 101

| | | |
|---|---|---|
| 1 | A | Okay.  It's a long document, but -- |
| 2 | Q | I'll give you a moment to look through it. |
| 3 | A | Okay.  I see the document. |
| 4 | Q | Did you ever complete the forms that are included |
| 5 | | in the document that's marked as Exhibit 13 and |
| 6 | | submit the completed information back to the |
| 7 | | person who requested it? |
| 8 | A | I would imagine I had to. |
| 9 | Q | Well, we don't have that.  Do you have a memory |
| 10 | | of doing that or is it just your speculation |
| 11 | | sitting here today that you did that? |
| 12 | A | So the first blush is speculation that if I'm |
| 13 | | moving forward with a legal deal and the lawyer |
| 14 | | sends me documents to fill out to move forward, I |
| 15 | | would think I would fill them out.  So that would |
| 16 | | be my presumption.  If I read them or look at |
| 17 | | these closer, let me see if it rings any bells. |
| 18 | Q | Please, thank you. |
| 19 | A | So I don't recall.  I mean, the questions look |
| 20 | | like good questions to ask and it looks sort of |
| 21 | | familiar, but it also looks fairly lengthy and |
| 22 | | onerous.  And I don't know. |
| 23 | Q | Do you remember identifying any trade secrets in |
| 24 | | response to the request for information that you |
| 25 | | received that we've marked as Exhibit 13? |

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 102

1    A    I don't have the memory or remember what I filled
2         out 15 years ago this morning, no.
3    Q    Did you -- do you remember reading this form 15
4         years ago?
5    A    I don't.
6    Q    Looking with me at Exhibit A to the document
7         we've marked as Exhibit 13.  It has a Bates
8         designation at the bottom right of Lavery 001426,
9         do you see that?
10   A    I don't see where you're looking at, no.
11            MR. INOSENCIO:  The bottom right corner
12        on this Exhibit A.
13            THE WITNESS:  Oh.
14            MR. INOSENCIO:  That's our Bates label,
15        Lavery 1426.  Bottom right corner.
16            THE WITNESS:  Oh, I see.  I'm on that
17        page, yes.
18   BY MR. BUSH:
19   Q    And do you see at the top of that page it has
20        the heading 'trade secret questionnaire,' do you
21        see that?
22   A    I do.
23   Q    And the first paragraph provides an instruction
24        to you from the law firm about what can qualify
25        as a trade secret.  Do you see that?

Kevin T. Lavery , MD            January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 103

1    A    I do.

2    Q    Do you believe that you had information in 2007

3         that meets this definition provided by that law

4         firm for qualifying as a trade secret?

5    A    I do.

6    Q    And what were those things?

7    A

8

9

10   Q    And how was your formula for making a kiosk

11        successful a secret?

12   A    Can you ask that question again?

13   Q    Yeah.  And I'll -- I'll refer you to the

14        instruction that you got from counsel which says

15        that --

16   A    This counsel?

17   Q    This counsel.  In the document we marked as

18        Exhibit 13, it says that the law generally

19        provides that a trade secret is any information

20        or ideas which provide you with an economic

21        advantage over the competition --

22   A    Uh-hmm.

23   Q    -- or held in secret by you and for which you

24        maintain reasonable security measures to continue

25        them as a secret.  Do you see that?

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 104

1   A   I did.  But you interjected the word 'and' after

2       section three.  'And for --' you have to do all

3       three of those.  And I read them as separate,

4       like three separate things.

5           Do you read them as 'and,' you have to

6       do all three?

7   Q   Well, I'm looking for your testimony.  So your

8       testimony --

9   A   As you read the question to me, you added the

10      word 'and' for which you maintain reasonable --

11          You put the conjugation in there,

12      not me.

13  Q   Respectfully, if you'll look at the paragraph and

14      look at the written language on the page.

15  A   Okay.

16  Q   The word --

17  A   Oh, it is there.  Sorry.  Sorry.  I'm trying to

18      read and I'm having trouble reading it.  And I've

19      got it.

20  Q   That's fair.

21  A   The word is in there.  Thank you.

22  Q   I know I'm pushing you.  It's all fair.

23          So you see that there are three things

24      that are required for maintaining a trade secret?

25  A   I do.

Kevin T. Lavery , MD     January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 105

1    Q    At least according to this information that you

2         received in 2007.

3    A    Correct.

4    Q    And do you believe you had information in 2007

5         that satisfied all three of these things?

6    A    Yes.

22              And so individually,

23    it, people may have

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 106

1    it in a mall in a self-automated kiosk.

8    Q    Well, your patent described the idea of the

10        your eyes.  I'm forgetting your testimony, I'm
11        sorry.
12   A    Nonmydriatic.
13   Q    A nonmydriatic camera with a medical screening
14        kiosk that would be placed in public locations,
15        correct?  That's in your patent, correct?
16   A    Yes.
17   Q    So that's public information, correct?
18   A    Yes.
19   Q    Do you have a memory of completing the form
20        that's attached to Exhibit 13 at Exhibit B, the
21        patent questionnaire?
22   A    I don't have a recollection of it, no.  And this
23        legal counsel was for SoloHealth?
24   Q    I'm not sure that I know the answer to that.
25        This was produced to us from your files.  So I'm

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 107

1          not completely certain as to whether this was

2          your counsel or SoloHealth counsel at the time.

3                    Do you have a memory of working with

4          Morris Manning in 2007?

5     A    I've never heard of the law firm before.

6                    MR. BUSH:  I think it's a good time to

7          take a lunch break, at least quickly, if this is

8          good.

9                    MR. INOSENCIO:  Sure.

10                   THE VIDEOGRAPHER:  We are off the record

11         and the time is 12:07 p.m.

12                   (Break from 12:07 to 1:31 p.m.)

13                   THE VIDEOGRAPHER:  We are back on the

14         record and the time is 1:31 p.m.

15    BY MR. BUSH:

16    Q    Going back on the record, Dr. Lavery.

17                   We talked earlier about your ideas

18         around a business model.  You told me you had a

19         number of conversations with Bart Foster around

20         improving the business model or iterations of the

21         business model.  Do you remember that testimony?

22    A    I do.

23    Q    Did you ever tell Bart Foster in those

24         discussions about business model ideas which of

25         your ideas you deemed to be a trade secret?

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 108

```
1    A    So during the conversation, I never stopped and

2         earmarked, this is trade secret information.

3              I was working under the assumption that

4         we were in a collaborative agreement.  We were --
```



```
8              I mean, we had lots and lots of

9         discussions about it.  But there were never -- I

10        don't recall saying, this is a trade secret.

11   Q    And the same question specific to your ideas

12        around a method for developing, implementing, and

13        expanding the usage of a medical screening kiosk.

14             In connection with those ideas, did you

15        ever explain to Mr. Foster which of those ideas

16        on your part you deemed to be trade secrets?

17   A    No.

18   Q

19

20

21   A

22   Q

23   A

24   Q

25
```



Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 109

1
2
3

4    A    I don't yet.

5    Q    Please take your time.

6    A    I do see that mentioned here, yes.

7    Q                                      that we've

8         marked as Exhibit 8, did you ever explain to

9         Bart Foster which of your ideas you believed to

10        be confidential information as opposed to trade

11        secrets?

12   A    I never distinguished between the two, no.

13   Q    You never distinguished between the two in your

14        own mind or you never distinguished between the

15        two in your conversations with Bart Foster?

16   A    Not in my conversations with him.  And I don't

17        know that I have the sophistication to

18        differentiate the two either.

19   Q    So you sitting here today don't know which of

20        your ideas constitute confidential information

21        and which of your ideas constitute trade

22        secrets?

23             MR. INOSENCIO:  I'm going to object to

24        the extent that the question calls for the

25        witness to provide a legal conclusion.

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 110

1    BY MR. BUSH:

2    Q    You can answer.

3    A    Yeah, I'm thinking.  Can you just repeat that

4         question again?

5              MR. BUSH:  Yeah.  Can you read it back?

6              (The last question was read back.)

7              THE WITNESS:  That's probably a fair

8         statement.

9    BY MR. BUSH:

10   Q    You don't know?

11   A    Agree.

12   Q    You're not able to distinguish between

13        confidential information and trade secrets in

14        connection with the ideas that you developed in

15        your collaborations with Bart Foster?

16              MR. INOSENCIO:  Same objection as

17        before, it calls for a legal conclusion.

18              THE WITNESS:  I have an idea, but I

19        couldn't define it.

20   BY MR. BUSH:

21   Q    And what is your idea about the difference

22        between confidential information and trade

23        secrets?

24   A    So trade secrets to me would be the process and

25        methods by which you would bring something to

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 111

1    happen.  The pathways they would flow through.

2    Sort of the schematic of everything.  And then

3    filling in some of the details along that

4    flowchart schematic.

5              Versus confidential information may be

6    more a financial statement or knowing pieces --

7    little pieces of information.  Opposed to -- to

8    me the trade secret is sort of the Coca-Cola

9    secret sauce definition you gave me -- the whole

10   recipe.

11 Q   And what of your ideas -- let's mark as

12   Exhibit -- this document, this one-page document

13   which you prepared that's dated January 31st,

14   2023.  We will mark that as -- I think it's

15   Exhibit 14.

16              THE WITNESS:  Do you have another copy?

17              MR. INOSENCIO:  Yes.

18              (Exhibit 14 is marked.)

19 BY MR. BUSH:

20 Q   Looking at the document we've marked as

21   Exhibit 14, is this a document that you prepared?

22 A   I created this last night just sort of in

23   preparation, some notes to myself.  So, yes, I

24   prepared it.

25 Q   And looking at -- under the heading Kevin

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page  112

1      Lavery's IP, what did you aim to capture in this

2      listing of 1 through 11?

3   A  The things above and beyond the black and white

4      patent application and the patent that was

5      granted.  The other components to what I brought

6      to the table at closing.  The reason why Bart

7      wanted me as his business partner.  The reason he

8      wanted the ideas guy at the table.

9   Q  And when you say brought to the table, you're

10     saying these are things that you brought to the

11     table in terms of the relationship that you had

12     with SoloHealth beginning in 2007?

13  A  Correct.

14  Q  And this is your perspective about what you

15     brought to the table, correct?

16  A  Correct.

17  Q  This isn't necessarily Bart Foster's perspective

18     or anybody else's perspective, correct?

19  A  That would be fair.

20  Q  Looking at number one, it says internet

21     connectivity.  Is that idea a trade secret or is

22     that confidential information?

23  A  So it was in the patent.  So at that point, it's

24     public information.  So I don't know.

25  Q  Okay.  The same question with respect to number

Kevin T. Lavery , MD                     January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 113



A    No.   These are notes to myself.   It wasn't meant
     to be submitted into evidence.   It was just
     talking points.

Q    So this is -- this is meant to be talking points
     rather than an exhaustive summary of your
     intellectual property?

A    Correct.

Q

          Is that meant to describe a trade
     secret or is that meant to describe confidential
     information?

A    At the time it was presented, that was a trade
     secret.

Q    And what was the time at which this was
     presented, from your perspective?

A

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 114

1    Q    And how was this information presented?

2    A    Verbally to Bart, I'm sure.

3    Q    And when you presented this information to Bart,

4         you didn't -- you didn't characterize it in your

5         conversations with Bart as a trade secret,

6         correct?

7    A    Correct.

8    Q    And the ███████ retinal camera at number

9         two, that's also in the patent as well, correct?

10   A    Correct.

11   Q    ████████████████████████████████████

12        Is this a description of a trade secret or a

13        description of confidential information?

14   A    Perhaps more confidential information.  But part

15        of that was -- we were reaching out to a national

16        organization to partner with to help sponsor us.

17        And so they became one of our visible partners.

18             And I don't know if the organization --

19        I can't remember the exact name.  It might -- but

20        something to prevent blindness.  And so we could

21        use these tools to get their interest in us.

22   Q    And number five references business models.  Is

23        that a reference to the business model ideas that

24        you testified about earlier?

25   A    Yes.

Kevin T. Lavery , MD                January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 115

1   Q   That were the subject of your telephone

2       conversations with Bart Foster in 2007?

3   A   Correct.

4   Q   And were those ideas around business models, were

5       those trade secrets or were those confidential

6       information?

7   A   Both.

8   Q   What aspects of your business model ideas

9       constituted trade secrets as opposed to

10      confidential information?

11              MR. INOSENCIO:  Again, objection to

12      these questions to the extent they're calling for

13      a legal conclusion as it relates to what is

14      defined as a trade secret.

15              You may answer.

16              THE WITNESS:  And I apologize, can you

17      ask that question again?

18  BY MR. BUSH:

19  Q   Yeah.  You said that the business model idea that

20      you've itemized here at number five --

21  A   Uh-hmm.

22  Q   -- included both trade secrets and confidential

23      information.  And I'm looking to understand

24      what -- how you distinguished between the two in

25      the subject area of business models.

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 116

1          Which of those ideas on your part were

2     trade secrets and which were confidential

3     information?

4          MR. INOSENCIO:   Objection, form.

18          That's how I would differentiate it.   I

19     don't know if that's accurate, but that's in my

20     mind how it worked.

21     BY MR. BUSH:

22     Q

23     Do you see that?

24     A     I do.

25     Q     And that's one dimension of your idea for a

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 117

1      business model?

2   A      Correct.

3   Q      And the idea of a ███████████████████

4      directly, is that a trade secret or is that

5      confidential information?

6              MR. INOSENCIO:  Same objection.

7              THE WITNESS:  I would look at that

8      mostly as a trade secret.

9   BY MR. BUSH:

10  Q      And from your perspective, why does the idea of a

11      ████████████████████████████ constitute a

12      trade secret?

13  A      Nobody had done it.  Nobody has done it.  People

14      do want to do it.

15              So making health care accessible was a

16      game changer.  And this would allow patients to

17      say, you know, I don't have insurance, I can't

18      get to the doctor's today, it's hard to get

19      there.

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 118

1      thought that was possible at the time.

2   Q   And -- go ahead.

3   A   No.

4   Q   Looking at what you referenced at 5-B,

5   ████████████████████████████████████████

6   ████████████████████████████████████████

7      referred.  Do you see that?

8   A   Yes, I do.

9   Q   What idea is being captured in this descriptive

10      language at 5-B?

11  A   So as we talked about earlier today, these

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████

23  ████████████████████████████████████████████

24          Quite frankly, if a patient comes into

25      my office looking for glasses, they're not going

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 119

1    to get the quality of care they would if they

2    went to an optometric office that sold glasses.

3          I don't sell glasses and we wouldn't

4    give them a good prescription.  We wouldn't even

5    give them a prescription.

6

7

8

9

10

11    Q

12

13    provider, is that in your mind a trade secret or

14    is that confidential information?

15    A    That would be a trade secret.

16    Q    And why is it that you believe that idea for

17

18    is a trade secret?

19    A    I would qualify your question.

20

21    machine.  And nobody is still doing it, that I'm

22    aware of.

23    Q    And looking at the descriptive information at

24    5-C, it starts with                    Do you

25    see that?

1  A   I do.

2  Q   And what concept did you mean to capture in that

3      description?

4  A   

5

6

7

8

9

10

11

12  Q   And is that information that you've described at

13      5-C, in your mind is that a trade secret or is

14      that confidential information?

15  A   As used by the kiosk, that would be a trade

16      secret.

17

18  Q   And 5-D references

19                        Do you see that?

20  A   I do.

21  Q   And what did you mean to convey in that language?

22  A

23

24

25

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 121

1    patients.

2 Q   ███████████████████████████████████████

3    ███████████████████████████ did you

4    conceive that in your mind to be a trade secret

5    or to be confidential information?

6 A   A trade secret.

7 Q   And why do you believe that idea is a trade

8    secret?

9 A   Because when you think about the Yellow Pages,

10    it's sort of global.  You can market a little bit

11    on a Yellow Page what you do and who you are and

12    what you're about.

13    ████████████████████████████████████████████

14    ████████████████████████████████████████████

15    ████████████████████████████████████████████

16    ████████████████████████████████████████████

17    ████████████████████████████████████████████

18        If I can say I have a patient who has

19    ████████████████████████████████████████████

20    ████████████████████████████████████████████

21    that provider.

22        And we can go down the list with

23    glaucoma and ████████████████ and all of the

24    other things that you can see on a retinal

25    camera.

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 122

1   Q    And the ███████████ and the glaucoma,

2        those are all conditions that are referenced in

3        your patent, correct?

4   A    That's not correct.

5   Q    How is that not correct?

6   A    I don't believe I mentioned ██████████████

7        in the patent.

8   Q    You did mention glaucoma.

9   A    I believe I did.  I don't believe I mentioned

10       ██████████████ in the patent.

11  Q    And you did mention diabetes, correct?

12  A    Correct.

13  Q    And you did mention in the patent that other

14       conditions could be evaluated or assessed based

15       on the retinal scan, correct?

16  A    Correct.

17  Q    ███████████████████████████████████████

18       ███████████████████████████████████████

19  A    ███████████████████████████████████████

20       ███████████████████████████████████████

21       ███████████████████████████████████████

22       ███████████████████████████████████████

23       ███████████████████████████████████████

24       ███████████████████████████████████████

25       ███████████████████████████████████████

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 123

1    stores.



9    Q    And do you deem that idea to be a trade secret or

10        to be confidential information?

11   A    Trade secret.

12   Q

14        you mean by that?

15   A

19              But in addition, I really thought that

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 124

1    fashion but still be a potential huge revenue

2    stream for Pursuant Health.

3    Q    And do you deem the idea of



7    A

12         So that's a little bit of both, a trade

13   secret and confidential information, creating a

14   new way to reach those patients who aren't being

15   reached.

16   Q    And is it your testimony that all of the ideas

17   that are captured at 5-A through 5-F were the

18   subject of your conversations with Bart Foster

19   in 2007?

20   A    Yes.

21   Q    And it's also your testimony that in having these

22   conversations with Bart Foster, you didn't

23   designate any of these ideas at 5-A through 5-F

24   specifically as trade secrets, correct?

25         MR. INOSENCIO:  For clarification, do

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 125

1        you mean now or at the time?

2    BY MR. BUSH:

3    Q     At the time.

4    A     At the time, we were committed to making things

5          happen and I wanted to partly sell him on my idea

6          of why this was going to change the world.

7                But I did not designate it as --

8          probably designate -- but Bart, everything from

9          this forward is a trade secret.

10   Q     And number 6 references the demo video as a proof

11         of concept.  Is that the same video or camera

12         stream that you testified about earlier that was

13         prepared by Mr. Hiremath in Australia?

14   A     Correct.

15   Q     Number 7 describes advertisers.  What did you

16         mean to convey in what is reflected in number 7?

17   A     I had a number of contacts in the industry and

18         was a consultant to companies.  So I knew a lot



19

20

21

22

23

24

25

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 126

1    Q    And ████████████████████████████████

2         kiosk, is that a concept that you deemed to be a

3         trade secret or something that you deemed to be

4         confidential information?

5    A    ████████████ is pretty ubiquitous.  So I might

6         file that -- knowing ████████████████████████

7         ████ is confidential information.

8    Q    And number 8 describes ████████████████████

9         ██████████████████████████ I know.  Do

10        you see that?

11   A    I do.

12   Q    What did you mean to capture in that statement?

13   A    So I had more significant conversations with some

14        ████████████████████████████████████████

15        ████████████████████████████████████████

16        ████████████████████████████████████████

17        ████████████████████████████████████████

18   Q    And those ████████████████████ that are

19        captured in your number 8, those are -- those are

20        ████████████████ you would deem to be confidential

21        information?

22   A    Yes.

23   Q    And not a trade secret, correct?

24   A    Correct.

25   Q    And number 9 references ████████████████████

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 127

1    ███████████████████████████████████

2    the machine.  Do you see that?

3  A    I do.

4  Q    And what do you mean to reference with that

5    language?

6  A    So specifically -- and I think a lot has changed,

7    but ███████████████████████████████  And

8    so there's value in ████████████████████████

9    ██████████    It wouldn't be difficult to modify the

10   ████████████████████████████

11        And that was not in the patent, but the

12   patent does talk about the diagnostic testing on

13   the side of the machine.

14        So other functionality that we could put

15   on the machine besides the blood pressure, which

16   they ultimately did, was glucose monitoring,

17   which was difficult to obtain back in 2000.  The

18   ██████████████████████████ patients who needed

19   testing.

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████

25  Q    And these ideas you've described for ████████

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 128

1    ████████████ is this -- is this a concept that

2    you deemed to be confidential information or

3    something you deemed to be a trade secret?

4    A    So both.  The ████████ would have been more just

5    confidential information, as an idea.  It could

6    be a trade secret.  Nobody is doing it out in the

7    mall like that.  It's not accessible to the

8    public.

9        That's part of why it was going to break

10   down barriers because -- and be disruptive, that

11   ████████ is one of those areas that's cartelled

12   off.  You have to -- there's a lot of regulations

13   around it.

14   Q    And number 10 references ██████████████

15   ████████  And what do you mean to reference in

16   that -- in that topic?

17   A    So at the time, it was more just -- I was an FDA

18   primary investigator-researcher on a number of

19   studies.  So I know that people are looking for

20   ████████████████████████████████████████

21   That's what I spent a fair amount of time on.

22   ████████████████████████████████████████

23   ████████████████████████████████████████

24   ████████████████████████████████████████

25   ████████████████████████████████████████

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 129

1      Now today looking at it, I'd say █████

2  ████████████████████████████████████████

3  ████████████████████████████████████████

4  ████████████████████████████████████████

5  Q    And the ██████ that you're describing in number 10,

6       is that something you deemed to be a trade secret

7       or confidential information?

8  A    It would be a trade secret.

9  Q    And why is it that you believe that ████████████

10      ██████ is a trade secret that you own?

11 A    So I don't own ██████████████████████████

12      ████████████████████

13 ████████████████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████████████████████████

16 ████████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████████

21 ████████████████████████████████████████

22 ████████████████████████████████████████

23 ████████████████████████████████████████

24      even know what the number is.  We had a clicker.

25      We had -- you could look and see what the actual

Kevin T. Lavery , MD                      January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 130

1    rolling number was of how many people had used

2    the machine.  I believe it got up to

3    two-and-a-half million a month.  Or well over

4    thirty million.  I don't even know what the

5    number is anymore.



19              MR. INOSENCIO:  Just reminder to slow

20       down a little bit --

21              THE WITNESS:  Sorry.

22              MR. INOSENCIO:  -- for Marilyn.

23              THE WITNESS:  Sorry, Marilyn.

24    BY MR. BUSH:

25    Q    And again, you're not taking the position that

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 132

1      support optometry, we ultimately got scope of

2      practice legislation passed for optometry.  We

3      fought a long battle for that.

4              So I experienced and knew what some of

5      the sensitivities were.  And I wanted SoloHealth

6      to be sensitive to that and how we presented that

7      data, how we interacted with the optometrists in

8      a way that wasn't threatening to them was really

9      important.

10             Otherwise we would have been in trouble

11     before we got started.

12  Q   And thinking about everything on this page that

13     we've talked about, 1 through 11, and all of the

14     ideas that you've described that are captured by

15     these -- by these -- by these notes that you made

16     last night, are you aware of any confidentiality

17     agreements specific to any of these ideas other

18     than the language that's in Exhibit 8 that we

19     looked at earlier?

20  A   And Exhibit 8 is referencing what?

21  Q   The █████████████

22  A   I'd have to look at the documents to know what

23     confidentiality we put in the contribution

24     agreement versus the ████████████

25  Q   Let me give you time to do that.  You told me

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 133

1    earlier that you didn't know of any

2    confidentiality restrictions in the contribution

3    agreement that's marked as Exhibit 12, and we've

4    talked about the confidentiality language in the

5    document we marked as Exhibit 8.

6  A  Okay.

7  Q  And so my question is, other than the

8     confidentiality language in Exhibit 8 that we

9     talked about --

10 A  Okay.

11 Q  -- can you identify any other nondisclosure

12    agreement specific to any of these ideas that

13    you've testified about that are captured on

14    Exhibit 14?

15 A  No.

16 Q  And the contribution agreement that we marked as

17    Exhibit 12 has the Exhibit B for the disclosure

18    of intellectual property, correct?  We looked at

19    that earlier.

20 A  Can you reference what page that was?  Oh,

21    that's --

22 Q  It's Exhibit 12.  It's the executed version of

23    the confidentiality -- of the contribution

24    agreement.

25 A  Exhibit 12 is the -- is something different.

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 135

1   BY MR. BUSH:

2   Q    So the ideas that are captured in your notes

3        that we marked as Exhibit 14, none of those are

4        specifically identified in the Exhibit B,

5        intellectual property, to the executed

6        contribution agreement that we marked as

7        Exhibit 9, right?

8             MR. INOSENCIO:  Objection, asked and

9        answered.

10            You may answer.

11            THE WITNESS:  Correct.

12  BY MR. BUSH:

13  Q    Let's mark now the other documents that you

14       brought with you today.  You brought a redline

15       version of ███████████████   right?  We'll

16       mark that as Exhibit 15.

17            MR. INOSENCIO:  Do you have that in

18       front of you, Kevin?

19            THE WITNESS:  I don't.  Yeah, I

20       probably do.  Yes, I do.

21            MR. INOSENCIO:  Okay.

22  BY MR. BUSH:

23  Q    So can you identify Exhibit 15 for the record?

24            MR. INOSENCIO:  We have not marked that

25       yet, Joel.  If we could just have a second.

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 136

```
 1              MR. BUSH:  I thought -- I thought we
 2       marked it.  I'm sorry.
 3              (Discussion off the record.)
 4              (Exhibit 15 is marked.)
 5              THE WITNESS:  So I'm looking at a draft
 6       ██████████████████████████████████████████████
 7       ██████████████████████████████████████████████
 8  BY MR. BUSH:
 9  Q    And this document we marked as Exhibit 15 is a
10       document that you brought with you today to the
11       deposition, correct?
12  A    Correct.
13  Q    And why did you bring Exhibit 15 to the
14       deposition today?
15  A    It was something that I reviewed last night and
16       was in my folder.
17  Q    Is there any reason you wanted to have a copy of
18       the redlined ████████████████  instead of a copy
19       of the executed version of ███████████████████
20  A    I think it was the only one that was available
21       to me.
22              MR. BUSH:  We will mark as Exhibit 16 --
23              (Exhibit 16 is marked.)
24  BY MR. BUSH:
25  Q    Can you identify Exhibit 16 for the record?
```

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 137

A    This is a redline version of the contribution

agreement of myself to SoloHealth, version .7.

Q    And this redline version of the contribution

agreement that we marked as Exhibit 16 is a

document that you brought from your personal

files to the deposition today, correct?

A    It was provided to me by counsel for review.

Q    And why did you deem it important to bring the

document we've marked as Exhibit 16 to the

deposition today?

A    Because it speaks to who I may have partnered

with and gave my -- one of my greatest life

inspirations to.

       And I signed off on an agreement with

legal counsel's review on Saturday.  This is --

this is the one that intersected the perpetual.

This was the agreement that was sent out on

Saturday around 2:00 for approval.  I approved

it.

       If you follow the email train, you know,

the hard and fast for me was there had to be a

perpetual royalty.  Because all of this other

stuff was, you know, smoke and mirrors of sorts.

       I didn't know if they were going to be

successful with the company.  I didn't know if

Kevin T. Lavery , MD                      January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 138

1    they were going to make it happen.

2         One of the things in the ██████████

3    ████████████████████████████████████████

4    ████████████████████████████████████████

5    ████████████████████████████████████████

6    ████████████████████████████████████████

7         I mean, it was really important to me

8    to have this happen.  I wasn't just signing over,

9    you know, the patent and being gone.  But I

10   wanted -- ████████████████████ we started off

11   at three percent and then two percent and then it

12   got reduced down, and there were some caveats for

13   it to go up and down.

14        But at the end of the day, I said all

15   right, you know, I'm taking a reduced payment on

16   my royalty compared to ████████ but I want that to

17   be a perpetual guaranteed royalty.

18        And the word perpetual was put in by

19   Brian Gordon in response to those emails of that

20   same week, leading up to that Saturday.  We

21   signed off on the agreement.  And unfortunately

22   that's not the agreement I signed.

23   Q    And the document we marked as Exhibit 16 in

24   your testimony is the document -- the version of

25   the agreement that you approved on Saturday at

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 139

```
 1        two p.m., is that your testimony?

 2   A    Two something p.m., but yes.

 3   Q    The Saturday before the execution of the final

 4        document the following week?

 5   A    Correct.

 6               MR. BUSH:  And we'll mark Exhibit 17.

 7               (Exhibit 17 is marked.)

 8               THE WITNESS:  Thank you.

 9   BY MR. BUSH:

10   Q    Can you identify Exhibit 17 for the record?

11   A    This appears to be 7 without the redline

12        mark-ups.

13   Q    When you say 7 without the redline mark-ups, what

14        you're saying is that Exhibit 17 is the same

15        document as the one we marked as Exhibit 16

16        except that Exhibit 17 does not have any

17        redlining?

18   A    I believe so.

19   Q    But otherwise Exhibit 17 and Exhibit 16 are the

20        same documents?

21   A    I haven't read the whole thing, but I believe so.

22   Q    And what was your reason for bringing the

23        document we marked as Exhibit 17 to the

24        deposition today?

25   A    There wasn't any.  Yeah, the same -- I --
```

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 140

1   Q    It's just a document that you reviewed?

2   A    Yeah.  There was no hidden intention for having

3        two copies of it.

4             But to me the redline version is just

5        so striking because perpetual is in bright blue

6        in ink saying we have now inserted that as a --

7        as we've come to an understanding of what we've

8        agreed to and was delineated between Tom Spillane

9        and Brian Gordon as a reference to Bart Foster

10       and Kevin Lavery's discussion, we realize that

11       this is a deal breaker, he needs a perpetual

12       royalty if we're going to make this happen, and

13       he put the word perpetual in.  That was really

14       big.

15  Q    And your view is you're owed a perpetual royalty

16       even if your patent is expired?

17  A    Absolutely.

18  Q    Let's look at -- do you agree that the patent

19       that was issued in your name for which you were

20       named inventor, do you agree that that patent is

21       expired?

22  A    I don't disagree with it.  I'm not sent anything

23       from the patent office, so relying on what

24       Pursuant Health has told me, I believe it has

25       expired.

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 152

1           agreement,' do you see that?

2    A      Okay.  Yes.

3    Q      And going to the last line in that paragraph, you

4           write, 'unfortunately for both myself and

5           Pursuant, the retinal camera was not added on

6           during the life of the patent.'  Do you see that?

7    A      I do.

8    Q      Was that a true statement when you wrote this

9           email in January of 2022?

10   A      I believe it to be.

11   Q      And you reference the life of the patent in this

12          sentence.  What did you mean by the life of the

13          patent?

14   A      Until the expiration date of the patent.

15   Q      So your point in making this statement was that

16          the retinal camera had not been added by Pursuant

17          Health before the expiration date of your patent,

18          correct?

19   A      Correct.

20   Q      Let's look at what we will mark as 21.

21               (Exhibit 21 is marked.)

22   BY MR. BUSH:

23   Q      Do you recognize the document we've marked as

24          Exhibit 21?

25   A      I recognize what it is.

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 153

1    Q    And can you tell me what it is?

2    A    It looks like the complaint that was filed

3         against Pursuant Health.

4    Q    And this is the complaint that you filed against

5         Pursuant Health, correct?

6    A    Correct.

7    Q    Did you read this pleading before it was filed?

8    A    I did.

9    Q    Do you believe it's true and accurate?

10   A    I do.

11   Q    Look with me at paragraph 50.  It's on page ten.

12   A    I'm sorry, page 50?

13   Q    Paragraph 50, page ten.  And paragraph 50 alleges

14        that Pursuant Health came to manufacture and

15        market a retinal scan kiosk.  Do you see that?

16   A    I don't see that, no.  Paragraph 50?

17   Q    Paragraph 50.  'Although the retinal scan kiosk

18        came to be manufactured, marketed and sold,' do

19        you see that?

20   A    I do see that, yes.

21   Q    And that statement is not correct, is it?

22   A    So although the retinal camera has not been made

23        operational yet, I know they were diligently

24        working on it and don't know that they don't have

25        a full unit ready to go.

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 154

1              So the last one I saw, there was a

2     prototype with a retinal camera in it.  So I

3     don't know that this is a false statement.

4  Q  So paragraph 50 doesn't reference a prototype,

5     correct?

6  A  It doesn't say it's in the marketplace either.

7  Q  It says marketed and sold, right?  Paragraph 50

8     references a retinal scan kiosk that came to be

9     manufactured, marketed, and sold.

10             Do you know of a retinal scan kiosk

11    that Pursuant Health has manufactured, marketed,

12    and sold?

13 A  So -- no.

14 Q  Let's look at paragraph 22.  Do you believe that

15    the allegations in paragraph 22 are factually

16    correct?

17 A  Yes.

18 Q  Do you believe that the health and wellness kiosk

19    developed by Pursuant Health is based on a trade

20    secret that you developed?

21 A  Yes.

22 Q  What is the trade secret that you developed that

23    forms the basis for the Pursuant Health kiosk?

24 A  ███████████████████████████████████████████

25    And I saw a t-shirt of mine this morning that

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 155

1    said SoloHealth.  On the back it says, you know,

2    make your change a reality or something, you

3    know.  Take charge of your health, you know.



12          Those are all my ideas, you know.  And

13   so -- or a lot of them are.  And they're jointly,

14   you know, some of them are jointly.  But that was

15   what we put together.  And so, yes, those were my

16   information to make that happen.

17   Q    And you say jointly.  Ideas that you had along

18        with Mr. Bart Foster?

19   A    A lot of things were discussed.  And so as things

20        morph and evolve, I'd have to go through each

21        item and say this was my idea, this was his idea,

22        he wanted green, I wanted red, whatever it is.

23   Q    And you haven't found occasion to do that as of

24        today, have you?

25   A    I have not.

Kevin T. Lavery , MD          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 156

1              MR. INOSENCIO:  Objection.

2              THE WITNESS:  Sorry.

3     BY MR. BUSH:

4     Q    And you said that part of your ideas that are

5          imbedded in the current kiosk are the fact that

6          it is connected to the internet.  That's a

7          concept that's in your patent, correct?

8     A    Correct.

9     Q

10

11

12

13    A

14

15

16

17

18             MR. BUSH:  Respectfully I'm goin to move

19         to strike as non-responsive.  That wasn't -- that

20         wasn't my question.

21    BY MR. BUSH:

22    Q    My question was, your patent references the

23         capacity of the kiosk as you envisioned it to

24         capture medical information above and different

25         from vision tests, correct?