UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN T. LAVERY,

    Plaintiff,                                 Case No. 2:22-cv-10613

v.                                                 Hon. Jonathan J.C. Grey

PURSUANT HEALTH, INC.,

    Defendant.

---

**CONSOLIDATED SUPPLEMENTAL RESPONSE TO DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT AND FOR SANCTIONS**

The principal issue raised by defendant's motion for summary judgment (ECF 30) and motion for sanctions (ECF 34) is whether the promised 1% perpetual royalty on product sales is enforceable in light of *Kimble v. Marvel Entertainment*, *LLC,* 576 U.S. 446 (2015). Dr. Lavery files this supplemental brief to alert the Court to a very recent case which, under comparable facts, upheld enforcement of a perpetual royalty clause, and to highlight facts that are especially relevant in light of that case. The evidence shows (1) that the disputed perpetual royalty is tied to one or more non-patent contributions by plaintiff, thus falling outside of *Kimble's* proscription, and (2) like the newly cited case (and unlike *Kimball*) the royalty at issue here is calculated from a sales base that is defined without reference to the patent. This Court should deny Pursuant's motions and allow this case to proceed to a jury to decide the disputed questions of fact.

**I.    Recent Law Construing *Kimble*.**

In *Kimble,* the Supreme Court confirmed its earlier holding in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), barring enforcement of a royalty obligation tied only to an expired patent. However, *Kimble* does not bar all continuing royalties. "[P]ost-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent." *Kimble,* 576 U.S. at 454.

1

The only case plaintiffs have located construing *Kimball* and having analogous facts is *Zimmer Biomet Holdings, Inc. v. Insall*, case no. 22-CV-02575 (N.D. Ill., April 11, 2023) (Lindsay Jenkins, J.) (unpublished memorandum order attached as Exhibit A). Briefly summarized, in 1991 Zimmer promised Dr. Insall, the inventor of an improved artificial knee, a 1% royalty on sales of Zimmer's products "until expiration of the last to expire of the patents licensed hereunder <u>or so long as Product is sold by Zimmer</u>, whichever is last to occur." *Memorandum Order,* PageID 572 (Ex. A, emphasis added). In 1994 and 1998, the parties amended their agreement to tie the perpetual 1% royalty to "all sales of the NexGen Knee and all subsequently developed articles, devices or components marketed by Zimmer as part of the NexGen Knee family." After Insall's patents expired in March 2018, Zimmer argued that *Brulotte* allowed it to suspend royalty payments, even though it continued to sell products incorporating the same features under the "NexGen Knee" family. An arbitration panel rejected Zimmer's argument and ruled that *Brulotte* and *Kimble* did not bar perpetual payments.

Zimmer filed suit to vacate the award, arguing that the royalty was unenforceable under *Kimball* because Insall's now-expired patent leverage was "baked in" to the amended License Agreement. *Id.* at PageID 578. The district court, in rejecting Zimmer's arguments, affirmed the enforceability of post-expiration royalties when those royalties are tied to a non-patent right:

> The 1998 Amendment decoupled the royalty from Insall's patents by instead basing the royalty on sales of "NexGen Knee and all subsequently developed articles, devices or components *marketed by Zimmer* as part of the NexGen Knee family of knee components." In other words, the 1998 Amendment does not prevent Zimmer from using Dr. Insall's patents or tie royalties to those patents, but rather requires and ties payment to Zimmer's decision to market certain components as part of the NexGen Knee family. Since "post-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent," *Kimble*, 576 U.S. at 454, the Court finds no error in the Panel's conclusion that *Brulotte* does not apply to NexGen Knee royalties set out in the 1998 Amendment.

*Zimmer,* Ex. A at PageID 581 (emphasis original).

2

## II. Brief Summary of Relevant Facts

It is appropriate to review some of the facts in this case that relate to the analysis conducted by the *Zimmer* court, specifically the nature of the patentee's contributions to the business enterprise and the defined royalty base.

1. In 2007, Lavery and Bart Foster, the founder and principal of SoloHealth (defendant's predecessor), combined their skills and resources to launch a new company. *See* Oct. 11 2007 Contribution Agreement (ECF 030-8 PageID 508); *see also* June 5 2007 Letter of Intent (ECF 030-7 PageID 501). Dr. Lavery contributed valuable intellectual property to the new enterprise before, during, and after the closing.

Contributions prior to closing (past performance):

2. Lavery introduced Foster to a software and biomedical engineer who demonstrated a working model of retinal screening using infrared sensors. Lavery dep. 44-45 (Exhibit B).[1] Lavery also communicated business ideas how to best commercialize the medical kiosk concept including i) broadening the capabilities of the kiosk beyond simple vision screening (such as hearing testing); ii) introducing a new-to-market eye care delivery system, disruptive entry in the eye care and ophthalmology; iii) exploiting alternative revenue streams beyond consumer payment, such as collecting referral fees from large retailers and ophthalmologists; and iv) collecting fees from insurance companies for screening services. Lavery dep. 26-27 (hearing testing), 33-36 (business model with alternate revenue streams); 59-61 (ideas communicated at pre-closing discussions); Lavery

---

[1] Plaintiff attaches the deposition transcripts hereto as public documents. Plaintiff intends to withdraw its motion (ECF 36) seeking authorization to file deposition transcripts under seal. Defendant consents to filing the deposition transcripts publicly (ECF 41 PageID 1092). Plaintiff does not waive his allegation and argument that at the time Lavery communicated his many ideas and helpful information to Bart Foster and defendant, they were confidential trade secrets.

viewed these strategic business ideas as "the things that were going to bring, in my mind, the patent to life." *Id.* at 36.

3. Bart Foster largely corroborates plaintiff's pre-closing contributions. *See* Foster dep. at 80 (Exhibit C) (Lavery provided strategic advice and consultation under the Consulting Agreement). Importantly, Bart Foster understood that all of Dr. Lavery's pre-closing discussions with him were confidential under the terms of the Letter of Intent. *Id.* at 139 (all discussions after signing the LOI were subject its confidentiality and nondisclosure provisions); *see also* LOI (ECF 030-7 PageID 504).

<u>Contributions at closing:</u>

4. Assigned U.S. patent No. 6,594,607 ("the Patent" ECF 030-5 PageID 431) for a medical screening apparatus and method Lavery invented (ECF 030-10 PageID 531 (assignment)). The patent broadly claimed a patient-activated, fully automated medical screening apparatus that transmitted test results via the internet (Patent, claim 1) and, more particularly, retinal screening (*e.g.* dependent claims 8-12).

5. Along with the Patent, Lavery agreed to convey all proprietary information, trade secrets, and other intellectual property rights he held that were "attendant to the Patent." Contribution Agreement Ex. B ("Intellectual Property") (ECF 030-08 PageID 520), to be effected through a contemporaneous Consulting Agreement. (ECF 030-012 PageID 536).

<u>Contributions post-closing:</u>

6. Post-closing IP contributions were governed by a separate Consulting Agreement, which expressly contemplated Lavery's making valuable post-closing contributions:

> Consultant acknowledges and agrees that as part of Consultant's engagement with the Company, *Consultant is expected to make new contributions of value to the Company*. *Id.* PageID 537 (emphasis added).

4

7. The scope of these covered contributions was unusually broad. The Agreement required Lavery to convey all his ideas, inventions, know-how, etc. "which relate to, or are capable of use in connection with the Products (as defined in the Contribution Agreement), or any services or programs offered, used, sold or being developed by the Company in connection with the Products. Any and all of the foregoing shall belong exclusively to the Company." *Id.* PageID 538. The Consulting Agreement imposed on Lavery a continuing obligation to convey his ideas and inventions to defendant regardless of when or how he conceived them and regardless whether he conceived them in the course of performing his duties at SoloHealth. *Id.* In other words, Lavery was tasked with conceiving and irrevocably conveying to defendant any idea which related to defendant's business or was even capable of use in connection with the Products.

8. Lavery's contributions under the Consulting Agreement were closely guarded confidential trade secrets, and continue to be confidential to this day. *Id.* PageID 536-37 (broad confidentiality clause prohibiting use or disclosure of Confidential Information "during the Engagement Period and thereafter"). Bart Foster testified that he regarded Lavery's contributions under the Consulting Agreement as SoloHealth property. Foster dep. 101.

9. In conjunction with the foregoing contributions, Lavery served as SoloHealth's Chief Medical Officer without any additional compensation for the first 20 hours of his service per month. See Contribution Agreement § 1.6 (assigning title and duties, ECF 030-08 PageID 510); Consulting Agreement § 3 (compensation, ECF 030-12 PageID 536).

10. Dr. Lavery testified that he provided extensive technical advice, business guidance, and strategic advice as independent consultant and Chief Medical Officer. Lavery dep. 71 ("absolutely" provided intellectual property to SoloHealth after the closing), 73 (worked

extensively on SoloHealth business model after the closing), 75-76 (extensive calls, meetings and discussions with SoloHealth under the Consulting Agreement).

11. In his deposition, Bart Foster corroborated all of plaintiff's alleged contributions under the Consulting Agreement and more. Foster readily agrees that Dr. Lavery provided many ideas on how he saw the kiosk rolling out. Foster dep. 149 ("He had tons of ideas."). Foster confirmed that he spoke "frequently" with Dr. Lavery after the closing about "all kinds of things … and ideas." Foster dep. 105. For example, Lavery provided specific business model involving physician referrals (Foster dep. 98-99), provided names of potential vendors, consultants, regulatory path guidance, clinical validation, content of eye health information provided by a kiosk (*id.* 100); and recommended putting a retinal camera into the kiosk device (*id.* 103). Lavery's contributions after the closing included market size, ophthalmology markets and scope *(id.* at 109-10), as well as ideas relating to internet connectivity of kiosk (*id.* 145).

12. It is undisputed that Lavery fulfilled his duties and provided SoloHealth with recommendations and consulting expertise on equipment design. ophthalmology expertise, business ideas, and strategic guidance. Bart Foster further testified:

> Q. **Do you have a memory of making any modifications to the kiosk in late 2008 or early 2009 as a consequence of any information received … from Dr. Lavery?**
>
> A. **Absolutely**…. I bet we made 100 little modifications. And it could have been everything from change the button from green to orange. It could have been make sure the sign is – says free. Modify the hardware this way. **Dr. Lavery and I would talk sometimes every couple weeks**; sometimes a couple months would go by. I didn't take detailed notes of who said what. We were just moving. We were moving fast. So I can't clearly determine who said what and what modifications were made.

Foster dep. 123-25 (emphasis added). Foster summed up Dr. Lavery's many post-closing contributions to the company as "He had tons of ideas." *Id.* 149.

6

13. Lavery testified that he validated processes, identified what information to capture, assisted with obtaining a key $1.2 million NIH grant, and generally provided a great deal of immediate expertise and guidance on "what data we should get and how we should use it." (Lavery dep 19-20). Lavery shared with Foster his contacts in the industry, including lens manufacturers (*Id.* 61) and provided instant credibility for the new company through his reputation as a recognized expert in ophthalmology.

> [Bart Foster] saw that I had contacts in the industry, that I had been talking to lens manufacturers, that I knew optometry well. I had been speaking at big optometric national meetings. I had a big optometric referral network. I knew ophthalmology. They didn't know ophthalmology. They didn't have any doctor on their staff. They weren't thinking about the medical aspects of what we could do. And so between all of the different things that – you know, the businesses I've run, the contacts, the knowledge in medicine, *he wanted me at the table. He wanted access to those ideas. And that's why we talked as much as we did even after the closing and starting the business. He ran most ideas by me before implementing them.*

Lavery dep. 61-62.

14. Dr. Lavery testified he regularly communicated with SoloHealth personnel, including with defendant's current president Leslie Sommers, until about January 2022, shortly before he filed this lawsuit. Lavery dep. 18 (describing "fairly regular" communications including video conferences with Pursuant regarding implementation of retinal camera into kiosk).

Royalty Basis

15. Under the Contribution Agreement, Lavery received 10% equity in SoloHealth plus 1% perpetual royalty on defendant's "Product sales." Contribution Agreement § 1.2(a) (ECF 030-8 PageID 509). Critically, the Agreement does <u>not</u> define "Products" as limited to medical screening kiosks that incorporate a patented feature. Rather, the royalty base broadly encompasses "vision screening kiosks and any derivative or complementary applications." *Id.* § 1.2(e).

7

**III.   The Perpetual Royalty is Not Tied to the Patent.  At a Minimum, the Facts Raise a Genuine Issue Concerning the Existence of a Patent Tie.**

Lavery contributed far more to the new enterprise than his patent.  Beginning months before the October 2007 closing, and continuing for nearly fifteen years, Lavery contributed a steady flow of confidential information including valuable medical expertise, business acumen, and industry contacts.  He also brought substantial intangible value to the new company through his reputation as a prominent ophthalmologist serving as its Chief Medical Officer.  Defendant continued benefitting from Lavery's expertise through 2021.  Around January 2022, Defendant terminated the relationship, not because of any failure on Lavery's part but rather because of Pursuant's unilateral decision to halt the promised 1% royalty payment.  Every document and every witness in this case refutes Defendant's contention that Lavery's only contribution to the business was his Patent.

The documents also soundly disprove Pursuant's assertion that Lavery's contributions were not trade secrets.  The Letter of Intent provided that Lavery's pre-closing discussions were confidential (ECF 30-8 PageID 504).  The Consulting Agreement likewise makes clear that plaintiff's pre- and post-closing ideas concerning medical technology, device design, business models, and market strategy were Confidential Information, *i.e.* trade secrets. (ECF 30-12 PageID 536-37).

This case is distinguishable from *Kimball* and *Brulotte* in several respects.  <u>First</u>, unlike the licensee companies in those cases, Pursuant received much more than simple permission to practice a patented invention.  Indeed, Pursuant continued to receive Dr. Lavery's contributions as recently as 2021, even after the Patent expired.  <u>Second</u>, in neither *Kimball* nor *Brulotte* did the patentee have a formal continuing consulting relationship subject to i) confidentiality provisions and ii) a strict requirement to convey all intellectual property conceived during the consultancy relating to the company's business or even *capable* of being utilized by the company.  Because

Pursuant received valuable contributions far broader than a narrow right to practice the invention protected by the Patent, the perpetual royalty is enforceable. *Kimble,* 576 U.S. at 454 ("[P]ost-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent.").

A third and important distinction from *Kimble* and *Brulotte* is highlighted in the recent *Zimmer Biomet* case cited above, namely, the base from which the perpetual royalty is calculated. The underlying party dynamics in this case closely resemble *Zimmer Biomet.* In both cases, a medical doctor patented a ground-breaking medical device that allowed the recipient company to enjoy remarkable commercial success. In both cases, the company and the inventor agreed to a long-term consulting arrangement under which the company received exclusive rights over new inventions. *See Zimmer Biomet Memorandum Op.* Ex. B, PageID 572 (Insall's consulting relationship with Zimmer was exclusive). In both cases, it was undisputed that the parties mutually intended a perpetual royalty. And in both cases, the recipient company sought to avoid its promise to pay a perpetual royalty based on *Brulotte* and *Kimble*.

Perhaps the most important fact shared by the parties here and in *Zimmer Biomet,* the 1% perpetual royalty is *calculated on a sales base that is defined without reference to a patent.* In *Zimmer*, the court emphasized that the base for the perpetual royalty was not "Zimmer products incorporating a patent claim" but rather "products marketed under the NexGen Knee family." *Memorandum Op.*, PageID 581 (Ex. B hereto). The court found that this royalty base distinguished Insall's claims from the inventor in *Kimball* and held that the arbitration panel had not erred in finding that the perpetual royalty did not run afoul of *Brulotte. Id.; cf. Kimball v. Marvel Ent., Inc.,* 727 F.3d 856, 859 (9th Cir. 2013) (parties' royalty base defined as "product sales that would infringe the Patent").

9

Like the royalty base upheld in *Zimmer Biomet,* the royalty base here is not "SoloHealth products incorporating features covered by a Patent claim" but rather "vision screening kiosks and any derivative or complementary applications." Although this base relates to the Patent rights that Dr. Lavery conveyed in 2007, its definition omits any reference to the Patent, thereby removing this case from *Kimball*'s proscription against perpetual royalties tied solely to an expired patent.

**CONCLUSION**

This case is distinguishable from *Kimball* and its progeny in at least two important respects. First, *Kimball* permits perpetual royalties if they are tied to an inventor's non-patent contributions. Here, it is beyond dispute that Dr. Lavery provided valuable contributions to defendant for many years after the 2007 closing. This fact alone plainly distinguishes this case from *Kimball*. Second, unlike *Kimball,* the royalty base here is completely independent of whether the company's products incorporate a patented feature. This Court should follow the reasoning employed by the court in *Zimmer Biomet* and rule that a perpetual royalty falls outside of *Kimball's* proscriptions if the royalty base is defined without reference to a patent. The Court should deny Pursuant's motions for summary judgment and for sanctions.

Respectfully submitted,

Inosencio & Fisk, PLLC
Bruce A. Inosencio, Jr. P54705
740 West Michigan Avenue
Jackson, MI 49201
(517) 796-1444
bruce@inosencio.com

/s/ Bradley L. Smith
Bradley L. Smith (P48138)
Endurance Law Group PLC
156 W. Michigan Ave., Ste. 56
Jackson, MI 49201
(517) 879-0253
bsmith@endurancelaw.com
*Attorneys for plaintiff*

Dated: August 14, 2023

## CERTIFICATE OF SERVICE

       I certify that on August 14, 2023, the foregoing Supplemental Brief was filed with the Clerk of the Court, via the ECF system, which will provide electronic notification of the filing on all parties of record.

                                            /s/ Bradley L. Smith
                                            Bradley L. Smith (P48138)
                                            Endurance Law Group PLC
                                            156 W. Michigan Ave., Ste. 56
                                            Jackson, MI  49201
                                            (517) 879-0253
                                            bsmith@endurancelaw.com