# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ZIMMER BIOMET HOLDINGS, INC., *Plaintiff*, v. MARY N. INSALL, as Executrix of The Estate of John N. Insall, *Defendant* | No. 22 CV 2575 Judge Lindsay C. Jenkins |

## MEMORANDUM OPINION AND ORDER

Plaintiff Zimmer Biomet Holdings, Inc. ("Zimmer") initiated this action against Mary N. Insall, as Executrix of the Estate of John N. Insall ("the Estate") to vacate an arbitration award entered in favor of the Estate and against Zimmer. Currently before the Court are Zimmer's motion to vacate [Dkt. 21] and the Estate's motion to dismiss the motion to vacate and to confirm the arbitration award [Dkt. 27]. For the reasons explained below, Zimmer's motion to vacate [Dkt. 21] is denied. The Estate's motion [Dkt. 27] is moot to the extent it requests dismissal of the motion to vacate but is otherwise granted. The Court confirms the arbitration award in favor of the Estate.

**I. Background**

The following facts are taken from Zimmer's complaint, the arbitration award being challenged, and the various records submitted by the parties in support of their

positions.[1] Zimmer is a medical device manufacturer and global leader in the manufacture and sale of artificial knees. Dr. John Insall was an orthopedic surgeon who specialized in knee reconstruction and replacement. He participated in the development of knee repair and replacement systems for more than 30 years, including Zimmer Biomet's NexGen Knee System, obtaining a dozen U.S. patents and numerous foreign patents. Dr. Insall died in 2000.

Zimmer's relationship with Dr. Insall was governed by a license agreement and several amendments to the agreement. Zimmer and Dr. Insall entered into the NexGen License Agreement ("License Agreement") in 1991. The License Agreement gave Zimmer an "exclusive worldwide license … under Licensed Patents and to use Technology to make, have made, use and sell Product." [Dkt. 24 at 9.] "Technology" was defined as "all information, technical data, instruments or other know-how" relating to the "manufacture, use or sale of the Device." [Dkt. 24-2 at 5.] "Device" was defined as "the medical article described in Attachment A" [*id.* at 4], and Attachment

---

[1] Along with its memorandum in support of its motion to vacate the arbitration award, Zimmer submits a "Local Rule 56.1 Statement of Material Facts In Support of Its Motion for Vacatur of Arbitration Award." [Dkt. 24-1.] Curiously, however, Zimmer does not style its motion to vacate as a motion for summary judgment and its motion and opening brief never cite Local Rule 56.1 or Federal Rule of Civil Procedure 56. In its reply brief, Zimmer claims that its statement of facts must be accepted as true because "[t]he Estate did not provide accompanying L.R. 56 submissions with its responsive pleading." [Dkt. 32 at 7.] The Court declines to follow the course urged by Zimmer. The FAA provides that a petition to confirm or vacate an arbitral award "shall be made and heard in the manner provided by law for the making and hearing of motions...." 9 U.S.C. § 6. According to the Seventh Circuit, this provision "removes actions to confirm or vacate arbitration awards from the realm of civil cases governed by the Federal Rules of Civil Procedure." *Webster v. A.T. Kearney, Inc.*, 507 F.3d 568, 570 (7th Cir. 2007). Since the parties were not required to and did not bring their motions as ones for summary judgment, the Court finds it inappropriate to deem admitted the facts in Zimmer's L.R. 56.1 Statement. Instead, the Court will consider the arbitration award and "whatever supporting documentation" the parties have submitted for the Court to consider. *Id.* at 571; see also *Wellpoint Health Networks, Inc. v. John Hancock Life Ins., Co.*, 547 F. Supp. 2d 899, 901 n.1 (N.D Ill. 2008).

A listed "KNEE SYSTEM WITH CRUCIATE RETAINING/SACRIFICING FEATURES." [*Id.* at 23.] "Product" meant "any device the manufacture, use or sale of which would, but for this Agreement, infringe a Valid Claim or any device incorporating, or the manufacture, use or sale of which utilizes Technology." [*Id.* at 6]. And "Valid Claim" meant "a claim pending in a patent application or in an unexpired patent included within the Licensed Patents which has not been held unenforceable, unpatentable or invalid …." [*Id.* at 5.]

In consideration for this license, Zimmer agreed to pay Dr. Insall a royalty equal to:

> (1) One percent (1%) of the Net Sales Price of Product, the manufacture, use or sale of which is covered by a Valid Claim, sold by ZIMMER and its Subsidiaries and sublicensees; or
> (2) One percent (1%) of the Net Sales Price of all other Products sold by ZIMMER and its Subsidiaries and sublicensees.

[Dkt. 24 at 9.] The License Agreement continues until "expiration of the last to expire of the patents licensed hereunder or so long as Product is sold by ZIMMER, whichever is last to occur." [*Id.*]

Zimmer and Dr. Insall signed an amendment to the License Agreement in 1994 ("1994 Amendment"), making Dr. Insall's consulting relationship with Zimmer exclusive, extending the agreement through January 1, 2011, and expanding its scope from "improvements relating to the Device" to "the design and development of all components of any future knee system that is developed in whole or in part in the United States and offered as a standard line product for Zimmer." [Dkt. 24 at 10.] The 1994 Amendment also expanded the definitions of "Product" and "Technology" to

3

encompass Dr. Insall's additional work on "future knee systems" and added a 0.5% royalty to Dr. Insall for sales of "implant components of such future knee systems." [*Id.*] That royalty expires "upon the expiration of the last to expire of the Patents licensed hereunder or on January 1, 2011, whichever is last to occur." [*Id.*]

The parties amended the License Agreement again in 1998 ("1998 Amendment"). Although the 1998 Amendment did not delete the License Agreement's original license or royalty provisions [see Dkt. 24 at 10-11], it provided that:

> The parties acknowledge that Articles IV, X and XIV of the [License Agreement] shall be interpreted so that royalties shall be paid at the rate of 1% of Net Sales Price on all sales of the NexGen Knee and all subsequently developed articles, devices or components marketed by Zimmer as part of the NexGen Knee family of knee components and not at the rate provided for sales of "future knee systems."

[*Id.* at 11.]

Dr. Insall's last surviving U.S. licensed patents—U.S. Pat. Nos. 6,123,729 and 6,402,786—expired in March 2018. At that time, Zimmer notified the Estate that it would not be making further NexGen Knee royalty payments pursuant to the License Agreement and its amendments, because doing so allegedly would violate the Supreme Court's instruction in *Brulotte v. Thys Co.*, 379 U.S. 29, 30 (1964), that patent license agreements are unenforceable once their licensed patents expire.

In October 2019, the Estate initiated an arbitration (Case No. 02-13-0001-4010) with the American Arbitration Association in Chicago seeking a determination that it was still entitled to royalties based on Zimmer's sale of NexGen Knee components. The panel of three arbitrators ("Panel") allowed the parties to file AAA

4

Commercial Rule 33 dispositive motions (akin to summary judgment), which were denied. The parties then conducted extensive discovery and in November 2021 the Panel held a week-long evidentiary hearing. The Panel issued its final award two months later, ruling that *Brulotte* did not render the restructured royalty payment provision of the 1998 Amendment unenforceable. The details of the Panel's decision are discussed in the analysis section below.

Zimmer filed this action seeking to vacate the arbitration award under 9 U.S.C. § 10 on the ground that the Panel has allegedly ordered Zimmer to violate the well-defined and dominant public policy, expressed in *Brolotte*, precluding enforcement of royalty provisions that compensate patentees for patented inventions post-expiration. The Estate moves to dismiss the motion to vacate and requests an order confirming the arbitration award.

## II. Legal Standard

"'Judicial review of arbitration awards is tightly limited. Confirmation is usually routine or summary, and a court will set aside an arbitration award only in very unusual circumstances.'" *Bartlit Beck LLP v. Okada*, 25 F.4th 519, 522 (7th Cir. 2022) (quoting *Standard Sec. Life Ins. Co. of N.Y. v. FCE Benefit Adm'rs, Inc.*, 967 F.3d 667, 671 (7th Cir. 2020)). The court will uphold the arbitrator's award "so long as 'an arbitrator is even arguably construing or applying the contract and acting within the scope of this authority.'" *Johnson Controls, Inc. v. Edman Controls, Inc.*, 712 F.3d 1021, 1025 (7th Cir. 2013) (quoting *Local 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.*, 495 F.3d 779, 782–83 (7th Cir. 2007)). It will not overturn an award

5

simply "because an arbitrator 'committed serious error,' or the decision is 'incorrect or even whacky.'" *Id*.

Instead, "[t]he FAA spells out a narrow set of reasons that may support a court's confirmation, vacatur, or modification of an award." *Continental Casualty Co. v. Certain Underwriters of Lloyds of London*, 10 F.4th 814, 816 (7th Cir. 2021) (citing 9 U.S.C. §§ 10-11). Zimmer seeks to vacate the arbitration award under 9 U.S.C. § 10. Section 10(a) authorizes district courts to vacate an arbitration award "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." This list "is exclusive; neither judges nor contracting parties can expand it." *Affymax, Inc. v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, 660 F.3d 281, 284 (7th Cir. 2011); *see also Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008).

Subsection 10(a)(4) of the FAA has been interpreted to encompass scenarios where the arbitrator has shown a "manifest disregard of the law" by "direct[ing] the parties to violate the law." *George Watts & Sons, Inc. v. Tiffany & Co.*, 248 F.3d 577, 578, 580 (7th Cir. 2001); *see also Affymax*, 660 F.3d at 283; *Halim v. Great Gatsby's*

6

*Auction Gallery, Inc.*, 516 F.3d 557, 563 (7th Cir. 2008). Under this "public policy" justification for vacating an arbitration award, "the judiciary may step in when the arbitrator has commanded the parties to violate legal norms (principally, but not exclusively, those in positive law)" but "may not deprive arbitrators of authority to reach compromise outcomes that legal norms leave within the discretion of the parties to the arbitration agreement." *George Watts & Son*, 248 F.3d at 580 (citing *Eastern Assoc. Coal Corp. v. United Mine Workers*, 531 U.S. 57 (2000)). Thus, for example, "an award directing the parties to form a cartel, and fix prices or output, could be vacated as a violation of the Sherman Antitrust Act, even though the Federal Arbitration Act does not authorize the award's vacatur." *Affymax*, 660 F.3d at 284.

### III. Analysis

The controlling issue raised by the arbitration award and the parties' motions is whether the award violates public policy as set forth in *Brulotte*. In that case, the Supreme Court held that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*." 379 U.S. at 32. The Court explained that:

> A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly. But to use that leverage to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent by tying the sale or use of the patented article to the purchase or use of unpatented ones. The exaction of royalties for use of a machine after the patent has expired is an assertion of monopoly power in the post-expiration period when, as we have seen, the patent has entered the public domain. [A]fter expiration of the last of the patents incorporated in the machines 'the grant of patent monopoly was spent' and … an

7

attempt to project it into another term by continuation of the licensing agreement is unenforceable.

*Brulotte*, 379 U.S. at 33-34 (citations omitted).

*Brulotte* applies to both "pure licensing agreements" as well as "so-called 'hybrid' agreements that 'contain[] a provision for a single royalty payment for use of both a patent and other non-patent assets, such as trade secrets.'" *Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1115 (N.D. Ill. 2015) (quoting *Nordion Int'l, Inc. v. Medi-Physics, Inc.*, 1995 WL 519798, at \*4 (N.D. Ill. Aug. 30, 1995)). However, *Brulotte* does not apply to post-expiration royalties that are "tied to a non-patent right—even when closely related to a patent." *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 454 (2015). Although *Brulotte* was decided nearly sixty years ago, its "statutory and doctrinal underpinnings have not eroded." *Id.* at 458 (2015). According to the Supreme Court in *Kimble*, "[t]he decision is simplicity itself to apply": "A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Id.*

Zimmer argues that the arbitration award should be vacated because it orders Zimmer to "pay royalties to the Estate that the Estate obtained from leveraging patent rights beyond patent expiration," in violation of "the explicit, Constitutionally-imposed public policy prohibiting projection of a patent monopoly after the patent expires, as set forth in *Brulotte* … and its progeny." [Dkt. 1 at ¶¶ 2-3 (citing *EEOC v. Indiana Bell Tel. Co.*, 256 F.3d 516, 524 (7th Cir. 2001) (en banc); *Eastern Assoc. Coal Corp. v. United Mine Workers*, 531 U.S. 57, 63 (2000)); see also Dkt. 24 at 20.] Zimmer

8

claims that the Tribunal "declared that … it somehow had no obligation to apply *Brulotte*." [Dkt. 24 at 23.] According to Zimmer, "[t]he Tribunal's plain disagreement with *Brulotte*'s rationale and its heavy reliance on the parties' prior arbitration involving an altogether different royalty obligation for 'future knee products' (in which Zimmer Biomet prevailed) reflects the Tribunal's obvious intention to impose a Solomon-esque resolution across both disputes, notwithstanding the legal merits." [*Id.*]

The Court is not convinced. First, contrary to Zimmer's argument that the Panel believed it had "no obligation" to apply *Brulotte*, the Panel expressly recognized *Brulotte*'s holding and that *Brulotte* was more recently upheld in *Kimble*, despite a strongly worded dissent. [See Dkt. 9-2 at 4-5, 13-14.] The Panel applied *Brulotte* to the original 1991 License Agreement and concluded that the royalty provisions in that agreement, taken by itself, would violate *Brulotte* because it was a "hybrid" licensing agreement that encompassed inseparable patent and non-patent rights that extended beyond the expiration date of the underlying patents. [*Id.* at 6.] However, the Panel concluded, the 1998 Agreement superseded the License Agreement with respect to patent royalties for the NexGen Knee family of products and was *not* a hybrid agreement or otherwise subject to *Brulotte*. [*Id.* at 7.]

The Panel expressly addressed and rejected the central argument that Zimmer makes here: that "Insall's patent leverage was 'baked' into the [License] Agreement and that this leverage persists despite the 1998 [Amendment]." [Dkt. 9-2 at 14.] The Panel found that "[w]hat the parties contemplated in 1991 and Dr. Insall's imputed

9

leverage were superseded by events and a new basis for determining royalties in 1998, as Zimmer strenuously and successfully maintained" in the immediately preceding arbitration between the parties in 2016, the "Persona Arbitration" (AAA Case No. 01-15-002-6201). [*Id.*]

Zimmer's opening brief glosses over the Persona Arbitration without discussion. But as the Panel's discussion shows, the Persona Arbitration expressly concerned the parties' intentions in drafting the 1998 amendment and its royalty provision. According to the Panel (whose factual findings the Court is required to take as true, *Titan Tire*, 734 F.3d at 716), the 1998 Amendment was instigated by Zimmer so that it could clear a path to developing future knee systems (like the Persona knee system) that would be royalty free. Zimmer was concerned that a 1994 amendment to the License Agreement could be interpreted to entitle Dr. Insall to royalties in future knee systems beyond the "NexGen" family of products. [Dkt. 9-2 at 7.]

Zimmer's signatory to the 1998 Amendment, Dr. Crowninshield, testified at the Persona Arbitration. According to Dr. Crowninshield, in negotiating the 1998 Amendment the parties decided that Dr. Insall would be "paid royalties on the *brand* [NexGen] as opposed to the *technology*." [Dkt. 9-2 at 11 (emphasis added).] Dr. Crowninshield explained that this had "the effect of compensating Dr. Insall and his estate for components designed and manufactured long after his death by virtue of their being *marketed* in the NexGen knee family." [*Id.* at 9 (emphasis added).] While "[t]hat broadened potentially the scope of things in the future that he would be compensated for in the NexGen [family]," it also "restricted what might be considered

10

a NexGen Knee in the future as being differentiated from a future knee," which benefited Zimmer's interest in *not* paying NexGen royalties for those knee systems. [*Id.* at 11.] Zimmer emphasized this position in its closing arguments and post-hearing brief in the Persona Arbitration. [See *id.* at 11-12.] The Persona Arbitration ended with a January 2018 award in favor of Zimmer on the issue of whether Dr. Insall's estate was entitled to royalties for Persona knee systems. [*Id.* at 13.]

The Court sees no error—and certainly no error providing a valid ground for vacating the arbitration award—in the Tribunal looking to testimony in the Persona Arbitration to understand the parties' intentions at the time they agreed to the 1998 Amendment. Under Indiana Law, which governs the License Agreement and its amendments [see Dkt. 9-2 at 3], "[t]he paramount goal of contract interpretation is to ascertain and effectuate the intent of the parties." *KR Enterprises, Inc. v. Zerteck, Inc.*, 461 F. Supp. 3d 825, 833 (N.D. Ind. 2020) (citing *Vic's Antiques & Uniques, Inc. v. J. Elra Holdingz, LLC*, 143 N.E.3d 300, 303-04 (Ind. Ct. App. 2020). "This in turn requires that words and phrases are to be given their plain meaning unless doing so would defeat the parties' intent, and agreements are to be construed so as to give each provision meaning and to avoid rendering any provision, or the agreement as whole, meaningless." *Id.* The Tribunal's award properly focuses on the parties' intentions, as expressed by Zimmer's own Vice President and signatory to the 1998 Amendment.

The award and Dr. Crowninshield's testimony are consistent with the plain language of the 1998 Amendment and undermine Zimmer's argument that the amendment "provides royalties for post-expiration use of a patent." [Dkt. 24 at 26-

11

27.] In the original License Agreement, Zimmer's royalty payment had been tied to the "Product," which was defined by reference to a "Valid Claim" to use of Dr. Insall's patents. [Dkt. 24-2 at 5-6.] The 1998 Amendment decoupled the royalty from Insall's patents by instead basing the royalty on sales of "NexGen Knee and all subsequently developed articles, devices or components *marketed by Zimmer* as part of the NexGen Knee family of knee components." [Dkt. 9-2 at 8 (emphasis added).] In other words, the 1998 Amendment does not prevent Zimmer from using Dr. Insall's patents or tie royalties to those patents, but rather requires and ties payment to Zimmer's decision to market certain components as part of the NexGen Knee family. Since "post-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent," *Kimble*, 576 U.S. at 454, the Court finds no error in the Panel's conclusion that *Brulotte* does not apply to NexGen Knee royalties set out in the 1998 Amendment.[2]

---

[2] Given its decision to confirm the arbitration award, the Court finds it largely unnecessary to address the Estate's alternative arguments opposing Zimmer's motion to vacate. But one point bears mentioning. The Estate argues that only arbitrations involving collective bargaining agreements—and not other types of contracts—are subject to the "public policy" ground for vacating an arbitration award. [See Dkt. 27 at 21-22.] The Court declines to follow the district court cases cited by the Estate, however, because the Supreme Court has indicated that the doctrine applies more broadly. In *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757 (1983), the Court explained that "[a]s with *any contract*, … a court may not enforce a collective bargaining agreement that is contrary to public policy." 461 U.S. at 766 (emphasis added) (citing *Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948)). And in the *Hurd* cases cited in *W.R. Grace*, the Court explained: "The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents. Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power." 334 U.S. at 34-35.

## IV. Conclusion

For these reasons, Zimmer's motion to vacate [Dkt. 21] is denied. The Estate's motion [Dkt. 27] is moot to the extent it requests dismissal of the motion to vacate but is otherwise granted. The Court confirms the arbitration award in favor of the Estate.

Enter: 22-cv-2575
Date: April 11, 2023

_____
Lindsay C. Jenkins
United States District Judge

13