# Exhibit B

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 1

1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF MICHIGAN

3              SOUTHERN DIVISION

4          * * * * * * * * * *

5

6    KEVIN T. LAVERY, M.D.,

7

          Plaintiff,

8

                              Case Number:

9     vs.

                              2:22-cv-10613-BAF-KGA

10

PURSUANT HEALTH, INC.,

11

          Defendant.

12

_____/

13

14

15

16    THE VIDEOTAPED DEPOSITION OF KEVIN LAVERY, M.D.

17

18          The videotaped deposition of Kevin

19    Lavery, M.D. taken at 740 West Michigan Avenue,

20    Jackson, Michigan, on Tuesday, January 31, 2023,

21    commencing at about 9:05 in the morning, pursuant

22    to notice.

23

24

25

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 18

1    Q    And just so our record is clear, you don't know

2         whether today you formally serve as the Chief

3         Medical Officer of Pursuant Health, is that

4         correct?

5    A    Correct.

6    Q    But if you are presently serving as the Chief

7         Medical Officer at Pursuant Health, you haven't

8         performed any duties in that role in at least the

9         past two years, is that correct?

10   A    No.

11   Q    What duties have you performed as the Chief

12        Medical Officer of Pursuant Health in the last

13        two years?

14   A    So up until I was asked not to communicate with

15        them, on a fairly regular basis Leslie and I

16        would be having conversations regarding the

17        development of the implementation of putting a

18        retinal camera into the kiosk.

19             So she would send me photos to show

20        me the photos that had been done.  I was

21        participating in videoconferences to see the

22        ergonomics of the machine and get my feedback on

23        that.  Review the photos, could I see the photos,

24        and what we needed, were they good quality.

25   Q    And since the time of those phone calls and

Kevin T. Lavery , MD                                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 19

```
 1          videoconferences that you described, are there
 2          any other duties that you've performed as the
 3          Chief Medical Officer at Pursuant Health?
 4     A    Can you be more specific?
 5     Q    Can you name anything else that you've done --
 6     A    Yes.
 7     Q    -- in a role as Chief Medical Officer for
 8          Pursuant Health since the date of the
 9          videoconferencing and phone calls that you
10          described where you collaborated with Leslie
11          Sommers looking at photos and talking about
12          potentially integrating a retinal camera?
13     A    So since communication has been stopped, I've not
14          had any role as the Chief Medical Officer.
15     Q    And before the communication stopped, can you
16          describe any other duties and responsibilities
17          that you fulfilled in a role as Chief Medical
18          Officer for Pursuant Health other than what
19          you've already testified about?
20     A    Going back over what timeframe?
21     Q    At any timeframe during which you had the role of
22          Chief Medical Officer.
23     A    So I'm trying to think where to start.  I mean --
24          so from being on the web page as, you know, the
25          doctor validating the process, you know, during
```

Kevin T. Lavery , MD                                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 20

1        fundraising, giving -- helping them with the NIH

2        grant that brought in the 1.2 million that

3        brought validation for blood pressures and

4        weights and helping them through that study.

5                Answering the questions and validations,

6        you know.  Early on there was a printout making

7        sure that it was compliant with what we printed

8        out on the form for patients when they failed the

9        vision test or passed the vision test.  So I had

10       to validate that information.

11               Talking about what data we should get

12       and how we should use it potentially.  There was

13       a lot of just, sort of, on the fly we need an

14       answer to this, you know, how should we proceed

15       with that.

16               So it was a very sort of just

17       interactive, you know, start-up mentality in the

18       early days of we're just trying to get stuff

19       done, let's call Kevin and get his opinion.

20               MR. BUSH:  If you would mark this as

21       Exhibit 3.

22               (Exhibit 3 is marked.)

23   BY MR. BUSH:

24   Q   And we've handed you a document, Dr. Lavery, we

25       marked as Exhibit 3.  Are you able to identify

Kevin T. Lavery , MD                          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 26

```
 1        things.
 2              And so one of the big ones with
 3        diabetics was glucose testing.  So maybe we would
 4        do some glucose testing on the side of the
 5        machine.
 6              We talked about the need to get
 7        demographics from the patient so we could track
 8        them.  Getting their age, their contact
 9        information, their weights and other factors.
10              So it was open broadly enough -- it
11        wasn't in the patent, but in one of the early
12        discussions was hearing, we would be very
13        amenable to doing hearing testing.
14              So we could add on a lot of
15        functionality to that original platform.
16   Q    And all that you described, this is part of your
17        original idea that was essentially the patent
18        application, correct?
19              MR. INOSENCIO:  I didn't catch the
20        question.  That was what?
21              MR. BUSH:  That was part of the original
22        patent application.  The idea that was a part of
23        the original patent application.
24              MR. INOSENCIO:  Thank you.
25              THE WITNESS:  Can you ask that question
```

Page 27

```
 1        one more time?
 2   BY MR. BUSH:
 3   Q    I just want to understand everything that you've
 4        told me about the sorts of information that could
 5        be captured.  Vision loss, the blood pressure
 6        cuff.
 7   A    I didn't mention vision loss.
 8   Q    That's what you said when you were describing the
 9        vision screening that could take place for the
10        patient utilizing the medical kiosk.  And you
11        described a blood pressure cuff, glucose testing,
12        potentially capturing different demographics, the
13        weight of the patient, potentially hearing
14        testing.
15             And my question is, all of those
16        different potential functionalities of the
17        medical kiosk, that was captured in the idea that
18        was the subject of the patent application,
19        correct?
20   A    Well, the hearing was not mentioned in the
21        patent.  I did mention in the patent spirometry
22        for emphysemic patients.
23                  And in the patent itself, we didn't
24        mention all of the -- some of those things like
25        the macular degeneration and some of those things
```

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 33

1              And so as I'm looking at those screened

2        images, and I own that, I'm going to read those

3        images.  I may be able to get -- and we talked

4        about the HEDIS scores, get insurance to pay for

5        the readings of those pictures.  So there's a lot

6        of ways to leverage insurance buy-ins to this.

7              But now that I have that picture and

8        I've read it, I can do several things with it.  I

9        can look at a reasonably healthy eye exam and say

10       they don't really need to see my well-trained

11       specialist.  I'm going to send this out to one of

12       my referring optometrists.

13             So the referring optometrist now is

14       thrilled because they just got a patient for

15       years to come that they can sell glasses to or

16       whatever.

17             And if the patient has pathology, I can

18       send that patient a note.  So the diabetic who

19       just hasn't been able to get into the eye exam,

20       if they get a note from a doctor saying, you

21       know, you've got some bleeding in your eyes, we

22       really think you should come in, chances are

23       they're going to take that bus and get in or get

24       a ride or do the things that are really hard for

25       them to actually come in for their eye exam.

Kevin T. Lavery , MD                          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

                                                          Page 34

1               And so we could screen for the
2         cataracts, you know, the macular degeneration
3         treatments and the diabetics and the glaucoma.
4         Those are the ones that require a lot of testing,
5         a lot of physician treatment.  So that was a
6         business model.
7               I also thought with insurance, though --
8         so insurance companies pay a lot of money to
9         primary care eye doctors to get their diabetic
10        eye exams done.  And it's sort of a bone of
11        contention.
12              But if they get a high HEDIS score, sort
13        of an assessment for HMOs and such, there's like
14        81 pieces now, I don't know what it was back in
15        those days.  But the more of those pieces they
16        can fill out, the higher their payment is,
17        their -- they get a bump at the end of the year.
18        I can't remember the name of the word for that.
19        A bonus.
20              And so it was difficult for them to get
21        diabetic patients, which was a simple exam, into
22        a medical doctor to get that testing done.  But
23        it was needed.
24              And so if we could provide this out in
25        a remote location, and it's now approved, you

Kevin T. Lavery , MD                                              January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 35

1     know, telecommunication has taken off of late.

2              But if we could do those in remote

3     locations, an insurance company would not have

4     the cost of sending the patient to a primary care

5     doctor or to an ophthalmologist's office, which

6     can be expensive.

7              The primary care doctor would check off

8     a box on their HEDIS score, so they would love

9     it.  And I envisioned that the insurance

10    companies would pay us for reading the fees or a

11    reduced fee exam.  So they're winning, they're

12    not paying for a full eye exam but they're

13    getting the information they need to save a

14    patient's vision.  And I think that would work.

15              I think some of the doctors would pay

16    for referrals.  So you -- these are very valuable

17    patients.  A different market, but I remember

18    once somebody said a Lasik patient -- people were

19    willing to pay $175 to get a Lasik patient.  The

20    laser, you know.  So there's a monetary value to

21    getting that referral.

22              Collecting that money and setting up the

23    structure is a different issue.  Which

24    unfortunately SoloHealth ran into.

25              We could lease out those units.  And

Kevin T. Lavery , MD
January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 36

1       again, there could be a professional fee for

2       reading the pictures.

3                   You know, if we created a reading center

4       where all of the pictures -- instead of going to

5       one doctor's office or the doctor that owned it,

6       if we wanted to own all of the units, we could

7       create a reading center or hire people to be the

8       ones who read those pictures and gave a report as

9       to how to handle that picture, to sort of score

10      the picture.  And that may be something that was

11      billable as well.  So --

12   Q  And all of these dimensions for this idea of a

13      business model about which you've given

14      testimony, these were all ideas that you had at

15      the time of the patent --

16   A  Correct.

17   Q  -- when the patent was issued?  And these ideas

18      that you had for these different ways of

19      capturing the business model that you've

20      described, these were all part of the ideas that

21      were embodied in the application that became the

22      patent that we've marked as Exhibit 3?

23   A  So this is -- these are the things that were

24      going to bring, in my mind, the patent to life.

25   Q  But they were related to and part of the things

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 44

1    International has different -- three -- four

2    different functions, and one is to train the

3    local doctors how to do better surgery, but

4    another big component is the biomedical, having

5    somebody there to fix their equipment.

6            They get donated a lot of equipment and

7    they don't know how to fix it.  So a brand new

8    laser missing a fuse, it doesn't get worked on.

9            A gentleman there who was from Australia

10   who's a software engineer and a biomedical

11   engineer, Sanjeev Hiremath, and we were

12   discussing what we could do with this technology.

13           He was very interested on an

14   international basis to make this work.  But he

15   and I together then came up with a working model,

16   a video model, so that -- I wanted to be able to

17   show somebody that, no, we really could make

18   this work.  And that came later in the process.

19           And I -- we had -- I don't even know if

20   streaming was out yet.

21           But he was able to show us remotely from

22   his home in Australia -- I was on the call, Bart

23   was on the call -- that we could actually have

24   infrared sensors to make this technology work.

25   This wasn't just a pie in the sky, you know,

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 45

1    can't make it happen.  It's like, no, we really

2    can.  And he did a working model of it.

3           So Bart's testimony was incorrect in

4    that he said he thought I was just sitting on my

5    patent for eight years.  So my patent was issued

6    in 2003.  You know, we were meeting in the spring

7    of 2007.  And so a little less than four years.

8           And it wasn't that it was dormant, it

9    wasn't that it was sitting on a shelf empty.  I

10   was trying to do what I could with a busy

11   practice and still make this come to life.

12   Q   Were you successful in monetizing the patent in

13       any specific way --

14   A   No.

15   Q   -- before you came to collaborate with Bart

16       Foster?

17   A   No.

18   Q   You've read Mr. Foster's deposition testimony?

19   A   I have.

20   Q   So the closest you came to monetizing your patent

21       was a potential opportunity with a camera company

22       that had some discussions but didn't ultimately

23       reach a closed transaction, right?

24   A   Correct.

25   Q   And the relationship that you described with the

Kevin T. Lavery , MD                            January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 59

1   Q    Can you tell me your memory as to how this Letter

2        of Intent came about in 2007?

3   A    Yes.

4   Q    How did it come about?

5   A    Bart had contacted me and reached out to me by

6        phone, told me what he was doing.  He was trying

7        to start a company.  He saw my patent.  Really

8        loved what my patent would do.  And we started

9        having discussions.

10              And so he wanted to come up and meet

11       with me.  It was a -- unlike today, a wonderful

12       day in Michigan where we could sit outside.  We

13       sat by the tennis courts at the country club of

14       Jackson.

15              We absolutely hit it off.  Bart, as you

16       know, is very charismatic, very energized, very

17       bright, very engaging.

18              And because of that meeting and through

19       discussions, I was able to show Bart that he was

20       looking at the universe too small by just doing

21       vision screening alone with the hope of maybe

22       selling contact lenses and having obstruction in

23       the industry fighting him at every step of the

24       way.

25              And I shared with him my vision of being

Kevin T. Lavery , MD                             January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

                                                              Page 60

1        disruptive in the field of eye care and

2        ophthalmology, and Bart got really excited.

3              So when we first had the conversations,

4        Bart never stated this, but wanted to get access

5        to my patent.  After reading his deposition, I

6        know why.  Because he needed it to get the other

7        patent released by CIBA and to get a spin off.

8              But at the time, he bought into my plan

9        to change how eye care is delivered.  And through

10       lots of discussions about how we could change

11       the world, he decided not to just have me as a

12       royalty owner that he just wrote a check to on a

13       quarterly basis, but he said let's start a

14       business together.

15             You know, I'll own 90 percent, you'll

16       own 10 percent, and we're going to found a

17       business.  And the operating agreement states

18       that.  I mean, we were the founders of

19       SoloHealth.

20             And I never touted that.  I never,

21       like, celebrated that.  Bart was always the

22       perfect front person.  And I was kind of the

23       quiet guy in the background.

24             But I sold Bart on what we could do in

25       the universe of health care and where we could go

Kevin T. Lavery , MD                              January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

                                                        Page 61

1        after real payers, the insurance companies and

2        the ophthalmologists with deep pockets and the

3        consumer, and showed him all of the revenue

4        streams that were not available to just hoping

5        that Walmart was going to pay you for -- Walmart

6        doesn't want to pay anybody for anything.

7                 So through a process of those

8        discussions, Bart wanted me at the table with my

9        ideas.  And as he said at his deposition, Kevin

10       had tons of ideas.  And we worked together.

11                 And so we -- I founded SoloHealth.  I'm

12       one of the founders in my mind.  And I think the

13       documents support that.

14                 And so Bart saw that I had contacts in

15       the industry, that I had been talking to lens

16       manufacturers, that I knew optometry well.  I had

17       been speaking at big optometric national

18       meetings.  I had a big optometric referral

19       network.

20                 I knew ophthalmology.  They didn't know

21       ophthalmology.  They didn't have any doctor on

22       their staff.  They weren't thinking about the

23       medical aspects of what we could do.

24                 And so between all of the different

25       things that -- you know, the businesses I've run,

Kevin T. Lavery , MD                          January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 62

```
 1        the contacts, the knowledge in medicine, he
 2        wanted me at the table.  He wanted access to
 3        those ideas.
 4               And that's why we talked as much as we
 5        did even after the closing and starting the
 6        business.  He ran most ideas by me before
 7        implementing them.
 8               So you know, Bart saw in me an idea guy
 9        that he didn't have to areas of medicine that he
10        didn't even know about.  I had to explain
11        diabetic retinopathy to him.
12               And so, you know, through those
13        interactions over the course of a relatively
14        short period was 'I want you as an owner and I
15        want you at the table.'
16    Q    And this first phone call that you described that
17        you received from Bart Foster, do you remember
18        when that phone call took place?
19    A    I do not.
20    Q    Sometime in 2007 before the date of the document
21        we've marked as Exhibit 8?
22    A    Correct.
23    Q    Do you believe it was a couple of weeks before or
24        a couple of months before?  What's your best
25        memory about the timing of that phone call from
```

Kevin T. Lavery , MD                           January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 71

1   A   I was there as an individual.  So everybody else

2       would have been related to SoloHealth or counsel

3       for SoloHealth.

4   Q   Was your counsel present?

5   A   He was not.

6   Q   And you were in person present for the closing of

7       the contribution agreement?

8   A   Correct.

9   Q   And that closing took place where?

10  A   I believe at the offices of DLA Piper in Atlanta.

11  Q   Now, at the closing, did you provide anything

12      other than the patent to SoloHealth?

13  A   I'm not sure what you're asking.

14  Q   Did you provide any intellectual property to

15      SoloHealth at the closing other than the

16      assignment of your patent?

17  A   I thought the contribution agreement was I was

18      also giving them my intellectual property.

19  Q   What intellectual property did you provide to

20      SoloHealth at the closing other than your patent?

21  A   I did not provide them any documents or

22      material -- materials at the time of closing.

23  Q   Did you provide other intellectual property to

24      SoloHealth after the closing?

25  A   Absolutely.

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 72

1    Q    Focusing on the closing, at the time of the

2         closing, did you have a demonstration video at

3         that point in time of the concept that was

4         captured in your patent?

5    A    I don't recall the dates as to where and when

6         that video was shown.  It probably was -- I don't

7         know.  I don't know.  I don't remember when that

8         video was shown.

9    Q    And the video that you're describing right now,

10        that's the video that you testified about earlier

11        that was prepared by Mr. Hiremath out of

12        Australia?

13   A    Hiremath, yes.

14   Q    Hiremath.  There's not a different demonstration

15        video other than the one prepared by Mr. Hiremath

16        about which you testified earlier this morning,

17        correct?

18   A    Correct.  And again, we don't know if it's a

19        video or just a camera footage stream.

20   Q    And whether it's a video or a footage stream,

21        that's not something that you presented to

22        SoloHealth at the closing of the contribution

23        agreement, correct?

24   A    Correct.

25   Q    Was there a business model for your idea of a

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 73

```
 1        medical screening kiosk that you provided to

 2        SoloHealth at the closing of the contribution

 3        agreement?

 4   A    I don't believe there was one at closing, no.

 5   Q    Did you come to work on a business model for

 6        SoloHealth after the date of the closing of the

 7        contribution agreement?

 8   A    It was certainly a big part of our focus.  We

 9        just started a new business, hopefully we've got

10        a business model.  And it was changing.

11             But there was a document that I saw

12        relatively quickly after the closing.  We were

13        discussing strategy and business models, and I

14        was referenced in that discussion.

15             So presumably I was at that meeting

16        and part of the discussions on the business

17        model.

18   Q    But you didn't present a business model to

19        SoloHealth at the closing of the contribution

20        agreement that we marked as exhibit -- Exhibit 9,

21        correct?

22             MR. INOSENCIO:  Asked and answered.

23             You may answer.

24             THE WITNESS:  I don't believe so.

25   BY MR. BUSH:
```

Kevin T. Lavery , MD                         January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

                                                                Page 75

1    BY MR. BUSH:

2    Q    Do you recognize the document we've marked as

3         Exhibit 10, Dr. Lavery?

4    A    I do.

5    Q    And what is the document we've marked as

6         Exhibit 10?

7    A    It's a consulting agreement made between myself

8         and SoloHealth.

9    Q    And you executed the consulting agreement we

10        marked as Exhibit 10 at the closing of the

11        contribution agreement that we marked as

12        Exhibit 9, correct?

13   A    Correct.

14   Q    What kinds of services did you provide to

15        SoloHealth in your performing the consulting

16        agreement we've marked as Exhibit 10?

17   A    So it's hard for me to differentiate, largely

18        because to the best of my recollection I never

19        submitted a bill and was never paid as a

20        consultant.

21             So I looked at this as I'm the founder

22        of a company, I'm the start-up, I want it to

23        succeed, I'm going to do whatever I can to make

24        them successful.

25             And so all of the calls and meetings and

Kevin T. Lavery , MD                    January 31, 2023
Lavery, MD., Kevin T. v. Pursuant Health, Inc.

Page 76

1        discussions and looking for partners was all done

2        to help the company not -- presumably under the

3        consulting agreement, but I was never paid.

4                 If I was paid, I may have been paid once

5        but I don't recall that.  But I was never paid

6        more than once, that I know of.

7    Q   And during the time in which you were providing

8        services under the consulting agreement, did you

9        come to work on a business model with SoloHealth?

10   A   A start-up is a very fluid thing.  And so you're

11       always trying and failing and trying and failing.

12                Unfortunately SoloHealth has not

13       succeeded as much as I would have liked it to.

14       But that's always on your brain as a start-up

15       company.  What are we going to do to drive

16       revenue?  So that's never off your brain.

17   Q   Did you provide a business model to SoloHealth in

18       connection with providing consulting services or

19       did you instead collaborate with SoloHealth

20       around different iterations or ideas for a

21       business model?

22   A   So before we signed the contribution agreement, I

23       had laid out lots of different potential business

24       models for them to pursue and revenue sources.

25                Once we started rolling out the vision