# Exhibit C

Page 1

1            UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF MICHIGAN
2                  SOUTHERN DIVISION

3    _____

KEVIN T. LAVERY, M.D.,              Case No:
4                                    2:22-cv-10613-BAF-KGA
         Plaintiff,
5
vs.
6
PURSUANT HEALTH, INC.,
7
         Defendant.
8
   _____
9
10       VIDEO-RECORDED DEPOSITION OF BART FOSTER
11                January 13, 2023
12   _____
13
14            PURSUANT TO WRITTEN SUBPOENA and the
15   appropriate rules of civil procedure, the
16   video-recorded deposition of Bart Foster, called for
17   examination by the Defendant, was taken at Hotel
18   Boulderado, 2115 13th Street, Boulder, Colorado,
19   commencing at 10:48 a.m. on January 13, 2023, before
20   Jennifer Bajwa Melius, Verbatim Stenographic Reporter
21   and Registered Professional Reporter.
22
23
24
25

Page 80

1    not an issued patent?

2            A.      Correct.

3            Q.      When you entered into the letter of

4    intent with Dr. Lavery, did you have the objective of

5    obtaining any other intellectual property from

6    Dr. Lavery, other than his issued patent?

7            A.      Maybe a little strategic guidance or

8    consultation because he's an ophthalmologist.

9            Q.      Did you ultimately enter into a

10   consulting agreement with Dr. Lavery in order to

11   obtain that strategic guidance and consultation?

12           A.      We did.  We did.

13           Q.      Was there any other specific

14   intellectual property that you hoped to obtain from

15   Dr. Lavery, other than his issued patent?

16           A.      No, not that I'm aware of.

17                   MR. BUSH:  All right.  Let's go off the

18   record.  I'm at a great stopping place for lunch.

19                   THE VIDEOGRAPHER:  We are going off the

20   video record at 12:49 p.m.

21                   (Recess from 12:49 p.m. to 1:58 p.m.)

22                   (Mr. Jesser was not present.)

23                   THE VIDEOGRAPHER:  This is Media

24   Number 2 in the continuing deposition of Bart Foster.

25   We are back on the record at 1:58 p.m.

Page 98

1          A.    Yes.

2          Q.    -- in connection with the contribution

3     agreement?

4                Can you describe what sorts of services

5     or information Dr. Lavery provided to SoloHealth in

6     connection with his performing the consulting

7     agreement we've marked as Exhibit 29?

8          A.    Can you repeat the question?

9          Q.    Yeah.  Can you remember what services or

10    other information that Dr. Lavery might have provided

11    to SoloHealth after execution of the consulting

12    agreement and during Dr. Lavery's performance of the

13    consulting agreement?

14         A.    Just likely general consultation, likely

15    discussions around potential business model.  Yeah.

16         Q.    You say likely he provided potential

17    business model options?

18         A.    Correct.

19         Q.    Do you remember any specific business

20    model options that he provided to SoloHealth in

21    performing the consulting agreement?

22         A.    It would have been just a referral --

23    you know, referral model or what doctors -- how

24    doctors were -- ophthalmologists would, you know,

25    perceive the units or potentially with the American

Page 99

1    Optometric Association, but nothing technical.

2                    MR. INOSENCIO:  Joel?

3                    MR. BUSH:  Yes, sir.

4                    MR. INOSENCIO:  Before we go forward

5    further, can we have Peter identify himself and his

6    role?

7                    MR. BUSH:  Yes.  He's a board member of

8    Pursuant Health.  I'll let him introduce himself.

9                    MR. KRIVKOVICH:  Yeah.  Hi.  Peter

10   Krivkovich, board member of Pursuant Health, and I've

11   been on the board for -- I forget the exact date, but

12   for a while.  Current all the way back to when Bart

13   was operating CEO.

14                   MR. BUSH:  And --

15                   MR. INOSENCIO:  Thank you.  I just want

16   the record to reflect that we had someone join the

17   deposition and the person's role.

18                   Joel, are they -- is Peter appearing as

19   the corporate representative today or . . .

20                   MR. BUSH:  Peter is appearing as a

21   corporate rep.  John Jesser had to depart.

22                   MR. INOSENCIO:  Okay.

23                   MR. BUSH:  And so Peter is in lieu of

24   John Jesser's participation.

25                   MR. INOSENCIO:  Okay.  Not a problem.

Page 100

1           Peter, nice to meet you.

2           MR. KRIVKOVICH:  Nice to meet you.

3       Q.    (By Mr. Bush)  Mr. Foster, you describe

4    this referral model about -- from Dr. Lavery about

5    what doctors -- what ophthalmologists would be

6    thinking.

7           Was this information provided to

8    SoloHealth by Dr. Lavery in any tangible form?

9       A.    There may have been emails or -- but,

10   no, I wouldn't think any documents of material

11   importance.

12      Q.    Other than the referral model that

13   you've described that Dr. Lavery might have provided

14   to SoloHealth in connection with performing the

15   consulting agreement, can you think of anything else

16   that Dr. Lavery provided to SoloHealth in performing

17   the consulting agreement?

18      A.    Potentially vendors to work with or

19   consultants.  Maybe things on the regulatory path or

20   clinical validation, eye health information related to

21   some of the content, perhaps, in a kiosk.

22      Q.    And all of these things that you

23   described including this referral model, did

24   Dr. Lavery characterize any of these things as trade

25   secrets during that time period?

Bart Foster
January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

Page 101

1          A.    Not outside of what would be considered

2     SoloHealth property.

3          Q.    And what do you mean by that?

4          A.    There was no mention of, "Hey, this is a

5     trade secret that's mine," or anything like that.  It

6     was more we would just have conversations.

7          Q.    In other words, Dr. Lavery provided

8     information to you, but he didn't label it as a trade

9     secret?

10         A.    Correct.

11         Q.    Do you have a memory of Dr. Lavery

12    providing any sort of demonstration video to

13    SoloHealth in connection with his performing

14    consulting services, under the consulting agreement we

15    marked as Exhibit 29?

16         A.    What type of video?

17         Q.    Demonstration --

18         A.    I don't --

19         Q.    -- videos.

20         A.    A demonstration of what?

21         Q.    Dr. Lavery has alleged that he provided

22    a demonstration video about the kiosk, and I'm asking

23    whether you remember anything about a demonstration

24    video prepared by Dr. Lavery that he provided to

25    SoloHealth.

Bart Foster                                      January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

Page 103

1    know, late 2013 probably, if I had to guess.  It

2    wasn't in the first five years.

3              Q.    And the idea of putting retinal cameras

4    into the device, was that recommendation provided to

5    you in any tangible form, or was this emails and

6    informal conversations?

7                    THE STENOGRAPHER:  Formal or informal?

8                    MR. BUSH:  Informal.

9              A.    I would say the latter.  There was

10   likely some emails and some communication.  I don't

11   recall any documents that were produced.

12             Q.    (By Mr. Bush)  After the execution of

13   the contribution agreement, did you undertake to

14   modify the kiosk as it had been developed?

15                   Did you undertake to modify it in any

16   way in order to account for anything that you had

17   received from Dr. Lavery?

18             A.    Possibly.  Not sure.

19             Q.    And when you say "possibly," what are

20   you potentially referring to?

21             A.    Well, we would talk frequently.  And

22   there was all kinds of things we talked about and

23   ideas, so I can't be certain of that.

24             Q.    So sitting here today, can you identify

25   any specific modification to the kiosk that was

Bart Foster
January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

Page 106

```
 1    stressing the importance of putting a retinal camera
 2    into the device.
 3              A.    Uh-huh.
 4              Q.    Did Dr. Lavery characterize that idea on
 5    his part as a trade secret?
 6              A.    No.
 7              Q.    From your perspective, did Dr. Lavery's
 8    recommendation of putting a retinal camera into the
 9    device, was that a follow-on idea from the ideas
10    embedded in his patent?
11              A.    Likely.
12              Q.    Do you remember at any time Dr. Lavery
13    characterizing anything at all to you as a trade
14    secret that was owned by Dr. Lavery?
15              A.    I'm not sure.
16              Q.    Do you remember either way --
17              A.    No.
18              Q.    -- Dr. Lavery using the word "trade
19    secret" in his communications --
20              A.    I'm sure --
21              Q.    -- with you?
22              A.    -- he used that word, yes.  But in what
23    context, I have no idea.
24              Q.    Let's look at 31.
25                    (Exhibit Number 31 was marked.)
```

Page 109

1   information is being conveyed in these pages about the

2   SoloHealth business model as of February 2008?

3            A.     How if you can educate people on the

4   importance of eye health and visual acuity needs, that

5   you can grow the overall market and drive revenue.

6            Q.     And this -- these are business model

7   concepts for SoloHealth that you prepared?

8            A.     That's correct.

9            Q.     Did anybody assist you in your

10  preparation of this business model planning --

11           A.     Many.

12           Q.     -- for SoloHealth?

13           A.     Many.

14           Q.     And who helped you?

15           A.     Stephen Kendig, maybe Peter Krivkovich,

16  I don't know.  You know, whoever the advisory board

17  members were.  There's a guy, Gary Gerber, some of the

18  early investors likely.  Yeah.  It was very

19  collaborative.  Just asked a lot of questions, so I'm

20  sure there were many people that provided input.

21           Q.     Did Dr. Lavery provide input to you in

22  his performing his responsibilities under the

23  consulting agreement?

24           A.     Yeah.  Likely.

25           Q.     Do you remember any specific

Bart Foster                                January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

Page 110

1      contributions from Dr. Lavery in connection with his

2      performance of the consulting agreement?

3              A.    Not specific.  It might have been market

4      size or how many ophthalmologists there were or an

5      ophthalmologist's role versus an optometrist's role,

6      things like that.

7              Q.    I'll give you a document we've marked as

8      Exhibit 33.

9                    (Exhibit Number 33 was marked.)

10             Q.    (By Mr. Bush)  Do you recognize the

11     document we've marked as Exhibit 33, Mr. Foster?

12             A.    I do.

13             Q.    And can you identify Exhibit 33 for the

14     record?

15             A.    It's a thank you note to Andrea Saia,

16     who was current CEO of CIBA Vision on April 14 of

17     2008.

18             Q.    And what was your reasoning in sending

19     this thank you note to Andrea Saia?

20             A.    To build rapport so we could get the IP

21     signed over from CIBA Vision.

22             Q.    Do you remember when you received the IP

23     from CIBA Vision?

24             A.    I don't.

25             Q.    And you're referring to the patent --

Bart Foster
January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

Page 123

```
 1          Q.    When you say "I don't know," is it that
 2   you don't remember making a modification to the kiosk
 3   to account for any information from Dr. Lavery?
 4          A.    Yeah.
 5                MR. INOSENCIO:  I'm going to object.
 6   You're assuming the fact that it would have had to
 7   have been modified at some point to include
 8   information from Dr. Lavery.
 9                And he's already testified he doesn't
10   know.
11                MR. BUSH:  I'm asking whether he
12   remembers, but your objection is noted.
13          Q.    (By Mr. Bush)  Do you remember,
14   Mr. Foster, making any modifications to the kiosk in
15   late 2008 or early 2009 --
16          A.    There were -- there were a ton of
17   modifications made.
18          Q.    I need to finish my question so that our
19   record is clear, and I apologize for that.
20                And I'm asking specifically for your
21   memory about any modifications to the kiosk,
22   specifically to incorporate any information received
23   from Dr. Lavery.
24                Do you have a memory of making any
25   modifications to the kiosk in late 2008 or early 2009
```

Bart Foster
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.
January 13, 2023

Page 124

1    as a consequence of any information received --

2              A.    Yeah.

3              Q.    -- from Dr. Lavery?

4              A.    Absolutely.

5              Q.    What did you do?

6              A.    I have no idea.

7              Q.    You believe you made modifications based

8    on information from Dr. Lavery, but you don't know

9    what you did?

10             A.    Correct.

11             Q.    How is it that you remember doing it,

12   and you can't describe what you did?

13             A.    It's real easy.  I bet we made 100

14   little modifications.  And it could have been

15   everything from change the button from green to

16   orange.  It could have been make sure the sign is --

17   says free.  Modify the hardware this way.

18                   Dr. Lavery and I would talk sometimes

19   every couple weeks; sometimes a couple months would go

20   by.  I didn't take detailed notes of who said what.

21   We were just moving.  We were moving fast.  So I can't

22   clearly determine who said what and what modifications

23   were made.

24             Q.    Understood.  That's fair.

25                   And these conversations that you

Bart Foster                              January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

Page 125

1    describe that you remember having with Dr. Lavery in

2    which he made -- he gave information to you, these are

3    conversations that took place in connection with

4    Dr. Lavery's performance of the consulting agreement;

5    is that correct?

6             A.    Yeah.

7                   Could I get copies of all this stuff,

8    Joel?

9             Q.    Sure.  Not a problem.

10            A.    I like the color ones.

11            Q.    All right.

12                  MR. INOSENCIO:  Can I just say I wish

13   every witness was this enthusiastic about being in a

14   deposition.

15                  THE DEPONENT:  Dude, it's something I

16   invented 20 years ago, and it's like --

17                  MR. INOSENCIO:  I get it.  I get it.

18                  THE DEPONENT:  It's crazy, man.  Like,

19   you should see this shit.  It's like 20 years ago.  We

20   were 15 years too early.  This shit still should be

21   out there right now.

22                  MR. INOSENCIO:  I agree with you.  It

23   should be.

24                  THE DEPONENT:  It will be.  It's just we

25   were too early.

Bart Foster                                          January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

                                                          Page 139

1          A.     That's right.

2          Q.     -- right?

3          A.     Yes.

4          Q.     And that's not in any of the documents

5    that you have in your patents or your application for

6    patents?  That's not anything that you were bringing

7    to the table?  That was his -- that was his

8    contribution, right?

9          A.     Correct.

10         Q.     And he told you that before you signed

11   any agreements with him relative to the contribution

12   agreements or the consulting agreement, right?

13         A.     Correct.

14         Q.     The discussions that you had with

15   Dr. Lavery after you entered into the letter of

16   intent, ==those were all subject to the confidentiality,==

17   ==publicity, and nondisclosure provision in paragraph 10==

18   ==of Exhibit 22, right?==

19               MR. BUSH:  Object to form.

20         A.     What paragraph?  Sorry.

21         Q.     (By Mr. Inosencio)  Paragraph 10.

22         A.     =="Confidentiality, publicity, and==

23   ==nondisclosure."==  ==Correct.==  ==Yes.==

24         Q.     Okay.  And so the whole idea of this

25   letter of intent -- well, not the whole idea.  But

Bart Foster                                    January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

Page 140

1    part of the idea of this letter of intent is that the

2    two of you wanted to share information and determine

3    whether or not you can go forward as a team with you

4    holding 90 percent of the company and him holding

5    10 percent of the company in exchange for him

6    providing you with information in addition to what's

7    contained in the patent, right?

8             A.    Correct.

9             Q.    And those are his trade secrets and

10   confidential information, and you treated it as such,

11   right?

12                  MR. BUSH:  Object to form.

13            A.    I don't know what that means.

14            Q.    (By Mr. Inosencio)  Well, you weren't

15   taking his information and sharing it with other

16   people that might potentially compete with --

17            A.    No.

18            Q.    -- SoloHealth, right?

19            A.    No.

20            Q.    That would certainly be detrimental to

21   the business, right?

22            A.    Yeah.  Correct.

23            Q.    So anyone that you talked to about these

24   ideas that Dr. Lavery had would have been only in your

25   circle of trust, also subject to some other type of

Bart Foster                                          January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

                                                        Page 141

1    confidentiality restriction, right?

2          A.    Most likely, yes.

3          Q.    When you first met with Dr. Lavery, do

4    you recall whether you told him that you had a

5    patent -- or that you had applied for a patent?

6          A.    I do.

7          Q.    What did you -- what's your

8    recollection?

9          A.    That we applied for a patent.  I shared

10   with him the business plan that I had, and he got

11   excited.  He realized that I took it way farther than

12   I think than he ever contemplated, and he was excited

13   to be part of it.

14         Q.    In a nutshell, what was your business

15   plan relative to generating revenue with the visual

16   acuity kiosk when you first met with Dr. Lavery?

17         A.    Initially, it was to obtain referrals --

18   referral fees from doctors and get large retailers,

19   including Walmart and Luxottica, to pay for us to

20   generate referrals or leads to them.

21         Q.    Did he have a similar business model

22   that he discussed with you --

23         A.    No.

24         Q.    -- at the time you were having these

25   initial discussions?

Page 142

1          A.    No.

2          Q.    He had a business model -- right? --

3    relative to generating revenue from the kiosk?

4          A.    What was it?

5          Q.    Well, I'm asking you if you recall --

6          A.    No.

7          Q.    -- discussions with him relative to what

8    he intended to do with the retinal scan aspect of the

9    kiosk?

10          A.    I think he contemplated charging to get

11    your, you know, retinal scan, but that was never in my

12    plans or business model.  So if he did project that,

13    it was more future state, and he realized that it

14    would take significant funding and more time to

15    develop what he wanted to.

16          Q.    You said earlier, quote, "I had the

17    impression that because it had been sitting there and

18    no work had been done," and then you went on from

19    there, and you were referring to Dr. Lavery's patent.

20                What did you mean by that?

21          A.    I meant that -- what was the year that

22    he had his patent filed?

23          Q.    Oh, hold on.  I'm looking at all of

24    yours right now.  I'd have to look back.

25          A.    Hold on.

Bart Foster                                    January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

Page 145

1    agreement that related to the capabilities of the

2    kiosk that were beyond what you initially

3    contemplated, correct?

4              A.    Correct.

5              Q.    He had ideas different from yours,

6    right?

7              A.    Correct.

8              Q.    One of the ideas that Dr. Lavery had

9    related to the internet connectivity aspect of the

10   kiosk, right?

11             A.    Correct.

12             Q.    The kiosk that you developed, either on

13   your own or in connection with these other vendors and

14   with CIBA Vision, was more of a stand-alone that was

15   not going to generate reports that would send data to

16   SoloHealth, then potentially to be distributed on from

17   there to medical providers; is that accurate?

18             A.    That's not correct.

19             Q.    Okay.  Can you explain why it's not

20   correct?

21             A.    Yeah.  We had a software provider early

22   on called Netkey that was introduced to us from Kiosk

23   Information Systems, and their software enabled us to

24   remotely connect into the kiosk.

25                   And it did two functions.  One, it

Bart Foster
January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

Page 146

1    provided realtime reports on if the kiosk was running

2    or not, and we also could update the software

3    remotely.  And it enabled us to create a database

4    where we could collect patient identifiable

5    information and then transfer information to a doctor

6    for referrals.

7         Q.    But the information that was being

8    gathered under that premise did not include anything

9    for scanning for glaucoma, diabetes, anything of that

10   nature like Dr. Lavery was suggesting; is that

11   correct?

12        A.    Correct.

13        Q.    So that aspect of what he was offering

14   was different from the concept that you had relative

15   to the visual acuity?

16        A.    That's correct.

17             MR. INOSENCIO:  Okay.  So what I'd like

18   to do, Joel, is share my screen and discuss a couple

19   different documents and make them exhibits that I can

20   forward to you via email.

21             Are you opposed to that at all?

22             MR. BUSH:  Yeah.  Let me see if I can

23   get into the Zoom so that I can see them.

24             THE DEPONENT:  Are we still okay on the

25   video?  I'm pulling the screen closer.

Bart Foster
January 13, 2023
Lavery, MD., Kevin T.  Vs. Pursuant Health, Inc.

Page 149

1          Q.     -- right?

2          A.     -- correct.

3          Q.     And eventually you settled on a letter

4    of intent that reflected the requirement of

5    confidentiality and nondisclosure, right?

6          A.     Correct.

7          Q.     And there's a reference in this

8    document, Exhibit 41, to Kevin Lavery's IP, right?

9          A.     Yes.

10         Q.     And from an intellectual property

11   standpoint, you understood that there was more to what

12   Kevin Lavery was bringing to the table than just his

13   patent, right?

14         A.     I'm not sure what you're referring to.

15         Q.     Well, he's sharing ideas with you

16   relative to how he sees the kiosk rolling out,

17   regardless of whether those ideas were implemented or

18   approved at some point or funded at some point.

19         A.     Sure.

20         Q.     He was bringing other ideas to you,

21   right?

22         A.     He had tons of ideas.

23         Q.     Let's go to 42.

24                (Exhibit Number 42 was marked.)

25         A.     Okay.